## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Michael Kane; William Castro; Margaret Chu; Heather Clark; Stephanie Di Capua; Robert Gladding; Nwakaego Nwaifejokwu; Ingrid Romero; Trinidad Smith; Amaryllis Ruiz-Toro**.<br><br>Plaintiffs,<br><br>vs.<br><br><br>**Bill de Blasio**, in his official capacity as Mayor of the City of New York; **David Chokshi**, in his official capacity of Health Commissioner of the City of New York; **New York City Department of Education.**<br><br>Defendants. | **COMPLAINT**<br>CASE NO. 1:21-cv-7863<br><br><br><br>JURY TRIAL DEMANDED |

Plaintiffs, herein, complain of the defendants as follows:

### Nature of the Suit

1.     New York City educators, by and through undersigned counsel, file this suit seeking to vacate the Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination for Department of Education Employees, Contractors, and Others, dated August 24, 2021 (the "Vaccine Mandate")[1]; and to enjoin Defendants Mayor Bill de Blasio and the Board of Education of the City School District of New York ("NYC DOE") from implementing the Vaccine Mandate.

2.     Th Vaccine Mandate violates fundamental constitutional rights, both facially and

---

[1] A true and accurate copy of the Mandate is attached hereto as <u>Exhibit A</u>

as applied to these and other similarly situated plaintiffs, arbitrarily and capriciously discriminates between employees based on religion and medical status, even though the employees pose no direct threat to others because of their religious and medical decisions, and places unconstitutional conditions on employment.

3.     The discriminatory Vaccine Mandate is irrational. It was promulgated after public health officials universally acknowledged that COVID-19 vaccines cannot stop transmission of SARS-CoV-2. The vaccines may blunt severity of disease, but the evidence does not support an assumption that they stop infection and transmission of SARS-CoV-2 to others. These vaccines are for personal protection only. Plaintiff's vaccine status does not cause any direct threat to other people.

4.     Even if the need was compelling, the Vaccine Mandate is overbroad. It does not allow for reasonable medical and religious exemptions afforded to all other New York City employees. Nor does it allow natural immunity to suffice, even though the data overwhelmingly shows that natural immunity is more robust and durable than vaccine immunity.

5.     Plaintiffs seek injunctive relief, enjoining defendants from enforcing the Vaccine Mandate, declaratory relief that the Vaccine Mandate is unconstitutional and an order modifying or striking it, actual and punitive damages and attorney's fees and costs.

6.     Pending permanent relief, Plaintiffs will move this Court for temporary emergency injunctive relief to: (a) prevent the violation of bodily integrity for those workers who will be forced to undergo a mandatory experimental medical procedure without due process of law and without justification; (b) ensure due process of law for workers who will otherwise be subject to arbitrary disciplinary action and/or termination if they remain unvaccinated; (c) safeguard the health of DOE employees for whom vaccination is medically contraindicated; and

(d) protect the rights of those employees objecting to inoculation due to sincerely held religious beliefs.

7.      Without relief, on or before September 27, 2021, Plaintiffs and thousands of other New York City teachers will be harmed irreparably by loss of employment and professional standing as well as invasive violations of their constitutional rights. The public at large will be harmed by the mass firing of qualified and dedicated teachers and staff during a time when schools are already working without adequate staffing resources.

<u>**Jurisdiction and Venue**</u>

8.      This Court has jurisdiction to hear all federal claims asserted in this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States; the Supremacy Clause of the Constitution of the United States, which allows federal district courts to hear suits alleging preemption of state and local laws by the Constitution and federal laws made in pursuance thereof; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343 in relation to Defendants' deprivation and infringement under color of law of the Individual plaintiffs' rights, privileges, and immunities secured by the United States Constitution and laws, as detailed further herein.

9.      This Court has jurisdiction over the claims asserting violations of the laws and Constitution of the State of New York through its supplemental jurisdiction under 28 U.S.C. § 1367(a), as those claims are so closely related to the plaintiffs' federal question and Section 1983 claims that they form part of the same case or controversy under Article III of the United States Constitution.

10.     This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorney's fees and

costs under 42 U.S.C. § 1988.

11.     The United States District Court for the Southern District of New York is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendants deprived plaintiffs of their rights and liberties under the laws and Constitution of the United States and violated the laws and Constitution of the State of New York, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur.

## PARTIES

### Plaintiffs

12.     As more particularly alleged below, the plaintiffs herein are ten teachers, educators and administrators employed by the NYC DOE whose sincere religious beliefs compel them to refuse vaccination with the available COVID-19 vaccines. Some of the plaintiffs also risk serious physical harm due to underlying medical conditions and risk factors.

13.     All plaintiffs are employed by government entities covered by Title VII, which mandates the reasonable accommodation of sincere religious beliefs.

14.     All plaintiffs work in the Southern District of New York and have standing to sue.

### Defendants

15.     Defendant Mayor Bill de Blasio ("Mayor de Blasio"), sued in his official capacity, is the chief executive officer of New York City. He is responsible for exercising all powers vested in the city and ensuring the effectiveness of city government operations. Mayor de Blasio is the architect and proponent of the challenged Vaccine Mandate.

16.     Defendant David Chokshi ("Commissioner Chokshi") is the Commissioner of Health and Mental Hygiene of the City of New York ("DOHMH"). Sued in his official capacity,

Commissioner Chokshi promulgated the Vaccine Mandate in coordination with Mayor de Blasio's directives.

17.    Defendant New York City Department of Education ("NYC DOE") is the department of city government responsible for the management of the New York City School District and the administration of New York City's public schools. Through the issuance of Chancellor's Regulations, the Department of Education sets policies in New York City's public schools and is implementing the Vaccine Mandate in an unconstitutional manner. For all purposes, the NYC DOE serves as the government or public employer of all persons employed by it.

### Facts

18.    By the end of July 2021, the scientific consensus among world public health leaders coalesced around two facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people; (2) herd immunity cannot be achieved with these vaccines.

19.    Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the experimental COVID-19 vaccines. At a press conference, he described the goals of the program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation

approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities, indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[2]

20.     As the Mayor noted in the press conference, the goal was not to increase safety, but rather to increase rates of vaccination, which cannot meaningfully impact a person's ability to infect others.

21.     On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the now dominant delta variant is conclusive: though the vaccines can prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission. So if you are going home to somebody who has not been vaccinated to somebody who can't get vaccinated, somebody who might be immunosuppressed or a little bit frail, somebody who has co-morbidities that put them at high risk, I would suggest you wear a mask in public indoor settings." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[3]

22.     Rather than cause him to cease or pause the mandates, the emerging consensus that the vaccines cannot stop transmission only prompted Mayor de Blasio to become more aggressive in his vaccine crusade.

23.     In the weeks that followed Dr. Walensky's announcement, Mayor de Blasio issued vaccine mandates for all employees and patrons of indoor dining, recreation and entertainment facilities and hospitals in New York City. He then issued a separate mandate for all New York

---

[2]https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability
[3] http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

Complaint for Declaratory and Injunctive Relief

City government employees, including employees of the NYC DOE, who were required to get vaccinated or be subjected to weekly testing requirements. As he issued this mandate, Mayor de Blasio announced that he hoped that the testing requirements would be so burdensome that people would need to get vaccinated to avoid them.

24.     On August 23, 2021, Mayor de Blasio and Commissioner Chokshi announced to the press that NYC DOE teachers would be subjected to even more repressive mandates. Unlike all other New York City government employees, employees of the NYC DOE would no longer have the "Vax or Test" option, and would need to be vaccinated by September 27, 2021, if they wanted to keep their jobs. No exemptions were offered for medical reasons or religious reasons.

25.     The Vaccine Mandate was promulgated in writing by Commissioner Chokshi the next day.

26.     The Vaccine Mandate and the indoor dining bans are the first "no-option" vaccination mandates in the country.

27.     New York City labor unions unanimously decried the Vaccine Mandate as reckless and unlawful and announced that they would be taking legal action. Leaders from all major impacted unions as well as the Municipal Labor Committee and leaders from each of the member unions of the MLC all put out statements that the Vaccine Mandate for teachers violates basic constitutional rights.

28.     Mass protests ensued and have continued.

### The UFT and CSA Arbitrations

29.     On September 1, 2021, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse, contending, among other things, that the DOE's failure to provide religious and medical accommodations is unlawful and that the DOE further

Complaint for Declaratory and Injunctive Relief

failed to afford due process regarding job and benefit protection. The challenge moved to arbitration by agreement of the parties.

30.    On September 10, 2021, a decision was rendered requiring that the DOE provide full time UFT eligible employees with medical and religious exemptions, as defined in the arbitration award ("Arbitration Award"). A true and accurate copy of the UFT Arbitration Award is attached hereto as Exhibit B.

31.    Subsequently, the Counsel of School Supervisors and Administrators ("CSA") submitted to arbitration by the same arbitrator, who issued a materially identical award covering CSA employees on September 15, 2021. A true and accurate copy of the CSA arbitration award is attached hereto as Exhibit C. The NYC DOE did not release this policy to the employees until September 20, 2021. The deadline to apply is September 21, 2021.

*32.*    Pursuant to the arbitration awards, covered employees seeking an exemption for medical or religious exemptions were given only a few days (one day) to prepare and submit their applications. These requests require, in addition to thoughtful certifications written by the employees, documentation from third parties – clergy members or doctors –to be considered. Any documentation that is available online will be denied. Anyone whose doctor or priest is unavailable on such short notice will not receive protection.

33.    The exemptions and process afforded by arbitrator Scheinman in the UFT and CSA arbitration awards purport to protect and require medical and religious exemptions. However, in fact they articulate a policy designed to preclude those with religious and medical need for exemption from any protection.

### The Medical Exemption is Too Narrow and Facially Unconstitutional

34.    Never before has a mandatory vaccination program failed to include at least a

medical exemption.

35.     Mayor de Blasio's indoor dining and the Vaccine Mandate are the first vaccination policy to fail to even pretend to protect people who are at risk of serious harm.

36.     The UFT and CSA arbitration awards recognizes that medical exemptions are constitutionally necessary.

37.     However, the Arbitration Award policies meant to remedy those legal defects do not meet minimal constitutional standards and are wholly inadequate.

38.     Pursuant to the Arbitration Award, "[f]ull medical exemptions will only be considered if an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J) – with contraindications delineated in CDC clinical considerations for COVID-19 vaccination." Exhibit B at 7.

39.     This is insanity. A contraindication is not meant to define the limit of valid reasons for a medical exemption. Rather, it is a floor. Representatives of the Centers for Disease Control ("CDC") repeatedly stress that "The CDC does not determine medical exemptions. We define contraindications. It is the medical provider's prerogative to determine whether this list of conditions can be broader to define medical exemptions."[4]

40.     In their online "Summary Document for Interim Clinical Considerations", the CDC articulates only two "contraindications" for COVID-19 vaccination which, if present, mean that a person can never be safely vaccinated, and it would be malpractice to let them take another COVID-19 vaccine. These are: (1) "Severe allergic reaction (e.g., anaphylaxis) after a previous dose or to component of the COVID-19 vaccine" and (2) "Immediate (within 4 hours of exposure)

---

[4] December 28, 2019, from Dr. Andrew Kroger, CDC representative and author of CDC clinical guidelines, to a group of parents and advocates challenging New York State's arbitrary decision to base medical exemption decisions on a narrow list of CDC contraindications and precautions.

allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the vaccine."[5]

41.    But there are many other reasons a person might need an exemption to safeguard their health or should be allowed to choose. Hundreds of reasons have been identified which could put some people at substantial risk of harm even from well understood vaccines, as indicated by the long list of precautions, and known adverse reactions listed in manufacturers' inserts, the long list of injuries and conditions compensated by the Vaccine Injury Compensation Program ("VICP"), and the Institute of Medicine ("IOM") reports that clearly and expressly acknowledge subpopulations who have a pre-existing susceptibility to serious adverse reaction.

42.    The following is a partial list of conditions that the VICP has compensate – there are many more:

> *Abscess, acute disseminated encephalomyelitis (ADEM), acute liver failure, adhesive capsulitis,aggravation of pre-existing encephalopathy, agoraphobia, **anaphylactic shock**, anaphylaxis,antisynthetase syndrome, angiomatoid fibrous histiocytoma, anxiety, aplastic anemia, arm injury,arthritis, ataxia, autism, autoimmune hep type 2, autoimmune hemolytic anemia, behavioral issues, bell's palsy, benign tumor, bilateral peripheral neuropathy, bilateral shoulder pain, bilateral symmetric diaphragmatic palsy, blindness, brachial neuritis, brachial plexopathy, brachial plexus neuritis, cardiac injury, celiac disease, cellulitis, cerebellitis, cerebellar ataxia, cerebrovascular accident, chest pain, choreiform movement disorder, chronic fatigue, chronic gastrointestinal issues, chronic arthritis, chronic inflammatory demyelinating polyneuropathay (CIDP), chronic urticarial, demyelinating disease of central nervous system, demyelinating polyradiculoneuropathy, chronic pain, complex regional pain syndrome, death, deltoid bursitis, demyelinating condition, demyelinating sensorimotor polyneuropathy, dermatomyositis, dravet syndrome, developmental delay, devic's disease, eczema, encephalititis, encephalopathy, epilepsy, epstein barr virus, erythema multiforme major, evan's syndrome, exacerbation of existing cardiomyopathy, expressive language delay, fatigue, fibromyalgia, frozen shoulder, gastrointestinal symptoms, gastroparesis, GM1 gangliosidosis, guillain-barre syndrome (GBS), headaches, hemophagocytic lymphohistiocytosis (HLH), hodgkin's lymphoma, phypereosinophilia, hypersensitivity, hypotensive-hyporesponsive shock collapse (HHE), hypoproteinemia, hypotonia, immobile flaccid legs, immune issues, immune thrombocytopenia purpa,increased risk of cancer, infantile spasms, inflammatory arthritis, joint pain, juvenile dermatomyositis, juvenile idiopathic arthritis, juvenile rheumatoid arthritis (JRA), Kawasaki disease, keloid scarring, leukocytoclastic vasculitis (LCV), leukodystrophy, latent herpes simplex*

[5] https://www.cdc.gov/vaccines/covid-19/downloads/summary-interim-clinical-considerations.pdf

Complaint for Declaratory and Injunctive Relief

*virus infection, lichen planus, lipomas, long thoracic nerve palsy, lupus (SLE), lymphangitis, lymphomatoid granulomatosis, macrophagic myofasciitis, meningoencephalitis, metal toxicity, mixed connective tissue disease (MCTD), monoplegia, multi organ failure, multiple sclerosis, muscle spasms,myalgias, myelitis, necrotizing pancreatitis, nerve damage, neurological injury, neuromyelitis optica (NMO), neuropathic arm pain, neuropathy, nodular fasciitis, opsoclonusmyoclonus syndrome (OMS), ocular visual disturbance, optic neuritis, panic,overlap syndrome, panuveitis, panniculitis, parsonage turner syndrome, pemphigus vulgaris, peripheral neuropathy, permanent spastic tetraparesis, polyarthralgia, progressive encephalopathy, psoriatic arthritis, pulmonary edema, SIDS, radial nerve damage, rash, reactive inflammatory arthritis, reflex sympathetic dystrophy, residual seizure disorder (RSD), retro seizures, rhabdomyolysis, rheumatoid arthritis, rheumatologic injuries, scaring, scn1a, seizures, seizure disorder, sensory neuropathy, sensory polyneuropathy, serum sickness, sirva, small fiber neuropathy, shoulder pain, splenic rupture, abscesses, strep infection, stroke, suprascapular neuropathy, syncope, synovitis, tendonitis, tendinopathy, toxic epidermal necrolysis (TEN), toxic shock syndrome, transverse myelitis (TM), thrombocytopenic purpa, tics, tremors, undifferentiated connective tissue disease (UCTD), urinary incontinence, uticarial andgiodema, uveitis, vasculitis, vestibular neuronitis*

43.     The following list shows some of the many vaccine adverse reactions and conditions acknowledged by manufacturers in marketed vaccines that were identified in post marketing data. The COVID-19 vaccine inserts acknowledge that these types of data are not available yet for the still experimental COVID-19 vaccines.

## Vaccine Package Inserts: Post-Marketing Experience
### Blood and lymphatic system disorders

- **Anemia, aplasic or hemolytic** (Pneumovax-23, ProQuad, Varivax)
- **Autoimmune hemolytic anemia** (Gardasil/Gardasil 9)
- **Epistaxis** [*nosebleed*] (ProQuad)
- **Extravasation blood** (ProQuad)
- **Hematochezia** [*bloody stools*] (ProQuad, Rotarix, RotaTeq)
- **Increased erythrocyte sedimentation rate** (Recombivax)
- **Leukocytosis** (MMR-II, Pneumovax-23)
- **Lymphadenitis** (Boostrix, Pneumovax-23, ProQuad)
- **Lymphadenopathy, including regional** [*enlarged lymph nodes*] (Boostrix, Daptacel, DT, Fluad, Fluarix, Flulaval, FluzoneQ and FluzoneHD, Gardasil/Gardasil 9, Infanrix, IPV, Kinrix, MMR-II, PedvaxHIB, Pneumovax-23, Prevnar-13, ProQuad, Tenivac)
- **Thrombocytopenia, including severe** [*low platelets*] (Afluria, Engerix-B, Fluad, FluzoneQ and FluzoneHD, Havrix, Infanrix, Kinrix, MMR-II, Pneumovax-23, ProQuad, Recombivax, Twinrix, Vaqta, Varivax)
- **Thrombocytopenic purpura, idiopathic (ITP)** (Gardasil/Gardasil 9, Rotarix, Twinrix, Varivax)

### Cardiac disorders
- **Cyanosis** [*bluish discoloration*] (Daptacel, Hiberix, Infanrix, Pediarix, Pentacel, Prevnar-13, Quadracel)

- **Myocarditis** [*inflammation of heart muscle*] (Adacel, Boostrix)
- **Palpitations** (Engerix-B, Twinrix)
- **Pericarditis** [*inflammation of pericardium*] (FluMist)
- **Tachycardia** [*abnormally high heart rate*] (Engerix-B, Fluarix, Recombivax, Twinrix)

**Congenital**
- **Congenital anomaly** (Havrix)

**Death**
- **Death** (Gardasil/Gardasil 9, MMR-II, Rotarix, RotaTeq)
- **SIDS** (Infanrix)

**Ear and labyrinth disorders**
- **Ear pain** (Engerix-B, Infanrix, ProQuad, Twinrix)
- **Nerve deafness** (MMR-II, ProQuad)
- **Otitis media** (MMR-II)
- **Tinnitis** (Engerix-B, Recombivax, Twinrix)
- **Vertigo** (Engerix-B, Fluarix)

**Eye disorders**
- **Conjunctivitis** (Engerix-B, Fluarix, MMR-II, Recombivax, Twinrix)
- **Eye irritation** (Fluarix, ProQuad)
- **Eye pain** (Fluarix, Flulaval)
- **Eye redness** (Fluarix)
- **Eye swelling** (Bexero, Fluarix)
- **Eyelid swelling** (Fluarix, ProQuad)
- **Keratitis** [*cornea inflammation*] (Engerix-B)
- **Ocular hyperemia** [*eye inflammation*] (FluzoneQ and FluzoneHD)
- **Ocular palsies** (MMR-II, ProQuad)
- **Optic neuritis/neuropathy, papillitis** (Engerix-B, FluzoneQ and FluzoneHD, MMR-II, ProQuad, Recombivax, Twinrix)
- **Photophobia** (Flulaval)
- **Retinitis, necrotizing retinitis** (MMR-II, ProQuad, Varivax)
- **Retrobulbar neuritis** (MMR-II, ProQuad)
- **Uveitis** [*eye inflammation*] (Recombivax)
- **Visual disturbances** (Engerix-B, Recombivax, Twinrix)

**Gastrointestinal disorders**
- **Abdominal pain or discomfort** (Fluarix, ProQuad)
- **Candidiasis** (ProQuad)
- **Constipation** (Recombivax)
- **Diarrhea** (Daptacel, FluMist, FluzoneHD, MMR-II, Pediarix, Pentacel)
- **Dyspepsia** (Engerix-B, Twinrix)
- **Dysphagia** [*swallowing difficulties*] (Flulaval)
- **Gastroenteritis** (Rotarix, RotaTeq)
- **Intussusception and recurrent intussusception (including fatal)** (Rotarix, RotaTeq) ((*ACIP would allow exemption from further immunization with rotavirus vaccine only*)
- **Mouth ulcers** (ProQuad)

- **Nausea** (Daptacel, DT, Fluarix, FluMist, FluzoneHD, Gardasil/Gardasil 9, MMR-II, Pneumovax-23, TDVAX)
- **Pancreatitis** (Gardasil/Gardasil 9, MMR-II)
- **Swelling of the mouth, throat, and/or tongue** (Fluarix)
- **Vomiting** (Flulaval, FluMist, FluzoneQ and FluzoneHD, Gardasil/Gardasil 9, MMR-II, Pediarix, Pentacel, Pneumovax-23, Tenivac)

**General disorders and administration site conditions**
- **Abnormal gait** (Flulaval)
- **Apathy** (ProQuad)
- **Asthenia** [*fatigue, weakness*] (Fluarix, Flulaval, FluzoneQ and FluzoneHD, Gardasil/Gardasil 9, Infanrix, Pediarix, Tenivac)
- **Body aches** (Fluarix)
- **Chest pain** (Fluarix, Flulaval, FluzoneQ and FluzoneHD)
- **Chills** (Fluarix, FluzoneHD, Gardasil/Gardasil 9)
- **Decreased limb mobility** (Pneumovax-23)
- **Feeling hot** (Fluarix)
- **Fever** (MMR-II, Pneumovax-23)
- **Injected limb—extensive swelling** (ActHIB, Bexero, Hiberix)
- **Injection site abscess** (Adacel, Daptacel, Fluarix, Flulaval, PedvaxHIB, Pentacel, Quadracel)
- **Injection site bruising** (Adacel, Flulaval)
- **Injection site cellulitis** (Afluria, Daptacel, Fluad, Fluarix, Flulaval, Pediarix, Quadracel, Tenivac)
- **Injection site reactions: mass, pain, warmth** (Adacel, Afluria, Bexero, Boostrix, Daptacel, DT, Engerix-B, Fluad, Fluarix, Flucelvax, Flulaval, Havrix, Hiberix, Infanrix, IPV, Kinrix, MMR-II, Pediarix, Pentacel, Pneumovax-23, Prevnar-13, ProQuad, Quadracel, TDVAX, Tenivac, Twinrix)
- **Injection site rash** (Daptacel, Flulaval, IPV, Prevnar-13)
- **Listlessness** (Quadracel)
- **Malaise** (Gardasil/Gardasil 9, MMR-II, Pneumovax-23, TDVAX, Twinrix)
- **Peripheral edema** (ActHIB, MMR-II, Pneumovax-23, ProQuad, TDVAX, Tenivac, Varivax)
- **Pyrexia** (TDVAX)
- **Swelling** (MMR-II, ProQuad)

**Hepatobiliary and liver disorders**
- **Elevation of liver enzymes** (Recombivax)
- **Hepatitis** (Havrix, Twinrix)
- **Jaundice** (Havrix, Twinrix)

**Immune system disorders**
- **Allergic reactions/hypersensitivity** (ActHIB, Adacel, Afluria, Bexero, Boostrix, Daptacel, Engerix-B, Fluarix, Flublok, FluMist, FluzoneQ and FluzoneHD, Hiberix, Infanrix, IPV, Kinrix, Pediarix, Pentacel, Quadracel, Recombivax, Tenivac, Trumenba, Twinrix)
- **Anaphylactic and anaphylactoid reactions, including shock** (ActHIB, Adacel, Afluria, Bexero, Boostrix, Daptacel, Engerix-B, Fluad, Fluarix, Flublok, Flucelvax, Flulaval, FluMist, FluzoneQ and FluzoneHD, Havrix, Hiberix, Infanrix, IPV, Kinrix, MMR-II, Pediarix, Pentacel, Pneumovax-23, Prevnar-13, ProQuad, Quadracel, Recombivax, RotaTeq, Tenivac, Trumenba, Twinrix, Varivax)(*ACIP would only allow exemption from the triggering immunization only*)
- **Angioedema, angioneurotic edema** [*swelling beneath skin*] (ActHIB, Adacel, Boostrix, Daptacel, Engerix-B, Fluad, Fluarix, Flucelvax, Flulaval, FluMist, FluzoneQ and FluzoneHD, Havrix, Hiberix, Infanrix, Kinrix, MMR-II, Pediarix, PedvaxHIB, Pneumovax-23, Prevnar-13, ProQuad, RotaTeq, Tenivac, Twinrix, Varivax)
- **Edema** (Adacel)

Complaint for Declaratory and Injunctive Relief

- **Hypotension** (Adacel)
- **Serum sickness** (Afluria, Engerix-B, Fluarix, Havrix, Pneumovax-23, Recombivax, Twinrix)

**Infections and infestations**
- **Atypical measles** (MMR-II, ProQuad)
- **Bronchitis** (Infanrix, ProQuad)
- **Cellulitis** (Daptacel, Infanrix, Pneumovax-23, ProQuad, TDVAX, Varivax)
- **Chills** (Havrix, Twinrix)
- **Early-onset Hib disease** (PedvaxHIB)
- **Herpes simplex** (ProQuad)
- **Herpes zoster** (Engerix-B, ProQuad, Recombivax, Twinrix, Varivax)
- **Infection** (ProQuad)
- **Influenza, influenza-like illness** (Afluria, Flulaval, Havrix, ProQuad)
- **Invasive Hib disease** (Pentacel)
- **Kawasaki disease** (Rotarix, RotaTeq)
- **Laryngitis** (Flulaval)
- **Measles** (ProQuad)
- **Measles-like rash** (MMR-II)
- **Meningitis, aseptic meningitis, eosinophilic meningitis** (Engerix-B, FluMist, MMR-II, Pentacel, ProQuad, Twinrix, Varivax)
- **Pharyngitis** (Fluarix, FluzoneHD, Varivax)
- **Pneumonia, pneumonitis** (MMR-II, ProQuad, Varivax)
- **Pulmonary congestion** (ProQuad)
- **Respiratory tract infection** (Infanrix, Pediarix, ProQuad)
- **Rhinitis** (Fluarix, Flulaval, FluzoneHD, Havrix, MMR-II, Pentacel, ProQuad)
- **Secondary bacterial infections of skin and soft tissue** (Varivax)
- **Sinusitis** (ProQuad)
- **Skin infection** (ProQuad)
- **Sore throat** (MMR-II, ProQuad)
- **Tonsillitis** (Fluarix)
- **Transmission of vaccine virus strains to non-vaccinated** (RotaTeq)
- **Varicella (vaccine strain)** (ProQuad, Varivax)
- **Varicella-like rash** (ProQuad)
- **Viral infection** (Pentacel)

**Investigations**
- **Abnormal liver function tests** (Engerix-B, Twinrix)
- **Increased serum C-reactive protein** (Pneumovax-23)

**Metabolic disorders**
- **Decreased appetite** (Pentacel)
- **Diabetes mellitus** (MMR-II)
- **Mitochondrial encephalomyopathy/Leigh syndrome exacerbation** [*neurometabolic disorder*] (FluMist)

**Musculoskeletal and connective tissue disorders**
- **Arthralgia** (Boostrix, Engerix-B, FluzoneHD, IPV, MMR-II, Pneumovax-23, ProQuad, Recombivax, TDVAX, Twinrix)
- **Arthritis** (Engerix-B, Flulaval, MMR-II, Pneumovax-23, ProQuad, Recombivax, Twinrix)
- **Back pain** (Boostrix)

- **Hypotonia** (Prevnar-13)
- **Lupus-like syndrome** (Recombivax)
- **Muscle spasm** (Adacel)
- **Muscle weakness** (Engerix-B, Fluad, Flulaval, Recombivax, Twinrix)
- **Musculoskeletal pain** (ProQuad)
- **Musculoskeletal stiffness** (Havrix)
- **Myalgia** (Boostrix, IPV, MMR-II, ProQuad, TDVAX, Tenivac)
- **Myositis** (Adacel)
- **Pain in extremities** (Fluarix, FluzoneQ and FluzoneHD, Pediarix, Recombivax, TDVAX, Tenivac)
- **Systemic lupus erythematosus (SLE)** (Recombivax)

**Nervous system disorders**
- **Acute disseminated encephalomyelitis (ADEM)** (MMR-II, ProQuad)
- **Ataxia** (MMR-II, ProQuad, Varivax)
- **Bulging fontanelle** (Pediarix)
- **Cerebellar ataxia** (Vaqta)
- **Convulsions/seizures** (ActHIB, Adacel, Afluria, Boostrix, Daptacel, DT, Fluad, Fluarix, Flulaval, FluzoneQ and FluzoneHD, Havrix, Hiberix, IPV, Kinrix, MMR-II, Quadracel, Recombivax, TDVAX, Twinrix, Varivax)
- **Depressed level of consciousness** (Boostrix, Pediarix, Pentacel)
- **Dizziness** (Fluarix, Flulaval, FluzoneQ and FluzoneHD, Havrix, MMR-II, ProQuad, TDVAX, Tenivac, Varivax)
- **Encephalitis, vaccine-induced encephalitis** [*brain inflammation*] (Boostrix, Engerix-B, FluMist, MMR-II, Pediarix, Recombivax, Twinrix, Vaqta, Varivax) (*ACIP will only allow exemption from further vaccination with the triggering vaccine*)
- **Encephalomyelitis** [*inflammation of brain and spinal cord*] (Afluria, Fluad, Fluarix, FluzoneQ and FluzoneHD)
- **Encephalopathy** [*brain disease*] (Afluria, Engerix-B, Flulaval, Havrix, Infanrix, MMR-II, ProQuad, Twinrix)
- **Facial palsy, Bell's palsy** (Adacel, Boostrix, Engerix-B, Fluarix, FluMist, FluzoneQ and FluzoneHD, ProQuad, Recombivax, Twinrix, Varivax)
- **Facial (or cranial) nerve paralysis** (Flulaval)
- **Facial paresis** [*impaired movement*] (Fluarix)
- **Febrile convulsions/seizures** (Afluria, Daptacel, FluzoneQ and FluzoneHD, IPV, MMR-II, PedvaxHIB, Pneumovax-23, ProQuad, Quadracel, Recombivax)
- **Guillain-Barré syndrome** (Adacel, Afluria, Engerix-B, Fluad, Fluarix, Flulaval, FluMist, FluzoneQ and FluzoneHD, Havrix, MMR-II, PedvaxHIB, Pneumovax-23, ProQuad, Recombivax, Tenivac, Vaqta, Varivax)
- **Headache** (DT, Infanrix, IPV, MMR-II, ProQuad, TDVAX, Twinrix)
- **Hypoesthesia** [*decreased tactile sensitivity*] (Adacel, Engerix-B, Fluarix, Flulaval, Havrix, Recombivax, Twinrix)
- **Hypokinesia** [*loss of muscle movement*] (Flulaval)
- **Hypotonia** [*low muscle tone*] (Daptacel, Hiberix, Infanrix, Pediarix, Quadracel)
- **Hypotonic-hyporesponsive episode to immunization (HHE)** (Daptacel, Hiberix, Kinrix, Pediarix, Pentacel, Quadracel)
- **Lethargy** (Pediarix)
- **Limb paralysis** (Flulaval)
- **Measles inclusion body encephalitis (MIBE)** (MMR-II, ProQuad)
- **Migraine** (Engerix-B, Recombivax)

Complaint for Declaratory and Injunctive Relief

- **Multiple sclerosis (or MS exacerbation)** (Engerix-B, Havrix, Recombivax, Twinrix)
- **Myelitis** [*spinal cord disease*] (Adacel, Fluarix, FluzoneQ and FluzoneHD, Havrix, Recombivax, Twinrix)
- **Neuralgia** [*nerve pain*] (Afluria, Fluad)
- **Neuritis, including brachial, polyneuritis** [*nerve inflammation*] (Adacel, Afluria, Engerix-B, Fluad, Fluarix, FluzoneQ and FluzoneHD, MMR-II, Twinrix)
- **Neuropathy, polyneuropathy** [*nerve damage*] (Afluria, Engerix-B, Fluarix, Havrix, MMR-II, ProQuad, Recombivax, Twinrix)
- **Paralysis** (Engerix-B, Twinrix)
- **Paresis** (Engerix-B, Twinrix)
- **Paresthesia** [*abnormal skin sensations*] (Adacel, Afluria, Boostrix, Engerix-B, Fluad, Fluarix, Flucelvax, Flulaval, FluzoneQ and FluzoneHD, Havrix, IPV, MMR-II, Pneumovax-23, ProQuad, Tenivac, Varivax)
- **Partial seizures, seizures** (Daptacel, Engerix-B, ProQuad)
- **Presyncope** [*feeling faint*] (Fluad, Flucelvax)
- **Radiculopathy** [*"pinched nerve" in spine*] (Pneumovax-23, Recombivax)
- **Somnolence** (Daptacel, DT, Flulaval, Havrix, Hiberix, IPV, Pediarix, Pentacel, Quadracel, Recombivax)
- **Subacute sclerosing panencephalitis (SSPE)** (MMR-II, ProQuad)
- **Syncope, vasovagal syncope** [*fainting*] (Adacel, Bexero, Boostrix, Daptacel, DT, Engerix-B, Fluad, Fluarix, Flucelvax, Flulaval, FluzoneQ and FluzoneHD, Havrix, Hiberix, Infanrix, Kinrix, MMR-II, Pediarix, ProQuad, Recombivax, Tenivac, Trumenba)
- **Transverse myelitis** [*spinal cord demyelination*] (Afluria, Engerix-B, FluzoneQ and FluzoneHD, MMR-II, ProQuad, Recombivax, Twinrix, Varivax)
- **Tremors** (Flulaval, ProQuad)

**Psychiatric disorders**
- **Agitation** (IPV, ProQuad, Recombivax)
- **Crying/unusual crying** (Pediarix)
- **Hypersomnia** (ProQuad)
- **Insomnia** (Flulaval, Pediarix)
- **Irritability** (MMR-II, Recombivax)
- **Nervousness** (Pediarix, ProQuad)
- **Restlessness** (Pediarix)
- **Screaming** (Daptacel, Pediarix, Pentacel, Quadracel)

**Respiratory, thoracic, and mediastinal disorders**
- **Apnea** (Engerix-B, Hiberix, Infanrix, Kinrix, Pediarix, Pentacel, Prevnar-13)
- **Asthma, asthma-like symptoms** (Engerix-B, Fluarix, Twinrix)
- **Bronchospasm** (Engerix-B, Fluarix, Flulaval, MMR-II, ProQuad, Recombivax, Tenivac, Twinrix)
- **Cough** (Fluarix, FluzoneQ and FluzoneHD, Infanrix, MMR-II, Pediarix, Pentacel)
- **Dyspnea** [*shortness of breath*] (Fluarix, Flulaval, FluzoneQ and FluzoneHD, Havrix, Pediarix, Quadracel, Twinrix)
- **Dysphonia** [*vocal abnormalities*] (Flulaval)
- **Epistaxis** [*nosebleed*] (FluMist)
- **Oropharyngeal pain** (FluzoneQ)
- **Respiratory distress** (Fluarix)
- **Rhinorrhea** [*runny nose*] (FluzoneQ)
- **Stridor** [*high-pitched wheezing*] (Fluarix)

Complaint for Declaratory and Injunctive Relief

- **Throat tightness** (Flulaval, FluzoneQ and FluzoneHD)
- **Wheezing** (FluzoneQ and FluzoneHD, ProQuad)

**Skin and subcutaneous tissue disorders**
- **Acute hemorrhagic edema of infancy** (MMR-II, ProQuad)
- **Alopecia** [*hair loss*] (Engerix-B, Recombivax, Twinrix)
- **Ecchymoses** [*subcutaneous bleeding*] (Engerix-B, Recombivax, Twinrix)
- **Eczema** (Engerix-B, Recombivax, Twinrix)
- **Erythema** [*skin redness*] (Fluarix, Infanrix, MMR-II, Pediarix, Pentacel, TDVAX)
- **Erythema multiforme** (Engerix-B, Fluad, Fluarix, Havrix, MMR-II, Pneumovax-23, ProQuad, Prevnar-13, Recombivax, Twinrix, Varivax)
- **Erythema nodosum** (Engerix-B, Recombivax, Twinrix)
- **Exanthem** [*widespread rash*] (Boostrix)
- **Facial swelling/edema** (Daptacel, Fluarix, MMR-II, ProQuad, Varivax)
- **Hyperhydrosis** [*abnormal sweating*] (Flulaval, Havrix, Twinrix)
- **Impetigo** (ProQuad, Varivax)
- **Lichen planus** [*inflammatory skin rash*] (Engerix-B, Twinrix)
- **Panniculitis** [*disease of fatty layer of skin*] (MMR-II, ProQuad)
- **Parotitis** [*inflammation of salivary glands*] (MMR-II, ProQuad)
- **Pruritus** [*itchy skin*] (ActHIB, Adacel, Afluria, Boostrix, Daptacel, Fluad, Fluarix, Flucelvax, Flulaval, FluzoneQ and FluzoneHD, Infanrix, Kinrix, MMR-II, Prevnar-13, ProQuad, TDVAX, Tenivac)
- **Purpura** [*red/purple spots*] (Engerix-B, MMR-II, ProQuad)
- **Rash** (ActHIB, Adacel, Afluria, Bexero, Boostrix, Daptacel, DT, Fluad, Fluarix, Flucelvax, Flulaval, FluMist, FluzoneQ, Hiberix, Infanrix, IPV, MMR-II, Pediarix, Pentacel, Pneumovax-23, Prevnar-13, Quadracel, TDVAX, Tenivac)
- **Skin discoloration** (Pentacel)
- **Skin induration** (MMR-II, ProQuad)
- **Stevens-Johnson syndrome** [*severe skin reaction*] (Engerix-B, Fluarix, FluzoneQ and FluzoneHD, MMR-II, ProQuad, Recombivax, Varivax)
- **Urticaria** [*hives*] (ActHIB, Adacel, Afluria, Boostrix, DT, Engerix-B, Fluad, Fluarix, Flucelvax, Flulaval, FluMist, FluzoneQ and FluzoneHD, Hiberix, Infanrix, IPV, Kinrix, MMR-II, Pediarix, Pentacel, Pneumovax-23, Prevnar-13, Quadracel, Recombivax, RotaTeq, Tenivac, Twinrix)
- **Vesiculation** (MMR-II)

**Vascular disorders**
- **Cerebrovascular accident** (ProQuad, Varivax)
- **Flushing** (Flulaval, FluzoneQ and FluzoneHD)
- **Henoch-Schönlein purpura** [*blood vessel inflammation*] (Boostrix, Fluarix, MMR-II, ProQuad, Varivax)
- **Pallor** (DT, Flulaval, Hiberix, Pediarix, Pentacel, Prevnar-13, Quadracel)
- **Petechiae** [*bleeding capillaries*] (Pediarix, Recombivax)
- **Polyarteritis nodosa** [*inflamed/damaged arteries*] (Recombivax)
- **Renal vasculitis** (Afluria, Fluad)
- **Vasculitis** [*blood vessel inflammation*] (Afluria, Engerix-B, Fluad, Fluarix, FluzoneQ and FluzoneHD, Havrix, MMR-II, Recombivax, Twinrix)

**Urogenital disorders**
- **Epididymitis** [*testicular inflammation*] (MMR-II, ProQuad)
- **Orchitis** [*inflammation of the testes*] (MMR-II, ProQuad)

Complaint for Declaratory and Injunctive Relief

44.     Institutes of Medicine Reports show similar long lists of established or credible potential risk factors and adverse reactions.

45.     Such identified precautions indicate that a person with certain risk factors might be at risk of serious harm and should work with their doctor to decide the safest course of action.

46.     For some at risk people, there may be a reason to take a chance and risk harm, since COVID-19 can be serious, particularly for the elderly, but for others, subjecting themselves to risk of harm from the vaccines would be far too dangerous and reckless. This is not a one-sized fits all proposition and clinical judgment must be exercised in light of all factors affecting a person's health in coordination with a treating physician.

47.     The right to rely on one's chosen treating physician's independent medical judgment has been recognized even for well-understood and established medicine. This right  is even more crucial when making policy for experimental and relatively unstudied vaccines such as the COVID-19 vaccines.

48.     The COVID-19 vaccines are experimental and there is still a lot that is unknown about the potential side effects or impacts.

49.     An unprecedented number of adverse events have already been reported for the three available COVID-19 vaccines.

50.     Data released September 17, 2021, by the CDC showed that between December 14, 2020 and September 10, 2021, a total of 701,561 adverse events following administration of a COVID-19 vaccine were reported to the Vaccine Adverse Event Reporting System ("VAERS"). This number includes almost 6,756 deaths and 43,073 serious injuries, ranging from life threatening autoimmune blood clotting disorders to onset of autoimmune disease, debilitating migraines, loss of function of limbs, heart attacks and inflammatory heart conditions and many

other serious potential adverse effects.[6]

51.     VAERS data does not prove causation, however, there are serious penalties for false reporting and doctors and medical professionals must provide extensive supporting data for any report made. While many of these adverse events might be coincidence, it is more likely that the system is underreporting severe adverse reactions than overreporting them. A peer reviewed Harvard study found that "fewer than 1% of vaccine adverse events are reported" to VAERS. [7]

52.     Moreover, there is little data available on the safety of the COVID-19 vaccines for vulnerable subpopulations.

53.     As one of many examples, while the CDC does not *prohibit* people with underlying autoimmune conditions from taking a chance with a COVID-19 vaccine, they also acknowledge that no studies have been conducted to evaluate safety. "People with autoimmune conditions may receive a COVID-19 vaccine. However, they should be aware that no data are currently available on the safety of COVID-19 vaccines for people with autoimmune conditions."[8]

54.     People with autoimmune conditions (or any other risk factor) must maintain the right to exercise precaution when it comes to an intervention that might seriously harm them, for which no safety data exists, particularly when their doctors certify that the risks do not outweigh the benefits for them.

55.     The Arbitration Award eschews such precautions and basic rights. Under the Arbitration Award, autoimmune conditions are not a valid basis for exemption, even for people whose autoimmune conditions have been exacerbated by vaccination in the past (which is an

---

[6] Search Results from the VAERS Database (medalerts.org)
[7] https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf
[8] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/underlying-conditions.html

established and routinely compensated type of adverse vaccine reaction to vaccination). In fact, even if a person had a serious complication from their first shot, this is not sufficient to warrant acceptance of a medical exemption from their treating physician from subsequent doses.

56.     Indeed, the Arbitration Award specifies that even official contraindications, such as an anaphylactic reaction documented after receipt of a COVID-19 vaccine while under observation for the fifteen minutes required to sit after getting the vaccine, is only considered a "precaution" to vaccination with one of the other two vaccines and thus a medical exemption written on this basis may not be accepted by the DOE. Id at 7-8. According to the Arbitration, the person with the anaphylactic reaction might have to try the other two vaccines and have the same reaction documented before they are able to be exempt.

57.     It should be noted that no controlled data has been gathered to show that it is safe to mix and match the different vaccines for different doses.

58.     The Arbitration Award also allows "temporary medical exemptions" but again, only under absurdly narrow circumstances - for a few days during COVID-19 infection, or during stem-cell treatment or other specified immunosuppressive therapies but only in cases where the licensed physician who is conducting that treatment documents that the treatment would temporarily interfere with the individual's ability to respond to vaccination. Even then, if the CDC revises its guidelines for such categories of people and indicates that it might be effective for them to try vaccination anyway, then such temporary exemption will be denied. Id at 8.

59.     Under this standard, no data has to exist to prove it is safe, so long as the CDC hasn't outright prohibited use for these subpopulations.

60.     A temporary exemption is also available to those who have suffered severe heart inflammation from a COVID-19 vaccine or an underlying condition. It is unclear how long they

will be exempt, though, "[l]ength of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption as described, above." Id. at 9.

61.     Death and severe debilitation from heart attacks and heart inflammation caused by the COVID-19 vaccines is a known adverse reaction identified in the clinical trials. There is no evidence that the risk factors are limited to people who have underlying conditions. In fact, the data shows that many of the people developing serious adverse heart issues in response to the COVID-19 vaccines are seemingly healthy individuals without preexisting heart conditions. Investigation is still underway to determine why some people may be more at risk than others.

62.     One other potential "medical exemption" applies. If a person has been *fully* vaccinated already (meaning both doses) but is so immune compromised that they failed to mount an immune response, a medical accommodation from further vaccination *might* be considered after submission of a certification from a licensed medical doctor.

63.     A frightening aspect of this provision is that it seems to indicate that the Vaccine Mandate is not meant to be a temporary response to an emergency, but is here to stay, through years of anticipated booster shot requirements and impositions on employee's right to determine the course of their own healthcare. Indeed, the Vaccine Mandate does not actually specify that it applies only to COVID-19 vaccination at all.

64.     This medical exemption policy puts people at serious risk of harm and excludes people from protection who are at risk for one of the hundreds of known serious potential adverse reactions and risk factors routinely compensated and acknowledged as reasons to avoid further vaccination. Under this polity, even those who have already had a serious adverse reaction to their first dose of a COVID-19 vaccination are not eligible for protection from further harm.

65.     Considering that the vaccines at issue are still experimental and little data is available about vulnerable subpopulations and adverse impacts, even greater caution should be employed to ensure that those at risk of harm are able to opt-out, not less.

66.     The medical exemption offered under the Arbitration Award shocks the conscience and is far too narrow to meet basic constitutional requirements governing the sufficiency of medical exemptions.

### *The Religious Exemption is Unconstitutional*

67.     The Arbitration Award correctly notes that a religious exemption is legally required in addition to a medical exemption. However, it provides an inadequate and arbitrarily narrow definition of an "acceptable" religious exemption which discriminates against people with religious beliefs that are not held by the mainstream.

68.     The criteria advanced by the Arbitration Award requires the state to impermissibly pass judgment on which religions are "valid" and which it will decline to acknowledge or give blessings to.

69.     Under the terms of the award, people who follow personal religious paths, or who belong to religions that are not "established" and "recognized" by the random reviewing administrator will not be considered.

70.     The policy provides that religious objections based on personal religious beliefs, not official doctrine of a church relayed by "clergy", will be denied. Id.

71.     Moreover, to be considered, the exemption "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs.

72.     There are more restrictions. To the extent that people have "recognized" church leaders that write letters attesting that a person has religious beliefs against vaccination and these beliefs are the beliefs of the church, this documentation cannot be available online. If the church as placed a description of their ministry online, the person will be denied an exemption.

73.     Additionally, if a person does happen to belong to an "established" and "recognized" religious organization that is hierarchical and provides letters from clergy (that are not available online), the person will still be denied if any "leader" of the person's "religious organization" has ever spoken publicly in favor of vaccination. "Leader" is not defined and in practice, the DOE is reading this very broadly (i.e., if you are Jewish, and any Jewish faith leader has made a statement in favor of vaccines, you will be denied even if you don't follow that Jewish "leader").

74.     The language of the policy shows that the intention is to deny everyone. In fact, the policy gives only one example of a religion that they will accept for exemption: Christian Science. For those who practice any other faith, religious accommodation will be denied, pursuant to the official policy of the NYC DOE.

75.     Administrators have been advising teachers that the NYC DOE intends to deny all religious exemptions other than Christian Science based objections. They assert that the NYC DOE has instructed, without authority, that "all other religions have publicly made statements in support of vaccination."

76.     These policies are as blatantly unconstitutional as they are repulsive. This issue is long-settled, and it shocks the conscience that this type of unconstitutional discrimination would be resurrected by the NYC DOE.

77.     In the 1980's, the New York State Legislature similarly limited religious

exemptions, only allowing exemption from vaccination to families who are "bona fide members of a recognized religious organization" with teachings that are contrary to immunization.

78.     After parents with personally held religious beliefs challenged the language codified into the Public Health Law in federal court, it was determined that the statute violated the Establishment Clause of the United States Constitution (in a number of ways, one of which was to exclude those with personally held religious beliefs from protection).

79.     As a result of that holding, New York State had to change its statutory language to provide religious exemptions to anyone who holds a religious exemption, whether personally held or echoed by an established religious organization, and no certification from clergy or attestation of membership could be required.

80.     To this day, the amended Section 2165 of the New York State Public Health Law, which governs immunization requirements for adults, subsequently states: "this section shall not apply to a person who holds genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such person being admitted or received into or attending an institution."

81.     Such broad and equal protection is the Constitutional floor, and it must be afforded to the Plaintiffs in this case as well.

### *The proposed process for determining exemptions is inadequate and reckless*

82.     In addition to imposing unconstitutionally narrow religious and medical exemption criteria, the proposed procedure, and policies for reviewing the exemptions is designed to ensure denial.

83.     Plaintiffs, many of them tenured teachers and staff, have procedural due process rights that are grossly violated by the DOE's new policy.

84.     Pursuant to the approach handed down in the arbitration awards, religious and medical exemptions will be substantively reviewed by the "staff" in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and the Office of Employee Relations.

85.     These three offices will somehow have to review and make determinations about all the exemption requests submitted in New York City in the span of three days. Thousands of NYC DOE employees are expected to submit these exemptions.

86.     The reviewing staff do not typically have medical training or medical degrees. To the extent that they are or will be employing doctors as consultants, which is not clear, those doctors will never have met or treated the employee and are not qualified to make medical decisions on their behalf or overrule treating physicians.

87.     Similarly, the staff in these offices do not possess specialized education in religion or religious matters and are not qualified to pass judgment on the validity of fellow NYC DOE employee's religious beliefs (even if such blatantly unconstitutional practices were somehow allowable).

88.     Moreover, the time frame is absurd. The due date for all employees to submit religious or medical exemptions is September 20th by close of business (a Monday). Decisions will be rendered by Thursday, September 23rd. The staff have only three days to review what is expected to be thousands of medical and religious exemptions. Even for qualified reviewers, which these are not, this is too short a time to meaningfully consider such an important request in good faith.

89.     If denied, employees have one day to appeal, and the appeal requires "additional documentation" to be uploaded to Scheinman Arbitration and Mediation Services within forty-

eight hours of filing an appeal, even though employees are not told the grounds for denial and thus have no idea what needs to be supplemented for fair consideration

90.     Moreover, decisions on the appeal are due on Saturday, September 25th, so it is unlikely that anyone who waits the full forty-eight hours after the denials (expected to be received on September 23rd) will have their additional documentation considered.

91.     Just as no reasons for denial are provided below, no reasons or written decision are required to be given if an appeal is denied.

92.     A Saturday deadline is also unfair to Saturday sabbath observers.

93.     The arbitrator can, in his or her individual discretion, elect to hold an expedited hearing, though having a hearing is not guaranteed and cannot be requested.

94.     The arbitration hearing, if offered, will occur by Zoom. No cross examination is allowed. Employees are not allowed to bring their own doctor, clergy, or other expert witness to testify, nor are they given meaningful time to review any documents submitted by the DOE. According to the arbitrators, no written decisions will be issued after hearings to explain the basis for denial.

95.     Most employees will be fired either the day of the initial denial, or by September 25, 2021, if they file for an appeal.

96.     If an employee is allowed to have a "hearing," they will be paid while the hearing decision is pending. However, if a "larger number of employees than anticipated" have pending appeals as of September 27, 2021, employees may be required to use their sick days and then take unpaid leave until the hearing decision comes out.

97.     The process is intentionally set up to make it impossible to receive a medical or religious exemption, while attempting to sidestep the expected lawsuits about the

unconstitutionality of withholding such exemptions.

98.    If an employee achieves the impossible, and is granted a medical or religious exemption, they will remain on payroll, but they will be prohibited from even entering any school building as long while the mandate is in effect. The Arbitration Award proposes that they should have to work in an administrative building and do a totally different job. Thus, even if an exemption is "granted", the person still loses their job and the children still lose their beloved teachers.

### Form DOE denials have started to be issued and reveal that no one will be exempt

99.    But no one will be accepted under this system. Just a few days into the new procedure, it is already clear that the NYC DOE, working in concert with the other Defendants, has no intention of allowing anyone to receive an exemption.

100.    First, the NYC DOE instructed principals and supervisors to ask their employees to meet with them if they were considering submitting a religious or medical exemption in order to discourage the employees from applying and pressure them instead to resign.

101.    Employees report widespread similar conversations with principals and supervisors across the DOE in which they are told point blank that it is impossible to get an exemption and advised to quit.

102.    Some of the plaintiffs filed early, hoping that their applications would receive more meaningful review with more time.  Upon information and belief, they have all gotten the same response, regardless of their religious sincerity, documentation or need for exemption:

> We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation because, per the order of the Commissioner of Health, unvaccinated employees cannot work in a school building without posing a direct threat to health and safety. Due to the configuration of the 2021-2022 school year, which includes no remote classwork, we cannot offer another worksite

as an accommodation, as that would impose an undue hardship (more than a minimal burden) on the DOE and its operations. This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of the UFT and the Board of Education regarding the vaccine mandate.

103.    The letters are signed "HR Connect" and come from a no reply email address.

104.    As these denials point out, even if a person meets the "criteria" for a religious exemption, they will be denied any accommodation, as the DOE views accommodation as an undue burden.

105.    In sum, the Arbitration Awards do not solve the Constitutional problems with the Vaccine Mandate. Though the Arbitration clearly held that religious and medical exemptions are legally necessary, religious, and medical exemptions are not in fact available, since the NYC DOE takes the position that it would be an undue hardship to allow any exemption given that the Vaccine Mandate still prohibits exempt employees from entering any school building.

### *The Vaccine Mandate Lacks Scientific Support*

106.    There is no valid justification for the state to exclude unvaccinated employees from all school buildings in New York City.

107.    Not only does the Vaccine Mandate burden Plaintiffs fundamental religious rights as well as right to medical privacy and self-determination in medical choices, but it is also irrational.

108.    To date, no peer reviewed study supports the assumption that the vaccinated are not able to spread SARS-CoV-2 or are substantially less infectious than unvaccinated people, particularly against the now dominant strains of SARS-CoV-2 widely circulating.

109.    On the contrary, transmission was not even studied in clinical trials, and it was expressly acknowledged from the outset that these vaccines cannot provide sterilizing immunity. They were not designed to stop transmission and the evidence-based science conclusively shows

Complaint for Declaratory and Injunctive Relief

that they do not stop transmission of SARS-CoV-2. They are for personal protection only.

110.    Any initial hopes that the vaccines would somehow turn out to provide sterilizing immunity have long-since been dashed, particularly with the dominance of the delta variant.

111.    In July, the CDC released the findings of a study confirming the vaccinated are as infectious as the unvaccinated. The study also showed the vaccinated are as likely to contract COVID-19 and asymptomatic vaccinated people were just as infectious as asymptomatic unvaccinated people.[9] Multiple other studies emerged at the same time showing the same findings.

112.    The same month, as cases skyrocketed in the most vaccinated nations, public health officials around the world began universally releasing statements that herd immunity would not be possible with these vaccines because they do not stop infection and transmission, at best only mitigating symptoms.

113.    Moreover, at the same time, evidence emerged that the vaccines were even waning in efficacy for symptom mitigation thus prompting many to start advocating for boosters after a few months. Studies from Israel and other highly vaccinated countries show efficacy plummeting less than eight weeks after vaccination.

114.    At the same time, study after study came out showing that unlike vaccine immunity, natural immunity appears to be durable, and far more robust. Those with natural immunity cannot typically transmit virus to other people and the protection appears to be long-lasting and possibly lifelong.[10]

---

[9] Brown CM, Vostok J, Johnson H, et al. Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings – Barnstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep. ePub: 30 July 2021. DOIhttp://dx.doi.org/10.15585/mmwr.mm7031e2 Last Viewed on August 4, 2021.

[10] *See, e.g.,* Turner, J.S., Kim, W., Kalaidina, E. *et al.* SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans. *Nature* **595,** 421–425 (2021). https://doi.org/10.1038/s41586-021-03647-4 Last

115.    These plaintiffs, most of whom have already had COVID-19 when they were working on the front lines for the last year and a half, without any provided PPE or available vaccines, pose no danger to those around them and are more protected than those who have vaccine immunity.

116.    In short, they do not meet the criteria for constituting a "direct threat" to those around them, which would be necessary to override their rights to choose what to do with their bodies or receive religious or medical accommodation.

117.    But the continued flood of evidence that vaccination cannot stop transmission and that the unvaccinated are no more dangerous than the vaccinated did nothing to stop the Defendants' crusade against the unvaccinated. In fact, Defendants just kept getting more militant the more evidence emerged to show the mandates were not justified.

118.    There still may be good reasons to get the vaccine. Many studies support the theory that vaccinated people will suffer less death than unvaccinated, for example, at least in the first several months after vaccination. However, the potential benefits here are personal, and the state (and City) have no jurisdiction to exercise their police powers over this decision.

119.    The Vaccine Mandate is not based on any science that showed it was necessary or appropriate (or even safe) to impose burdens on the unvaccinated but not the vaccinated in such an inflexible manner. Rather, Defendants promulgated the discriminatory regulation as part of a political strategy to coerce people into participating in the experimental vaccine program.

120.    This is not an acceptable purpose. Coercing the use of experimental vaccines is not only unlawful, but also defined as a war crime and cannot be tolerated in a just society.

### *EUA Vaccines Cannot be Mandated as a Matter of Statutory Condition*

---

Reviewed September 20, 2021.

121.    As a threshold matter, the only available vaccines in New York State are still authorized only pursuant to Emergency Use Authorization (EUA), which conditionally allows unapproved products to be offered for use during an emergency pursuant to Section 564 of the Food, Drug, and Cosmetic Act ("FDCA"), codified at 21 U.S.C. § 360bbb-3 ("Section 564").

122.    One of the conditions of any EUA product is that the product cannot be mandated or coerced. *See, e.g.,* Section 564, 21 U.S.C. § 360bbb-3(e)(1)(A)("the Secretary … shall … establish … [a]ppropriate conditions designed to ensure that individuals to whom the product is administered are informed … of the option to accept or refuse administration of the product..."

123.    FDA guidance defines the option to refuse as a substantive *right* guaranteed to all individuals:

> [A]s a general rule, persons must be made aware of their right to refuse the product (or to refuse it for their children or others without the capacity to consent) and of the potential consequences, if any, of this choice. An exception to this rule is that the president, as commander in chief, can waive military personnel's right to refuse this product. If the right is not specifically waived by the president for a particular product given under EUA, military personnel have the same right to refuse as civilians. [11]

124.    On August 23, 2021, in response to enormous political and industry pressure, the FDA did issue its first approval of any vaccine against COVID-19.

125.    However, this one approved vaccine is not actually available in New York.

126.    The circumstances are odd, and a lawsuit is pending on this issue against the FDA. Essentially, the FDA licensed one manufacturer of the Pfizer BioNtech vaccine to produce an approved COVID-19 vaccine, which must be labeled Pfizer "Comirnaty." The same day, however, the FDA issued a renewed EUA authorization for all other Pfizer BioNTech vaccines,

---

[11] 6 Nightingale SL, Prasher JM, Simonson S. Emergency Use Authorization (EUA) to Enable Use of Needed Products in Civilian and Military Emergencies, United States. Emerging Infectious Diseases. 2007;13(7):1046. doi:10.3201/eid1307.061188 available at https://wwwnc.cdc.gov/eid/article/13/7/06-1188_article#r1 (emphasis added).

including those currently available in New York.

127.    The FDA asserts that "the licensed vaccine has the same formulation as the EUA-authorized [unapproved] vaccine" but notes that the "products are legally distinct."

128.    While the FDA asserts (without explanation) that the safety and effectiveness is the same in both the licensed and the EUA product, the reality is that the EUA unbranded version is still subject to the clear prohibition on any mandate for EUA products. It is not clear why the FDA elected to refrain from approving or licensing the unbranded Pfizer BioNTech version of the vaccine, but they cannot overrule the statutory protection provided to EUA products by stating that the products are similar or even identical.

129.    Either way, the only available vaccines in New York are those conditionally authorized under EUA status, which cannot be mandated. Comirnaty is not available in New York.

130.    Even if Comirnaty vaccine was offered in New York, or "full approval" were to be rushed through for the Pfizer BioNTech or one of or both of the other available EUA vaccines, as some sources announce may occur this fall due to political and corporate pressures, the vaccines have not been tested for any sufficient length of time to be categorized as anything other than experimental for purposes of fundamental rights analysis.

131.    Two of the three available COVID-19 vaccines are mRNA vaccines. Though these are much faster to produce than traditional vaccines, no one has ever before made an RNA vaccine that has progressed past animal trials before.

132.    Moreover, approval does not take a vaccine out of the experimental phase. Rather, after initial approval, the vaccines still must undergo Phase IV trials, rendering all participants subjects in experimental vaccine trials even if they take the now licensed Comirnaty vaccine.

133.    Neither does approval change the fact that these will continue to be experimental products for many years to come, given that no long term studies can occur until a long enough time has passed since the vaccines were introduced into human trials.

*The Vaccine Mandate Coerces Participation in Experimental Medicine*

134.    Receipt of a COVID-19 vaccine is and for many years to come will be, participation in experimental medicine. Experimental medicine cannot be mandated or coerced.

135.    In April 2020, a handful of top health and defense department officials concocted a plan to bring a COVID-19 vaccination to market with unthinkable speed.

136.    The program was initially dubbed "MP2" for "second Manhattan Project" named after the devastating race to create nuclear weapons after World War II. Eventually, it became known as "Operation Warp Speed."

137.    Alex Azar, then Health and Human Services Secretary and long-time pharmaceutical company executive, was quoted as saying "if we can develop an atomic bomb in 2.5 years and put a man on the moon in seven years, we can do this [put out a vaccine in less than a tenth of the time it normally takes to establish safety] *this* year, in 2020."

138.    Typically, vaccines take at least a decade and often longer to progress through safety trials to get to market. Historically, the required process is as follows:

    a.  Exploratory Stage: Laboratory and Animal Studies. This stage typically lasts 2-4 years, during which time, scientists ensure that the product is safe in animals over long periods of observation.

    b.  Pre-Clinical Stage: next, additional animal testing is done to determine the safest dosage and method and schedule of delivery of the vaccine. Challenges may also take place, in which animals are vaccinated and then infected with the target

pathogen to ensure that there aren't inflammatory impacts that occur upon rechallenge. The pre-clinical stage usually lasts 1-2 years at minimum. Once completed, developers can apply to begin testing on human subjects.

c.   Phase I Trials. The first human test stage assesses 20-80 subjects. The goals of this phase are to assess the safety of a candidate vaccine and note the response. Subjects are supposed to be carefully monitored and controlled. Typically, this phase lasts 1-2 years.

d.   Phase II Trials. This stage is larger – usually hundreds of individuals. Unlike Phase I, the trials are randomized, well-controlled, and include a placebo group. The goal is to hone dosing and to begin to assess safety, proposed schedule, and method of delivery. This phase lasts 2-3 years on average.

e.   Phase III Trials. If successful over time, Phase III is commenced, involving thousands to tens of thousands of people. The Phase III tests must be randomized and double-blind and involve a placebo. The goal is to assess the vaccine's safety in a large group of people. Rare side effects often do not surface in the smaller trials. To detect a significant difference for a relatively low-frequency adverse reaction, the trial would have to include at least 60,000 subjects, half of them in the control group with no vaccine.[12] This phase usually lasts 5-10 years.

f.   After a successful Phase III trial, the vaccine developer will submit Biologic License Application to the FDA. The FDA then inspects the factory where the vaccine will be made and approve the labeling of the vaccine.

g.   The approval phase does not end the testing phase, and a vaccine is still

---

[12] Plotkin SA et al. Vaccines, 5th ed. Philadelphia: Saunders, 2008.

experimental.

    h.   Approval by the FDA initiates Phase IV vaccine trials, which last for years after the initial license is granted. Even post approval, recipients of the vaccine are still part of ongoing Phase IV trials whether they are aware of this or not.

139.    According to an article published in April 2020 in the New York Times, it would take at least until November 2033 for any COVID-19 vaccine to be available under normal procedures, and most of the vaccines would be expected to fail before they were determined to be safe and effective enough for licensure.[13]

140.    Less than ten percent of vaccines ever even make it past Phase III under normal circumstances. They either prove to be ineffective, have too many side effects, or in some cases, make the person less safe to the ravages of the virus. This is not always immediately apparent. It can take years to discover these problems.

141.    And yet, under Operation Warp Speed, experimental COVID-19 vaccines were offered to the public eight months after they were conceived, in less time than it typically takes to even assess the safety of a vaccine for purposes of introduction into human trials after pretrial animal challenge studies have established a baseline modicum of minimal safety controls.

142.    To expedite the COVID-19 vaccines, Operation Warp Speed allowed developers to skip, overlap and shorten many phases, including animal safety studies, and to use research done previously in SARS, RSV and MERS vaccines which may not have any real relevance or bearing on these COVID-19 vaccines.

143.    It should be noted that none of these prior SARS, RSV and MERS vaccines was actually ever approved before now, because "the data generated in the development and testing

---

[13] https://www.nytimes.com/interactive/2020/04/30/opinion/coronavirus-covid-vaccine.html

of these vaccines suggest a serious mechanistic concern: that vaccines designed empirically using traditional approach (consisting of the unmodified or minimally modified coronavirus viral spike to elicit neutralizing antibodies), be they composed of protein, viral vector, DNA or RNA and irrespective of delivery method, may worsen COVID-19 disease via antibody-dependent enhancement (ADE).[14]

144.    ADE is very serious and can cause death and severe injury to a person whose immune system is improperly primed, and thus overreacts to subsequent encounters with a virus that they are vaccinated for, or even another similar virus. It is not uncommon for ADE reactions to result in death.[15] ADE does not always become readily apparent right away.

145.    We do not have sufficient data to determine if ADE is happening or will occur in any vaccinated people rechallenged with SARS-CoV-2 or any of its variants. That is one of the potential issues that scientists are still in the early stages of monitoring.

146.    And there are many more potential problems that are still being monitored. It simply is not possible to understand the long-term effects of this vaccine until we have waited long enough to receive long-term data.

147.    A study published in the International Journal of Clinical Practice in March 2021 found that patients' right to informed consent was violated in the pre-license phase trials and would be violated if not communicated properly even after FDA approval because "the specific and significant COVID-19 risk of ADE should have been and should be prominently and independently disclosed to research subjects currently in vaccine trials, as well as those being

---

[14] Cardozo T, Veazey R. Informed consent disclosure to vaccine trial subjects of risk of COVID-19 vaccines worsening clinical disease. Int J Clin Pract. 2021 Mar;75(3):e13795. doi: 10.1111/ijcp.13795. Epub 2020 Dec 4. PMID: 33113270; PMCID: PMC7645850. Last reviewed September 18, 2021: https://pubmed.ncbi.nlm.nih.gov/33113270/

[15] https://www.nature.com/articles/s41564-020-00789-5

Complaint for Declaratory and Injunctive Relief

recruited for the trials **and future patients after vaccine approval**, in order to meet the medical

ethics standard of patient comprehension for informed consent."[16]

### *Plaintiffs Injuries and Standing to Seek Declaratory and Injunctive Relief*

148.    All plaintiffs have sincere religious objections to vaccination, and in some cases,

also need medical exemptions because they risk serious harm from the experimental vaccines.

149.    In addition to their religious and medical exemptions, plaintiffs refuse to be

guinea pigs or to allow the state to coerce their participation in the experimental vaccine trials.

150.    They bring this suit on behalf of themselves and in hopes of getting relief for all

similarly situated teachers and educators in New York City, who have the right to make their

own free and uncoerced decisions regarding the use of an experimental medical product that

cannot prevent transmission of disease.

### *Plaintiff 1 – Michael Kane*

151.    Michael Kane ("Mr. Kane") is a resident of Nassau County and has been a special

education teacher in New York City public school system for over fourteen years.

152.    Mr. Kane currently teaches in special education at a public school in Queens.

153.    Mr. Kane objects to the vaccine mandate due to his long-standing sincerely held

religious objections to vaccines.

154.    These religious objections are sincerely held, and deeply personal. Mr. Kane was

raised Buddhist and Catholic, and experienced religious intolerance to his unusual religious

beliefs as a child.

155.    Through the years, and after battling addiction and depression, Mr. Kane found

salvation in his deep personal relationship with God, and the spiritual forces of Christ and

---

[16] Cardozo article *Id.*

Buddha.

156.   Mr. Kane derives his religious beliefs from personal communion with God, meditation, and prayer, as well as study of the sacred teachings of Buddha, Christ and spiritual texts.

157.   He does not blindly follow the dictates of any one preacher or clergy member, and objects to having to submit any "certification" from an outside party about what his faith is or should be.

158.   Mr. Kane's clear guidance from prayer and meditation is to refrain from vaccination. This is in line with the religious beliefs that he relied upon to free himself from addiction and depression by giving up pharmaceutical interventions that he'd been using to unsuccessfully treat his condition, and instead turning to prayer.

159.   Pursuant to his personal religious beliefs, Mr. Kane has not had a flu vaccine or any other vaccine for over twenty years.

160.   Because Mr. Kane practices a personally derived religious path, rather than following the dictates of a mainstream religious narrative or the direction of a hierarchical religious order, he is not eligible for a religious exemption under the Arbitration Award.

161.   His religious beliefs are no less sincere, however, and he cannot take the COVID-19 vaccine without violating the sacred tenets of his faith.

162.   Mr. Kane duly submitted an exemption request on Monday, September 20, 2021. By the end of the day, he received the form letter being sent to all teachers, which noted that the NYC DOE takes the position that accommodation would be an undue hardship in light of the fact that the Vaccine Mandate still prohibits teachers from entering any school building.

163.   Mr. Kane is a dedicated and experienced tenured teacher. He teaches some of the

most vulnerable students in New York City, in a field that is terribly understaffed.

164.    Mr. Kane's students are very attached to him and will suffer serious harm if he is fired next week, which the DOE has made clear will happen to him and all other plaintiffs without this Court's intervention.

165.    Mr. Kane is already experiencing serious harm due to the unequal treatment and discrimination he faces for following his religious beliefs.

166.    Mr. Kane already had symptoms of COVID-19 and believes he is naturally immune, though he has not had an antibody test.

167.    He has a family to support, and it will be a serious hardship to him if he loses his livelihood and profession.

### Plaintiff 2 – William Castro
168.    William Castro ("Mr. Castro") is a resident of Pennsylvania and works in the New York City School District as an administrator in the Bronx Borough Office.

169.    He has been working in the New York City Public School system for over twelve years.

170.    Mr. Castro was born and raised in New York City and grew up in public housing in Queens. Early on, he developed an appreciation for the power of education, seeing that it could elevate people's lives and provide meaningful opportunities.

171.    He knew, from a young age, that he wanted to be an educator.

172.    Mr. Castro began his career as a teacher teaching English in public schools on the Lower East Side for over eight years. He started as a teacher, then quickly became a lead teacher and then the Dean of Students.

173.    Mr. Castro's background is similar to many of his students, and his leadership and passion for teaching has been an inspiration to countless New York City children.

174.    He always goes above and beyond, seeing needs and fulfilling them. At his first job, he noticed, for example, that no one had stepped up to create a basketball program for the girls. So on top of all the other things he was handling, he started a team and served as coach for five years, inspiring the children to apply the discipline and skills learned on the team to their academic studies as well as their athletic achievements.

175.    At the urging of colleagues, and because he wanted to share his skills and passion for education on a broader scale, Mr. Castro went back to school to pursue a career in administration.

176.    With certifications as a building leader, school district leader, teacher, and English as a Second Language instructor, it was a natural fit for Mr. Castro to be hired three years ago as the ESL service administrator for the lowest performing district in the Bronx. This district is characterized as "high needs" and has many ESL students from diverse cultural and language backgrounds.

177.    Mr. Castro was hired to the burrow office in November, right before the pandemic struck.

178.    Though he was very new to the position when the pandemic hit, Mr. Castro poured his heart and soul into the job to ensure that the ESL students received the instructional services they need and making sure the school did not let them fall through the cracks.

179.    When the first shutdown occurred, area leaders were trying to figure out what to do and looking for guidance.

180.    Mr. Castro did not wait, but rather "took the bull by the horns," quickly realizing that since they were going into this new arena with fully remote learning, the teachers were going to need substantial support to learn how to navigate online systems and platforms.

181.    Mr. Castro immediately began professional development with teachers, and led sessions that were conducted remotely, where he had over a hundred participants at a time in multiple sessions. His efforts were applauded and the teachers in his district were particularly prepared.

182.    Mr. Castro worked tirelessly over the next year and a half to maintain this excellence and make sure the students in his district were taken care of and overworked teachers were supported and listened to.

183.    Some students were in person, some remote. Constant issues arose, and everyone was anxious and stretched to the limit. But Mr. Castro consistently stepped up to be there for his community and to be a leader.

184.    Though there was no vaccine or even PPE available from the school in the beginning of the pandemic, he would not hesitate when asked to go into the buildings to support students and staff. His constant refrain was "anything you need me to do, I am gonna do it for the schools and these communities."

185.    In December 2020, Mr. Castro got sick. Soon after, his wife got sick as well. Diagnosed with COVID-19 by his physician, Mr. Castro lost his sense of smell and taste, and developed symptoms of long-COVID, with brain fog, and fatigue lasting for several months.

186.    He was allowed to take a leave of absence to rest and recover, but instead, he continued to work for his district remotely, putting in long days to support the community and students he cares so much about even though he was not well.

187.    Once he recovered, Mr. Castro was routinely asked to start going back into schools and buildings. As an administrator, he was never required or expected to be vaccinated, or even tested.

188.    Mr. Castro cannot take the vaccine for two reasons. First, he a had an anaphylactic reaction to PEG, which cross-reacts with the COVID-19 vaccines. His physician has certified that given the allergy, and given the fact that Mr. Castro already had COVID-19 and is naturally immune, vaccination is not recommended at this time as it puts Mr. Castro at unnecessary risk of harm.

189.    Second, and just as importantly, Mr. Castro has a religious objection to vaccination that is long-standing and deeply held.

190.    In fact, the reason that he moved his family from New York City to Pennsylvania, and has to commute each day, was because New York repealed the religious exemption to immunization for children two years ago.

191.    Mr. Castro's six-year-old son is now in a Christian school in Pennsylvania, where they respect his religious exemption to immunization. It put a hardship on the family, and was a traumatic experience for them, but they determined that their religious beliefs were important enough to withstand that hardship.

192.    The loss of the religious exemption for the children was devastating for Mr. Castro and his family. Lawsuits against the New York repeal are ongoing and in light of recent Supreme Court rulings, may eventually prevail. But relief is slow without emergency relief, and in 2019, the Supreme Court had not weighed in on the protection afforded to religious rights during a pandemic.

193.    Now Mr. Castro feels like he is facing the same trauma again, this time as he faces the loss of his career as well. His family cannot survive this blow and they do not know what to do.

194.    Mr. Castro submitted his exemptions through the online system, but it appears that

the NYC DOE is refusing to accommodate any exemptions, regardless of merit, as they claim it would be an undue hardship.

195.     Mr. Castro poses no heightened danger to his community due to his vaccine status. Mr. Castro's district needs him and will suffer serious harm if he is removed.

### Plaintiff 3 – Margaret Chu

196.     Margaret Chu ("Ms. Chu") is a resident of Brooklyn, New York and teaches English as a Second Language in a public school in Harlem, New York.

197.     Ms. Chu is Chinese-American and was born and raised in New York City.

198.     She worked as a Special Education Teacher in New York City for twelve years.

199.     She was recently certified to teach English as a New Language ("ENL" – formerly "ESL") and now works as an ENL teacher in East Harlem. This is her calling, and her dream job.

200.     Ms. Chu loves her students and is a dedicated and passionate teacher.

201.     However, she cannot take the COVID-19 vaccine.

202.     Ms. Chu already had COVID-19 and has natural immunity. For her, the risks outweigh any potential personal benefit.

203.     Ms. Chu was diagnosed with a heart murmer in her twenties. She also has a family history of inflammatory heart conditions. She is waiting for the next available appointment with her cardiologist so that she can obtain a medical exemption, but they are not able to see her on such short notice by the deadline to submit an exemption. Well known side effects of the vaccine include thrombosis, myocarditis, pericarditis, and blood clotting, each of which she is at elevated risk of getting due to her serious heart condition.

204.     Ms. Chu also has religious objections to COVID-19 vaccination. She is a practicing Roman Catholic, with strong religious convictions against the COVID-19 vaccine. She

believes in God and his teachings, went to twelve years of Catholic school, completed all of her Sacraments and lives her life according to the teachings of the Bible. Ms. Chu's Parish wrote a letter in support of her religious accommodation.

205.    Ms. Chu's mother and grandparents came to the United States to escape the repressive government of China. Ms. Chu cannot believe that she now faces the same kind of tyranny and lack of respect for individual religious beliefs and other fundamental rights that her family tried to escape.

206.    If Ms. Chu loses her job next week, she and her family, who rely on her financially, will be in a dire position.

207.    Her students also depend on her and will suffer to lose one of the few Asian-American ESL teachers in the district.

### Plaintiff 4 – Heather Jo Clark

208.    Heather Clark is a ("Ms. Clark") is a DOE Central Offices Employee. Her job title is "Assessment Systems Training Manager" and she works in Brooklyn.

209.    In March 2020, Ms. Clark was diagnosed with COVID-19 and became very sick. She lost her sense of taste and smell and had serious breathing trouble. The symptoms did not subside, and she was diagnosed with "high risk long COVID". She developed heart issues, and later a lung infection and gut pain and had to use her sick time and stay out of work for months.

210.    Her family, medical providers, and colleagues were very worried for her safety.

211.    Ms. Clark's sister and mother are nurses in Pennsylvania. They urged her to come and stay with them. Ms. Clark acknowledge that she felt "if I stay here by myself, I will die."

212.    Under her family's care, Ms. Clark slowly began to recover but her body is still weak. Ms. Clark's doctor noted that her mitochondrial function is dangerously low, which is a risk factor for adverse reactions from vaccination.

Complaint for Declaratory and Injunctive Relief

213.    In addition to the medical concerns raised by Ms. Clark's treating physician, Ms. Clark has sincerely held religious objections to the COVID-19 vaccines.

214.    On September 16, 2021, she duly submitted a religious exemption letter through the SOLAS system.

215.    The next day, she received back the same form letter that Mr. Kane received, noting that her exemption had to be denied because it would present an undue hardship due to the Vaccine Mandate's order that all unvaccinated people be prohibited from entering any school building.

216.    For Ms. Clark, the reason makes no sense. Ms. Clark is currently and has been working remotely for the NYC DOE since April 2020 with no indication that this has created any type of "undue hardship" for the DOE. Moreover, she is not a classroom teacher, but works in the Central Offices when not working remotely so does not enter school in any event as a typical part of her job.

217.    Ms. Clark filed her appeal on Monday September 20th.

218.    If she is denied her accomodation, Ms. Clark will lose her career and her livelihood on September 27, 2021 (and possibly before) without this Court's intervention.

### Plaintiff 5 – Stephanie Di Capua

219.    Stephanie DiCapua ("Ms. DiCapua") is a physical education teacher working in the New York City Public School System in Staten Island.

220.    Due to her deeply held religious beliefs, Ms. DiCapua is unable to be vaccinated. These beliefs are long-standing and are also reflected in the official teachings of her particular Christian church. Stephanie's pastor sent a letter supporting her religious exemption and pointing

out the teachings of the Bible that guide Ms. DiCapua's religious beliefs.

221.    On Friday, September 17, 2021, Ms. DiCapua received the same form rejection letter that Ms. Clarke received, alerting her that her religious accommodation would not be honored because it would present an undue hardship on the DOE.

222.    She has appealed but is certain that without the intervention of this Court, she will be forced to leave teaching next week.

223.    This would be a great loss to the students and the community.

224.    Ms. DiCapua has been employed by the DOE for over four years and has taught for over eight years.

225.    She always goes above and beyond, and volunteers for new projects at school to give her students the best experience possible. She created a physical education leader club in her school, raised money for their first ever Wellness Room, created the school's first ever Wellness Committee, developed a student and staff cookbook, and created various school wide wellness initiatives for students to participate in.

226.    Ms. DiCapua is dedicated to her job and to the kids she teaches. In addition to her normal duties, she coaches softball and organized a before school fitness and sports program and was selected to be a Physical Education reviewer through the Office of School Wellness to develop the first ever Physical Education scope and sequence for students in the NYCDOE.

### *Plaintiff 6 – Robert Gladding*

227.    Robert Gladding ("Mr. Gladding") resides in Manhattan and teaches at a New York City public school on the Upper East Side, where he has taught for seventeen years.

228.    Mr. Gladding has been a teacher with the New York City public school system for over twenty years.

229.    Mr. Gladding is a very religious mand and has sincerely held religious objections to the Vaccine Mandate.

230.    He was raised a Christian and was encouraged from a young age to develop a personal relationship with Christ.

231.    His mother, also a Christian, lived through the horrors of World War II in her home country of Germany, where she acutely witnessed the error of religious dogma. She survived that Godless and dangerous time by always being guided by her inner connection with Christ. She encouraged Robert to find God personally rather than through the dictates of fallible human leaders.

232.    Throughout Mr. Gladding's life, his choices have been made in consultation through prayer with God, including even such fundamental decisions as where to live, when to have a child, what profession to follow and of course, what medical course of action to follow.

233.    He became a teacher in response to a calling he believes to have received from God to join the New York City Teaching Fellows in 2001 after the tragedy of 9/11 so deeply wounded his beloved City.

234.    The teachings of Mr. Gladding's faith tradition and his guidance from prayer prohibit vaccination.

235.    On Friday, September 17, he submitted a religious exemption detailing his personal religious path and sincerity, and his religious objections to vaccines, along with a letter from an interfaith minister who can attest to Mr. Gladding's sincerity and commitment to his religious practices.

236.    Because Mr. Gladding does not believe in following the dictates of a fallible person, but rather has a direct relationship with his Christianity and with God, he does not meet the

discriminatory standard for religious exemption set forth by the Arbitration Award and will almost certainly be fired next week without this Court's intervention.

237.    Mr. Gladding has dedicated his career to his students and to teaching. It would be a serious blow to the New York City education system and to his school if he were to be summarily dismissed.

238.    Mr. Gladding had COVID-19 symptoms last year and believes he has natural immunity. Even if he does not, he poses no greater risk to his community than someone who has been vaccinated.

### *Plaintiff 7 - Nwakaego Nwaifejokwu*

239.    Nwakaego Nwaifejokwu (Mrs. Nwaifejokwu) has been a teacher with the New York City Public School system for twelve years. Prior to that, she worked with HEAD start.

240.    She currently works in the Bronx teaching first grade.

241.    For Mrs. Nwaifejokwu, teaching is not just a job, it is a passion. She finds herself spending hours of time outside of school making preparations to support her students, staying up late into the night thinking about how to get things "just right."

242.    She loves her students, and they love and need her.

243.    When the school announced suddenly in 2020 that they were going to go remote, no training or assistance was offered. Mrs. Nwaifejokwu spent hours working alone and with her colleagues to learn how to use various online platforms and make sure their students were supported. She went above and beyond, working in the wee hours of the morning and late into the night to reach out to families, support her students and make sure that she was able to give them the best education possible in such difficult circumstances.

244.    At that time, she was teaching kindergarten. When school resumed, 70 percent of the students were still remote, so Mrs. Nwaifejokwu had to work with the other teachers to come up with creative solutions to make sure everyone was taken care while she attended to both in person and remote lessons for little children simultaneously.

245.    Several of the children in her class are on the autism spectrum. Mrs. Nwaifejokwu is luckily able to draw on her many years as a special education teacher to support them while handling these uncertain times.

246.    Mrs. Nwaifejokwu has sincere religious objections to vaccination.

247.    In addition to her sincerely held religious objections, Mrs. Nwaifejokwu is not willing to partake in experimental medicine. Mrs. Nwaifejokwu's daughter was injured by the HPV vaccine while it was still in Phase IV trials. She developed early onset menopause after her first shot. Mrs. Nwaifejokwu, who had advised her daughter not to take the vaccine due to her religious beliefs, is particularly committed to avoiding any further participation in experimental medicine, particularly when it is a medication that violates her religious beliefs.

### *Plaintiff 8 – Ingrid Romero*

248.    Ingrid Romero ("Mrs. Romero") resides in New Jersey and is an elementary school teacher in the New York City Public School system in Queens.

249.    Mrs. Romero grew up in Queens, though she has a lot of family in Ecuador, where her family is originally from.

250.    To this day, her family in Ecuador depends on her income, which she regularly contributes for the good of the family.

251.    Mrs. Romero is a dedicated and beloved teacher. She has been teaching for almost eighteen years in the New York City School system.

Complaint for Declaratory and Injunctive Relief

252.     She started as a substitute teacher, then went on to teach kindergarten, second, and now third grade.

253.     Mrs. Romero regularly leads workshops and has been recognized by principals and parents as an excellent educator. Many teachers and principals from other schools visit her classroom to observe and learn from her best teaching practices.

254.      In March 2021, Mrs. Romero and her family were diagnosed with COVID-19 through testing. Now recovered, she has lasting natural immunity and poses no danger to any of her students or colleagues.

255.     Nonetheless, since Mayor de Blasio's announcement, she has been experiencing increasing discrimination due to her decision to opt out of vaccination in consideration of her deeply held religious beliefs and her unwillingness to subject herself to an experimental vaccine.

256.     Nonetheless, teaching is her calling. She loves her students and even though she is experiencing discrimination, loves and respects her colleagues as well. Every morning she looks forward to going to school and inspiring kids to learn and grow.

257.     Mrs. Romero attended the school she now teaches at as a little girl. Her supervisor used to be one of her teachers.

258.     Her presence at the school is vital, and she is a role model and an inspiration to her students. Her students relate to her.

259.     Mrs. Romero understands what the children are going through in a way that many cannot. Her mother, who came to the United States over fifty years ago, still does not speak English. Mrs. Romero had to learn on her own initiative. She shares this with her students and tells them not to give up, that they can achieve their dreams if they just give it their best effort.

260.     When Mrs. Romero sees her students or former students in the hall, they typically

exchange their favorite hello. She says, "Ok! Remember kids, always do your best, and nothing…" and they respond enthusiastically: "Nothing less!" That is her saying: "Do your best, and nothing less. That's all I am asking from you."

261.    Mrs. Romero encourages her students to be excellent at English but to speak their native language too, to never forget where they come from and be proud of their culture and heritage. She is proud of who she is and where she comes from, and she helps the children feel pride in where they come from and who they are as well.

262.    Mrs. Romero is not willing to violate her religious beliefs or to take an experimental vaccine, particularly since she has superior and robust natural immunity.

263.    The children should not have to lose such a special and important teacher.

### Plaintiff 9 – Trinidad Smith

264.    Trinidad Smith ("Mrs. Smith") was adopted from an orphanage in Bogota, Columbia, as a child.

265.    She worked hard, earned a master's degree, and has been teaching with the NYC DOE for almost twenty years.

266.    Currently, Mrs. Smith teaches in District 37, a 99% minority district which focuses on children with serious autism and emotional disturbance.

267.    Mrs. Smith is one of the most senior teachers in her district and is irreplaceable.

268.    Mrs. Smith cannot take the vaccines because she is opposed to them on religious grounds.

269.    She is a devout Catholic. However, after learning about the serious abuses taking place in the Catholic Church, and the associated years of cover-ups and collaboration from leadership, she decided to leave the Church and practice her Catholicism through direct

communion with spirit and God.

270.    Because Mrs. Smith has a personal practice, she does not qualify for exemption under the discriminatory Arbitration Award. But her religious convictions are no less sincere.

### Plaintiff 10 – Amaryllis Ruiz-Toro

271.    Amaryllis Ruiz-Toro ("Mrs. Toro") is an Assistant Principal of Administration at a New York City Public School in Queens.

272.    Mrs. Toro has been educating children for almost two decades. She spent years teaching ELA, and then serving as Dean at the same school in Queens. In September 2019, just before the start of the pandemic, she was promoted to the job of Assistant Principal.

273.    As a Title 1 school, the bulk of the work Mrs. Toro does is to service and support the students, largely from immigrant and lower socio-economic families, both academically and most recently socially and emotionally with internal support systems to address the current traumas that this pandemic has caused for students, families, and staff.

274.    Mrs. Toro is deeply committed to this work. In the days leading up to the first school closures, when masks and PPE were not available, Mrs. Toro did not complain. She worked tirelessly alongside her colleagues, ensuring that her staff was protected even if it meant she had to be without.

275.    She assured the students and parents that whatever happened, she would not abandon them, and that she and the school would do everything in their power to support them.

276.    During the months of largely remote education that followed, Mrs. Toro, who is bilingual, maintained her demanding duties as an Assistant Principal and also supported families as a bilingual person to ensure our Latino families were receiving support and having their needs addressed and heard.

277.    When students returned to school, she personally greeted them each day and made sure to find ways to make them feel safe and supported.

278.    Educating students and caring for her community is everything to Mrs. Toro and she has made a lot of sacrifices to do this work.

279.    After the return, even when the option for remote work was offered, Mrs. Toro elected to be there in the school to help her community. She knew that her physical presence was necessary to support students and staff and help offer a sense of normalcy.

280.    This was a big risk. Her sons and daughter all suffer from chronic asthma. Mrs. Toro reached deep and had to rely on her sincere and powerful faith in God to guide her and her family and keep them safe.

281.    Mrs. Toro worked actively with her principal to ensure that our systems would support all our constituents and were running as smoothly as possible. She initiated and supervised our freshmen advisory program to support the school's youngest members, researched and created SEL activities and strategies that would help the teachers best support the students during their remote learning, and even created a once-a-week mindfulness session for the staff members so that they would find a place of refuge and support.

282.    She made sure that no one was left behind.

283.    Mrs. Toro was tested regularly but never tested positive for COVID-19, though she has had regular exposures to people who had COVID-19 and worked and lived alongside her.

284.    She did not mind testing regularly as she understood it made people feel safe.

285.    However, she cannot take the COVID-19 vaccine.

286.    Mrs. Toro has prayed on this issue and has received clear guidance from prayer

not to take the vaccine. On this basis, she declined vaccination when it was made available.

287.    Subsequently, her physician has also expressed medical concerns.

288.    Mrs. Toro's mother had a serious adverse reaction to the COVID-19 vaccine. Her lower limbs swelled, her legs turned purple, and her feet got so swollen that she could no longer put her foot in a shoe.

289.    She developed daily swelling of her lower limbs which resemble edema as well as severe muscle aches and weakness in her right arm. Though there are periods where it will subside for a while, the pain, swelling, and inflammation have not gone away.

290.    Mrs. Toro's mother is in Puerto Rico now, and her symptoms have not fully subsided. In addition to the swelling and inflammation and pain, she has lost strength in her right arm, which became extremely weak for no apparent reason.

291.    Before the COVID-19 shot, Mrs. Toro's mother walked up to four miles a day and was healthy and strong. She is now in very poor physical condition and suffers from pain and what appears to be permanent disability. Mrs. Toro mother has also developed daily debilitating migraines that have not subsided. A VAERS report was filed, but no action has been taken by any public health official to follow up or to inquire into her symptoms and adverse reaction.

292.    Soon after, Mrs. Toro's aunt had a similar reaction after her second shot. In addition to the swelling and pain, she developed recurring, debilitating nonstop migraines.

293.    Mrs. Toro and her aunt and mother have preexisting sensitivities to a number of ingredients contained in all three of the COVID-19 vaccines.

294.    Mrs. Toro's physician advised that in his professional opinion, it would not be safe for her to take any of these vaccines. This was in line with her religious beliefs as well, and she was able to follow her religious beliefs and the medical advice of her physicians by

submitting to weekly testing, which she did without complaint.

295.    When the testing option was removed, Mrs. Toro returned to her licensed physician, who wrote her a medical exemption.

296.    On Friday, September 17, 2021, she met with her principal (at his request) to discuss the fact that she was filing a religious and medical exemption. He told her that the policy was crafted in such a way that it was simply not possible to get a religious or medical exemption regardless of the sincerity of belief or medical need. He reiterated the DOE's policy for any employee who is refusing to comply with their mandate and asked Mrs. Toro as to whether she would resign or take a leave of absence (unpaid). She explained that she will do neither.

297.    Mrs. Toro is the primary breadwinner in her home. She has a mortgage, three kids under the age of eighteen. All three of her children have serious asthma and require expensive medical plans. Two of her children are in private Christian schools.

298.    Mrs. Toro has spent her career as an educator and is on the path to becoming a principal. She does not know what she will do if she is stripped of the ability to work in schools.

299.    But she cannot violate her religious beliefs or subject herself to severe physical harm.

300.    All plaintiffs have submitted exemptions through the system. May have already gotten the same form letter back, stating that the NYC DOE is not going to accommodate any religious exemptions because it constitutes an "undue hardship" in light of the Vaccine Mandate's requirement that unvaccinated employees cannot enter any school building.

301.    Plaintiffs seek declaratory and injunctive relief on behalf of themselves and all others similarly situated.

302.    All conditions precedent to bringing this lawsuit have been performed, excused,

or waived.

## COUNT I

### VIOLATION OF THE FREE EXERCISE CLAUSE
### OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### AND THE NEW YORK STATE CONSTITUTION

303.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein and further allege:

304.    The Free Exercise Clause of the First Amendment to the United States Constitution (and corresponding provisions in the New York State Constitution), as applied to the states by the Fourteenth Amendment, prohibits the State from abridging plaintiffs' rights to free exercise of religion.

305.    All plaintiffs have sincerely held religious beliefs that compel them to refuse the mandated vaccines.

306.    The Vaccine Mandate, on its face and as applied, targets plaintiffs' sincerely held religious beliefs by prohibiting them from seeking and receiving exemption and accommodation for their sincerely held religious beliefs from their employers, with the employers citing the Vaccine Mandate as the grounds for refusing to even consider exemption requests.

307.    The Vaccine Mandate, on its face and as applied, impermissibly burdens plaintiffs' sincerely held religious beliefs, compels them to abandon their beliefs or violate them under coercion, and forces plaintiffs to choose between their religious convictions and the governments' unconstitutional value judgment that their religious beliefs are of no account and cannot be considered by their employer.

308.    The Vaccine Mandate, on its face and as applied, places plaintiffs in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs.

309.    The Vaccine Mandate, on its face and as applied, puts substantial pressure on plaintiffs to violate their sincerely held religious beliefs or face the loss of their occupations, professional standing, licenses, reputations, and ability to support their families.

310.    The Vaccine Mandate, on its face and as applied, is neither neutral nor generally applicable as it grants the possibility of religious exemptions to those who belong to certain religious organizations but not to those whose religious practices fall outside of those religions. The Vaccine Mandate, on its face and as applied, thus targets plaintiffs' religious beliefs for disparate and discriminatory treatment.

311.    The Vaccine Mandate, on its face and as applied, creates a system of individualized exemptions for preferred exemption requests based on membership in certain approved religious organizations, while discriminating against requests for exemption and accommodation based on sincerely held religious beliefs that fall outside of those belief systems.

312.    There is no legitimate, rational or compelling interest in the Vaccine Mandate's discriminatory application, nor in refusing to allow accommodation or exemption to honor sincerely held religious objections to vaccines, as is offered to all other New York City employees, particularly because: (a) DOE employees of New York City are no more susceptible to contracting and spreading COVID-19 than New York City employees working in law enforcement, fire management, sanitation or any of the other myriad jobs that the city still allows religious exemptions for; (b) available vaccines cannot stop transmission, so the vaccinated are just as capable of spreading disease as the unvaccinated; (c) naturally immune persons who have recovered from COVID have superior immunity to those who are vaccinated; (d) vaccinating naturally immune people puts them at increased risk of adverse reaction to the vaccine.

313.    The Vaccine Mandate is not the least restrictive means of achieving an otherwise permissible government interest, which could be achieved by other protective measures employed for the last year and a half.

314.    The Vaccine Mandate, on its face and as applied, has caused, is causing and will continue to cause irreparable harm and actual undue hardship to Plaintiffs from the violation of their sincerely held religious beliefs and the occupational, professional, social, and economic consequences pleaded above.

315.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

316.    WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that the Vaccine Mandate violates the First Amendment Rights of Plaintiffs and all others similarly situated, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just

## COUNT II

## VIOLATION OF SUBSTANTIVE DUE PROCESS

317.    Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

318.    Plaintiffs have a protected substantive due process right to life, and to protect their own life and health, secured by the Due Process Clause of the United States Constitution (and corresponding provisions of the New York Constitution), which includes the right to refuse non-consensual administration of any objectionable medical product, and/or to be free from the forced or coerced administration of medical products that they reasonably believe may cause them harm.

319.    A broad medical exemption is a constitutional prerequisite to any valid vaccine mandate. Defendants have violated plaintiffs' fundamental right to a medical exemption, both

facially and as applied, by creating and implementing a vaccine mandate that does not have a medical exemption at all. To the extent that the Arbitration Award creates a medical exemption at all, which is disputed as it is so narrow as to constructively exclude most people who need protection, defendants are facially violating plaintiffs fundamental right to a *sufficient* medical exemption. This requires that the exemption be broad enough to apply to *anyone* who *may* be at risk of harm, and that the state cannot substantively review exemptions written by licensed physicians nor can the state condition acceptance of the exemption on state or third-party review.

320.    As well, or in the alternative, plaintiffs have protected liberty interests, secured by the Due Process Clause of the United States Constitution and corresponding provisions in the New York State Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States and New York, to be free from burdens on rights deemed "fundamental" in nature.

321.    The Vaccine Mandate violates several fundamental rights, including but not limited to the right to be free from forced medical interventions (also referred to as the right to "informed consent" or the right to "bodily integrity").

322.    This right is not only acknowledged as a fundamental right pursuant to United States Supreme Court jurisprudence but is also recognized as a *jus cogens* norm under the laws of nations.

323.    Considering the serious rights at stake, and the dearth of evidence to show this policy is necessary or effective in light of the fact that the vaccinated can transmit disease and have inferior immunity to those who have caught the disease, there is no rational reason to mandate vaccines for school employees. Given that the vaccines are still experimental, this mandate shocks the conscience.

324.    The Vaccine Mandate is not narrowly tailored to impose the least restrictive burdens on fundamental rights. Rather, it is intentionally tailored to create an outsized burden in order to coerce participation in experimental medicine for no apparent reason.

325.    Plaintiffs have no adequate remedy at law available against defendants for the injuries and the irreparable harm they imminently suffer as a direct result of the Vaccine Mandate.

326.    WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that Defendants' Mask Mandate violates plaintiffs' substantive Due Process rights, for an injunction prohibiting enforcement of the Mask Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT III

### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND THE NEW YORK STATE CONSTITUTION

327.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

328.    By their actions, as described herein, defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected plaintiffs to the deprivation of the rights, privileges, or immunities secured by the United States Constitution and New York Constitution.

329.    The Vaccine Mandate violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and corresponding provision of the New York State Constitution) because it discriminates against unvaccinated people.

330.    There is no rational basis for such a distinction. Plaintiffs pose no more danger to others than a person who is participating in the trials for the experimental vaccines. The CDC acknowledges that vaccinated individuals are just as infectious as unvaccinated for SARS-CoV-2.

331.    The policy of discriminating based on an individual's willingness or ability to subject themselves to medical experimentation shocks the conscience and cannot be justified as relating to any rational permissible goal. It is not grounded in science, but rather in the effort to coerce people into waiving their right to freely opt out of medical experimentation.

332.    Plaintiffs face the loss of their employment, ability to practice their vocation, contractual rights and violation of civil rights and liberties as a result of the discriminatory regulation.

333.    The acts or omissions of defendants were conducted within the scope of their official duties and employment under color of law.

334.    While performing those duties, Defendant intentionally deprived plaintiffs of securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the State of New York by arbitrarily discriminating against them based on medical status, religious beliefs, and creed.

335.    WHEREFORE, Plaintiff respectfully requests that the Court enter a declaratory judgment that the Vaccine Mandate violates plaintiffs' Equal Protection rights, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT III

### VIOLATION OF THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION
### Violation of Title VII of the Civil Rights Act

336.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein and further allege as follows.

337.    The Vaccine Mandate violates Title VII of the Civil Rights Act of 1964 ("Title

VII").

338.    First, facially, and as applied, the Vaccine Mandate violates Title VII by prohibiting employers in the NYC DOE from providing reasonable religious exemptions to employees with sincerely held religious beliefs opposing receipt of a COVID-19 vaccine.

339.    Second, as modified by the Arbitration Award, the Vaccine Mandate requires employers to discriminate against those with religious beliefs that are not deemed "established" or "recognized" or which are personal in nature and not held by the mainstream.

340.    Third, the Vaccine Mandate requires employers to segregate and discriminate against employees whose reasonable religious accommodations are accepted, prohibiting these employees from entering any building, even though they pose no direct threat to anyone around them.

341.    All of plaintiffs' employers have 15 or more employees, are funded by the state and federal governments, are state actors and are subject to the requirements of Title VII.

342.    The Vaccine Mandate thus requires actions that federal law forbids, which renders the Vaccine Mandate null and void. *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 486 (2013).

343.    State laws that violate federal laws are preempted by the Supremacy Clause of the United States Constitution. The Supremacy Clause provides:

> **This Constitution, and the Laws of the United States** which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, **shall be the supreme Law of the Land**; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. U.S. Const. Art. VI, cl. 22 (emphasis added).

344.    By attempting to preclude application of Title VII to NYC DOE in the case of COVID vaccination, the Vaccine Mandate patently violates the Supremacy Clause.

345.    In particular, the Vaccine Mandate purports to negate Title VII's requirement that

employers provide reasonable accommodations to individuals with sincerely held religious beliefs, and even flatly prohibits religious exemption or accommodation requests, as the employers noted above have indicated.

346.    By purporting to place themselves and their mandate outside the protections of both Title VII and the First Amendment, Defendants have violated the basic constitutional principle that "federal law is as much the law of the several States as are the laws passed by their legislatures." *Haywood v. Drown*, 556 U.S. 729, 734 (2009) (emphasis added).

347.    The Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to plaintiffs from violation of their sincerely held religious beliefs and the occupational, professional, social and economic consequences pleaded above.

348.    Plaintiffs have no adequate remedy at law for the continuing deprivation of their statutory rights under Title VII as secured by the Supremacy Clause.

349.    WHEREFORE, Plaintiffs respectfully requests that the Court enter a declaratory judgment that the Vaccine Mandate violates and is preempted by the Title VII of the Civil Rights Act of 1964, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT IV

### VIOLATION OF THE SUPREMACY CLAUSE OF
### THE UNITED STATES CONSTITUTION
### Violations of Federal Statutory Provisions Governing EUA products

350.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein and further allege:

Complaint for Declaratory and Injunctive Relief

351.    Federal laws and regulations governing the approval and administration of medical products preempt all contrary or inconsistent laws of the States and/or local governments.

352.    The Vaccine Mandate is patently contrary to United States law, and thus preempted and invalid.

353.    Title 21 United States Code, Section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product. . .."

354.    Because all available vaccines in New York are each investigational products, only permitted for use under an Emergency Use Authorization, the laws and regulations of the United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including Plaintiffs.

355.    Plaintiffs do not consent to being vaccinated with an experimental vaccine.

356.    As well, Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

357.    21 C.F.R. § 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

358.    EUA vaccines and the licensed Comirnaty vaccine are all still being subjected to clinical trials. Population wide surveillance and data is still being gathered for all of them whether

they consent or not. Whether licensed or not, all available COVID-19 vaccines are classified as experimental medicine.

359.    None of the exemptions provided in sections 50.23 and 50.24 apply to Plaintiffs. They are competent to make a decision concerning medical treatment and experimentation.

360.    Accordingly, the Vaccine Mandate also violates federal law and regulations governing the administration of experimental medicine and is thus preempted.

361.    Plaintiffs have no adequate remedy at law available against Defendants for the injuries and the irreparable harms they are suffering as a direct result of the Mandate.

362.    WHEREFORE, Plaintiffs respectfully requests that the Court enter a declaratory judgment that the Vaccine Mandate violates and is preempted by the laws and regulations of the United States governing the administration of investigational medical products, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

363.    Both the Fourteenth Amendment and

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all matters so triable.

DATED this 21st day of September 2021.

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson,**
*Attorney for Plaintiff*
Gibson Law Firm, PLLC
408 West State Street/MLK Blvd
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

Complaint for Declaratory and Injunctive Relief