**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

Kate, et al.

         Plaintiffs,

         vs.

de Blasio, et al.               CIVIL ACTION NO. 1:21-CV-07863

         Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

DATED this 4th day of October 2021.

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson,**
*Attorney for Plaintiffs*
Gibson Law Firm, PLLC
408 W Martin Luther King, Jr. St.
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ..........................................................................................................1

BACKGROUND FACTS ................................................................................................1

STANDARD OF REVIEW ............................................................................................13

ARGUMENT .................................................................................................................13

     I.    PLAINTIFFS ARE LIKELY TO PREVAIL...........................................13

          *a.  Plaintiffs Will Likely Prevail on their First Amendment Claims* ..14

          *b.  Plaintiffs are Likely to Succeed on their Substantive*
             *Due Process Challenge*..................................................................20

          *c.  The Vaccine Mandate is not narrowly tailored to achieve a compelling*
             *government interest, nor is it even rationally related to that goal* ....
             ...................................................................................................*24*

     II.  PLAINTIFFS ARE SUFFERING IRREPARABLE HARM ...................24

     III. THE BALANCE OF EQUITIES IS IN PLAINTIFFS' FAVOR.............24

CONCLUSION................................................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**                                                                              **Page**

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d. Cir. 2020).....................................................................13,15,16

*Am. Civil Liberties Union v. Clapper*,
    804 F.3d 617 (2d Cir. 2015)....................................................................24

*Ayotte v. Planned Parenthood of N. New England*,
    546 U.S. 320 (2006).................................................................................21

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993).............................................................................17, 23

*Cruzan v. Director, DMH*,
    497 U.S. 261 (1990)................................................................................23

*Doe v. Bolton*,
    410 U.S. 179 (1973) ..............................................................................20,

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................24

*Everson v. Board of Educ. Of Ewing*,
    330 U.S. 1 (1947)...................................................................................19

*Fulton v. City of Philadelphia, Pennsylvania*
    141 S. Ct. 1868......................................................................................19

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)...............................................................................23

*Harvest Rock Church, Inc. v. Newsom*,
    141 S. Ct 889 (2020) .............................................................................15

*Jacobson v. Massachusetts*,
    197 U.S.11 (1905)...........................................................................14, 15, 20

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ...............................................................19, 24

*Masterpiece Cakeshop, Ltd. V. Colorado C.R. Comm'n*
    138 S. Ct. 1719 (2018)........................................................................17,18

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020)............................................................14,15,23,24

*School District of the City of Grand Rapids v. Ball,*
    473 U.S. 373 (1985)..................................................................20

*Sherr v. Northport-East Northport U. Free,*
    672 F. Supp. 81 (E.D.N.Y. 1987) ...............................................16, 19

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.,*
    190 F.Supp.2d 577 (S.D.N.Y. 2002) ...........................................13

*S. Bay United Pentecostal Church v. Newsom,*
    141 S. Ct. 716 (2021)...............................................................23

*Tandom v. Newsom,*
    141 S. Ct. 1294 (2021).........................................................15,22,23

*Tinker v. Des Moines Independent Community School Dist.,*
    393 U.S. 503 (1969)...................................................................1

*We the Patriots v. Hochul,*
    Civil Case No. 21-2179 (doc 65) .................................................14

**Statute**                                                                **Page**

Federal Rules of Civil Procedure, Rule 65(a)....................................13

Federal Rules of Civil Procedure, Rule 65(b)....................................13

U.S.C.A. Const. Amend. 1..........................................................15

"It can hardly be argued that either students or teachers shed their constitutional rights …at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969).

## INTRODUCTION

Plaintiffs seek a temporary restraining order ("TRO") and preliminary injunction pursuant to Fed. R. Civ. Pro. 65(a) to enjoin Defendants from enforcing a policy requiring all New York City public school teachers and staff to be vaccinated for COVID-19 with no option for testing or reasonable accommodations for medical or religious reasons. Plaintiffs seek injunctive relief to maintain the *status quo*. Without relief, 15,000 teachers and staff will be suspended or terminated and barred from doing their jobs today, on Monday, October 4, 2021. This policy is reckless, senseless, and not only violates the fundamental rights of thousands of New Yorkers but will also put over 1 million New York City public school children at risk of imminent harm. In a similar case, the Second Circuit Court of Appeals issued preliminary injunctive relief on September 30, 2021, to protect religious exemptions for healthcare workers in New York State, indicating likelihood of success. Ex. 1. The same relief should be issued here.

## BACKGROUND FACTS

On July 26, 2021, Mayor Bill de Blasio ("Mayor de Blasio") announced that New York City ("NYC") would require all municipal workers to be vaccinated against COVID-19 by September 13, 2021, the same day the public schools would open. The order gives employees the option to test weekly in lieu of vaccination.

However, three weeks before school opened, after consulting with the incoming Governor, the mayor announced a new mandate, just for DOE employees with no testing and no religious or medical exemption option. Ex. 2 (the "DOE Vaccine Mandate"). Two days later, Governor Hochul announced that the state would also remove the religious exemption for healthcare workers statewide ("State Vaccine Mandate").

1

At the time, the Mayor and the Governor had been meeting regularly to coordinate efforts. On August 24, 2021, the same day that the DOE Vaccine Mandate was issued and Governor Hochul sworn in, *Spectrum News* reported: "[b]eyond the Hochul family, there was likely no one happier about the Gov. Kathy Hochul's rise to power than de Blasio…'She and I have already started speaking regularly,' de Blasio said. 'We're going to keep it that way and do a lot of good work for the people of this city and this state." Ex. 3.

Governor Hochul defines vaccines as a religious issue and essentially declared a crusade against people who have religious beliefs against vaccination, or as she puts it people "who aren't listening to God and what God wants."

The *New York Times* reported on the infamous speech last week as follows:

> On Sunday at the Christian Cultural Center in Brooklyn, Gov. Kathy Hochul pushed back hard against the idea of religious exemptions to vaccination, urging worshipers to be "apostles" for the vaccine in order to "keep more people alive."

> "God did answer our prayers," she told the congregation. "He made the smartest men and women — the scientists, the doctors, the researchers — he made them come up with a vaccine. That is from God to us and we must say, 'Thank you, God, thank you!'"

> **"There are a lot of people out there who aren't listening to God and what God wants," she said as a gold necklace spelling "Vaxed" glinted from her chest**.[1]

Both mandates were immediately beset by legal challenges. One major issue was the lack of religious exemption in either. In an interview with NPR on September 15, 2021, Governor Hochul stated that religious exemptions are not a "legitimate" excuse to avoid COVID-19 vaccines and bragged that her health department "deliberately excluded religious exemptions from the mandate":

> Hochul said her health department deliberately excluded religious exemptions from the mandate, which requires all health care workers to be vaccinated by September 27. She

---

[1] Ex. 4

said while the state's attorneys will be arguing the case in court on September 28, her personal opinion is that a religious exemption is not a legitimate excuse. "I'm not aware of a **sanctioned** religious exemption from any organized religion, in fact they are encouraging the opposite," Hochul said. "Everybody from the Pope on down is encouraging people to get vaccinated."[2]

While Pope Francis and many Catholics take the religious view that vaccination is justified even though these vaccines all use aborted fetal cells in their production or development,[3] many other Catholic people do not agree. Governor Hochul's hostility towards those with religious beliefs different from her own is open and extreme.

Mayor de Blasio, though perhaps not sermonizing as openly as the Governor, often makes similar derogatory statements to the media about the invalidity of religious beliefs against vaccination. He has frequently decreed that the City will only accept religious exemptions from those who follow one of two faiths that he has sanctioned as "legitimate" sources of objection to vaccines: Christian Science, and Jehovah's Witnesses. *See, e.g.,* Ex. 6 and Ex. 7.

After unsuccessful and reportedly insulting failed attempts to negotiate reasonable religious and other accommodations with the mayor, the unions unanimously rose against the DOE Vaccine Mandate. The New York City Municipal Labor Committee ("MLC"), a coalition of unions representing over 390,000 workers in New York City, along with the leaders of fifteen other prominent unions filed a lawsuit in state court and won a temporary restraining order ("TRO"). Ex. 8 ("MLC lawsuit"). The MLC lawsuit challenges the mandate broadly – arguing that the DOE mandate violates bodily integrity along with the collective bargaining rights of its members. Another suit in the Eastern District of New York also challenged the mandate broadly, as a violation of the fundamental right to practice one's profession. On September 24, 2021, the Second Circuit briefly issued a stay, but it was dissolved the next day.

---

[2] Ex. 5
[3] *Dr. Bhattacharya Decl.* pp 58-59.

Meanwhile, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") and several other unions representing DOE employees entered arbitration with the DOE before Martin F. Scheinman, Esq. ("Arbitrator Scheinman"). Arbitrator Scheinman has done substantial fundraising for Mayor de Blasio, leading to allegations of conflict of interest and the perception of impropriety. *See, e.g.,* Ex. 9 and Ex. 10.

Though the media widely reported that the mayor was "forced" to add religious and medical accommodations to the DOE Vaccine Mandate, Arbitrator Scheinman's award defines these exemptions so narrowly, and provides so many roadblocks to fair evaluation, that they appear to be pretextual and mainly issued for cover against the pending lawsuits.

The UFT Arbitration Award was issued September 10, 2021. Ex.11 ("UFT Award"). Several other unions also received the same or substantially the same award within the next two weeks from Scheinman Arbitration Services (collectively "Arbitration Awards"). On the unexamined assumption that adequate religious and medical exemptions were now available, the state court dissolved the TRO in the MLC lawsuit. Unfortunately, what was not before the state court was the fact that the criteria and process set forth in the Arbitration Awards is discriminatory, and wholly inadequate to meet basic constitutional standards. This suit is focused on those issues.

### The Religious Exemption Provided is Blatantly Discriminatory

The Arbitration Award blatantly discriminates between religions and excludes personally held religious beliefs or beliefs that allegedly conflict with mainstream religious dogma. To be considered, religious exemption requests must be "documented in writing" by a religious official (i.e. clergy)" and "shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, or where the documentation is readily available (e.g., from an online source), or where the objection is personal, political or philosophical in nature." Further,

"Exemption requests shall [only] be considered for recognized and established religious organizations (e.g., Christian Scientists)." Ex. 11.

Mayor de Blasio repeatedly bragged to the media the City would openly discriminate between religions, and that they only planned to grant exemptions to those who belong to one of two state-preferred religions: Christian Science or Jehovah's Witnesses. *See, e.g.,* Ex. 7 *Gothamist* article September 24, 2021: "De Blasio has said that the religious exemptions would also be limited to two well established religions, Christian Science and Jehovah's Witnesses...the mayor warned those exemptions would be rare;" *See, also* Ex. 6, *New York Post* article September 23, 2021: "De Blasio said Thursday that only Christian Scientists and Jehovah's Witnesses have any prayer for a religious exemption."

True to form, in what only can be characterized as "heretic tribunals", the Arbitrators and DOE employees have been aggressively questioning the validity of religious beliefs that conflict with the state's view of what valid Catholic or other "sanctioned" beliefs require. Declarations from dozens of DOE employees are attached and incorporated into these moving papers describing a pattern and practice of unconstitutional questioning and harassment.

As one of countless examples, Plaintiff Kane appeared via zoom to defend his denied exemption on October 1, 2021. He was raised in both Catholicism and Buddhism. But his relationship with God and his religious beliefs are personal in nature. He follows the teachings of Buddha and Christ as his foundational spiritual guides, along with daily prayer, attention to scripture and reliance on guidance from the Holy Spirit. The DOE attorney stated that the City did not challenge Mr. Kane's sincerity but asserted in closing arguments only one argument: that Mr. Kane should be denied an exemption because "the Pope" and the "the Dalai Lama" got vaccinated. What that has to do with Mr. Kane's religious objections to vaccination is still unclear. *See,* Kane

<u>Decl.</u> Further, the DOE believes Mr. Kane cannot prevail without a letter from a clergy member certifying he needs an exemption. Mr. Kane noted for the record that he objects to that requirement as unconstitutional, and against his faith, which is not based on the affirmations of any particular "clergy" member. *Id.*

Similarly, when Plaintiff Chu appeared for her zoom appeal, Arbitrator Barry Peek aggressively stated that Ms. Chu would be denied because she is Catholic, and the Pope was vaccinated. Ms. Chu explained that her relationship as a Catholic is first and foremost with God, not the Pope or the Vatican. She pointed out that man is fallible, and religious leaders, even in her Catholic faith have acted against God's will many times. Therefore, her responsibility is to follow the guidance that comes from the Holy Spirit and her own moral conscience. This is a central tenet of Catholicism. *See* Ex. 12, Catechism of the Catholic Church - PART 3 SECTION 1 CHAPTER 1 ARTICLE 6 (e.g., I. 1777): "Moral conscience, present at the heart of the person, enjoins him at the appropriate moment to do good and to avoid evil. It also judges particular choices, approving those that are good and denouncing those that are evil. It bears witness to the authority of truth in reference to the supreme Good to which the human person is drawn, and it welcomes the commandments. When he listens to his conscience, the prudent man can hear God speaking." Arbitrator Peek refused to accept this, stating that he is not Catholic, but he will rely on the Pope over lay people's interpretation of what God or Catholicism requires. Ms. Chu notes that she felt like a Salem witch, cross-examined nonsensically about the validity of her faith, "burned, accused and guilty before trial." The DOE attorney affirmed Arbitrator Peek's assertions and argued that Ms. Chu should be denied for holding beliefs that in their opinion conflict with mainstream doctrine. *See,* <u>Chu Decl.</u>

### *The Process Afforded is Inadequate and Arbitrary*

In addition to being discriminatory, the process afforded was unreasonable and arbitrarily applied. Employees were given insufficient time to gather all the certifications, baptismal records and other onerous documented required. Unqualified staff then had to sort through over thirty thousand exemption requests within three business days (one day for some union members). Upon information and belief, everyone was summarily denied by an automated system with the same autogenerated message stating that it would be an "undue hardship" to grant any exemptions given that the Vaccine Mandate would still not allow accepted employees to enter any school building.

No specifics were provided about any other basis for denial sufficient to prepare for an appeal. Appeal letters and "additional documentation" was due within one day of denial.

Many employees then received summary denials with no explanation and no opportunity for a hearing. Robert Dillon's attached declaration reveals that in some cases, no one even read the supplemental materials before issuing a summary denial of appeal and hearing. Mr. Dillon was denied based on "undue hardship" to be able to accommodate him working remotely. But he has been working remotely for a year and a half, and, as he works in tech, can easily continue to do so now. His principal attached a letter affirming that Mr. Dillon could easily be remote and noting the impact it would have on the school to lose Mr. Dillon. No explanation was provided for why he was not accommodated. *See,* Dillon Decl. For those that had a zoom appeal, most were sent the same summary denial with no explanation. Inexplicably though, a few people with identical religious exemptions were granted sometimes by the same arbitrators. The process was arbitrary and Plaintiffs and thousands of other DOE employees felt violated and disrespected.

Many of the Plaintiffs were scheduled for zoom appeal hearings Friday. They still have not been notified whether they will be accepted or denied ultimately, but in some ways it matters little. The mandate still will prohibit them from entering any school building in New York City whether

they are accepted, denied or pending beginning today, October 4, 2021, unless vaccinated.[4]

### *The Medical Exemption Provided is so Narrow it Shocks the Conscience*

The medical exemption policy is simply inhuman. Rather than issue a broad exemption, as should be afforded with a vaccine that is still undergoing safety trials, or an exemption that is at least as broad as the New York State Public Health Law affords for well-tested vaccines (requiring exemption from vaccine requirements if "any state licensed physician" certifies a person is at risk of harm), the Arbitration Award only allows exemptions for certified contraindications from the CDC. These are limited, as contraindications are meant to define the known circumstances where a person could *never* get vaccinated. ACIP has clarified that they do not define medical exemptions and providers may need to consider additional information to determine if a person might be at risk of serious harm.

As applied, the DOE Mandate indicates that the City is unlikely to accept a medical exemption unless a person suffered anaphylactic shock and was intubated during the observation period after a shot. Even then, they might still need to suffer the same fate with each other available vaccine before they are exempt. For the two Plaintiffs with medical exemptions in this case, the DOE did not even bother to respond to the request or provide sufficient detail on how to submit it.

This is still an experimental vaccine program, rushed to market in eight months, rather than the normal twelve to fifteen years it takes to assess safety and efficacy properly. It has not been in existence long enough to understand the long-term consequences, and rigorous studies have not even commenced yet to try to understand the effects of the vaccine or boosters on subpopulations or persons with underlying specific conditions.

Even for well-established vaccines, hundreds of additional known risk factors, adverse

---

[4] Original deadline of September 27, 2021, extended as a result of a state and federal court TRO

reactions, and potential reasons to need a medical exemption exist, as documented in package inserts, Institutes of Medicine Reports and table injuries routinely compensated by the Vaccine Injury Compensation Program. <u>Complaint</u> pp 11-17. This narrow medical policy puts vulnerable people whose doctors believe are at risk in an extremely dangerous position.

> ### *Plaintiffs do not pose a direct threat on the basis of their vaccine status*

This is not necessary. There is no reason why these teachers, who were in the school buildings for the last month and over the course of the last year and a half, are now suddenly unsafe to those around them.

Attached and incorporated into these motion papers are declarations written by highly regarded public health experts, Dr. Jayanta Bhattacharya, M.D., PhD, and Dr. Marty Makary, M.D., M.P.H. Each is prepared to give expert testimony in a preliminary injunction hearing, and each concludes that Plaintiffs pose no significant risk to students or co-workers because of their vaccine status. Neither has received any compensation from Plaintiffs or anyone associated with Plaintiffs. Neither is anti-vaccine by any stretch of the term.

Dr. Makary is a professor of public health and surgery at John's Hopkins University, has served in leadership at the World Health Organization, is the editor-in-chief of the second largest medical trade publication in the country and has published over 250 articles. He says, "Those who choose to get vaccinated may be making a poor health decision at their own risk, however they are unlikely to pose a public health threat to those around them in a school setting." *Decl. Dr. Makary* ¶8.

Dr. Bhattacharya, Professor of Health Policy at Stanford University, who has published over 135 peer-reviewed articles in scientific and medical journals, and whose research has been cited over 1100 times in other peer-reviewed publications, concludes the same: *See, e.g., Decl. Dr.*

*Bhattacharya* ¶43 – *"Can the DOE keep its employees and students safe if it does not mandate that all its employees be vaccinated? The answer is a definitive yes".*

As Dr. Bhattacharya and Dr. Makary discuss in more detail in their declarations, the non-sterilizing vaccines currently available against COVID-19 are for personal protection, and will not meaningfully mitigate the spread of COVID-19 through the population.

This is not a controversial point. On August 5th, the Director of the CDC Rochelle Walensky ("Dr. Walensky") went on national television to clarify that emerging data has shown, beyond reasonable doubt, that although the COVID-19 vaccines are good at preventing serious symptoms in individuals who are vaccinated, they cannot prevent infection and transmission to others, especially now that the delta variant dominates. Specifically, when asked if asymptomatic vaccinated people pass on disease, Dr. Walensky said:

> So, yes, they can with the delta variant. And that was the reason that we changed our guidance last Tuesday. Our vaccines are working exceptionally well. They continue to work well with delta with regard to severe illness and death. They prevent it. **But what they can't do anymore is prevent transmission.** So if you are going home to somebody who has not been vaccinated to somebody who can't get vaccinated, somebody who might be immunosuppressed or a little bit frail, somebody who has comorbidities that put them at high risk, I would suggest you wear a mask in public indoor settings.[5]

While there may be some differences in recorded infection rates, it is not clear that any such data are reliable or meaningful. The CDC made the surprising decision to stop tracking so called "breakthrough infections" in May. Policies were then adopted under which the unvaccinated were tested far more frequently than vaccinated, leading to unreliable statistics on the percentage of infection based on vaccine rate. Moreover, the delta variant is far more likely to infect

---

[5] *See,* Ex. 9 - Transcript.

vaccinated people than previous variants, which existing data is largely based on. And vaccination doesn't generate robust immunity in those with underlying conditions, and it is shown to wane in effectiveness (particularly against mild infection) within a few weeks or months. On the other hand, those with natural immunity are well-protected from both symptomatic disease and transmission. Vaccine status is not a good predictor of infectiousness.

Both experts highly recommend vaccination as a tool to mitigate severe disease in those who but acknowledge that the facts do not justify excluding people with religious or medical need for accommodation from school buildings. This is particularly true for those who have had COVID-19 and recovered.

If schools believe that it is necessary to employ a mitigation strategy, Dr. Bhattacharya recommends daily temperature screens and testing, though he suggests that if testing is employed, that all employees get tested, as vaccinated people can also become infected and transmit covid. Reliable rapid antigen testing is now available that could simplify the process during critical times when infection rates are high and would do a far better job of safeguarding the community, especially if applied to both vaccinated and unvaccinated employees.

### *If a TRO is not granted today, over a million New York City children will suffer serious harm.*

The Second Circuit's TRO in the broad challenge to the mandate pushed back the effective date of the policy. However, that option now exhausted after an unsuccessful appeal for emergency relief to the Supreme Court, the deadline is upon us.

Effective today, Plaintiffs and 15,000 other DOE employees are expected to be excluded from the school buildings where they work. The impacts of this mass termination event is unimaginable, especially on the vulnerable children in the New York City school district. Attached declarations describe the intense pain that these educators feel, knowing that their students will be deprived of desperately needed (and legally required) services, along with their essential, dedicated, and much-beloved teachers. Already, the crisis has become evidence. Schools are reporting that they will be closing down entire programs schoolwide, even core subjects like math or science. Students will be shipped around to whatever untrained and unlicensed emergency "staff" the district can get to come in. There will not be any hot lunch (for some of these children, the school lunch is their only hot meal of the day). It is an absolute crisis in the making.

The teachers are worried about their own lives too. Many have spent their entire careers teaching in the NYC public schools. It breaks their hearts to leave their students and their careers so senselessly. It will also upend their security. Underpaid and living month to month by and large, few can survive leave without pay for any length of time. They are worried about losing their homes, their ability to support their families, and their careers, as they will continue to be barred from practicing their profession unless they violate their religious beliefs.

This policy is nothing short of reckless and there is no reason to abuse students and staff in this manner. To maintain the *status quo* and avoid this preventable crisis, Plaintiffs ask for a stay pending a hearing. They have been there for the last year and a half unvaccinated, a few more

weeks to ensure a measured and fair decision will not hurt anyone. Though there haven't been any major outbreaks, save at one school, where upon information and belief all of the infected teachers were fully vaccinated, the DOE could readily implement the weekly testing option pending the hearing to alleviate any fears.

## STANDARD OF REVIEW

Plaintiffs seek a TRO and preliminary injunction pursuant to Fed. R. Civ. Pro. 65.

Rule 65(a) governs preliminary injunctions. "When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d. Cir. 2020).

Rule 65(b) of the Federal Rules of Civil Procedure governs temporary restraining orders. "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *Spencer Trask Software & Info. Servs., LLC v. R. Post Int'l Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y. 2002). Due to the urgent and imminent nature of the relief, Plaintiffs cannot wait for an answer from Defendants about whether they consent to a TRO but have emailed courtesy copies of these papers immediately upon filing to counsel. Plaintiffs meet the standard and should be awarded a TRO for the reasons set forth below.

## ARGUMENT

## I.   AS EVIDENCED BY THE INJUNCTIVE RELIEF GRANTED BY THE SECOND CIRCUIT IN THE HEALTHCARE WORKERS MANDATE LAST WEEK, PLAINTIFFS ARE LIKELY TO SUCCEED.

Plaintiffs allege that the Vaccine Mandate unconstitutionally discriminates against them on the basis of their religious beliefs and medical needs. Reasonable religious and medical

accommodations are a constitutional prerequisite to any valid mandate. The DOE mandate fails facially and as applied. Facially, the Vaccine Mandate intentionally declines to offer exemptions. As applied through the UFT Arbitration, the exceptions "offered" are discriminatory and far too narrow to survive strict scrutiny review or even rational basis review.

### A.  Plaintiffs Will Likely Prevail on their First Amendment Claims

The First Amendment, applicable to states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S.C.A. Const. Amend. 1. These opening words to the Bill of Rights set forth a dual guarantee of religious liberty: the Establishment Clause and the Free Exercise Clause. The challenged mandate violates both clauses (facially and as applied).

### The Supreme Court Recently Clarified that there is no "Public Health Exception" to enforcing religious rights.

Plaintiffs have a good chance of succeeding on the merits of their free exercise claim. On September 30, 2021, the Second Circuit Court of Appeals issued a preliminary injunction to a substantially similar challenge against a New York State healthcare workers vaccine mandate. Citing the Supreme Court's decision in *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), the Second Circuit affirmed that the Plaintiffs were likely to succeed by issuing an injunction pending resolution of appeal enjoining enforcement "against persons claiming religious exemptions." *We the Patriots v. Hochul*, Civil Case No. 21-2179 (doc 65) (Ex. 1). There is no reason why the teachers should not get similar relief.

The Second Circuit's injunction is well supported by recent Supreme Court decisions affirming the importance of constitutional rights, particularly religious rights, even during a pandemic.

Previously, many circuit courts applied *Jacobson v. Massachusetts*, 197 U.S.11 (1905) to

14

avoid strict scrutiny of public health initiatives that burden fundamental rights. In *Roman Cath. Diocese*, the Supreme Court rejected this logic, holding that the Constitution must still be upheld even during a public health emergency, and that strict scrutiny requires that public health measures be narrowly tailored to avoid unnecessary infringement on important religious and constitutional rights and must employ the least restrictive measure to achieve a permissible goal in light of the important interests at stake. 141 S. Ct. at 67.

In the months since t *Roman Cath. Diocese* was decided, the Supreme Court has repeatedly emphasized the importance of this holding. *See, e.g., Tandom v. Newsom*, 141 S. Ct. 1294, 1296-97 (2021); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct 889 (2020) (granting certiorari and adopting *Roman Cath. Diocese v. Cuomo* holding as its decision.)

Before *Roman Cath. Diocese,* the Second Circuit followed the deference standard in matters of public health and generally avoided strict scrutiny even when fundamental rights were infringed. But in *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020), the Second Circuit applied the new standard set forth in *Roman Cath. Diocese,* and held that reliance on *Jacobson* to avoid strict scrutiny or exercise excessive deference is "misplaced": "[t]he district courts, the motions panel of this Court, and the Governor relied on *Jacobson* as support for the notion that courts should defer to the executive in the face of the COVID-19 pandemic. But this reliance on *Jacobson* was misplaced." Henceforth "courts must resume applying the Free Exercise Clause" even in cases of public health emergencies. *Id.* at 635 (quoting *Roman Cath. Diocese*, 141 S. Ct. at 70 (Gorsuch, J. concurring).

### *Plaintiffs Are Likely to Succeed on their Free Exercise Claims*

Plaintiffs should prevail on their free exercise claims for the same reason the healthcare workers were granted injunctive relief. Their religious rights are directly burdened by an openly hostile mandate, and there is insufficient justification and tailoring for that burden.

A substantially similar case to this already came before the federal courts of New York with dramatic results several decades ago. In *Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81 (E.D.N.Y. 1987), the Eastern District of New York held that the limitation of religious exemption to New York's school vaccine mandate to "bona fide members of a recognized religious organization" violated both the establishment and free exercise clauses of First Amendment and must be expanded to exempt all persons who sincerely held religious beliefs that prohibited inoculation of their children. The Court also held that certification requirements from clergy were unlawful. As a result, New York State rewrote their religious exemption statute to state that anyone "with sincerely held religious beliefs against vaccination" was exempt and no certification was required. *Sherr* firmly prohibits the discrimination as applied through administration of the Arbitration Award. But the lack of a religious exemption also renders the entire DOE Vaccine Mandate unconstitutional.

The Free Exercise Clause protects both an individual's private right to religious belief and "the performance of (or abstention from) physical acts that constitute the free exercise of religion." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620,631 (2d Cir. 2020) (citations omitted). There is an exception from strict scrutiny analysis of certain free exercise claims against indirect burdens caused by "neutral laws of general applicability." Official action "burdening religious conduct that is *not* both neutral and generally applicable, however, is subject to strict scrutiny." *Id*.

The DOE Vaccine Mandate is not a neutral law. The subject of vaccination itself is too entwined with religious beliefs to classify vaccine mandates as "indirect burdens" on religious

16

beliefs. Since vaccines were invented, they have existed alongside a strong and vocal portion of the public, coming from a myriad of religions, who assert that vaccination with some or all vaccines violates their sacred religious beliefs. An illustrative parallel could be imagined in the case of abortion. Abortion, like vaccination, can be a secular decision but it is also historically enmeshed with religious concerns for many. If the state were to declare, like some countries have, that for the public good women are required to have an abortion in service of a facially neutral goal of population control, it would clearly violate the free exercise rights of religious objectors not to offer a religious exemption. The same is true for vaccines. Perhaps the state can impose the requirement, but any infringement on the right to opt out for religious reasons must be necessary and narrowly tailored to inflict the least burden.

Moreover, the government's open hostility towards religious beliefs against vaccination negates any argument that this is a neutral law. In *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) the Supreme Court clarified that to respect the Constitution's guarantee of free exercise, the government cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. According to the Supreme Court, the Free Exercise Clause bars even "subtle departures from neutrality" on matters of religious significance. *Id.*   Under this clause, laws may not discriminate against "some or all religious beliefs." *Trinity Lutheran*, 137 S.Ct. at 2021 (quoting *Church of Lukumi Babulu Aye, Inc. v. Hialeah*, 508 U.S. 520, 532 (1993)).

Under this standard, any hostility or disrespect for religious beliefs indicated by government actors promulgating or enforcing the law triggers strict scrutiny, even of laws or policies that appear to be neutral on their face. *Masterpiece Cakeshop, Ltd. V. Colorado C.R.*

17

*Comm'n*, 138 S. Ct. 1719, 1731 (2018).

"Factors relevant to the assessment of governmental neutrality include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body." *Id.* Here, the context and series of events leading up to the mandate and follow its implementation are important.

From the outset, the Governor of New York State has expressed, in no uncertain language, that she views vaccines as a religious obligation, that she believes God made them, that he wants us to take them, and that she is seeking "apostles" to convert those "who are not listening to God and what God wants" by holding religious beliefs against vaccines.

The DOE Vaccine Mandate, which eliminates the right to opt out of vaccination, was promulgated by the NYC DOH the day that Governor Hochul took office after she held multiple pre-appointment public meetings with Mayor de Blasio. This was a coordinated effort between the state and the City. Two days later, Governor Hochul convinced the NYS DOH to strip the religious exemption from the healthcare workers vaccine mandate.

The Governor and the Mayor pushed these regulations through their respective unelected administrative agencies amidst a flurry of hostile speech that targets those with religious beliefs against vaccination. From the outset, both the Governor and the Mayor, repeatedly call any religious beliefs opposing vaccination "illegitimate" and repeatedly cite Pope Francis's decision to be vaccinated as proof that people who believe differently have illegitimate faiths. Governor Hochul stated that those with religious beliefs against vaccination are "not the smart ones" and bragged about how she intentionally stripped the religious exemption from the mandate because she does not respect religious objections to vaccination as "legitimate" or "sanctioned." Mayor de

Blasio announced he planned to explicitly discriminate between applicants for a religious accommodation and preference only state sanctioned religions for acceptance.

Given their open hostility, neither the Governor nor the mayor can assert in good faith that the removal of the option of reasonable accommodation for religious exemption from either mandate is "neutral." Nor is it of general applicability. The mandate is not imposed on students (who make up the majority of the population of the schools), and thousands of other municipal employees who are allowed to test in lieu of getting vaccinated. There is no reason why Plaintiffs cannot do the same.

### *Plaintiffs are Likely to Succeed on their Establishment Clause Claims*

The Establishment Clause claims provide a second avenue for relief. The Establishment Clause erects a "wall of separation between Church and State," *Everson v. Board of Educ. Of Ewing*, 330 U.S. 1, 15-16 (1947), so that the free exercise of one's religion cannot be hampered by the religious orthodoxy of any leader or majority belief system. By denying exemptions to anyone with personal beliefs or beliefs that are not identical to the religious orthodoxy of Defendants or leaders they see as "sanctioned", Defendants violate the Establishment Clause. In determining whether beliefs are to be accorded free exercise protection, the state's scrutiny can extend only to whether claimant sincerely holds particular belief and whether that belief is religious in nature. *Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996); *see, also Sherr* 672 F. Supp. at 87.

Judgment calls about the objective validity or legitimacy of someone's religious beliefs violates the prohibition against state entanglement protected by the Establishment Clause.  Rather, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021).

It is hard to imagine a more straightforward violation of the Establishment Clause. Far lesser transgressions routinely fail. Here, the policies go far beyond any semblance of compliance with the Establishment Clause. The mayor openly declared two state-sanctioned religions and the Governor declared a religious crusade and is recruiting "apostles" to convert and persecute people with religious beliefs that do not comport with her own about what God wants.

It is one of the fundamental principles of the Supreme Court's Establishment Clause jurisprudence that the Constitution forbids state practices that "aid one religion…or prefer one religion over another." *Id*. at 15. Statements or action by Government officials that deride certain religious beliefs or indicate disapproval of them violate the Establishment Clause. *See, e.g.,* "an important concern of the effects test is whether the symbolic union of church and state effected by the challenged government action is sufficiently likely to be perceived by adherents as a disapproval of their religious choices." *School District of the City of Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985).

**B.  Plaintiffs are Likely to Succeed on their Substantive Due Process Challenge**

A sufficient medical exemption has been a constitutional prerequisite to any valid vaccine mandate since this issue was first addressed in 1905. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). Even in *Jacobson*, the Supreme Court held that it would be cruel and inhuman (as well as unconstitutional) to require compliance with a mandatory vaccination requirement if a person is at risk of harm from the vaccine. *Id.*

Subsequent Supreme Court decisions clarify the limits of allowable state interference in determining whether a medical exemption is needed.  Controlling precedent expressly forbids state burdens on medical exemptions which subordinate the professional judgment of a patient's chosen physician. *Doe v. Bolton*, 410 U.S. 179, 199-200 (1973) (striking down regulatory burdens on a

medical exemption substantially similar to the ones challenged here and holding that the patient's chosen medical provider must have discretion in decisions about what may constitute harm: "[I]f a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment"). *Doe* holds that if a state licensed physician certifies a person is at risk of harm, that person *must* be able to receive a medical exemption and the state cannot condition acceptance of the exemption on consent of the state or any third party, or impose corroboration requirements, or predefine or narrow the criteria that a doctor can consider in determining necessity. *Doe*, 410 U.S. 179, 199-200 (1973).

The Supreme Court recognizes that patients have a fundamental right to make medical decisions in accordance with their physician's independent best medical judgment. *Doe* places strict limits against state interference on that right in the medical exemption context, even where the state has articulated interests as compelling as saving the life of a viable unborn child who will surely die if the medical exemption is granted. In this case, the state's interest is nowhere near as compelling. These are nonsterilizing vaccines and Plaintiffs do not pose a direct threat to others because of their vaccine status, as discussed in the expert declarations.

The challenged state action in this case blatantly violates *Doe*. The original DOE mandate has *no* exemption for medical accommodation. The Arbitration Award does not provide much more. Rather, it requires the schools to deny medical exemptions written by licensed physicians and limit important factors a physician must consider to keep a patient safe. As a matter of law, pursuant to the Supreme Court's binding decision in *Doe*, the challenged regulation and policies must be declared unconstitutional and struck down. Even the hypothetical chance that a medical exemption is narrow enough to exclude "a very few" from its protection renders a statute unconstitutional. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).

The right to a medical exemption also encompasses a number of other fundamental rights infringed here, including but not limited to the right to attempt to preserve one's life and health, the right to refuse unwanted medical treatment, bodily integrity, fundamental privacy rights, and the right to be free from unconstitutional conditions. Infringements on fundamental rights require strict scrutiny review.

### C. *The Vaccine Mandate is not narrowly tailored to achieve a compelling government interest, nor is it even rationally related to that goal.*

It is hard to imagine, given the open hostility, that the purpose of this mandate is public health. But if it were, it cannot survive strict scrutiny. "The government has the burden to establish that the challenged law satisfies strict scrutiny. To do so in this context [of Covid-19], it must do more than assert that certain risk factors 'are always present…or always absent from the other secular activities' the government may allow. Instead, narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Tandom v. Newsom*, 141 S. Ct. 1294, 1926-97 (2021) (internal citations omitted).

As discussed above, there are many less restrictive measures that could suffice to mitigate risk. Dr. Bhattachary provides several strategies that would be more than sufficient. Though he and Dr. Makary agree that Plaintiffs do not pose a direct threat to others based on their vaccination status. First, exemption should be offered for anyone with natural immunity. The science is clear that they have superior and longer-lasting immunity than vaccinated people. Second, daily temperature and symptom checks could be instituted, and employees could be provided with rapid antigen tests, and could take them whenever they felt symptomatic, or daily, depending on the spread in the community at the time. Third, weekly PCR tests could be implemented. The City cannot justify why this option, which is available to all other municipal employees, cannot suffice.

Dr. Bhattacharya does suggest, however, that if the rate of spread was high enough to necessitate PCR testing, all employees (vaccinated and unvaccinated) should be tested since both can spread COVID-19.

Ultimately, given the fact that the vaccines cannot reliably stop transmission, any measure which is only imposed on those with religious objections to vaccination is likely unconstitutional. It is not within the police powers of the state to mandate vaccines that can only provide a personal benefit, particularly when a person has religious objections to the vaccine. Even if it were arguably part of the police power, people have a fundamental right to decline medications, which overrides any state interest in trying to protect people from themselves. *Cruzan v. Director, DMH*, 497 U.S. 261 (1990); *Washington v. Glucksberg*, 521 U.S. 702 (1997) (the Due process clause protects traditional right to refuse unwanted lifesaving medical treatment).

It is not enough for the City to rely on vague assertions about the "delta variant" or to cite unsupported and generalized assertions on public health websites. When Constitutional rights are infringed, the Court is not only empowered to apply strict scrutiny to the state's rationale but is *required* to do so. *See, e.g., Roman Cath. Diocese*, 141 S. Ct. at 67; *see, also, S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021):

> In cases implicating this form of "strict scrutiny," courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard. See *Lukumi*, 508 U.S. at 546. Even in times of crisis—perhaps *especially* in times of crisis—we have a duty to hold governments to the Constitution.

Plaintiffs do not pose a significant threat of substantial harm to others, and multiple mitigation strategies could be employed short of termination or exclusion from school buildings.

## II.   PLAINTIFFS ARE SUFFERING IRREPARABLE HARM

It is well-settled that "the alleged violation of a constitutional right…triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Courts presume that a movant has established irreparable harm in the absence of injunctive relief when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). In particular, the Supreme Court holds that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 208 (2020).

## III.   THE BALANCE OF EQUITIES IS IN PLAINTIFFS' FAVOR.

Defendants cannot in good faith claim that it is an undue hardship on them to allow these dedicated educators to continue caring for the children who desperately need them. For more than a year and a half, these unvaccinated teachers and staff have worked on the frontlines of this pandemic, making sure that New York City's children did not fall through the cracks, without any vaccine or often even a mask to protect themselves. They have not suddenly become more dangerous, and they do not pose a direct threat to others based on vaccine status.

Herd immunity is not a possibility with this vaccine. As noted by the Director of the CDC, vaccinated people are just as capable of spreading disease. Moreover, the majority of the students in schools are unvaccinated. Even if 100% of teachers were vaccinated, and even if these vaccines could create sterilizing immunity and contribute to herd immunity, the percentage of unvaccinated

students would nullify that possibility. But in this case, where the vaccinated can spread disease as well, there is no legitimate, rational, or compelling interest that accommodations for sincerely held religious beliefs create an undue burden. Herd immunity could not be achieved even with 100% vaccination of all students and staff if the disease can still freely circulate.

To the extent that Defendants believe any of their employees pose a significant threat to the community, they bear the burden of establishing this with non-speculative and concrete evidence that there are no reasonable accommodations available short of termination.

Most importantly, the challenged policies not only fail to safeguard the public from any real harm, but as the attached declarations reveal, the mass firing of 15,000 teachers and staff tomorrow will seriously endanger and harm the one million children who attend public schools in New York City. These teachers have been in the school system buildings for the past year and a half. The balance of equities favors maintaining the *status quo* pending a hearing and avoiding a crisis in the New York City school system of unimaginable scale and scope like the crisis the Governor caused in the nursing homes and hospitals last week through the parallel state mandate.

## **CONCLUSION**

Defendants' absurd and unlawful policy discriminates against frontline heroes and endangers all New Yorkers. The Plaintiffs and the People of the State of New York deserve better.

Plaintiffs have successfully pled the required elements for injunctive relief, including a temporary restraining order and a preliminary injunction, and pray this Court stays the DOE Vaccine Mandate to maintain the *status quo* pending a hearing.

October 4, 2021,                    Respectfully Submitted,

*Sujata S. Gibson*
Sujata S. Gibson, Esq.

**Gibson Law Firm, PLLC**
408 W Martin Luther King, Jr St.
Ithaca, NY 14850
(607) 327-4125
Email: sujata@gibsonfirm.law