UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Kane, et al.<br><br>        Plaintiffs,<br><br>        vs.<br><br>de Blasio, et al.<br><br>        Defendants. | CIVIL ACTION NO. 1:21-CV-07863 |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

DATED this 7th day of October 2021.

                                        Gibson Law Firm, PLLC

                                        */s/ Sujata S. Gibson*

                                        **Sujata S. Gibson,**
                                        *Attorney for Plaintiffs*
                                        Gibson Law Firm, PLLC
                                        408 W Martin Luther King, Jr. St.
                                        Ithaca, NY 14850
                                        (607) 327-4125
                                        sujata@gibsonfirm.law

## **INTRODUCTION**

Plaintiffs comprise ten of the thousands of NYC DOE employees whose religious beliefs prevent them from being able to be vaccinated. They challenge a discriminatory vaccine mandate promulgated by the Mayor of NYC acting in his official capacity, along with Commissioner of Health Dave Chokshi and the New York City Department of Education (NYC DOE).

The NYC DOE Mandate contains no exemption for religious or medical accommodation. Without any valid reason or necessity, the NYC DOE Mandate replaces a far less burdensome policy available to all other NYC employees (as well as all other teachers in the state) that allows for regular testing in lieu of vaccination; thereby accommodating those who need to opt out.

The NYC DOE Mandate was contemporaneously promulgated alongside a flurry of hostile statements made by the Mayor and Governor Hochul (whom the mayor acknowledges he is working with on these issues). Both regularly state publicly that religious objections to vaccines are "illegitimate" citing, among other astonishing comments, the Pope's decision to get vaccinated. This is overt hostility to all religions, while simultaneously sanctioning one religion over another.

The NYC DOE Mandate was originally supposed to go into effect on September 28, 2021. However, an emergency injunction initially granted by the Second Circuit on the eve of this deadline prompted the mayor to push the deadline back so that the mandate would take effect as of October 4, 2021.[1]

Early in the morning on October 4, 2021, plaintiffs filed for a TRO to stop the NYC DOE from removing them all from school buildings. Shortly after filing, they were in fact each barred from entering any school building for the foreseeable future. At least half of them were then immediately stripped of their pay and DOE placed them on an involuntary and openly vindictive

---

[1] Though employees were supposed to get vaccinated by October 1, 2021, the mandate did not take effect until October 4, 2021, which was the first day any teacher was barred from school or stripped of their pay and rights.

2

"leave without pay" ("LWOP").[2] This LWOP policy strips plaintiffs of their income, prohibits them from getting any other job, bars them from collecting unemployment, and does not even allow them to use their accrued time off or vacation time. In order to keep their health benefits, (the only thing the LWOP continues to provide to them) plaintiffs have to sign a paper by October 27, 2021, stating that they waive their rights to pursue any legal remedy in courts against defendants' policies. The LWOP policy is *worse* than termination, as employees cannot even get compensated for their paid time off and accrued benefits and cannot collect unemployment insurance.

Plaintiffs were denied a TRO at the hearing held the following day. For the reasons set forth in the underlying motion papers, as well as in these supplemental papers requested by the Court, plaintiffs should be granted a preliminary injunction to avoid ongoing further harm.

## I. The NYC DOE Mandate is not a "Neutral Law of General Applicability that Only Incidentally Burdens Religious Rights"

Plaintiffs contend that the Court, finding that NYC DOE Mandate is neutral and generally applicable, erred and its denial of the TRO was mistaken. A law cannot be neutral where indicia of animus is present. The U.S. Supreme Court recently re-affirmed in multiple cases that *any* state action which displays "even [a] slight suspicion" of religious animus is *per se* unconstitutional, regardless of whether it otherwise forwards a compelling interest. *Masterpiece Cakeshop, LTD. v. Colo. Civil Rights Comm'n*, 138 S.Ct. 1719, 1731 (2018).

In *Masterpiece Cakeshop*, the majority decision plainly affirms that even if a law might otherwise be permissible, statements or conduct indicating the law was motivated by animus towards certain religious viewpoints require the strictest scrutiny and would likely require the law to be overturned. The language of the case is instructive:

---

[2] Several of those left "pending" last Tuesday have since been denied and placed on LWOP.

> [t]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. The free exercise clause bars even subtle departures from neutrality on matters of religion…The Constitution commits government itself to religious tolerance, and upon even slight suspicion that *proposals for state intervention* stem from animosity towards religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Id.* 1731-32.

In that case, the Supreme Court set forth indicia of animus that establish that a law is not "neutral". Among other indicia, "[f]actors relevant to the assessment of government neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question and the legislative history, including contemporaneous statements made by members of the decision-making body." *Id.* at 1732.

The animus here is more than subtle. The mayor, who publicly announced he is behind this policy, regularly states that he does not believe that there are any legitimate objections to vaccination and regularly preferences certain religious viewpoints over others. He openly says that any religious belief that is not in line with the Pope's beliefs is invalid, and that the only religious exemptions he will accept are from Christian Scientists and Jehovah's Witnesses. These sentiments are also advanced by the Governor, whom the mayor acknowledges he is working in concert with on this mandate. The Governor went so far as to state that it is God's will that people get vaccinated, that all other religious viewpoints are illegitimate, and that she is seeking "apostles" to convert and persecute those "who do not understand what God wants."

When forced to entertain religious exemptions after multiple courts issued TROs, not just against the NYC mandate but also against the Governor's parallel healthcare case, the mayor and the DOE attempted to circumvent this protection by advocating aggressively for and obtaining an

4

arbitration award that openly discriminates against people based on their sincerely held religious beliefs and is facially unconstitutional and against public policy.

The NYC DOE then implemented a vindictive, aggressive, and unconstitutional policy to single out, and punish those who have religious need for accommodation. Despite the arbitration award requiring them to accommodate religious beliefs, the NYC DOE denied everyone who applied through a form letter that it would be an "undue hardship" to accommodate any religious beliefs. NYC DOE then attended every zoom appeal and zealously advocated for open discrimination against the employees for holding religious beliefs that they considered "heretical" or outside of the norm. Even plaintiffs who met all the discriminatory criteria of the Arbitration Award, such as Plaintiff Castro, were challenged by DOE employees on the grounds that the Pope does not agree (Mr. Castro is not a Catholic). As discussed in the declarations from plaintiffs and others subjected to this process, already on file with the court (ecf 16 - 28), both the NYC DOE and the arbitrators consistently stated in these appeals that the appeals should be denied because the "Pope believes it is an act of love" to get vaccinated. These statements were advanced as a grounds for denial by DOE attorneys acting under the instruction of their employer in nearly every appeal, even against employees who are not Catholic or even Christian.

These indicia of hostility towards those with minority, or personally held beliefs that do not line up with the Governor and mayor's preferred religious dogma invalidate any argument that this is a "neutral" law. The Supreme Court consistently holds that indicia of animus negates an inference that the law is neutral and requires the Court to strictly scrutinize the infringement to ensure it is necessary and employs the least restrictive measures possible. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (striking pandemic related fixed-capacity regulations because they were not neutral "statements made in connection with the challenged rules can be

viewed as targeting the ultra-Orthodox Jewish community" [among other indicia]); *see, also See, also, Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 530 (1993) (striking a municipal ordinance where hostility toward religious belief was inferred to have motivated its enactment).

## II. The Government has Not Met its Burden of Showing this is the Least Restrictive Means of furthering its Compelling Interest.

Once an otherwise "neutral" law is tainted by any hint of religious animus or presupposition about the legitimacy of certain religious viewpoints, the law must be subjected to the strictest scrutiny. *Church of Lukumi,* 508 U.S. at 546; *Roman Cath. Diocese,* 141 S. Ct. at 67.

The Government bears this burden. "The government has the burden to establish that the challenged law satisfies strict scrutiny. To do so in this context, it must do more than assert that certain risk factors "are always present" …Instead, narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296–97 (2021).

Defendants argue that all that is required is that they advance a compelling interest in stopping the spread of COVID-19. However, as *Tandon, Lukumi, Masterpiece Cakeshop* and *Roman Cath. Diocese* each affirm, identification of a "compelling interest" is not enough. The Court's analysis in *Roman Cath. Diocese* provides a roadmap for what the Government must prove to establish narrow tailoring:

> Stemming the spread of COVID–19 is unquestionably a compelling interest, but it is hard to see how the challenged regulations can be regarded as "narrowly tailored." They are far more restrictive than any COVID–related regulations that have previously come before the Court, much tighter than those adopted by many other jurisdictions hard-hit by the pandemic, and far more severe than has been shown to be required to prevent the spread of the virus at the applicants' services. …Not only is there no evidence that the applicants have contributed to the spread of COVID–19 but there are many other less restrictive rules that could be adopted to minimize the risk to those attending religious services. *Id.* at 67.

6

Thus, the Government must prove that the burden on religion is *necessary* to achieve the compelling interest of stopping the spread of COVID-19 and that less restrictive means cannot reasonably satisfy the same goal. Vague or generalized statements about stopping the spread of COVID-19 do not suffice. The Government has not met this burden.

First, as acknowledged by the head of the CDC, it is now understood that the COVID-19 vaccines cannot stop transmission of disease. A number of thorough controlled studies in this country and around the world has made that very clear. These vaccines are still recommended to mitigate severe symptoms of COVID-19 for those who are infected. Indeed, they do appear to be very effective to that end. But as the two expert affidavits explain, vaccination status does not correlate to a significantly less likelihood of spreading COVID-19. It is unclear that this is contested. The Defendants rely heavily on generalized statements from the CDC alleged to say that "vaccination is the most critical strategy to help schools safely resume full operations." These statements do not necessarily refute the fact that vaccines cannot stop transmission. CDC Director Dr. Rochelle Walensky stated "Our vaccines are working exceptionally well. . . " She also proclaimed, "They continue to work well for Delta, with regard to severe illness and death – they prevent it. But what they can't do anymore is prevent transmission." Exhibit 5.

Vaccinations are a vital tool for those who want to use them for personal protection against severe disease and having such tools available for those who need them is a significant achievement and boon. However, the DOE is not empowered to force people whose religious beliefs conflict with vaccination to take a vaccine "for their own good."

Additionally, many of these plaintiffs have natural immunity. As discussed in the expert declarations, natural immunity is well-established by the science as far more robust and durable than vaccine immunity. Thus, those with natural immunity pose *less* of a risk to others.

Moreover, even if vaccines could protect against transmission, herd immunity would not be impacted by the 4% of NYC DOE employees who need to opt out of vaccination for religious or medical reasons. As the DOE points out, there is already 96% compliance, so if somehow vaccinating all or most of the teachers were sufficient, that should suffice. But in reality, even if 100% of the teachers were vaccinated, and even if these vaccines were sterilizing (meaning conferring robust immunity against infection as well as symptoms) and were able to stop transmission (like measles vaccines or smallpox vaccines), there would still be hundreds of thousands of unvaccinated children acting as vectors for the spread of disease, which would render the vaccine status of the teachers irrelevant in stopping the spread of virus.

Similar to *Roman Cath. Diocese*, in this case, there is no reason to infer an urgency to bar all unvaccinated people from school buildings. Less restrictive means are available. Every other school district in the state allows teachers to test in lieu of vaccination. The DOE has not explained why somehow a teacher at a school in Queens must be barred from schools if they have a religious exemption to vaccination, but unvaccinated teachers two miles away over the border into Nassau County can safely continue to teach children from the same community. To the extent there are more unvaccinated students in the NYC school system, this only strengthens the argument that accommodating the religious needs of a small percent of teachers can not make any significant impact on the spread of disease through the overwhelmingly unvaccinated population.

### III.   Judicial Review of Plaintiffs' Constitutional Claims is Not Precluded by *Pyett*

This Court based its decision to deny the TRO in large part because it was unclear to the Court if *14 Penn Plaza, LLC v. Pyett*, 556 U.S. 247, 258 (2009) might prohibit the Plaintiffs from seeking relief for their constitutional claims in court. *Pyett* is inapposite to this case and does not bar judicial review of Plaintiffs constitutional claims.

8

In *Pyett*, the Supreme Court broke with precedent and held that under certain narrow circumstances, a union-negotiated waiver of an employee's statutory right to a judicial forum might be enforceable, but only where the waiver is explicit. To qualify, the waiver must list the particular statute that is subject to arbitration as the sole forum and must contain a clear statement that arbitration is the sole and exclusive forum for violations of that statute. *Id.* This Court clarified that such a waiver cannot be granted based on generalized clauses. Specifically, arbitration clauses purporting to encompass 'any dispute concerning the interpretation, application, or claimed violation of a specific term or provision' of a Collective Bargaining Agreement "fall far short of a specific agreement to submit all federal claims to arbitration." *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 359–61 (S.D.N.Y. 2016).

Neither the UFT nor CSA contracts mentions 42 U.S.C. §1983 or asserts that constitutional claims brought under this statute are subject to arbitration as the "sole and exclusive remedy" for constitutional claims. Moreover, though that fact alone is sufficient to make *Pyett* inapplicable to constitutional claims brought in a §1983 action, nothing in the UFT or CSA collective bargaining agreements waives the right of DOE employees to litigate any discrimination claims, even those brought under state law or pursuant to Title VII of the Civil Rights Act of 1964. In fact, both collective bargaining agreements state that individual rights to pursue relief in judicial proceedings are *not* waived.

The UFT contract states, "Nothing contained herein shall be construed as a waiver of any substantive arbitrability objection or to preclude any other resort to judicial proceedings as provided by law" and stresses that "Nothing contained in this Article or elsewhere in this Agreement shall be construed" to deny employee's rights pursuant to civil rights laws. Exhibit 1.

Similarly, the CSA contract states, "Nothing contained in this Article or elsewhere in this Agreement shall be construed to deny to any employee his/her rights under Section 15 of the New York Civil Rights Law or under the State Education Law or under applicable Civil Service Laws and Regulations." Exhibit 2 pp. 81-82. The CSA contract further specifies that the arbitrator's authority is limited to interpreting violations of the contract.

### IV.   State Action is Found where Constitutional Violations are Furthered by State Actors or those Acting in Concert with them Pursuant to an Official Policy

In the TRO decision, this Court acknowledged that the Arbitration Award is facially unconstitutional – and that it is a recognized and blatant violation of the First Amendment for a state to discriminate in exemption policies against personally held religious beliefs or beliefs that conflict with or differ from the recognized dogma of any religious leader or church. *Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81 (E.D.N.Y. 1987)(Limitation of religious exemption to New York mandatory inoculation program for school children to "bona fide members of a recognized religious organization" violated establishment and free exercise clauses of First Amendment, and would be expanded to exempt all persons who sincerely held religious beliefs that prohibited inoculation of their children by state).

The state cannot sidestep responsibility for depriving the Plaintiffs of their constitutional rights (and their jobs) by shifting responsibility to the Arbitrator. The mayor's announcement to the media that the City adopted an official policy whereby it would discriminate against and deny anyone a religious exemption if they are not Christian Scientists or Jehovah's Witnesses admits that the policies were adopted as an official policy of the defendants as well. It is well-settled law that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New*

*York,* 436 U.S. 658, 694 (1978). *Monell* reflects the plain language of the Fourteenth Amendment, which asserts that states cannot make *or enforce* unconstitutional deprivations of rights.

The discriminatory policies adopted by the Defendants through the promulgation of the vaccine mandate, which is not neutral given the deplorable language used by the mayor to justify omitting a religious exemption, violate the most basic protections of the First Amendment. The further abuse heaped on those with religious beliefs that the mayor deems "illegitimate" through the zealous enforcement of the facially unconstitutional Arbitration Agreement and through the vindictive additional policies advanced by the DOE is also state action and simply shocks the conscience.

Public policy does not favor such a violation of the line between church and state. Here, there are many alternatives that could be employed to keep people safe. As recognized in another pandemic related case before the Second Circuit, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal. The restrictions challenged here specially and disproportionately burden religious exercise, and thus "strike at the very heart of the First Amendment's guarantee of religious liberty." *Id.* Such a direct and severe constitutional violation weighs heavily in favor of granting injunctive relief." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020).

Plaintiffs pray for a preliminary injunction to avoid irreparable ongoing harm.

October 7, 2021,                                Respectfully Submitted,

*Sujata S. Gibson*
Sujata S. Gibson, Esq.
**Gibson Law Firm, PLLC**
408 W Martin Luther King, Jr St.
Ithaca, NY 14850
(607) 327-4125
Email: sujata@gibsonfirm.law

11