LA51KANC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHAEL KANE; et al.,

                Plaintiffs,

          v.                          21 Civ. 7863
                                      (Part I)
BILL de BLASIO, in his
official capacity as Mayor of
the City of New York; et al.,

                Defendants.           TRO Hearing
------------------------------x
                                      New York, N.Y.
                                      October 5, 2021
                                      10:35 a.m.

Before:

              HON. MARY KAY VYSKOCIL,

                                      District Judge

                      APPEARANCES

GIBSON LAW FIRM, PLLC
     Attorneys for Plaintiffs
BY:  SUJATA S. GIBSON, ESQ.

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
     Attorneys for Defendants
BY:  LORA MINICUCCI, ESQ.
     Assistant Corporation Counsel

LA51KANC

1                    (Case called)

2                    THE DEPUTY CLERK:  Good morning, your Honor.

3                    THE COURT:  Good morning, Ms. Dempsey.

4                    Please be seated, everyone.

5                    THE DEPUTY CLERK:  Counsel, starting with plaintiffs,

6        please state your name for the record.

7                    MS. GIBSON:  Sujata Gibson, your Honor.

8                    THE COURT:  Good morning, Ms. Gibson.

9                    MS. MINICUCCI:  Lora Minicucci for the city of New

10       York and the DOE.

11                   THE COURT:  All right.  Good morning, Ms. Minicucci.

12                   Any other appearances this morning?

13                   All right.  So just a couple of preliminary

14       announcements before we get going:

15                   First, I apologize to people for the delay in getting

16       started this morning, but the delay was occasioned by the fact,

17       ironically, of restrictions as a result of COVID-19.  We're

18       here to talk about the city's vaccine mandate for teachers and

19       other employees of the Department of Education.  I would just

20       remind people that the court does have rules with respect to

21       social distancing and masking.  Anybody not following those

22       rules will be asked to leave the courtroom.

23                   Second, it is illegal to rebroadcast or publish live

24       or record any portion of court hearings.  If anybody does so,

25       it will be reported to the Marshals, who will take appropriate

LA51KANC

1   actions.

2         Now this case is pending in front of Judge Caproni,

3   who has scheduled a hearing on the motion for a preliminary

4   injunction for next Tuesday at 11 a.m. in her courtroom, which

5   is Courtroom 443 of the Thurgood Marshall Courthouse.  She will

6   allow the parties the opportunity to file any additional

7   materials.  Any supplemental materials that the plaintiffs wish

8   to file will be due on Thursday, October 7th, at 5 p.m., and

9   any supplemental materials by the city or the other defendants

10  will be due Friday by 5 p.m.

11        We're here today on plaintiffs' application made on an

12  *ex parte* basis for an emergency temporary restraining order

13  pending the hearing next week.  Please bear in mind, I have

14  carefully read all of the materials that were submitted to the

15  Court yesterday.  The Court received from the plaintiffs 12

16  affidavits, one from each of the nine plaintiffs, one from

17  counsel, and an affidavit from two medical professionals who

18  opine on matters that, in the Court's view, really have little

19  to nothing to do with the issues framed by the motion for

20  preliminary injunction.

21        Plaintiffs also filed a memorandum of law, and they

22  did that on an *ex parte* basis, no notice given in advance to

23  the defendants.  The Court entered an order directing the

24  defendants to serve any opposition by 8 p.m. last night, which

25  they did, and I have carefully reviewed that opposition as

LA51KANC

1    well.

2          So I will hear briefly from the parties, but please

3    bear in mind that I have very carefully reviewed everything

4    that has been filed.

5          All right.  Who would like to be heard for the

6    plaintiffs?

7          MS. GIBSON:  I'm the only attorney here, your Honor.

8          THE COURT:  Thank you.

9          MS. GIBSON:  Thank you.  Do you want me to go here or

10   there?

11         THE COURT:  Whichever is better for you is fine for

12   me.  Is there a microphone there?

13         MS. GIBSON:  There is, your Honor.

14         THE COURT:  Great.  Thank you.

15         MS. GIBSON:  So this case essentially brings us a few

16   different questions.  The threshold question is:  Is a

17   religious exemption required of these vaccine mandates?  This

18   case is not the other cases cited by defendants, which are

19   about completely different issues.  They're about whether, you

20   know, broader rights of bodily autonomy allow any vaccine at

21   any time; whether, you know, the right to work means no one can

22   ever tell you you have to get vaccinated.  That is not before

23   this Court.  What is before this Court is whether a religious

24   exemption is required and whether this particular approach to

25   it violates the law.  So the Second Circuit injunction does

LA51KANC

1   control on that issue of whether religious exemption is

2   required.  They just passed it last week, and they noted that

3   they did uphold -- citing *Roman Catholic Diocese*, they did

4   uphold the right, at least through a TRO, for this preliminary

5   injunctive relief for health care workers to have a religious

6   exemption.

7              THE COURT:  All right.  So a couple of things.

8              First of all, that case, that was, as you say, a TRO,

9   and the case is going to be argued next week, I believe,

10  correct?

11             MS. GIBSON:  I believe the 15th, I think.

12             THE COURT:  Okay.  So there's not a final,

13  on-the-merits ruling from the Second Circuit.

14             MS. GIBSON:  Right, your Honor, but they did

15  indicate --

16             THE COURT:  Hold on.

17             MS. GIBSON:  Sorry.

18             THE COURT:  There is now an opportunity in this case

19  for the teachers and other employees of the DOE to apply for

20  medical exemption or a religious exemption.  And by the way, in

21  your comments, you've referenced only the religious exemption.

22  Are you dropping your medical exemption argument?

23             MS. GIBSON:  No, your Honor.  Just in the interest of

24  time, I'm focusing on that.  But yes, there is.

25             So that brings us to the second point, which is

LA51KANC

1    whether the religious exemption offered through the arbitration

2    award is constitutionally sufficient.  The plaintiffs have

3    argued in great detail --

4            THE COURT:  Hold on.  You've just hit on a key point

5    that neither side has briefed here, which is that the

6    exemptions were put in place as a result of an arbitration

7    award, which is the product of the collective bargaining

8    process.  It was not part of the original mandate, correct?

9            MS. GIBSON:  Correct, and that's why I say facially

10   the law is unconstitutional.  As it's applied through this

11   award, though -- which not all of the members are members of

12   UFT -- but as it's being applied, it is unconstitutional, quite

13   blatantly.  What it does --

14           THE COURT:  All right.  But the point that you haven't

15   briefed -- and I know you want to launch into the argument, but

16   that argument that you want to launch into, you've fully

17   briefed in your papers.  What you haven't briefed in your

18   papers is whether an exemption, which is put in place as a

19   result of a collective bargaining process, is government action

20   for purposes of asserting a constitutional claim; and second,

21   whether, because there is the collective bargaining process,

22   the individual teachers, as opposed to the union, have standing

23   to even assert those violations.  And that hasn't been briefed

24   at all by either side, correct?

25           MS. GIBSON:  No, it hasn't, your Honor.  I would be

LA51KANC

1   happy to put that in my supplemental materials.  But one point

2   I'm going to point out now is, we're attacking the whole

3   mandate facially, so whatever happens -- whether this

4   arbitration agreement was allowed to be made or not, you

5   know -- it's not an agreement -- sorry -- it's an award.  So it

6   was made not as a result of agreement but rather it was an

7   award through arbitration, so the question is can that be

8   challenged -- can arbitration awards be challenged on

9   constitutional grounds.  My clients did not agree to this

10  arbitration award.  They did not agree to waive their rights

11  not to be discriminated against facially when they hold

12  religious beliefs that are in the minority or are, you know,

13  personally held religious beliefs, which has been very clearly

14  established as unlawful.  You cannot say that only religious

15  beliefs that the Pope sanctions are okay religious beliefs.  It

16  is just the most clear-cut Establishment Clause violation I've

17  ever seen.  But so the question of whether the arbitration

18  award changes that I think is addressed in the fact that we're

19  challenging this both facially and as applied.  So --

20          THE COURT:  I don't think that's a fair read of your

21  papers.  Your papers really challenge the application of the

22  exemption, and as you say, the fact that apparently, in some of

23  the appeals the arbitrator has said, apparently, or has taken

24  the position, that if the recognized leader of a particular

25  faith says there is no religious basis for objecting, the

LA51KANC

1    exemption won't be granted, and, apparently, takes the position

2    that one must belong to some kind of an organized religion.

3            MS. GIBSON:  Actually, the award itself takes that

4    position.  It says very clearly -- and many people did not even

5    apply because they were precluded from even applying if they

6    didn't provide a clergy note or belong to a religion.

7    Basically the mayor defined it as, if they weren't Christian

8    Scientists or Jehovah Witnesses, he very explicitly said he

9    would not grant it, and the arbitration award itself references

10   you have to belong to a bona fide --

11           THE COURT:  Counsel, somebody who doesn't bother to

12   apply and avail themselves of the process -- and, frankly, this

13   is the other problem that the Court sees with your application

14   for a TRO and your failure to make out the elements, is that

15   some of these plaintiffs didn't even file, or one of them

16   didn't even file an application; some of them, their appeal is

17   still pending; and some of them, as you say, didn't appeal the

18   original denial.  Now there are one or two who have gone

19   through the whole appellate process.

20           MS. GIBSON:  I'm sorry, your Honor.  I just want to

21   clarify something for the record.  The declarations were not

22   all from plaintiffs.  Some of those people were just other

23   affected people.  We are intending perhaps some changes in the

24   class action.  Right now --

25           THE COURT:  It's not a class action right now.

LA51KANC

1          MS. GIBSON:  But all the nine defendants did apply for

2     religious exemptions.

3          THE COURT:  Plaintiffs.

4          MS. GIBSON:  Plaintiffs.  Sorry.  And they did file to

5     appeal it, and half of them have been --

6          THE COURT:  But that's not in the record then.  If

7     you're telling me the affidavits that you gave me are not all

8     the plaintiffs, your representations about the state of the

9     record or the state of the plaintiffs' appeals is not part of

10    the record then.

11         MS. GIBSON:  Well, your Honor, this has been happening

12    very fast.  Even since Monday, changes -- when we filed

13    yesterday, changes have happened.  This was all applied over

14    the weekend.  It was a very fast --

15         THE COURT:  Yes, I know you applied over the weekend,

16    after the mandate, as extended, went into effect, on a mandate

17    that was announced at the end of August.

18         MS. GIBSON:  Right.  And decisions hadn't been made

19    yet on everybody.  But what I am saying is that defendants did

20    put in their materials, that are sworn, that some of our

21    plaintiffs have been denied, and they also put in that some are

22    pending, and in our record it shows that not only are some

23    pending but they were originally denied and then changed to

24    pending in anticipation of this litigation.  So I do find that

25    facts concerning -- and I think I -- it's important to point it

LA51KANC

```
1    out, but they did all apply, as they all said in their

2    statements that they applied, and they all said in their

3    statements that they appealed.  They didn't have a decision at

4    the time that we -- they didn't all have a decision at the time

5    that we turned in our emergency motion, but they did all apply.

6    So the --

7              THE COURT:  Counsel, let me just ask you, because I

8    know you want to argue the constitutional issue, but frankly,

9    I'm not prepared to hear that today because I think there are

10   some other threshold things that we need to talk about first.

11   Specifically, I would like you to address the question of why

12   these plaintiffs cannot be compensated with money damages if

13   they were to ultimately prevail on their constitutional claim.

14   So you're here seeking preliminary injunctive relief and, in

15   the interim, from me, a temporary restraining order, so in

16   order to prevail, you have to show irreparable harm.

17             MS. GIBSON:  Well --

18             THE COURT:  Let me finish.  The effect of the mandate

19   is not that the teachers are fired, as is the case in the

20   health care workers case that's up in the Second Circuit and

21   going to be heard in two weeks, but rather that they're placed

22   on leave with all of their benefits, and they can then pursue

23   their constitutional challenge in the case that you have filed,

24   that you filed in the third week in September, and if they

25   ultimately prevail, why can they not be fully compensated by
```

LA51KANC

1   money damages?  How can you show irreparable harm?

2                MS. GIBSON:  Your Honor, to correct the record, they

3   are not -- several of them have been fired; effective

4   yesterday, they were fired, and placed on unpaid leave, where

5   you can't get another job and you can't -- and you get health

6   insurance.  It is not sufficient.  But I would say to your

7   point --

8                THE COURT:  Counsel, you're playing a game of

9   semantics.  What the remedy is for failure to comply with the

10  mandate is, you're placed on administrative leave with

11  benefits.  Now you're calling that firing.  I understand there

12  are certainly implications of that, but that's different than

13  the health care workers case.

14               MS. GIBSON:  Your Honor, I would not agree that that

15  is the consequence of the mandate.  You have to make a separate

16  agreement to apply for those, the status of being on leave with

17  benefits, and you have to waive a whole lot of rights in order

18  to do that, including the right to get another job or the right

19  to a lot of other things.  So people are scrambling, they

20  haven't decided --

21               THE COURT:  But counsel, those are all the issues that

22  will be litigated in the case that you have brought.  We are

23  here on your application for emergency temporary relief.

24               MS. GIBSON:  Yes, and I will speak to that.

25               So the Supreme Court has -- multiple courts have

LA51KANC

```
1   stated that is a deprivation of constitutional rights.  Being
2   discriminated against openly and placed on unpaid leave or
3   fired is certainly discrimination, and that alone, the ongoing
4   discrimination against constitutional rights based on religious
5   views that are in the minority or heretical -- as the
6   dictionary definition of heretical is this UFT award basically
7   says, if you're a heretic, you don't get the same treatment as
8   everyone else -- that alone is enough.  That is irreparable
9   harm, and that has been affirmed by Jolly v. Coughlin, that has
10  been affirmed by Roman Catholic Diocese, it was affirmed in
11  Agudath v. Cuomo, it has been affirmed in Tandon v. Newsom.
12  It's been affirmed in multiple contexts.
13          THE COURT:  There are also cases that go on to say, if
14  you haven't shown a likelihood of success on the merits, the
15  presumption of irreparable harm may not attach.
16          MS. GIBSON:  Sure.  The most important thing in this
17  case is likelihood of success on the merits.
18          THE COURT:  Correct.
19          MS. GIBSON:  Because if the -- there are multiple
20  cases that say, in a constitutional challenge, if you show
21  likelihood of success on the merits, you are presumed to have
22  met the irreparable harm.
23          THE COURT:  Right.
24          MS. GIBSON:  Because, you know -- so, and that doesn't
25  mean you have to prove that you definitely will prevail but
```

LA51KANC

1    that you're likely to prevail, and so that is why it's so

2    important to talk about the Constitution today, because the

3    Second Circuit decision is controlling, and that it says, you

4    know -- recognizes that they're likely to succeed.  We're not

5    saying that that means they're definitely --

6             THE COURT:  What Second Circuit decision recognizes

7    that these plaintiffs on this mandate are likely to succeed?

8             MS. GIBSON:  That the concept of religious exemption

9    is likely to succeed, in *We The People v.* --

10             THE COURT:  There is a religious exemption.  You're

11    just quarreling or taking issue with the scope or how it's

12    applied.

13             MS. GIBSON:  Sure.  I would be happy to talk about

14    that.  So that is the *Sherr* case, and there is a whole host of

15    other Supreme -- of Supreme Court cases that say that any kind

16    of hostility -- there's the *Masterpiece Cake* case and many

17    others, like *Lukumi* and *Trinity Lutheran* and *Roman Catholic*

18    *Diocese* and *Agudath* -- well, *Agudath* is the Second Circuit --

19    and *Tandon v. Newsom* and a host of other cases that have hit

20    home the point that any kind of discrimination or any kind of

21    negative talk about certain religious beliefs versus others or

22    any kind of hint that there may be a, you know, impermissible

23    lack of neutrality, either in reality or as perceived from

24    statements from public officials that are passing these things

25    makes it very likely that the provision will not succeed is

LA51KANC

| 1 | going to be very strictly scrutinized, even if it's neutral law

| 2 | of general applicability, and here we actually have --

| 3 |          THE COURT:  And here, the law clearly is a neutral law

| 4 | of general applicability, is it not?

| 5 |          MS. GIBSON:  No, it's not, because they're

| 6 | specifically saying, if you hold heretical, you know -- I'm

| 7 | going to call it heretical.

| 8 |          THE COURT:  That's in the arbitration award.  The

| 9 | mandate itself is a neutral law of general applicability, is it

| 10 | not?

| 11 |          MS. GIBSON:  That's certainly something to -- no, I

| 12 | would not say it does.  I think the *Roman Catholic Diocese*

| 13 | makes clear that that standard doesn't mean that it -- if it

| 14 | seems to apply to everyone, that it's neutral.  The neutrality

| 15 | comes from the hostile statement.  That's what -- general

| 16 | applicability --

| 17 |          THE COURT:  The statements that you're calling hostile

| 18 | are about the exemption, which is part of the arbitrator's

| 19 | award, not part of the mandate.

| 20 |          MS. GIBSON:  The statements that I'm calling hostile

| 21 | are the statements by the governor and the mayor that say that

| 22 | there's no valid religious exemption, objection to this.  That

| 23 | is hostility towards religious views that conflict with the

| 24 | Pope's.  He says many, many times over:  Because the Pope has

| 25 | said that he's okay with vaccines, I hold the position that

LA51KANC

1    there's no valid religious objection to vaccines.

2              THE COURT:  But what the mayor said, with no

3    disrespect intended to the mayor, is not the end of the

4    process.  Individual teachers can apply for the religious

5    exemption.  If it's denied, there is an appellate review

6    process that the mayor is not a party to, other than in name.

7              MS. GIBSON:  Every single one of these people who were

8    denied, when they went -- if they were given, and a Zoom

9    appeal, which I wouldn't really call adequate process, if they

10   were -- every single one, even people who are Buddhists, not

11   Catholic, they mention the Pope as the reason.  The DOE

12   mentioned the Pope in every single one of those hearings as the

13   reason the person should be denied.  I mean, I don't know how

14   more clear-cut you can get as an Establishment Clause

15   violation.  We do not follow, you know -- the Pope, they have

16   wonderful -- and he may be right that this is what god wants

17   and Governor Hochul may be right that this is what god wants

18   and we have to go after people who don't understand what god

19   wants, but that is not the job of the state, and the state has

20   to maintain the strictest level of neutrality, the government

21   does, and we are seeing here hostility towards viewpoints that

22   do not comport with the Pope's on a level that really shocks

23   the conscience, and even in situations --

24             THE COURT:  All right.  Counsel, you have all of this

25   in your papers.  So --

LA51KANC

1          MS. GIBSON:  Even in situations where it hasn't been

2     that there's these negative statements on top of the, you know,

3     open hostility on top of limiting religious exemptions to

4     vaccinations, you know, the Eastern District case, court case,

5     *Sherr v. Northport Schools*, that case, well, you know, that's

6     not necessarily controlling, although it was appealed and

7     denied; it did overturn New York State law.  So New York used

8     to have a statute that limited, in the very similar fashion to

9     the way that the DOE is applying this, limited the exemption,

10    and in fact, you know, the *Sherr* case made them start over and

11    say, no, you cannot -- do not have to have a certification from

12    clergy, that's unlawful and unconstitutional, you can't be

13    limited --

14         THE COURT:  Counsel, I'm going to interrupt you

15    because I told you at the outset we're not here today to argue

16    the merits, the ultimate merits of your case, which is what

17    you're doing.  This may be even appropriate next week when you

18    are due for your preliminary injunction.  Today we're limited

19    to why are you entitled, on an *ex parte* emergency basis, to the

20    interim relief, and you're repeating all the arguments you've

21    made in your brief.  So unless you have something further, I

22    have a trial about to start.  I need to hear from the other

23    side too.

24         MS. GIBSON:  I do have something further, your Honor.

25         THE COURT:  Briefly.

LA51KANC

1          MS. GIBSON:  As we discussed, irreparable harm is tied

2     in this case to the likelihood of success, so that is why --

3          THE COURT:  Correct.

4          MS. GIBSON:  But in any event, once we get past that,

5     even just the mandate itself, facially, without any religious

6     or medical exemption, that mandate is not justified

7     constitutionally.  Then we have to, you know -- once you show

8     that plaintiffs are entitled to constitutional protection, then

9     the state has the burden of showing that it was necessary and

10    the least restrictive means, and that is where my expert

11    affidavits come in, very highly regarded public health experts,

12    and they're prepared to --

13         THE COURT:  Who speak largely to the due process

14    argument that was at issue in the Eastern District case before

15    Judge Cogan, and ultimately rejected.  That's not the gravamen

16    of your complaint here.  So we're not going to spend the rest

17    of the morning arguing about other cases.

18         MS. GIBSON:  I'm not really familiar with the judge's

19    decision in that case, but I would be happy to read it, but I'm

20    just saying that the burden is on the state to justify that

21    this is the least restrictive means, and I think the fact that

22    this is a non-sterilizing vaccine, that we all recognize can't

23    stop transmission, and the facts of this case --

24         THE COURT:  I don't think that that statement is

25    accurate, and that's what your affidavits go to, and again,

LA51KANC

1    we're not here to litigate the merits or the demerits of the

2    vaccine.

3              MS. GIBSON:  Okay.  So I will stick then only to one

4    more thing, your Honor, which is I think very -- what you're

5    asking me, which is, what other irreparable harm other than

6    constitutional violations are these plaintiffs --

7              THE COURT:  Alleged constitutional violations.

8              MS. GIBSON:  Sure, yes, your Honor.

9              THE COURT:  And no briefing on the issue that I raised

10   with you about whether, since the exemptions were put in place

11   as a result of the collective bargaining process and the

12   arbitrator's award, it's government action; and second, whether

13   there's any waiver, implied or otherwise, of the individual

14   right to challenge the exemptions or whether that standing

15   right belongs with the plaintiff.  So that's not something

16   you're going to be able to resolve today because neither side

17   addressed it in your briefing, but it is an issue that Judge

18   Caproni will need to hear about, I would think.

19             MS. GIBSON:  Very helpful to know, and I will

20   definitely brief that.  At the outset, I will say that your

21   constitutional rights always trump any other kind of

22   arbitration.  You cannot make a valid arbitration award or

23   court decision that violates constitutional rights.

24             THE COURT:  You can have an arbitration award that

25   says you waive your constitutional rights, but the Supreme

LA51KANC

19

Court has been very clear in *14 Penn Plaza v. Pyett* that you
can waive an individual remedy, and that's the point I'm making
to you:  Is it the individual employees of the DOE who have the
right to raise this issue or is it the union?  I don't know the
answer to that because nothing about this collective bargaining
process and, frankly, nothing even about whether these
plaintiffs were subject to or members of that union is before
the Court right now.  So I just don't know the answer to that.

            MS. GIBSON:  I would submit that that can't change
their individual rights, your Honor.

            THE COURT:  I heard what you said, but I think there
are legal issues about that that you haven't briefed, and
frankly, neither did the other side.

            MS. GIBSON:  I would talk about the irreparable harm
beyond the constitutional violations.  So in the first place,
even if you're accepted under this arbitration award, it still
doesn't change that the mandate requires you to not enter any
school building, so one of the central things we are
challenging, accepted or denied, is whether that is a
constitutionally permissible burden on people who have
religious objections to vaccines.  So if you can never enter a
school building and you're a teacher, that is why it is
relevant whether they are a direct threat to other people,
whether it's justified as the least restrictive means to deal
with --

LA51KANC

1          THE COURT:  Again, that goes to the merits, the

2     ultimate merits, but I do believe, I do believe that there is

3     case law out there that says that while you may have a

4     constitutional right to pursue your chosen profession, you

5     don't have a constitutional right to a specific job.

6          MS. GIBSON:  Well, you can't be fired or prohibited

7     from doing your job on the basis of your religious beliefs,

8     though.  So that is -- this is a discrimination case.  So we're

9     talking about reasons.  So --

10          THE COURT:  Counsel, you're constantly recasting what

11     your case is about.

12          MS. GIBSON:  I'll try to do a better job, your Honor,

13     of being clear.  I do think I was very clear in the papers that

14     this is about discrimination and that First Amendment

15     challenges are generally about discrimination, these ones

16     particularly.  But irreparable harm beyond not being able to go

17     into the building, there's more.  You know, these are teachers.

18     They're living paycheck to paycheck.  People are going, you

19     know -- not able to feed their kids in the meantime; they're

20     not able to, you know -- they may lose their homes.  They don't

21     have the kind of resources in tow that this is going to be

22     limited to, oh, I can just be paid back later, I'll use my

23     savings.  These are teachers in the New York City public school

24     system, many of whom are struggling to get by, and the effect

25     of stripping them of their salaries entirely, their livelihood

LA51KANC

1    and their ability to even, you know, go and do their jobs

2    inside of the schools, is extremely damaging and extremely

3    urgent for them.  I have plaintiffs here today who have already

4    suffered extremely, extreme stress, to the point that, you

5    know, they're getting conditions they had before, like Bell's

6    palsy --

7            THE COURT:  I understand your arguments, counsel.

8    It's in your papers, and I do appreciate your argument, and I

9    understand what you're saying.  I'd like to hear from the other

10   side now, please.

11           MS. MINICUCCI:  Good morning, your Honor.

12           THE COURT:  Good morning.

13           MS. MINICUCCI:  So the DOH, or the Commissioner of

14   Health order, is facially neutral.  Within the order, it says

15   that religious exemptions and medical exceptions are permitted,

16   and the arbitration, which was with the UFT, which was then

17   extended to other unions, provides a framework by which people

18   can apply for religious or medical exemptions and an appeals

19   process, where they can be, you know, accepted or denied for

20   their appeals.

21           THE COURT:  All right.  But counsel, what about the

22   argument made on behalf of the employees that apparently -- and

23   it does seem as though there's some support for this -- the

24   position in the arbitration process is:  The Pope says vaccines

25   are okay so certainly if you're a Roman Catholic you can't have

LA51KANC

1     a sincerely held religious belief that the vaccine is not okay.

2     And there's also apparently some indication that you have to

3     belong to an organized religion.  Now I disagree with the

4     characterization that it's only Jehovah Witnesses or Christian

5     Scientists because the order says "*e.g.*," but it does seem to

6     indicate that somebody who's an employee of the DOE and not a

7     member of an organized religion cannot qualify for a religious

8     exemption.  So how is that not applying the mandate unequally

9     on the basis of people's religious beliefs?

10         MS. MINICUCCI:  So each of those inquiries is an

11    individualized inquiry that has to do with the person's

12    application and what they have said in their application, and

13    then what is said in their appeal.  I don't have access to

14    plaintiffs' applications for their religious exemptions, but

15    looking at their affidavits, there really isn't anything

16    particularized about what their religious beliefs have to do

17    with them getting the vaccine.  There are a few details about

18    the by-product of abortion, but really, there is no link made

19    between the religious belief and what that sincerely held

20    religious belief is and --

21         THE COURT:  I don't think that's a fair

22    characterization, counsel.  I don't think that's fair.  If you

23    read the affidavits, there are certainly statements by some of

24    these plaintiffs that that is a sincere religious objection to

25    the way the exemptions are being applied.

LA51KANC

1          MS. MINICUCCI:  Yes.  I understand that, your Honor,

2     but what I'm saying is --

3          THE COURT:  And they're being told that because the

4     Pope has apparently said he doesn't have a problem with the

5     vaccine, that at least if you're a Roman Catholic, you can't

6     sincerely hold that belief.

7          MS. MINICUCCI:  Okay.  Well, that is, again, an

8     individualized inquiry that has to do with the arbitrator who

9     was hearing that appeal.

10          THE COURT:  I think that's part of the question: is it

11     being done on an individualized basis or is it being done as an

12     across-the-board, not-narrowly-tailored exemption.

13          MS. MINICUCCI:  I don't have that information, your

14     Honor.

15          THE COURT:  Who has the burden on that issue?

16          MS. MINICUCCI:  I'm not sure.  But in any event, the

17     actual order from the Commissioner of Health is neutral, and to

18     the extent that, you know, plaintiffs have exhausted their

19     appeal, they can also file an Article 75 proceeding.

20          Furthermore, we've, you know, already litigated this

21     case, or in the -- not this case, but this order was reviewed

22     by Judge Cogan and the Second Circuit and an appeal was made to

23     the Supreme Court, and that order was upheld.

24          THE COURT:  Not on these precise grounds.  Those were

25     on the grounds that there's a due process right to control your

LA51KANC

| | |
|---|---|
| 1 | own bodily integrity and simply say, I don't believe in the |
| 2 | vaccine and I don't want to take it.  This complaint is brought |
| 3 | on the basis, predominantly -- although there is a challenge to |
| 4 | the medical exemption as well, as I understand it, but |
| 5 | predominantly on the grounds of religious discrimination, which |
| 6 | was not an issue in the case before Judge Cogan. |
| 7 | MS. MINICUCCI:  That's true, your Honor. |
| 8 | And then I don't know, your Honor.  Did you want to |
| 9 | also hear about the actual process about whether they would be |
| 10 | keeping their job or -- because that was in the order, that was |
| 11 | what we were asked to brief, so if you had enough in our brief, |
| 12 | then I won't. |
| 13 | THE COURT:  Yes, I think your brief addresses it |
| 14 | sufficiently for my purposes today.  I will, you know, at the |
| 15 | conclusion, give you some thoughts on issues that I see that |
| 16 | the parties can decide whether you're going to brief it for |
| 17 | Judge Caproni in connection with the hearing on the preliminary |
| 18 | injunction next week.  Today we're just talking about the |
| 19 | temporary restraining order. |
| 20 | MS. MINICUCCI:  Okay. |
| 21 | THE COURT:  I raise it because I do believe it goes to |
| 22 | the point of irreparable harm, and you did address it in your |
| 23 | briefing. |
| 24 | MS. MINICUCCI:  Okay.  So I'll just conclude then by |
| 25 | saying that, you know, the irreparable harm, as defined within |

LA51KANC

1     our brief, is being -- it will be remedied by money damages to

2     the extent the plaintiffs are successful.  The order, the DOH

3     order is lawful.  It allows for exemptions as amended on

4     September 28th, and frankly, plaintiffs are now making this

5     application after the mandate is in place, even though they

6     filed their original papers on September 21, and we litigated

7     two other vaccine cases completely, and those cases were

8     appealed.  Those appeals were heard and denied, and then they

9     waited almost seven days before filing this.

10          THE COURT:  Is the injunction seeking a mandatory

11     injunction or prohibitory injunction?

12          MS. MINICUCCI:  I'm not sure, your Honor.

13          THE COURT:  Okay.  That's another legal issue you all

14     might want to brief.

15          All right.  Anything else, counsel?

16          MS. MINICUCCI:  No.  Thank you, your Honor.

17          THE COURT:  All right.  As I say, the Court has

18     carefully read all the papers that are before me today, and

19     today, we are here only on plaintiffs' *ex parte* emergency

20     application for a temporary restraining order pending the

21     hearing on their motion for a preliminary injunction, which

22     will take place next week.

23          Plaintiffs are nine employees of the Department of

24     Education who filed this case on September 21st seeking to

25     enjoin New York City's vaccination mandate for all DOE

LA51KANC

employees.  That mandate was announced on August 23rd.  It was

originally scheduled to go into effect on September 27th, but

due to ensuing litigation, which these plaintiffs apparently

did not join, and the collective bargaining process,

implementation of that mandate was delayed to the close of the

day, I believe, last Friday, October 1st.

In the complaint that they filed in this case, at

paragraph 7, on September 21st, plaintiffs made the following

statement:  "Without relief, on or before September 27, 2021,

plaintiffs and thousands of other New York City teachers will

be harmed irreparably by loss of employment."  They then go on

to talk about alleged harm to the public at large, which I'm

not sure these plaintiffs even have standing to assert.  But in

any event, the point that I'm making is, on September 21st,

plaintiffs themselves affirmatively said that if they didn't

get relief by September 27, there would be irreparable harm.

No defendant, to the Court's knowledge, was served

with the complaint when this case was filed two weeks ago.  To

date there is still no proof of service on the defendants filed

on the docket.  In fact, the docket reflects that plaintiffs

waited until 3:30 in the morning yesterday to request that

summonses be issued for service on each of the defendants, and

the Court does not know if the defendants have yet been served

with a copy of the complaint.

Yesterday morning, October 4th, at approximately

LA51KANC

8 a.m., after the mandate went into effect, plaintiffs moved
for a temporary restraining order and a preliminary injunction,
seeking to halt implementation of the mandate on the grounds of
First Amendment violations, and they also appeared to challenge
the medical exemption as being too narrow.  That was filed
around the start of the school day, as I say, after the mandate
was already in effect.  No explanation was given in the moving
papers, as is required under the federal rules, for why the
application was made *ex parte*, why no notice was given to the
city.

Now turning to the merits, the Court does note that
the mandate as issued contained no exemption for religious or
medical reasons, and it's the Court's understanding that there
is no testing option for teachers under that mandate.  However,
after the mandate was issued, one of the unions for certain DOE
employees filed a grievance on behalf of its members, and as
part of that bargaining process, a neutral arbitrator was put
in place and ruled on the issue.

On September 10th, that arbitrator recognized a
medical and a religious exemption from the mandate.  The scope
of those exemptions is set out in pages 7 through 9 of the
arbitrator's decision.  And the arbitrator also set out a
process for applying for the exemption and for appealing from
any rulings and also set forth a remedy.  Specifically, the
arbitrator ruled that employees who have not requested an

LA51KANC

exemption or who have had their requests denied and do not

receive at least one dose of the COVID-19 vaccine may be placed

on administrative leave as of September 28.  And as I say, that

deadline was later extended to October 1st, last Friday.  Those

employees will be put on leave.  They don't get a salary, but

they are provided with full benefits until next September, and

there is apparently some process in place to try to apply to

extend that leave.

I just want to say a bit, for the record, about the

plaintiffs.

All of the plaintiffs, as I understand it, are

employees of the Department of Education, but as I noted in my

colloquy with counsel, some of those plaintiffs still have

appeals pending, some of those plaintiffs didn't even bother to

apply at all for the exemption, but at least one of those

plaintiffs has had -- and maybe more -- has had the appeal from

their application denied and therefore are subject to being

placed, and perhaps have been placed, on administrative leave.

One of the plaintiffs does assert an entitlement to a medical

exemption, and so there is a plaintiff with standing to address

that issue.  But I do note that that plaintiff has not

exhausted the process for the application because the record,

or at least her affidavit seems to reflect that she was told to

submit additional information and has not done that.  So there

is a question about the ripeness of that issue right now.

LA51KANC

1          I'm going to turn to the merits of the application

2     that's before me today.  And I start with the proposition that

3     injunctive relief is an extraordinary remedy, never awarded as

4     of right.  I'll also note that the law draws a distinction

5     between mandatory injunctions, which alter the status quo, and

6     prohibitory injunctions, which maintain it.  I asked counsel

7     about this.  The papers do not address this issue at all.  But

8     the Court sees an issue about the fact that given that the

9     injunction had already gone into effect by the time this

10    application for injunctive relief was filed, there's a question

11    about whether the relief sought is a mandatory injunction or a

12    prohibitory injunction that the parties have not fully and

13    fairly addressed.

14          There is some suggestion that in determining whether

15    an injunction is mandatory or prohibitory, the Court should

16    look to the last -- and this is a quote -- "the last actual

17    peaceable, uncontested status which preceded the pending

18    controversy."  That would certainly suggest that perhaps the

19    status quo is the set of circumstances that were in effect

20    before there was a mandate.  On the other hand, since the

21    plaintiffs waited until after the mandate went into effect,

22    there is case law that says if a plaintiff waits to contest the

23    change in circumstance, the relevant status quo may also

24    change.  And I am referring to a case called *Williamson v.*

25    *Maciol*, 839 F. App'x 633.  That's a 2001 case.

LA51KANC

1          Turning to the elements of an application for a

2   temporary restraining order -- and the elements are the same

3   with respect to both an application for a temporary restraining

4   order and ultimately for a preliminary injunction -- in order

5   to prevail on that motion, a plaintiff must demonstrate: (1)

6   irreparable harm if an injunction is not entered; (2) a

7   likelihood of success on the merits or sufficiently serious

8   questions as to the merits, plus a balance of hardships that

9   tips decidedly in the plaintiff's favor; (3) a balance of

10  hardships that tips in the plaintiff's favor regardless of the

11  likelihood of success; and (4) that an injunction is in the

12  public's interest.

13          I'll begin with the requirement for irreparable harm.

14  The law is well settled that irreparable harm is the single

15  most important prerequisite for issuance of injunctive relief.

16  And I would cite you to any number of cases that stand for that

17  proposition.  I don't think it's controversial, frankly.  I'll

18  refer you to the case of *Faiveley Transp. Malmo AB v. Wabtec*

19  *Corp.,* 559 F.3d 110, 118 (2d Cir. 2009).  But you can also look

20  at Wright and Miller's *Federal Practice and Procedures,*

21  Section 2951, Third Edition.

22          The case of *Jolly v. Coughlin*, which was referred to

23  by counsel for the plaintiffs, reported at 76 F.3d 468, 482 (2d

24  Cir. 1996), did say that a court will presume the existence of

25  irreparable harm when the plaintiff alleges a violation of a

LA51KANC

1   constitutional right.  However, as I discussed with counsel, if

2   a court finds it unlikely that a plaintiff will succeed on the

3   merits of the constitutional claim, the argument that he's

4   entitled to a presumption of irreparable harm based on an

5   alleged constitutional violation is without merit.  I'll

6   explain in a few minutes that I cannot find on the record

7   before me that plaintiffs are likely to succeed on the merits

8   of their claim.  I'm not saying they won't; I'm saying on the

9   record before me, plaintiffs have not made an adequate showing

10   to entitle them to a temporary restraining order.  As a result,

11   no presumption of irreparable harm attaches here.  Instead, we

12   look to the actual harm the plaintiff is asserting.

13          As I've said, as a result of non-compliance with the

14   mandate, plaintiffs are placed on unpaid leave with benefits,

15   including health care benefits.  If plaintiffs ultimately

16   prevail on their constitutional challenge, the alleged injuries

17   are entirely compensable by money damages.  I'll just note as

18   well that the Court finds this case is different than the harm

19   in the health care workers case.  I'll also note that the

20   Second Circuit -- I think I said this a few minutes ago -- the

21   Second Circuit has scheduled argument for I believe

22   October 14th in two cases involving the vaccine mandate.

23          I would note, too, that plaintiffs' delay in seeking

24   relief on a mandate that was announced in late August, and

25   where they themselves said they needed to get relief by

LA51KANC

September 27th and yet waited until after the mandate went into

effect to bring on this motion, undercuts their burden to show

irreparable harm.

The Court is also mindful of the potential harm --

actually, the very real harm -- that could flow to the city

were I to grant temporary injunctive relief.  If I were to

grant injunctive relief today pending the hearing next week,

there could be an enormous disruption in the conduct of school

for thousands of New York City schoolchildren.  The plaintiffs

will have a full opportunity to be heard on an appropriately

developed record next week when they have a hearing before

Judge Caproni.

In addition, the Court cannot ignore the harm that

could take place if the children in the school system were

exposed to the risks of COVID, which is the very harm that the

mandate is intended to prevent.  If that harm happens, it's a

harm that cannot be undone.

Turning to the likelihood of success on the merits,

the Court also finds, as I say, that on the record before me

now, plaintiffs have not met the burden of showing likelihood

of success on the merits.  The mandate on its face is neutral

and it is generally applicable, and that's what the Supreme

Court says is required.  Now the Court does acknowledge that

the exemptions arguably might raise serious issues in terms of

how they are being applied and, most particularly, since that's

LA51KANC

1    the argument that was developed in the record before me, the

2    religious exemption may well raise substantial constitutional

3    issues.  The Court notes that the Supreme Court said in

4    *Masterpiece Cakeshop v. Colorado CR Commission*, "The

5    government, if it is to respect the Constitution's guarantee of

6    free exercise, cannot impose regulations that are hostile to

7    the religious beliefs of affected citizens and cannot act in a

8    manner that passes judgment upon, or presupposes the

9    illegitimacy of, religious beliefs and practices."

10           Justice Ginsburg, although it is a dissenting opinion,

11   in *Trinity Lutheran v. Comer*, made the observation that faith,

12   they believed, was a personal matter entirely between an

13   individual and his god.  Religion was best served when sects

14   reached out on the basis of their tenets alone, unsullied by

15   outside forces, allowing adherents to come to their faith

16   voluntarily.  And similarly, in *Engel v. Vitale*, the Supreme

17   Court noted religion is "too personal, too sacred, too holy to

18   permit its 'unhallowed perversion' by a civil magistrate."

19           And plaintiffs do correctly point to the 1987 Eastern

20   District case that dealt with this precise issue and held that

21   the New York statute's limitation of a religious exemption from

22   vaccinations to those who are members of recognized religious

23   organizations is blatantly violative of a First Amendment

24   guarantee, and that's *Sherr v. Northport*.  And that case does

25   not appear to have been appealed.

LA51KANC

1          But as I said earlier, the religious exemption that's

2     at issue here was put in place by a neutral arbitration in

3     response to a labor grievance that was brought by certain other

4     parties not before the Court pursuant to a collective

5     bargaining agreement, as the Court understands it.  That

6     collective bargaining agreement is apparently a public-private

7     agreement, and again, it is not before the Court, but there is

8     a significant legal question that neither side has addressed

9     about whether the exemption is issued as part of a government

10    action and can therefore be the basis for a constitutional

11    challenge.  Also not addressed by the parties is: does the

12    collective bargaining agreement preempt, in effect, claims by

13    individual plaintiffs and instead require that any claim has to

14    be brought by the union itself.  The Court honestly doesn't

15    know the answer to that because I don't have any of the

16    documents in front of me.  But that is a significant issue that

17    goes to the ultimate merits of the case.

18          As I say, there may well be questions, serious

19    questions, about the impact on the plaintiffs' constitutional

20    rights here, but on the record before me, the Court cannot find

21    that plaintiffs have met their burden of showing a substantial

22    likelihood of success on the merits in light of these

23    questions.

24          The final element that plaintiffs need to carry the

25    burden on is that the balance of equities weighs in their

LA51KANC

1   favor.  Where the government is the opposing party, the Court

2   notes that the final two factors in the temporary restraining

3   order analysis -- the balance of the equities and the public

4   interest -- merge.  Here, I do find that the balance tips

5   against the plaintiffs because of their delay in bringing this

6   application.  Plaintiffs knew that the mandate would go into

7   effect over a month ago, and they waited until after the

8   mandate was already in effect to take action.  Moreover, there

9   can't seriously be a dispute that there is a compelling

10  government interest that is served by the mandate.

11          Numerous courts have held that the government's

12  interest in minimizing the spread of a deadly infectious

13  disease is a compelling state interest.  I note too again, as I

14  said a moment ago, there are two pending Second Circuit cases

15  that could serve to moot the issues in this case as well.

16  Given the imminence of a decision in those cases, the Court

17  does not believe it's appropriate to entertain or grant at this

18  point a motion for extraordinary injunctive relief sought on an

19  *ex parte* basis.

20          So for those reasons, the plaintiffs' application for

21  a temporary restraining order is denied.

22          As I said at the outset, Judge Caproni has scheduled a

23  hearing to take place next Tuesday.  If there's not an order

24  yet in place, we'll take care of making sure that one does get

25  entered, but I've mentioned to you some of the issues that I

LA51KANC

1    think need to be addressed more fully in order for plaintiffs

2    to meet their burden.

3            That is the Court's ruling.  It is so ordered.  And we

4    are adjourned.

5            MS. GIBSON:  Thank you, your Honor.

6            THE COURT:  Thank you.

7            MS. MINICUCCI:  Thank you, your Honor.

8                              o0o