**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Michael Kane; William Castro; Margaret Chu; Heather Clark; Stephanie Di Capua; Robert Gladding; Nwakaego Nwaifejokwu; Ingrid Romero; Trinidad Smith; Amaryllis Ruiz-Toro**. Plaintiffs, vs. **Bill de Blasio**, in his official capacity as Mayor of the City of New York; **David Chokshi**, in his official capacity of Health Commissioner of the City of New York; **New York City Department of Education.** Defendants. | **FIRST AMENDED CLASS ACTION COMPLAINT** CASE NO. 1:21-cv-7863 JURY TRIAL DEMANDED |

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*
— James Madison, A Memorial And Remonstrance, On The Religious Rights Of Man: Written In 1784-85

Plaintiffs, proceeding as a proposed class, herein complain of the Defendants as follows:

**NATURE OF ACTION**

1.      Ten educators employed by the New York City Department of Education ("DOE")

bring this proposed action lawsuit on behalf of themselves and all similarly situated DOE

employees to challenge and remedy blatantly unconstitutional policies adopted by the DOE, acting

in concert with the Mayor and Commissioner of Health for the City of New York, among other state actors, that facially and as applied discriminate against them and violate their rights.

2.      Specifically, Plaintiffs challenge the "Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination for Department of Education Employees, Contractors, and Others", first promulgated August 24, 2021 (the "Vaccine Mandate")[1], along with amendments and policies adopted in the implementation of the mandate.

3.      The Vaccine Mandate violates fundamental constitutional rights, both facially and as applied to these Plaintiffs and other similarly situated employees, arbitrarily and capriciously discriminates between employees based on religion and medical status – even though the employees pose no direct threat to others because of their religious and medical decisions – and places unconstitutional conditions on employment.

4.      In implementing this policy, New York City state actors adopted facially unconstitutional standards and policies subjecting Plaintiffs and thousands of other employees to per se unconstitutional heresy inquisitions and other religious harassment.

5.      Mayor de Blasio sanctioned and encouraged this discrimination. In press briefings, he made statements clarifying that the City adopted a preference for the Pope's viewpoint about what "scripture" requires on the topic of vaccines, and that the City would be preferencing Christian Scientists, Jehovah's Witnesses and other "standing member[s] of a faith that has a very, very specific long-standing objection" to vaccination. Mayor de Blasio further stated that the City would discriminate against anyone with beliefs that fall under the definition of heresy—that is, lesser recognized, unorthodox or personally held religious beliefs.

6.      Under this standard, people with personally held religious beliefs or unorthodox

---

[1] A true and accurate copy of the Mandate is attached hereto as Exhibit A;

religious beliefs were expressly singled out for discrimination even if their beliefs were sincere.

7.     In addition to being discriminatory, the Vaccine Mandate is irrational. It was promulgated after public health officials universally acknowledged that COVID-19 vaccines cannot stop transmission of SARS-CoV-2. The vaccines may blunt the severity of the disease, but the evidence does not support an assumption that they stop infection with and transmission of SARS-CoV-2 to others, or are necessary to stop the spread in the community. These vaccines are for personal protection. To the extent that the employees did pose any danger to others because of their vaccine status, other far less invasive measures are sufficient to ensure public safety.

8.     Even if there were a valid reason to require vaccination, there is no valid reason to discriminate against people based on whether they hold orthodox or unorthodox religious viewpoints.

9.     The Vaccine Mandate is also overbroad. It does not allow for reasonable religious exemptions afforded to all other New York City employees. Nor does it allow natural immunity to suffice, even though the data overwhelmingly shows that natural immunity is more robust and durable than vaccine immunity.

10.     Plaintiffs seek injunctive relief enjoining Defendants from enforcing the Vaccine Mandate, declaratory relief that the Vaccine Mandate is unconstitutional both facially and as applied, and an order modifying or striking it. Further, Plaintiffs seek actual and punitive damages and attorney's fees and costs.

## Jurisdiction and Venue

11.     This Court has jurisdiction to hear all federal claims asserted in this case under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States; the Supremacy Clause of the Constitution

of the United States, which allows federal district courts to hear suits alleging preemption of state and local laws by the Constitution and federal laws made in pursuance thereof; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343 in relation to Defendants' deprivation and infringement under color of law of the individual Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and laws, as detailed further herein.

12.     This Court has jurisdiction over the claims asserting violations of the laws and Constitution of the State of New York through its supplemental jurisdiction under 28 U.S.C. § 1367(a), as those claims are so closely related to the Plaintiffs' federal question and Section 1983 claims that they form part of the same case or controversy under Article III of the United States Constitution.

13.     This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorney's fees and costs under 42 U.S.C. § 1988.

14.     The United States District Court for the Southern District of New York is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendants deprived Plaintiffs of their rights and liberties under the laws and Constitution of the United States and violated the laws and Constitution of the State of New York, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continues to occur.

## PARTIES

### Plaintiffs

15.     As more particularly alleged below, the named Plaintiffs herein are ten teachers, educators and administrators employed by the DOE whose sincere religious beliefs compel them

to refuse available COVID-19 vaccines but who were nonetheless denied reasonable accommodation, discriminated against and harassed by their government employer.

16.     All Plaintiffs are employed by government entities covered by Title VII, which mandates the reasonable accommodation of sincere religious beliefs, and protected against any action by their government employer which violates the protections of the First Amendment and other Constitutional restraints on discrimination or burdens on their religious freedoms.

17.     All Plaintiffs and proposed class members work in the Southern District of New York and have standing to sue.

**Defendants**

18.     Defendant Mayor Bill de Blasio ("Mayor de Blasio"), sued in his official capacity, is the chief executive officer of New York City. He is responsible for exercising all powers vested in the city and ensuring the effectiveness of city government operations. Mayor de Blasio is the architect and proponent of the challenged Vaccine Mandate.

19.     Defendant David Chokshi ("Commissioner Chokshi") is the Commissioner of Health and Mental Hygiene of the City of New York ("DOHMH"). Sued in his official capacity, Commissioner Chokshi promulgated the Vaccine Mandate in coordination with Mayor de Blasio's directives.

20.     Defendant New York City Department of Education ("NYC DOE") is responsible for the management of the New York City School District and the administration of New York City's public schools. Through the issuance of Chancellor's Regulations, NYC DOE sets policies in New York City's public schools. NYC DOE is implementing the Vaccine Mandate in an unconstitutional manner. For all purposes, the NYC DOE serves as the government or public employer of all persons employed by it.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs seek certification of this action as a class action pursuant to Fed. R. Civ.

P. 23(a) and 23(b)(2) on behalf of the named Plaintiffs and the following class: employees of the

DOE who assert sincerely held religious beliefs against vaccination and were denied the

opportunity to be reasonably accommodated by a non-discriminatory review.

22.     Named Plaintiffs assert facial and pattern and practice claims which are common

and typical of the claims possessed by other similarly situated persons too numerous to be

individually joined in this matter (more than forty). They also assert disparate impact claims.

23.     These common questions predominate over more individualized analysis because

the relief Plaintiffs seek relates to Defendants' practices and policies which affect or may affect

each purported class member.

24.     The participation of each class member is not required for the efficient and fair

resolution of the issues raised herein.

25.     Plaintiffs are represented by competent counsel who have experience representing

large classes and litigating on their behalf.

26.     Proposed class representatives have no conflicts with other class representatives,

with class members or with counsel. The named class members will fairly and adequately

represent the interests of the class.

27.     Each named Plaintiff possesses a strong personal interest in the subject matter.

Absent class certification, there is a possibility of inconsistent results affecting class members.

## Facts

28.     By the end of July 2021, the scientific consensus among world public health

leaders coalesced around two facts: (1) vaccinated people could still catch and spread SARS-

CoV-2 and were equally as infectious as unvaccinated people; (2) herd immunity could not be achieved with presently available vaccines.

29.     Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the experimental COVID-19 vaccines. At a press conference, he described the goals of the program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities, indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[2]

30.     As the Mayor noted in the press conference, the goal was not to increase safety, but rather to increase rates of vaccination. Reliable studies consistently show that high rates of vaccination do not correspond to lower rates of community spread.

31.     Expert opinion is nearly unanimous that we cannot stop COVID-19 with vaccination, that we need to learn to live with COVID-19 as an endemic seasonal illness, and that everyone will eventually get COVID-19 whether they are vaccinated or not.

32.     On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against

---

[2]https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability

the now dominant delta variant are conclusive: though the vaccines can prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission. So if you are going home to somebody who has not been vaccinated, to somebody who can't get vaccinated, somebody who might be immunosuppressed or a little bit frail, somebody who has co-morbidities that put them at high risk, I would suggest you wear a mask in public indoor settings." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[3]

33.     Rather than cause him to cease or pause the mandates, the emerging consensus that the vaccines cannot stop transmission only prompted Mayor de Blasio to become more aggressive in his vaccine crusade.

34.     In the weeks that followed Dr. Walensky's announcement, Mayor de Blasio issued vaccine mandates for all employees and patrons of indoor dining, recreation and entertainment facilities and hospitals in New York City. He then issued a separate mandate for all New York City government employees, including employees of the NYC DOE, who were required to get vaccinated or be subjected to weekly testing requirements. As he issued this mandate, Mayor de Blasio announced that he hoped that the testing requirements would be so burdensome that people would be coerced into getting vaccinated to avoid the burden.

35.     No new emergency was guiding these efforts. The state of emergency had been lifted months before by the Governor, and there were no urgent increases in hospitalizations or deaths guiding the implementation of these policies in New York City or elsewhere in the State.

36.     On August 23, 2021, Mayor de Blasio and Commissioner Chokshi announced to the press that NYC DOE teachers would be subjected to even more aggressive mandates.

---

[3] http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

37.     Beginning September 27, 2021, the testing option would be removed for DOE employees, who would now have to get vaccinated to keep their jobs, with no exemptions offered and no possibility of less restrictive measures being implemented to accommodate them.

38.     The Vaccine Mandate was promulgated in writing by Commissioner Chokshi on August 24, 2021 with an original effective date of September 27, 2021.

39.     The Vaccine Mandate and the indoor dining bans were the first "no exemption option" vaccination mandates in the country.

40.     New York City labor unions unanimously decried the Vaccine Mandate as reckless and unlawful and announced that they would be taking legal action. Leaders from all major impacted unions, the Municipal Labor Committee, and leaders from each of the member unions of the MLC all put out statements that the Vaccine Mandate for teachers violates basic constitutional rights.

41.     Mass protests ensued and continue.

42.     In two cases, TROs were initially issued in large part because the mandate lacked any religious or medical exemption and the City refused to negotiate in good faith to provide.

### *The UFT and CSA Arbitrations*

43.     On September 1, 2021, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse, contending, among other things, that the DOE's failure to provide religious and medical accommodations is unlawful and that the DOE further failed to afford due process regarding job and benefits protection. The challenge moved to arbitration by agreement of the parties.

44.     On September 10, 2021, a decision was rendered by Arbitrator Scheinman (who has served as a major donor and fundraiser to the mayor) requiring that the DOE provide full-

time UFT-eligible employees with medical and religious exemptions, as defined in the arbitration award ("Arbitration Award"). A true and accurate copy of the UFT Arbitration Award is attached hereto as Exhibit B.

45.     Subsequently, the Counsel of School Supervisors and Administrators ("CSA") submitted the matter to Arbitrator Scheinman, who predictably issued a materially identical award covering CSA employees on September 15, 2021. A true and accurate copy of the CSA arbitration award is attached hereto as Exhibit C.

46.     The NYC DOE did not release this policy to the employees until September 20, 2021. The deadline to apply was September 21, 2021. Substantially similar awards were issued for other DOE employees as well, with similarly unreasonable application deadlines.

47.     Pursuant to the arbitration awards, covered employees seeking an exemption for religious reasons were given only a few days (or in some cases one day) to prepare and submit their applications even though these requests require, in addition to thoughtful and detailed explanations of faith written by the employees, documentation from religious leaders – specifically clergy members.

48.     The exemptions and process afforded by Arbitrator Scheinman in the UFT and CSA arbitration awards purport to protect and require exemptions. However, in fact, they articulate a policy designed to preclude reasonable accommodation.

### *The Religious Exemption is Unconstitutional*

49.     The Arbitration Award correctly notes that a religious exemption is legally required in addition to a medical exemption. However, it provides an inadequate and arbitrarily narrow definition of an "acceptable" religious exemption which discriminates against people with religious beliefs that are not held by the mainstream.

50.     The criteria advanced by the Arbitration Award require the state to impermissibly pass judgment on which religions are "valid" and which it will decline to acknowledge or give its blessing.

51.     Under the terms of the award, people who follow personal religious paths, or who belong to religions that are not "established" and "recognized" by the random reviewing administrator will not be considered.

52.     The policy provides that religious objections based on personally held religious beliefs, and not necessarily echoed by the official doctrine of a church as relayed by "clergy", will be denied.

53.     Moreover, to be considered, the exemption "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs.

54.     There are more restrictions. To the extent that people have "recognized" church leaders that write letters attesting that a person has religious beliefs against vaccination and these beliefs are the beliefs of the church, this documentation cannot be available online. If the church has placed a description of their ministry online, the person will be denied an exemption.

55.     Additionally, if a person does happen to belong to an "established" and "recognized" religious organization that is hierarchical and provides letters from clergy (that are not available online), that person will still be denied if any "leader" of that person's "religious organization" has ever spoken publicly in favor of vaccination.

56.     "Leader" is not defined and in practice, the DOE has interpreted this very broadly (i.e., if one is Jewish, and any Jewish faith leader has ever made a statement in favor of vaccines,

the DOE zealously argued that the employee's religious exemption should be denied even if the employee's particular faith did not include following that particular "religious leader").

57.     The language of the policy shows that the intention is to deny everyone. In fact, the policy gives only one example of a religion that will be accepted for exemption: Christian Science.

58.     Supervisors advised teachers that the DOE intended to deny all religious exemptions other than Christian Science-based objections. They asserted that the DOE has instructed, without authority, that "all other religions have publicly made statements in support of vaccination" and thus that anyone belonging to any other religion than Christian Science must be denied.

59.     This widespread, acknowledged policy reflected Mayor de Blasio's stated approach. In a press briefing held on September 23, 2021, he was asked how the City intended to implement the religious exemption policies and what criteria would be used. He responded:

> **Mayor:** [responding to question about the City's stance on granting religious exemptions]: Yeah, it's a great question. Thank you. Yes. **And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated**. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection**.

60.     These policies are as blatantly unconstitutional as they are repulsive. This issue is long-settled, and it shocks the conscience that this type of unconstitutional discrimination would intentionally be resurrected by the DOE.

61.     In the 1980s, the New York State Legislature similarly limited religious

exemptions, only allowing exemption from vaccination to families who were "bona fide members of a recognized religious organization" with teachings that were contrary to immunization.

62.     After parents with personally-held religious beliefs challenged the language codified into the Public Health Law in federal court, it was determined that the statute violated the Establishment Clause of the United States Constitution in a number of ways, one of which was to exclude those with personally held religious beliefs from protection.

63.     As a result of that holding, New York State had to change its statutory language to provide religious exemptions to anyone who holds a religious objection, whether personally held or echoed by an established religious organization. No certification from clergy or attestation of membership could be required.

64.     To this day, the amended Section 2165 of the New York State Public Health Law, which governs immunization requirements for adults, subsequently states: "this section shall not apply to a person who holds genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such person being admitted or received into or attending an institution."

65.     Such broad and equal protection is the Constitutional floor. The City violated the rights of thousands of employees by adopting this facially unconstitutional policy to administer so-called "reasonable" accommodations required by the First Amendment and Title VII.

***The proposed process for determining exemptions is inadequate and reckless***

66.     The process was intentionally set up to make it impossible to receive a meaningful chance at a religious exemption, while attempting to sidestep the expected lawsuits about the unconstitutionality of withholding such exemptions.

67.     Indeed, upon the proclamation that the City now had a mechanism for religious

and medical exemption, the temporary restraining orders were dissolved.

68.     However, no court has looked at the adequacy of the process, which, if they had, would have been readily revealed as facially unconstitutional.

69.     In addition to discrimination claims, Plaintiffs, many of whom are tenured teachers and staff, have procedural due process rights that were grossly violated by the DOE's policy.

70.     Pursuant to the approach handed down in the arbitration awards, and eagerly adopted by the City, religious and medical exemptions were supposed to be reviewed by the "staff" in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and the Office of Employee Relations.

71.     The reviewing staff did not possess specialized education in religion or religious matters and were not qualified to pass judgment on the validity of fellow NYC DOE employees' religious beliefs (even if such blatantly unconstitutional practices were somehow allowable).

72.     Requests were supposed to be uploaded into the SOLAS system. It jammed and some people were unable to upload anything.

73.     Moreover, the time frame for review was absurd. The due date for all employees to submit religious or medical exemptions was September 20th by close of business (a Monday; or Tuesday, September 21, 2021 for CSA members). Decisions were to be rendered by Thursday, September 23rd.

74.     With less than three days to review thousands of medical and religious exemption requests, the staff did not have time to meaningfully consider the applications in an individualized manner.

75.     Rather than make any individualized determination, as required by Title VII, the

DOE instead simply issued summary blanket denials to *every* employee that applied for religious accommodation, stating that it would be an undue hardship for the DOE to grant *any* accommodation.

76.     This review policy does not make sense. Plaintiffs have been safely working in schools for the last year and a half, and were allowed to continue to keep working safely in person in schools for a month and a half *after* the "emergency" regulation was promulgated by Defendant Chokshi on August 24, 2021.

77.     Even employees who did not ever work in school buildings, such as named Plaintiff Heather Clark, and employees who could easily be accommodated by working remotely according to building principals (such as computer programmer declarant Robert Dillon) were summarily denied on the allegation that it would be an undue hardship because "unvaccinated employees cannot work in a school building without posing a direct threat to health and safety. Due to the configuration for the 2021 - 2022 school year, which includes no remote classwork, we cannot offer another worksite as an accommodation."

78.     Employees had one day to appeal their denials.

79.     Plaintiffs received no information about why they were denied other than that the DOE takes the position that any accommodation for religious beliefs would be an undue hardship, even for employees who were already working remotely. Plaintiffs had no basis to understand what supplemental materials might be relevant or needed.

80.     The appeals process was just as arbitrary as the underlying blanket denial. With no rhyme or reason, some employees were given the opportunity to participate in a "Zoom hearing" and others were simply issued a paper with a box checked stating "denied" with no further explanation.

81.     Pursuant to the DOE policy, the arbitrator can, in his or her individual discretion, elect to hold an expedited hearing, though a hearing is not guaranteed and cannot be requested. No reason was provided to Plaintiffs if they were denied the opportunity for a hearing.

82.     Declarant Robert Dillon, for example, submitted a sincere and valid religious exemption on time. It was summarily denied on the ground that it would present an "undue hardship" to accommodate him. He then timely submitted a letter from his building principal, stating that it would not be an undue hardship to accommodate him remotely as a computer programmer, and that it would cause an undue hardship to the school to lose him. He was again summarily denied by Arbitrator Scheinman, who simply rubber stamped a checkbox stating "denied" with no further information and no opportunity for a hearing.

83.     Several named Plaintiffs with sincerely held religious beliefs against vaccination were similarly denied the right to even have a Zoom appeal, even though their applications met the criteria set forth in the discriminatory policy in that they are sincere in their religious beliefs.

84.     The arbitration hearings, if offered, were last-minute and held by Zoom. No cross examination was allowed. Employees were not allowed to bring their own expert witness to testify, nor were they given any advance notice of documents or arguments to be made by the DOE against them. According to the award, no written decisions were issued after hearings to explain the basis for denial.

85.     Most of the named Plaintiffs who were offered Zoom hearings were given arbitration deadlines on or after October 1, 2021 and were thus in "pending" status at the time the vaccine mandate was to take effect (October 4, 2021 – moved back from the original deadline as a result of multiple lawsuits and restraining orders).

86.     At the Zoom appeals, the DOE representatives zealously argued that the standards

should be even more unconstitutional and discriminatory than required by the awards.

87.     In Plaintiff Chu's Zoom appeal, the DOE argued that she should be denied because the Pope got vaccinated and called vaccination an act of love. When Ms. Chu noted that she was following her moral conscience in accordance with the Catholic Church's central tenets, the DOE and the arbitrator both stated that though Ms. Chu was sincere, she should be denied because the Pope disagrees with her interpretation of her responsibilities to God and the Pope is more "qualified" than a "lay person" to determine a valid religious viewpoint.

88.     In Plaintiff Kane's appearance, the DOE representatives argued zealously that Mr. Kane, who holds personal religious beliefs grounded in the teachings of Buddha and Christ, should be denied because his Buddhist beliefs are not shared by Pope Francis. When directly asked by the arbitrator whether the DOE alleged that Mr. Kane is insincere in his beliefs against vaccination, the DOE said that he was not found to be insincere, but that his beliefs conflicted with Pope Francis' beliefs and thus should be denied.

89.     In Plaintiff Castro's appearance, the DOE attorneys argued vociferously that Mr. Castro's entire religion was invalid because it was contradicted by Pope Francis. Mr. Castro belongs to a non-denominational Christian church that shares his beliefs. Although not a Catholic church, DOE representatives acknowledged that he was sincere but stated that he should be denied because his Church's teachings were not shared by Pope Francis.

90.     Additionally, the DOE took issue with Mr. Castro's objection to the use of aborted fetal cells in the research and development of the COVID-19 vaccines. DOE representatives stated that he should be denied. Relying on a letter from Defendant Chokshi asserting that aborted fetal cells were not used in developing the vaccines, DOE determined Mr. Castro was wrong. In fact, aborted cells were used in developing all three vaccines. Mr. Castro politely pointed this out

and noted that the religious debate was not about whether they are used but what degree of participation in abortion is acceptable to various religious people. The DOE's comments in these three arbitrations is representative of the repeated conduct in all, or nearly all, of the other Zoom appeals reflecting a widespread, pervasive pattern and practice of zealous attempts to discriminate. On advice by the mayor, these denials were even more discriminatory than the arbitration awards required, Sincerity was not at issue. For the DOE, the primary argument was an unconstitutional conviction that these religious viewpoints were themselves invalid and in conflict with the state's preferred, "sanctioned" religions.

91.     When Plaintiffs filed this suit on September 21, 2021, most had not yet even received their initial blanket denials. At that time, they presciently asserted the following:

"***Form DOE denials have started to be issued and reveal that no one will be exempt***"

92.     But no one would be accepted under this system. Just a few days into the new procedure, it was already clear that the NYC DOE, working in concert with the other Defendants, had no intention of allowing anyone to receive an exemption.

93.     First, the NYC DOE instructed principals and supervisors to ask their employees to meet with them if they were considering submitting a religious or medical exemption in order to discourage the employees from applying, and instead pressured them to resign.

94.     Employees report widespread similar conversations with principals and supervisors across the DOE in which they were told point blank that it is impossible to get an exemption and were advised to quit.

95.     Some of the Plaintiffs filed early, hoping that their applications would receive more meaningful review with more time.  Upon information and belief, they all received the same response, regardless of their religious sincerity, documentation or need for exemption:

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation because, per the order of the Commissioner of Health, unvaccinated employees cannot work in a school building without posing a direct threat to health and safety. Due to the configuration of the 2021-2022 school year, which includes no remote classwork, we cannot offer another worksite as an accommodation, as that would impose an undue hardship (more than a minimal burden) on the DOE and its operations. This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of the UFT and the Board of Education regarding the vaccine mandate.

The letters are signed "HR Connect" and come from a no reply email address. As these denials point out, even if a person meets the "criteria" for a religious exemption, they will be denied any accommodation, as the DOE views accommodation as an undue burden.

96.     In sum, the Arbitration Awards do not solve the Constitutional problems with the Vaccine Mandate. Though the arbitration clearly held that religious and medical exemptions are legally necessary, religious and medical exemptions are not in fact available. The NYC DOE takes the position that it would be an undue hardship to allow any exemption given that the Vaccine Mandate still prohibits exempt employees from entering any school building.

***Events Subsequent to Filing***

97.     Plaintiff Smith was so shocked by the blatantly discriminatory religious exemption policy that instead of submitting to the unlawful process, she filed this suit.

98.     Plaintiff Smith grew up in an orphanage in Columbia and is a deeply religious person. She has personally held religious beliefs and rejects the City's decision to subject her and others to heresy tribunals if their beliefs are not shared by state-preferred "sanctioned" religious leaders. All other named Plaintiffs submitted their exemptions under duress.

99.     When they originally filed this suit on September 21, 2021, many had had no response yet. Some, who filed early, had already received immediate summary denials identical

to the language in Paragraph 95.

100.   All Plaintiffs and all those similarly situated got the denial within a day of this lawsuit being filed. Each timely appealed.

101.   About a third were denied the right to a Zoom hearing (arbitrarily and without explanation). These Plaintiffs received emails indicating that they were to stop coming to work effective October 4, 2021, on which day they would be removed from the payrolls. They would be placed on "leave without pay", under which they could not work, could not earn any money from any source (even outside work) and they could not receive unemployment compensation. If they wanted to keep their benefits and receive payment for their accrued paid time off, they would need to waive their right to sue on or before one of two deadlines (October 29 to receive paid time off, November 30th to keep receiving benefits and to keep seniority and tenure track status for a year).

102.   Most of the Plaintiffs were still "pending review" on October 4, 2021.

103.   Though many were still pending on October 4, 2021, Plaintiffs elected to file for emergency injunctive relief on October 4, 2021, the effective date of the removal of most employees from payroll and all affected employees from school buildings.

104.   Plaintiffs and their colleagues are working class people without substantial resources to spend on attorneys.

105.   Plaintiffs had to fundraise money to bring a suit and were trying to conserve their resources to file at the right time. Had they filed earlier, they would not have had their Zoom appeals yet heard and understandably believed a motion might be dismissed due to not being ripe.

106.   At 8 am on October 4, 2021, after working tirelessly all weekend to put together an emergency appeal with sufficient evidence to succeed (sworn declarations from experts,

declarations from those who had been discriminated against and legal arguments), Plaintiffs filed their motion.

107.   Defendants and the lower court argued that Plaintiffs motion was both "unripe" and too late.

108.   By the date of the preliminary injunction hearing on October 12, 2021, Plaintiffs had all been summarily denied except for one – Plaintiff Toro.

109.   Plaintiff Toro's application was accepted. Since October 4, 2021, Plaintiff Toro has had to be segregated from her co-workers and has been subjected to regular harassment, coercion and derision for her decision not to receive a COVID-19 vaccine.

110.   Plaintiff Toro is also unable to complete her required classroom hours, which she needs to be able to finish her qualification as a principal, because she is barred from entering any classroom to observe.

111.   Until she applied for a religious exemption, Plaintiff Toro had an unblemished record and enjoyed widespread respect and praise from her co-workers and supervisors. She now feels she is being pushed out and harassed.

### *The Vaccine Mandate Lacks Scientific Support*

112.   There is no valid justification for the state to exclude unvaccinated employees from all school buildings in New York City.

113.   Not only does the Vaccine Mandate burden Plaintiffs' fundamental religious rights, their right to medical privacy and self-determination in medical choices, but the City's policy is also irrational.

114.   To date, no peer reviewed study supports the assumption that the vaccinated are not able to spread SARS-CoV-2 or are substantially less infectious than unvaccinated people,

particularly against the now dominant strains of SARS-CoV-2 widely circulating.

115.    On the contrary, transmission was not even studied in clinical trials, and it was expressly acknowledged from the outset that these vaccines cannot provide sterilizing immunity. These vaccines were not designed to stop transmission and the evidence-based science conclusively shows that they do not stop transmission of SARS-CoV-2, but are for personal protection only.

116.    Any initial hopes that the vaccines would somehow turn out to provide sterilizing immunity have long-since been dashed, particularly with the dominance of the delta variant.

117.    In July, the CDC released the findings of a study confirming the vaccinated are as infectious as the unvaccinated. The study also showed the vaccinated are as likely to contract COVID-19, and asymptomatic vaccinated people were just as infectious as asymptomatic unvaccinated people.[4] Multiple other studies emerged at the same time showing the same findings.

118.    The same month cases skyrocketed in the most highly vaccinated nations, public health officials around the world began universally releasing statements that herd immunity would not be possible with these vaccines because they do not stop infection and transmission, at best only mitigating symptoms.

119.    Moreover, at the same time, evidence emerged that the vaccines were even waning in efficacy for symptom mitigation thus prompting many to start advocating for boosters after a few months. Studies from Israel and other highly vaccinated countries show efficacy plummeting

---

[4] Brown CM, Vostok J, Johnson H, et al. Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings – Barnstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep. ePub: 30 July 2021. DOIhttp://dx.doi.org/10.15585/mmwr.mm7031e2 Last Viewed on August 4, 2021.

Complaint for Declaratory and Injunctive Relief

less than eight weeks after vaccination.

120.    At the same time, study after study came out showing that unlike vaccine immunity, natural immunity appears to be durable and far more robust. Those with natural immunity cannot typically transmit virus to other people and the protection appears to be long-lasting and possibly lifelong. [5]

121.    These Plaintiffs, most of whom have already had COVID-19 when they were working on the front lines for the last year and a half without any provided PPE or available vaccines, pose no danger to those around them and are more protected than those who have been vaccinated.

122.    In short, Plaintiffs do not meet the criteria for constituting a "direct threat" to those around them. The City's policy cannot override their rights to choose what to do with their bodies or receive religious accommodation.

123.    The Vaccine Mandate is not based on any science that showed it was necessary or appropriate (or even safe) to impose burdens on the unvaccinated but not the vaccinated in such an inflexible manner. Rather, Defendants promulgated the discriminatory regulation as part of a political strategy to coerce people into participating in the experimental vaccine program.

124.    This is not an acceptable purpose. Coercing the use of experimental vaccines is not only unlawful, but also defined as a war crime, and cannot be tolerated in a just society.

### *EUA Vaccines Cannot be Mandated as a Matter of Statutory Condition*

125.    As a threshold matter, the only available vaccines in New York State are still authorized only pursuant to Emergency Use Authorization (EUA), which conditionally allows

---

[5] *See, e.g.,* Turner, J.S., Kim, W., Kalaidina, E. *et al.* SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans. *Nature* **595**, 421–425 (2021). https://doi.org/10.1038/s41586-021-03647-4 Last Reviewed September 20, 2021.

unapproved products to be offered for use during an emergency pursuant to Section 564 of the

Food, Drug, and Cosmetic Act ("FDCA"), codified at 21 U.S.C. § 360bbb-3 ("Section 564").

126.    One of the conditions of any EUA product is that the product cannot be mandated

or coerced. *See, e.g.,* Section 564, 21 U.S.C. § 360bbb-3(e)(1)(A)("the Secretary … shall …

establish … [a]ppropriate conditions designed to ensure that individuals to whom the product is

administered are informed … of the option to accept or refuse administration of the product...")

127.    FDA guidance defines the option to refuse as a substantive *right* guaranteed to all

individuals:

> [A]s a general rule, persons must be made aware of their right to refuse the
> product (or to refuse it for their children or others without the capacity to consent)
> and of the potential consequences, if any, of this choice. An exception to this rule
> is that the president, as commander in chief, can waive military personnel's right
> to refuse this product. If the right is not specifically waived by the president for a
> particular product given under EUA, military personnel have the same right to
> refuse as civilians. [6]

128.    On August 23, 2021, in response to enormous political and industry pressure, the

FDA did issue its first approval of any vaccine against COVID-19.

129.    However, this one approved vaccine is not available in New York.

130.    The circumstances are odd, and a lawsuit is pending on this issue against the FDA.

Essentially, the FDA licensed one manufacturer of the Pfizer-BioNTech vaccine to produce an

approved COVID-19 vaccine, which must be labeled Pfizer "Comirnaty." The same day,

however, the FDA issued a renewed EUA authorization for all other Pfizer-BioNTech vaccines,

including those currently available in New York.

131.    The FDA asserts that "the licensed vaccine has the same formulation as the EUA-

---

[6] 6 Nightingale SL, Prasher JM, Simonson S. Emergency Use Authorization (EUA) to Enable Use of Needed
Products in Civilian and Military Emergencies, United States. Emerging Infectious Diseases. 2007;13(7):1046.
doi:10.3201/eid1307.061188 available at https://wwwnc.cdc.gov/eid/article/13/7/06-1188_article#r1 (emphasis
added).

authorized [unapproved] vaccine" but notes that the "products are legally distinct."

132.    While the FDA asserts (without explanation) that the safety and effectiveness is the same in both the licensed and the EUA product, the reality is that the EUA version is still subject to the clear prohibition on any mandate for EUA products. It is not clear why the FDA elected to refrain from approving or licensing the Pfizer-BioNTech version of the vaccine. However, the FDA cannot overrule the statutory protection provided to EUA products by stating that the products are similar or even identical "but legally distinct."

133.    Either way, the only available vaccines in New York are those conditionally authorized under EUA status, which cannot be mandated. Bottom line, Comirnaty is not available in New York, therefore no vaccine can be mandated under federal law.

134.    Even if Comirnaty vaccine was offered in New York, or "full approval" were to be rushed through for the Pfizer-BioNTech or one of the other available EUA vaccines (as some sources announce may occur this fall due to political and corporate pressures) the vaccines have not been tested for any sufficient length of time to be categorized as anything other than experimental for purposes of fundamental rights analysis.

135.    Two of the three available COVID-19 vaccines are mRNA vaccines. Though these are much faster to produce than traditional vaccines, no one has ever before made an RNA vaccine that has progressed past animal trials before.

136.    Moreover, approval does not take a vaccine out of the experimental phase. Rather, after initial approval, the vaccines still must undergo Phase IV trials, rendering all participants subjects in experimental vaccine trials even if they were to be able to take the Comirnaty vaccine.

137.    Neither does approval change the fact that these will continue to be experimental products for many years to come, given that no long-term studies can occur until enough time

has passed since these vaccines were introduced into human trials.

### *The Vaccine Mandate Coerces Participation in Experimental Medicine*

138.    Receipt of a COVID-19 vaccine is, and for many years to come will, constitute participation in experimental medicine. Experimental medicine cannot be mandated or coerced.

139.    In April 2020, a handful of top health and defense department officials concocted a plan to bring a COVID-19 vaccination to market with unthinkable speed.

140.    The program was initially dubbed "MP2" for "second Manhattan Project", named after the devastating race to create nuclear weapons after World War II. Eventually, it became known as "Operation Warp Speed."

141.    Alex Azar, then Health and Human Services Secretary and long-time pharmaceutical company executive, was quoted as saying "if we can develop an atomic bomb in 2.5 years and put a man on the moon in seven years, we can do this [put out a vaccine in less than a tenth of the time it normally takes to establish safety] *this* year, in 2020."

142.    Typically, vaccines take at least a decade and often longer to progress through safety trials to get to market. Historically, the required process is as follows:

    a.   Exploratory Stage: Laboratory and Animal Studies. This stage typically lasts 2-4 years, during which time scientists ensure that the product is safe in animals over long periods of observation.

    b.   Pre-Clinical Stage: next, additional animal testing is done to determine the safest dosage and method and schedule of delivery of the vaccine. Challenges may also take place, in which animals are vaccinated and then infected with the target pathogen to ensure that there aren't inflammatory impacts that occur upon rechallenge. The pre-clinical stage usually lasts 1-2 years at minimum. Once

completed, developers can apply to begin testing on human subjects.

c.   Phase I Trials. The first human test stage assesses 20-80 subjects. The goals of this phase are to assess the safety of a candidate vaccine and note the response. Subjects are supposed to be carefully monitored and controlled. Typically, this phase lasts 1-2 years.

d.   Phase II Trials. This stage is larger – usually hundreds of individuals. Unlike Phase I, the trials are randomized, well-controlled, and include a placebo group. The goal is to hone dosing and to begin to assess safety, proposed schedule, and method of delivery. This phase lasts 2-3 years on average.

e.   Phase III Trials. If successful over time, Phase III is commenced, involving thousands to tens of thousands of people. The Phase III tests must be randomized and double-blind and involve a placebo. The goal is to assess the vaccine's safety in a large group of people. Rare side effects often do not surface in the smaller trials. To detect a significant difference for a relatively low-frequency adverse reaction, the trial would have to include at least 60,000 subjects, half of them in the control group with no vaccine.[7] This phase usually lasts 5-10 years.

f.   After a successful Phase III trial, the vaccine developer will submit a Biologic License Application to the FDA. The FDA then inspects the factory where the vaccine will be made and approves the labeling of the vaccine.

g.   The approval phase does not end the testing phase, and a vaccine is still experimental.

h.   Approval by the FDA initiates Phase IV vaccine trials, which last for years after

---

[7] Plotkin SA et al. Vaccines, 5th ed. Philadelphia: Saunders, 2008.

the initial license is granted. Even post-approval, recipients of the vaccine are still part of ongoing Phase IV trials, whether they are aware of this or not.

143.   According to an article published in April 2020 in the New York Times, it would take at least until November 2033 for any COVID-19 vaccine to be available under normal procedures, and most of the vaccines would be expected to fail before they were determined to be safe and effective enough for licensure.[8]

144.   Less than ten percent of vaccines ever even make it past Phase III under normal circumstances. They either prove to be ineffective, have too many side effects, or in some cases, make the person less safe to the ravages of the virus. This is not always immediately apparent. It can take years to discover these problems.

145.   And yet, under Operation Warp Speed, experimental COVID-19 vaccines were offered to the public eight months after they were conceived, in less time than it typically takes to even assess the safety of a vaccine for purposes of introduction into human trials after pretrial animal challenge studies have established a baseline modicum of minimal safety controls.

146.   To expedite the COVID-19 vaccines, Operation Warp Speed allowed developers to skip, overlap and shorten many phases, including animal safety studies, and to use research done previously in SARS, RSV and MERS vaccines which may not have had any real relevance or bearing on these COVID-19 vaccines.

147.   None of these prior SARS, RSV and MERS vaccines were actually ever approved before now, because "the data generated in the development and testing of these vaccines suggest a serious mechanistic concern: that vaccines designed empirically using traditional approach (consisting of the unmodified or minimally modified coronavirus viral spike to elicit neutralizing

---

[8] https://www.nytimes.com/interactive/2020/04/30/opinion/coronavirus-covid-vaccine.html

antibodies), be they composed of protein, viral vector, DNA or RNA and irrespective of delivery method, may worsen COVID-19 disease via antibody-dependent enhancement (ADE)."[9]

148.    ADE is very serious and can cause death and severe injury to a person whose immune system is improperly primed, and thus overreacts to subsequent encounters with a virus that they were vaccinated for, or even another similar virus. It is not uncommon for ADE reactions to result in death.[10] ADE does not always become apparent right away.

149.    We do not have sufficient data to determine if ADE is happening or will occur in any vaccinated people rechallenged with SARS-CoV-2 or any of its variants. That is one of the potential issues that scientists are still in the early stages of monitoring.

150.    There are many more potential problems that are still being monitored. It simply is not possible to understand the long-term effects of this vaccine until we have waited long enough to receive long-term data.

151.    A study published in the International Journal of Clinical Practice in March 2021 found that patients' right to informed consent was violated in the pre-license phase trials and would be violated if not communicated properly even after FDA approval because "the specific and significant COVID-19 risk of ADE should have been and should be prominently and independently disclosed to research subjects currently in vaccine trials, as well as those being recruited for the trials **and future patients after vaccine approval**, in order to meet the medical ethics standard of patient comprehension for informed consent."[11]

152.    These facts are relevant because there is an independent fundamental right to

---

[9] Cardozo T, Veazey R. Informed consent disclosure to vaccine trial subjects of risk of COVID-19 vaccines worsening clinical disease. Int J Clin Pract. 2021 Mar;75(3):e13795. doi: 10.1111/ijcp.13795. Epub 2020 Dec 4. PMID: 33113270; PMCID: PMC7645850. Last reviewed September 18, 2021: https://pubmed.ncbi.nlm.nih.gov/33113270/

[10] https://www.nature.com/articles/s41564-020-00789-5
[11] Cardozo article *Id.*

refuse experimental medical treatment.

### *Plaintiffs Injuries and Standing to Seek Declaratory and Injunctive Relief*

153.     All Plaintiffs have sincere religious objections to vaccination and are entitled to

opt out of these vaccines both because they are experimental medicine and because the vaccines

conflict with their deeply held religious beliefs.

154.     They bring this suit on behalf of themselves and in hopes of getting relief for all

similarly situated teachers and educators in New York City, who have the right to make their

own free, uncoerced decisions regarding the use of an experimental medical product that cannot

prevent transmission of disease and to which so many have religious objections.

### *Plaintiff 1 – Michael Kane*

155.     Michael Kane ("Mr. Kane") is a resident of Nassau County and has been a special

education teacher in New York City public school system for over fourteen years.

156.     Mr. Kane currently teaches in special education at a public school in Queens.

157.     Mr. Kane objects to the Vaccine Mandate due to his long-standing sincerely held

religious objections to vaccines.

158.     These religious objections are sincerely held, and deeply personal. Mr. Kane was

raised Buddhist and Catholic, and experienced religious intolerance to his unusual religious

beliefs as a child.

159.     Through the years, and after battling addiction and depression, Mr. Kane found

salvation in his deep personal relationship with God, and the spiritual forces of Christ and

Buddha.

160.     Mr. Kane derives his religious beliefs from personal communion with God,

meditation, and prayer, as well as study of the sacred teachings of Buddha, Christ and spiritual

texts.

161.    He does not blindly follow the dictates of any one preacher or clergy member, and objects to having to submit any "certification" from an outside party about what his faith is or should be.

162.    Mr. Kane's clear guidance from prayer and meditation is to refrain from vaccination. This is in line with the religious beliefs that he relied upon to free himself from addiction and depression by giving up pharmaceutical interventions that he'd been using to unsuccessfully treat his condition, and instead turning to prayer.

163.    Pursuant to his personal religious beliefs, Mr. Kane has not had a flu vaccine or any other vaccine for over twenty years.

164.    Because Mr. Kane practices a personally derived religious path, rather than following the dictates of a mainstream religious narrative or the direction of a hierarchical religious order, he is not eligible for a religious exemption under the Arbitration Award.

165.    His religious beliefs are no less sincere, however, and he cannot take the COVID-19 vaccine without violating the sacred tenets of his faith.

166.    Mr. Kane duly submitted an exemption request on Monday, September 20, 2021. By the end of the day, he received the form letter claiming he was denied on the basis of undue hardship.

167.    Mr. Kane is a dedicated and experienced tenured teacher. He teaches some of the most vulnerable students in New York City, in a field that is terribly understaffed.

168.    Mr. Kane's students are very attached to him.

169.    When Mr. Kane was removed from the classroom, many of his students suffered serious harm and neglect.

170.    They are not receiving their mandated services, they do not have adequate tenured and trained teachers, and they are daily subjected to danger and neglect.

171.    Mr. Kane was subjected to discrimination and harassment by DOE employees in his Zoom arbitration.

172.    It was humiliating to be told that his beliefs were invalid because they conflict with the Pope's.

173.    Mr. Kane was left in pending status for several days after his Zoom appeal, but finally summarily denied any accommodation after the initial TRO appearance on October 4, 2021.

174.    Mr. Kane had COVID-19 and upon information and belief, has natural immunity.

175.    Mr. Kane does not pose a significant risk to anyone else based on his vaccine status and has been safely teaching in the NYC schools throughout the pandemic.

176.    He has a family to support, and losing his job has been very hard on him and his family.

### Plaintiff 2 – William Castro

177.    William Castro ("Mr. Castro") is a resident of Pennsylvania and works in the New York City School District as an administrator in the Bronx Borough Office.

178.    He has been working in the New York City Public School system for over twelve years.

179.    Mr. Castro was born and raised in New York City and grew up in public housing in Queens. Early on, he developed an appreciation for the power of education, seeing that it could elevate people's lives and provide meaningful opportunities.

180.    He knew, from a young age, that he wanted to be an educator.

181.    Mr. Castro began his career as a teacher teaching English in public schools on the Lower East Side for over eight years. He started as a teacher, then quickly became a lead teacher and then Dean of Students.

182.    Mr. Castro's background is similar to many of his students, and his leadership and passion for teaching has been an inspiration to countless New York City children.

183.    He always goes above and beyond, seeing needs and fulfilling them. At his first job, he noticed, for example, that no one had stepped up to create a basketball program for the girls. So on top of all the other things he was handling, he started a team and served as coach for five years, inspiring the children to apply the discipline and skills learned on the team to their academic studies as well as their athletic achievements.

184.    At the urging of colleagues, and because he wanted to share his skills and passion for education on a broader scale, Mr. Castro went back to school to pursue a career in administration.

185.    With certifications as a building leader, school district leader, teacher, and English as a Second Language instructor, it was a natural fit for Mr. Castro to be hired three years ago as the ESL service administrator for the lowest performing district in the Bronx. This district is characterized as "high needs" and has many ESL students from diverse cultural and language backgrounds.

186.    Mr. Castro was hired to the Borough office in November, right before the pandemic struck.

187.    Though he was very new to the position when the pandemic hit, Mr. Castro poured his heart and soul into the job to ensure that the ESL students received the instructional services they need and makesure the school did not let them fall through the cracks.

Complaint for Declaratory and Injunctive Relief

188.    When the first shutdown occurred, area leaders were trying to figure out what to do and looking for guidance.

189.    Mr. Castro did not wait, but rather "took the bull by the horns," quickly realizing that since they were going into this new arena with fully remote learning, the teachers were going to need substantial support to learn how to navigate online systems and platforms.

190.    Mr. Castro immediately began professional development with teachers, and led sessions that were conducted remotely, where he had over a hundred participants at a time in multiple sessions. His efforts were applauded and the teachers in his district were particularly prepared.

191.    Mr. Castro worked tirelessly over the next year and a half to maintain this excellence and make sure the students in his district were taken care of and overworked teachers were supported and listened to.

192.    Some students were in person, some remote. Constant issues arose, and everyone was anxious and stretched to the limit. But Mr. Castro consistently stepped up to be there for his community and to be a leader.

193.    Though there was no vaccine or even PPE available from the school in the beginning of the pandemic, he would not hesitate when asked to go into the buildings to support students and staff. His constant refrain was "anything you need me to do, I am gonna do it for the schools and these communities."

194.    In December 2020, Mr. Castro got sick. Soon after, his wife got sick as well. Diagnosed with COVID-19 by his physician, Mr. Castro lost his sense of smell and taste, and developed symptoms of long-COVID, with brain fog and fatigue lasting for several months.

195.    He was allowed to take a leave of absence to rest and recover, but instead, he

continued to work for his district remotely, putting in long days to support the community and students he cares so much about even though he was not well.

196.    Once he recovered, Mr. Castro was routinely asked to start going back into schools and buildings. As an administrator, he was never required or expected to be vaccinated, or even tested.

197.    Mr. Castro cannot take the vaccine for two reasons. First, he had an anaphylactic reaction to PEG, which cross-reacts with the COVID-19 vaccines. His physician has certified that given the allergy, and given the fact that Mr. Castro already had COVID-19 and is naturally immune, vaccination is not recommended at this time as it puts Mr. Castro at unnecessary risk of harm.

198.    Second, and just as importantly, Mr. Castro has a religious objection to vaccination that is long-standing and deeply held.

199.    In fact, the reason that he moved his family from New York City to Pennsylvania, and has to commute each day, was because New York repealed the religious exemption to immunization for children two years ago.

200.    Mr. Castro's six-year-old son is now in a Christian school in Pennsylvania, where they respect his religious exemption to immunization. It put a hardship on the family, and was a traumatic experience for them, but they determined that their religious beliefs were important enough to withstand that hardship.

201.    The loss of the religious exemption for the children was devastating for Mr. Castro and his family. But they are so committed to their religious beliefs that they had no other choice but to move to another state and commute for work.

202.    Now Mr. Castro feels like he is facing the same trauma again, this time as he faces

the loss of his career as well. His family cannot survive this blow and they do not know what to do.

203.    Mr. Castro submitted his exemptions through the online system within the one day afforded to CSA employees. He meets all of the criteria set forth in the award. He belongs to a church that shares and supports his religious views on vaccines, no leader of his church has gone on record making statements supportive of vaccines, he is sincere, he submitted a letter from his pastor, and his church does not violate any of the rules set forth in the policy.

204.    Nonetheless, Mr. Castro was summarily denied with the boilerplate "undue hardship" letter.

205.    Mr. Castro then timely and immediately appealed. During his Zoom appeal, they affirmed he is sincere, and he pointed out that he met all of the criteria. Nonetheless, the DOE argued that he should be denied relief because he and his church hold beliefs that run contrary to Pope Francis' beliefs.

206.    The DOE also argued that because Defendant Chokshi says that the COVID-19 vaccines do not use aborted fetal cells, one of the reasons for objecting (indirect participation in abortion) is invalid.

207.    Mr. Castro poses no heightened danger to his community due to his vaccine status. Mr. Castro's district needs him and has suffered as a result of his removal.

208.    Mr. Castro was denied his religious exemption and removed from the payroll before the October 12, 2021 hearing.

209.    Mr. Castro is supporting his wife and children, and his wife is pregnant.

210.    They do not know what they will do without health insurance or income and cannot survive much longer in limbo.

*Plaintiff 3 – Margaret Chu*

211.    Margaret Chu ("Ms. Chu") is a resident of Brooklyn, New York and teaches English as a Second Language in a public school in Harlem, New York.

212.    Ms. Chu is Chinese-American and was born and raised in New York City.

213.    She worked as a Special Education Teacher in New York City for twelve years.

214.    She was recently certified to teach English as a New Language ("ENL" – formerly "ESL") and now works as an ENL teacher in East Harlem. This is her calling, and her dream job.

215.    Ms. Chu loves her students and is a dedicated and passionate teacher.

216.    However, she cannot take the COVID-19 vaccine due to her sincerely held religious beliefs.

217.    Ms. Chu is a practicing Roman Catholic, with strong religious convictions against the COVID-19 vaccine. She believes in God and his teachings, went to twelve years of Catholic school, completed all of her Sacraments, and lives her life according to the teachings of the Bible. Ms. Chu's Parish wrote a letter in support of her religious accommodation.

218.    Ms. Chu's mother and grandparents came to the United States to escape the repressive government of China. Ms. Chu cannot believe that she now faces the same kind of tyranny and lack of respect for individual religious beliefs and other fundamental rights that her family tried to escape.

219.    Ms. Chu timely filed for an exemption, was summarily denied, timely appealed and was granted a Zoom appeal.

220.    At the Zoom appeal, the DOE representatives and Arbitrator Barry Peek ridiculed her concerns about abortion and her Catholic faith. They stated that they should deny her because her beliefs are not supported by the Pope.

221.   Ms. Chu felt like she was the subject of a witch hunt. She eloquently explained that her religious beliefs as a Catholic are not dictated by the Pope's choices. She discussed the responsibility of all Catholics to follow their moral conscience.

222.   The DOE and the arbitrator would not accept that Ms. Chu could have different beliefs than the Pope and though they acknowledged she was sincere, the DOE argued that Ms. Chu should be denied.

223.   Ms. Chu was still pending at the TRO hearing on October 4, 2021. She was denied an exemption after the TRO hearing and removed from the payroll.

### *Plaintiff 4 – Heather Jo Clark*

224.   Heather Clark ("Ms. Clark") is a DOE Central Offices Employee. Her job title is "Assessment Systems Training Manager" and she works in Brooklyn in an administrative building.

225.   In March 2020, Ms. Clark was diagnosed with COVID-19 and became very sick. She lost her sense of taste and smell and had serious breathing trouble. The symptoms did not subside, and she was diagnosed with "high risk long COVID". She developed heart issues, and later a lung infection and gut pain, and had to use her sick time and stay out of work for months.

226.   Her family, medical providers, and colleagues were very worried for her safety.

227.   Ms. Clark's sister and mother are nurses in Pennsylvania. They urged her to come and stay with them. Ms. Clark acknowledges that she felt "if I stay here by myself, I will die."

228.   Under her family's care, Ms. Clark slowly began to recover but her body is still weak. Ms. Clark's doctor noted that her mitochondrial function is dangerously low, which is a risk factor for adverse reactions from vaccination.

229.   In addition to the medical concerns raised by Ms. Clark's treating physician, Ms.

Clark has sincerely held religious objections to the COVID-19 vaccines.

230.    On September 16, 2021, she duly submitted a religious exemption letter through the SOLAS system.

231.    The next day, she received back the same form email that everyone else did stating that it would be an undue hardship to accommodate her since it would not be safe for her to enter into any school building.

232.    For Ms. Clark, this reason makes no sense. Ms. Clark is currently, and has been, working remotely for the NYC DOE since April 2020 with no indication that this has created any type of "undue hardship" for the DOE. Moreover, she is not a classroom teacher, but works in the Central Offices when not working remotely, so does not enter school in any event as a typical part of her job.

233.    Ms. Clark timely filed an appeal but was denied the opportunity for a Zoom hearing even though she holds sincere religious beliefs in opposition to vaccination.

### *Plaintiff 5 – Stephanie Di Capua*

234.    Stephanie DiCapua ("Ms. DiCapua") is a physical education teacher working in the New York City Public School System in Staten Island.

235.    Due to her deeply held religious beliefs, Ms. DiCapua is unable to be vaccinated. These beliefs are long-standing and are also reflected in the official teachings of her particular Christian church. Stephanie's pastor sent a letter supporting her religious exemption and pointing out the teachings of the Bible that support and guide their religious viewpoints.

236.    On Friday, September 17, 2021, Ms. DiCapua received the same form rejection letter that Ms. Clarke received, alerting her that her religious accommodation would not be honored because it would present an undue hardship on the DOE.

237.    She appealed but was summarily denied even the right to have a Zoom hearing without explanation.

238.    On October 4, 2021, Ms. Di Capua was removed from the payroll.

239.    Ms. Di Capua's removal, like the removal of all Plaintiffs, is a great loss to the students and the community.

240.    Ms. DiCapua has been employed by the DOE for over four years and has taught for over eight years.

241.    She always goes above and beyond, and volunteers for new projects at school to give her students the best experience possible. She created a physical education leader club in her school, raised money for their first ever Wellness Room, created the school's first ever Wellness Committee, developed a student and staff cookbook, and created various school wide wellness initiatives for students to participate in.

242.    Ms. DiCapua is dedicated to her job and to the kids she teaches. In addition to her normal duties, she coaches softball and organized a before-school fitness and sports program and was selected to be a physical education reviewer through the Office of School Wellness to develop the first ever physical education scope and sequence for students in the NYC DOE.

### *Plaintiff 6 – Robert Gladding*

243.    Robert Gladding ("Mr. Gladding") resides in Manhattan and until October 4, 2021, he taught at a New York City public school on the Upper East Side, where he has taught for the last seventeen years.

244.    Mr. Gladding has been a teacher with the New York City public school system for over twenty years.

245.    Mr. Gladding is a very religious man and has sincerely held religious objections

to the Vaccine Mandate.

246.    He was raised a Christian and was encouraged from a young age to develop a personal relationship with Christ.

247.    His mother, also a Christian, lived through the horrors of World War II in her home country of Germany, where she witnessed the horrific effects of religious intolerance and adherence to dogma. She survived that Godless and dangerous time by always being guided by her inner connection with Christ. She encouraged Robert to find God personally rather than through the dictates of fallible human leaders.

248.    Throughout Mr. Gladding's life, his choices have been made in consultation through prayer with God, including even such fundamental decisions as where to live, when to have a child, what profession to follow and of course, what medical course of action to follow.

249.    He became a teacher in response to a calling he believes to have received from God to join the New York City Teaching Fellows in 2001 after the tragedy of 9/11 so deeply wounded his beloved City.

250.    The teachings of Mr. Gladding's faith tradition and his guidance from prayer prohibit vaccination.

251.    On Friday, September 17, he submitted a religious exemption detailing his personal religious path and sincerity, and his religious objections to vaccines, along with a letter from an interfaith minister who can attest to Mr. Gladding's sincerity and commitment to his religious practices.

252.    Mr. Gladding was summarily denied, and denied after appeal, even though he has a long-standing religious objection to vaccination.

253.    After the motion for emergency relief was filed on October 4, 2021, Mr. Gladding

was oddly changed to "pending" status from denied. A few hours after the TRO hearing, his application was changed back to denied.

254.    Mr. Gladding has dedicated his career to his students and to teaching. It would be a serious blow to the New York City education system and to his school if he were to be summarily dismissed.

255.    Mr. Gladding had COVID-19 symptoms last year and believes he has natural immunity. Even if he does not, he poses no greater risk to his community than someone who has been vaccinated.

### *Plaintiff 7 - Nwakaego Nwaifejokwu*

256.    Nwakaego Nwaifejokwu (Mrs. Nwaifejokwu) has been a teacher with the New York City Public School system for twelve years. Prior to that, she worked with Head Start.

257.    Until October 4, 2021, she worked in the Bronx teaching first grade.

258.    For Mrs. Nwaifejokwu, teaching is not just a job, it is a passion. She finds herself spending hours of time outside of school making preparations to support her students, staying up late into the night thinking about how to get things "just right."

259.    She loves her students, and they love and need her.

260.    When the school announced suddenly in 2020 that they were going remote, no training or assistance was offered. Mrs. Nwaifejokwu spent hours working alone and with her colleagues to learn how to use various online platforms and make sure their students were supported. She went above and beyond, working in the wee hours of the morning and late into the night to reach out to families, support her students and make sure that she was able to give them the best education possible in such difficult circumstances.

261.    At that time, she was teaching kindergarten. When school resumed, 70 percent of

the students were still remote, so Mrs. Nwaifejokwu had to work with the other teachers to come

up with creative solutions to make sure everyone was taken care of while she attended to both in

person and remote lessons for little children simultaneously.

262.    Several of the children in her class are on the autistic spectrum. Mrs.

Nwaifejokwu is luckily able to draw on her many years as a special education teacher to support

them while handling these uncertain times.

263.    Mrs. Nwaifejokwu has sincere religious objections to vaccination.

264.    In addition to her sincerely held religious objections, Mrs. Nwaifejokwu is not

willing to partake in experimental medicine. Mrs. Nwaifejokwu's daughter was injured by the

HPV vaccine while it was still in Phase IV trials. She developed early onset menopause after her

first shot. Mrs. Nwaifejokwu, who had advised her daughter not to take the vaccine due to her

religious beliefs, is particularly committed to avoiding any further participation in experimental

medicine, particularly when it is a medication that violates her religious beliefs.

265.    Mrs. Nwaifejokwu timely filed for an exemption and was summarily denied. She

appealed and then was denied again without explanation.

### *Plaintiff 8 – Ingrid Romero*

266.    Ingrid Romero ("Mrs. Romero") resides in New Jersey and is an elementary school

teacher in the New York City Public School system in Queens.

267.    Mrs. Romero grew up in Queens, though she has a lot of family in Ecuador, where

her family is originally from.

268.    To this day, her family in Ecuador depends on her income, which she regularly

contributes for the good of the family.

269.    Mrs. Romero is a dedicated and beloved teacher. She has been teaching for almost

eighteen years in the New York City School system.

270.     She started as a substitute teacher, then went on to teach kindergarten, second, and now third grade.

271.     Mrs. Romero regularly leads workshops and has been recognized by principals and parents as an excellent educator. Many teachers and principals from other schools visit her classroom to observe and learn from her best teaching practices.

272.      In March 2021, Mrs. Romero and her family were diagnosed with COVID-19 through testing. Now recovered, she has lasting natural immunity and poses no danger to any of her students or colleagues.

273.     Mrs. Romero attended the school she now teaches at as a little girl. Her supervisor used to be one of her teachers.

274.     Her presence at the school is vital, and she is a role model and an inspiration to her students. Her students relate to her.

275.     Mrs. Romero understands what the children are going through in a way that many cannot. Her mother, who came to the United States over fifty years ago, still does not speak English. Mrs. Romero had to learn on her own initiative. She shares this with her students and tells them not to give up, and that they can achieve their dreams if they just give it their best effort.

276.     When Mrs. Romero sees her students or former students in the hall, they typically exchange their favorite hello. She says, "Ok! Remember kids, always do your best, and nothing…" and they respond enthusiastically: "Nothing less!" That is her saying: "Do your best, and nothing less. That's all I am asking from you."

277.     Mrs. Romero encourages her students to be excellent at English but to speak their native language too, to never forget where they come from and be proud of their culture and

heritage. She is proud of who she is and where she comes from, and she helps the children feel pride in where they come from and who they are as well.

278.     Mrs. Romero is not willing to violate her religious beliefs.

279.     The children should not have to lose such a special and important teacher.

*Plaintiff 9 – Trinidad Smith*

280.     Trinidad Smith ("Mrs. Smith") was adopted from an orphanage in Bogota, Columbia, as a child.

281.     She worked hard, earned a master's degree, and until October 4, 2021, has been teaching with the NYC DOE for almost twenty years.

282.     Currently, Mrs. Smith teaches in District 37, a 99% minority district which focuses on children with serious autism and emotional disturbance.

283.     Mrs. Smith is one of the most senior teachers in her district and is irreplaceable.

284.     Mrs. Smith cannot take the vaccines because she is opposed to them on religious grounds.

285.     Mrs. Smith is a devout Catholic. However, after learning about the serious abuses taking place in the Catholic Church, and the associated years of cover-ups and collaboration from leadership, she decided to leave the Church and practice her Catholicism through direct communion with spirit and God.

286.     Because Mrs. Smith has a personal practice, she does not qualify for exemption under the discriminatory Arbitration Award. But her religious convictions are no less sincere.

287.     She objects to the facially discriminatory process and filed this lawsuit to demand that the City provide a constitutional process.

288.     Mrs. Smith's removal from the school she teaches at has been devastating for the

children. They are currently facing serious neglect and are not receiving needed care and services due to the staffing crisis caused by the mandate.

289.    Mrs. Smith does not pose a direct threat to anyone based on her vaccine status and has been safely teaching in the school throughout the pandemic without issue.

### *Plaintiff 10 – Amaryllis Ruiz-Toro*

290.    Amaryllis Ruiz-Toro ("Mrs. Toro") is an Assistant Principal of Administration at a New York City Public School in Queens.

291.    Mrs. Toro has been educating children for almost two decades. She spent years teaching ELA, and then serving as Dean at the same school in Queens. In September 2019, just before the start of the pandemic, she was promoted to the job of Assistant Principal.

292.    As a Title I school, the bulk of the work Mrs. Toro does is to service and support the students, largely from immigrant and lower socio-economic families, both academically and most recently socially and emotionally with internal support systems to address the current traumas that this pandemic has caused for students, families, and staff.

293.    Mrs. Toro is deeply committed to this work. In the days leading up to the first school closures, when masks and PPE were not available, Mrs. Toro did not complain. She worked tirelessly alongside her colleagues, ensuring that her staff was protected even if it meant she had to be without.

294.    She assured the students and parents that whatever happened, she would not abandon them, and that she and the school would do everything in their power to support them.

295.    During the months of largely remote education that followed, Mrs. Toro, who is bilingual, maintained her demanding duties as an Assistant Principal and also supported families as a bilingual person to ensure Latino families were receiving support and having their needs

addressed and heard.

296.    When students returned to school, she personally greeted them each day and made sure to find ways to make them feel safe and supported.

297.    Educating students and caring for her community is everything to Mrs. Toro, and she has made a lot of sacrifices to do this work.

298.    After the return, even when the option for remote work was offered, Mrs. Toro elected to be there in the school to help her community. She knew that her physical presence was necessary to support students and staff and help offer a sense of normalcy.

299.    This was a big risk. Her sons and daughter all suffer from chronic asthma. Mrs. Toro reached deep and had to rely on her sincere and powerful faith in God to guide her and her family and keep them safe.

300.    Mrs. Toro worked actively with her principal to ensure that their systems would support all their constituents and were running as smoothly as possible. She initiated and supervised the freshmen advisory program to support the school's youngest members, researched and created activities and strategies that would help the teachers best support the students during their remote learning, and even created a once-a-week mindfulness session for the staff members so that they would find a place of refuge and support.

301.    She made sure that no one was left behind.

302.    Mrs. Toro was tested regularly but never tested positive for COVID-19, though she has had regular exposures to people who had COVID-19 and worked and lived alongside her.

303.    She did not mind testing regularly as she understood it made people feel safe.

304.    However, she cannot take the COVID-19 vaccine.

305.    Mrs. Toro has prayed on this issue and has received clear guidance from prayer not to take the vaccine. On this basis, she declined vaccination when it was made available.

306.    On Friday, September 17, 2021, Mrs. Toro met with her principal (at his request) to discuss the fact that she was filing a religious and medical exemption. He told her that the policy was crafted in such a way that it was simply not possible to get a religious exemption regardless of sincerity. He reiterated the DOE's policy for any employee who is refusing to comply with their mandate and asked Mrs. Toro as to whether she would resign or take a leave of absence (unpaid). She explained that she will do neither.

307.    Mrs. Toro is the primary breadwinner in her home. She has a mortgage and three kids under the age of eighteen. All three of her children have serious asthma and require expensive medical plans. Two of her children are in private Christian schools.

308.    Mrs. Toro has spent her career as an educator and is on the path to becoming a principal. She does not know what she will do if she is stripped of the ability to work in schools.

309.    But she cannot violate her religious beliefs.

310.    Mrs. Toro submitted her exemption request and was initially denied with everyone else. She timely appealed.

311.    She had a Zoom hearing after October 4, 2021. Mrs. Toro's hearing took place *after* the initial TRO appearance. The DOE representative was more constrained in their arguments as a result, though they still insulted Mrs. Toro's beliefs and advocated for denial, not because of sincerity, but based on the allegation that her beliefs were wrong.

312.    The arbitrator said that many of his colleagues were denying people who belonged to minority churches but that he, as a Southerner, appreciated that there were independent churches.

313.    Mrs. Toro met all of the criteria in the award. She was granted an exemption.

314.    Nonetheless, she is still barred from entering any classroom. She is regularly harassed and retaliated against since she submitted an exemption, and she is in danger of losing her ability to become a principal, because the window to get her classroom observation hours accomplished is rapidly closing, and she is barred from entering any school building to observe classes as required.

### *Neutrality and General Applicability*

315.    The City's policies are not neutral or generally applicable.

316.    Though the Plaintiffs and most other DOE employees are banned from entering any school building despite having religious beliefs that do not allow them to be vaccinated, there are multiple carve-outs for persons who can enter school buildings.

317.    Pursuant to the Vaccine Mandate, the one million children who attend New York City schools can enter school buildings each day.

318.    Bus drivers are allowed to be unvaccinated, even though they have children in enclosed spaces for long periods of time, and they can enter school buildings unvaccinated.

319.    Voters, delivery people and visiting parents can also enter school buildings unvaccinated.

320.    Moreover, people whose vaccine immunity waned long ago, or who have only just begun their doses are allowed to teach in person under the terms of the mandate.

321.    In addition, the Vaccine Mandate has been tainted by substantial evidence of religious animus, not only from the City of New York, but by decision makers at the State level as well.

322.    The mandate was promulgated on the same day that Governor Kathy Hochul was

appointed interim Governor of the State of New York.

323.    Governor Hochul has strongly held religious beliefs in support of vaccination. In place of a cross, she wears a golden "Vaxed" necklace, which she describes in religious terms. Before taking office, she met with Mayor de Blasio and coordinated a vaccine strategy.

324.    Two days after Mayor de Blasio's New York City Department of Health Vaccine Mandate was passed without a religious exemption, Governor Hochul removed the religious exemption from the New York State Department of Health regulation governing healthcare workers.

325.    Mayor de Blasio's mandate references the healthcare workers' mandate as a justification to enact his.

326.    Both mandates were to take effect on September 27, 2021. The day before the state mandate was supposed to take effect, Governor Hochul gave a sermon at a Brooklyn Church, during which she said that God made the vaccine and that she was recruiting apostles to coerce those who did not understand God's will and what God wants (that we be vaccinated). Governor Hochul then told the press that the Pope supports vaccination and that no religious objections to vaccination are valid, and this is why she removed the religious exemption from the state healthcare mandate.

327.    Mayor de Blasio's statements have frequently echoed this New York government assertion that people's religious beliefs against vaccination are "invalid" because they are unorthodox. Representatives of the DOE repeatedly argued the same in each Zoom appeal.

328.    These statements are as ignorant as they are unlawful.

329.    The history of religious opposition to vaccination is well-established and religious objectors exist in nearly every faith tradition.

330.    Even within the Catholic Church, there is currently a robust debate about the religious propriety of getting a COVID-19 vaccine.

331.    Similar to abortion, the topic of vaccination is so intertwined with religion that it is itself a religious issue, and any vaccine mandate is inherently enmeshed with religion.

332.    Refusing to allow for reasonable religious accommodation is itself indicative of a lack of neutrality.

333.    The State has now doubled down on its persecution of those with religious objections to vaccination.

334.    Just before this mandate was to take effect, Governor Hochul gleefully announced that she had instructed the Department of Labor to deny unemployment compensation to anyone who is unable to work due to a vaccine requirement.

335.    Several terminated DOE employees have applied and been denied unemployment compensation even though they are unable to get vaccinated due to their sincerely held religious beliefs.

336.    Plaintiffs seek declaratory and injunctive relief on behalf of themselves and all others similarly situated.

337.    All conditions precedent to bringing this lawsuit have been performed, excused, or waived.


## COUNT I

### VIOLATION OF THE
### FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### AND THE NEW YORK STATE CONSTITUTION

338.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein and further allege:

339.    The Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution (and corresponding provisions in the New York State Constitution), as applied to the states by the Fourteenth Amendment, prohibit the State from preferencing any particular religion or religious dogma or belief, or abridging Plaintiffs' rights to free exercise of religion.

340.    Both rights are violated here.

341.    First, all of the Defendants violated and continue to violate the Establishment Clause by expressing a preference for the beliefs of certain religions and religious leaders over others and by stating that certain religious beliefs opposing vaccination are not legitimate or valid. This triggers strict scrutiny of the Vaccine Mandate as a violation of the Establishment Clause.

342.    Moreover, all Plaintiffs have sincerely held religious beliefs that compel them to refuse the mandated vaccines.

343.    The Vaccine Mandate, on its face and as applied, targets Plaintiffs' free exercise of their sincerely held religious beliefs by prohibiting them from seeking and receiving exemption and accommodation for their sincerely held religious beliefs from their employers, with the employers citing the Vaccine Mandate as the grounds for refusing to even consider exemption requests.

344.    The Vaccine Mandate, on its face and as applied, impermissibly burdens Plaintiffs' sincerely held religious beliefs, compels them to abandon their beliefs or violate them under coercion, and forces Plaintiffs to choose between their religious convictions and the governments' unconstitutional value judgment that their religious beliefs are of no account and cannot be considered by their employer.

345.    The Vaccine Mandate, on its face and as applied, places Plaintiffs in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs.

346.    The Vaccine Mandate, on its face and as applied, puts substantial pressure on Plaintiffs to violate their sincerely held religious beliefs or face the loss of their occupations, professional standing, licenses, reputations, and ability to support their families.

347.    The Vaccine Mandate, on its face and as applied, is not generally applicable, as it grants the possibility of religious exemptions to those who belong to certain religious organizations but not to those whose religious practices fall outside of those religions. Moreover, it allows exception for certain secular policy reasons but not for religious reasons.

348.    The Vaccine Mandate, on its face and as applied, creates a system of individualized exemptions for preferred exemption requests based on membership in certain approved religious organizations or groups, while discriminating against requests for exemption and accommodation based on sincerely held religious beliefs that fall outside of those belief systems.

349.    The Vaccine Mandate, on its face and as applied, is not neutral. It was imposed amidst substantial indicia of animus both from the state and City government policymakers and it targets Plaintiffs' religious practices for disparate and discriminatory treatment.

350.    There is no legitimate, rational or compelling interest in the Vaccine Mandate's discriminatory application, nor in refusing to allow accommodation or exemption to honor sincerely held religious objections to vaccines, as is offered to all other New York City employees, particularly because: (a) DOE employees of New York City are no more susceptible to contracting and spreading COVID-19 than New York City employees working in law enforcement, fire management, sanitation or any of the other myriad jobs that the city still allows religious exemptions for;  (b) available vaccines cannot stop transmission, so the vaccinated are just as

capable of spreading disease as the unvaccinated; (c) naturally immune persons who have recovered from COVID have superior immunity to those who are vaccinated; and (d) vaccinating naturally immune people puts them at increased risk of adverse reaction to the vaccine.

351.    The Vaccine Mandate is not the least restrictive means of achieving an otherwise permissible government interest, which could be achieved by other protective measures employed for the last year and a half.

352.    The Vaccine Mandate, on its face and as applied, has caused, is causing and will continue to cause irreparable harm and actual undue hardship to Plaintiffs from the violation of their sincerely held religious beliefs and the occupational, professional, social, and economic consequences pleaded above.

353.    Plaintiffs have no adequate remedy at law to prevent the continuing violation of their constitutional liberties and sincerely held religious beliefs.

354.    WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Vaccine Mandate violates the First Amendment rights of Plaintiffs and all others similarly situated, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT II

### VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND THE NEW YORK STATE CONSTITUTION

355.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein and further allege:

Complaint for Declaratory and Injunctive Relief

356.     Plaintiffs have a protected substantive due process right to be free from the forced or coerced administration of medical products, especially medical products that are experimental or could cause them harm.

357.     This right is also a fundamental human right, so widely recognized as to be defined by the world courts, the laws of nations, and by the Second Circuit Court of Appeals and the Supreme Court of the United States as a *Jus Cogens* norm.

358.     As well, or in the alternative, this right to refuse experimental medicine is secured by the Due Process Clause of the United States Constitution and corresponding provisions in the New York State Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States and New York, to be free from burdens on rights deemed "fundamental" in nature.

359.     Considering the serious rights at stake, and the dearth of evidence to show this policy is necessary or effective in light of the fact that the vaccinated can transmit disease and have inferior immunity to those who have caught the disease, there is no rational reason to mandate vaccines for school employees. Given that the vaccines are still experimental, this mandate shocks the conscience.

360.     The Vaccine Mandate is not narrowly tailored to impose the least restrictive burdens on fundamental rights. Rather, it is intentionally tailored to create an outsized burden in order to coerce participation in experimental medicine for no apparent reason.

361.     Moreover, Plaintiffs are entitled to strict scrutiny review of their Free Exercise claims because this case is a hybrid rights case, and the mandate burdens not only Plaintiffs' First Amendment rights but also burdens Plaintiff's fundamental right to refuse experimental medicine.

Complaint for Declaratory and Injunctive Relief

362.    Plaintiffs have no adequate remedy at law available against defendants for the injuries and the irreparable harm they imminently suffer as a direct result of the Vaccine Mandate.

363.    WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that Defendants' Vaccine Mandate violates Plaintiffs' substantive Due Process rights, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT III

### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND THE NEW YORK STATE CONSTITUTION

364.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein and further allege:

365.    By their actions, as described herein, Defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiffs to the deprivation of the rights, privileges, or immunities secured by the United States Constitution and New York Constitution.

366.    The Vaccine Mandate violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and corresponding provision of the New York State Constitution) because it discriminates against unvaccinated people who need to exercise their fundamental rights to refuse experimental vaccines that conflict with their sincerely held religious beliefs.

367.    There is no rational basis for such a distinction. Plaintiffs pose no more danger to others than a person who is participating in trials for the experimental vaccines. The CDC acknowledges that vaccinated individuals are just as infectious as unvaccinated for SARS-CoV-2.

Complaint for Declaratory and Injunctive Relief

368.    The policy of discriminating based on an individual's willingness or ability to subject themselves to medical experimentation or to give up their deeply held religious beliefs shocks the conscience and cannot be justified as relating to any rational, permissible goal. It is not grounded in science, but rather in the effort to coerce people into waiving their protected rights.

369.    Plaintiffs face the loss of their employment, ability to practice their vocation, contractual rights and violation of civil rights and liberties as a result of the discriminatory regulation.

370.    Moreover, the policies adopted by the DOE facially discriminate against Plaintiffs and their similarly situated class members on the basis of religion by refusing to afford accommodations to people who hold minority or unorthodox religious viewpoints.

371.    The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

372.    While performing those duties, Defendanta intentionally deprived Plaintiffs of securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the State of New York by arbitrarily discriminating against them based on medical status, religious beliefs, and creed.

373.    WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Vaccine Mandate violates Plaintiffs' Equal Protection rights, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

### COUNT IV

**VIOLATION OF THE SUPREMACY CLAUSE OF
THE UNITED STATES CONSTITUTION
Violation of Title VII of the Civil Rights Act**

374.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein and further allege as follows.

375.    The Vaccine Mandate violates Title VII of the Civil Rights Act of 1964 ("Title VII").

376.    First, facially and as applied, the Vaccine Mandate violates Title VII by prohibiting employers in the NYC DOE from providing reasonable religious exemptions to employees with sincerely held religious beliefs opposing receipt of a COVID-19 vaccine.

377.    Second, as modified by the Arbitration Award, the Vaccine Mandate requires employers to discriminate against those with religious beliefs that are not deemed "established" or "recognized" or which are personal in nature and not held by the mainstream.

378.    Third, the Vaccine Mandate requires employers to segregate and discriminates against employees whose reasonable religious accommodations are accepted, prohibiting these employees from entering any building, even though they pose no direct threat to anyone around them.

379.    It is not a reasonable accommodation to adopt a de facto segregation policy that excludes all employees with religious exemptions from entering any school building.

380.    By asserting that such employees pose a safety hazard on the basis of their vaccine status, the City is imputing that they are infected with COVID-19. Such an imputation of physical health status as a basis for segregation and denial of religious accommodation requires a direct threat analysis under the ADA as well as an individualized analysis under Title VII.

381.    Defendants cannot establish that these Plaintiffs all pose a significant risk of substantial harm to their colleagues and others based on their vaccine status.

382.    All of Plaintiffs' employers have 15 or more employees, are funded by the state and

federal governments, are state actors, and are subject to the requirements of Title VII.

383.    The Vaccine Mandate thus requires actions that federal law forbids, which renders the Vaccine Mandate null and void. *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 486 (2013).

384.    State laws that violate federal laws are preempted by the Supremacy Clause of the United States Constitution. The Supremacy Clause provides:

> **This Constitution, and the Laws of the United States** which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, **shall be the supreme Law of the Land**; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. U.S. Const. Art. VI, cl. 22 (emphasis added).

385.    By attempting to preclude application of Title VII to NYC DOE in the case of COVID vaccination, the Vaccine Mandate patently violates the Supremacy Clause.

386.    In particular, the Vaccine Mandate purports to negate Title VII's requirement that employers provide reasonable accommodations to individuals with sincerely held religious beliefs, and even flatly prohibits religious exemption or accommodation requests, as the employers noted above have indicated.

387.    By purporting to place themselves and their mandate outside the protections of both Title VII and the First Amendment, Defendants have violated the basic constitutional principle that "federal law is as much the law of the several States as are the laws passed by their legislatures." *Haywood v. Drown*, 556 U.S. 729, 734 (2009) (emphasis added).

388.    The Vaccine Mandate, on its face and as applied, has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to plaintiffs from violation of their sincerely held religious beliefs and the occupational, professional, social and economic consequences pleaded above.

389.    Plaintiffs have no adequate remedy at law for the continuing deprivation of their

statutory rights under Title VII as secured by the Supremacy Clause.

390.    WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Vaccine Mandate violates and is preempted by the Title VII of the Civil Rights Act of 1964, for an injunction prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## COUNT V

### VIOLATION OF THE SUPREMACY CLAUSE OF
### THE UNITED STATES CONSTITUTION
### Violations of Federal Statutory Provisions Governing EUA products

391.    Plaintiffs hereby incorporate all other paragraphs of this Amended Complaint as if fully set forth herein and further allege:

392.    Federal laws and regulations governing the approval and administration of medical products preempt all contrary or inconsistent laws of the states and/or local governments.

393.    The Vaccine Mandate is patently contrary to United States law, and thus preempted and invalid.

394.    Title 21 of the United States Code, Section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product. . .."

395.    Because all available vaccines in New York are each investigational products, only permitted for use under an Emergency Use Authorization, the laws and regulations of the United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including Plaintiffs.

396.   Plaintiffs do not consent to being vaccinated with an experimental vaccine.

397.   As well, Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

398.   21 C.F.R. § 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

399.   EUA vaccines and the licensed Comirnaty vaccine are all still being subjected to clinical trials. Population-wide surveillance and data are still being gathered for all of them, whether the "test subjects" consent or not. Whether licensed or not, all available COVID-19 vaccines are classified as experimental medicine.

400.   None of the exemptions provided in sections 50.23 and 50.24 apply to Plaintiffs. They are competent to make a decision concerning medical treatment and experimentation and will not consent.

401.   Accordingly, the Vaccine Mandate also violates federal law and regulations governing the administration of experimental medicine and is thus preempted.

402.   Plaintiffs have no adequate remedy at law available against Defendants for the injuries and the irreparable harms they are suffering as a direct result of the Mandate.

403.   WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Vaccine Mandate violates and is preempted by the laws and regulations of the United States governing the administration of investigational medical products, for an injunction

prohibiting enforcement of the Vaccine Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

## JURY TRIAL AND OTHER DEMANDS

Plaintiffs hereby demand a trial by jury for all matters so triable. In addition to any and all other relief authorized by equity or law, Plaintiffs seek injunctive and declaratory relief, attorneys' fees, costs, nominal, compensatory and punitive damages where authorized, and reinstatement of all benefits and privileges that they enjoyed prior to the events complained of herein.

DATED this 16th day of November 2021.

Gibson Law Firm, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson,**
*Attorney for Plaintiffs*
Gibson Law Firm, PLLC
408 West State Street/MLK Blvd
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

Mary Holland, Esq., *Of Counsel*