# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X  :

**MICHAEL KANE, WILLIAM CASTRO, MARGARET CHU, HEATHER CLARK, STEPHANIE DI CAPUA, ROBERT GLADDING, NWAKAEGO NWAIFEJOKWU, INGRID ROMERO, TRINIDAD SMITH, NATASHA SOLON, AMARYLLIS RUIZ-TORO**, individually, and for all others similarly situated,

Plaintiffs,

vs.

**BILL DE BLASIO**, personally and in his official capacity as Mayor of the City of New York, **DAVID CHOKSHI**, in his official capacity of Health Commissioner of the City of New York, **NEW YORK CITY DEPARTMENT OF EDUCATION**,

Defendants.

-----------------------------------------------------------------  :

**MATTHEW KEIL, JOHN DE LUCA, SASHA DELGADO, DENNIS STRK, SARAH BUZAGLO, EDWARD (ELI) WEBER, CAROLYN GRIMANDO, AMOURA BRYAN, JOAN GIAMMARINO, and BENEDICT LOPARRINO**, individually, and for all others similarly situated,

Plaintiffs,

- against -

**THE CITY OF NEW YORK; BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF NEW YORK, DAVID CHOKSHI**, in his official capacity of Health Commissioner of the City of New York, and **DAVID C. BANKS,** in his official capacity as chancellor of the New York City Department of Education,

Defendants.

-----------------------------------------------------------------X  :

Case No. 1:21-cv-7863 (VEC)

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

JURY TRIAL DEMANDED

1

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*
— James Madison, <u>A Memorial And Remonstrance, On The Religious Rights Of Man: Written In 1784-85</u>

Plaintiffs, proceeding as individuals and as a proposed class, herein complain of the Defendants as follows:

<u>NATURE OF ACTION</u>

1. Named Plaintiffs and Class members are New York City teachers and other employees of the New York City Department of Education ("DOE").

2. Plaintiffs allege violations of their fundamental religious and constitutional rights. On behalf of themselves and all others similarly situated, they seek declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual and punitive damages, attorneys' fees and other remedies, for harms arising from the Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination for Department of Education Employees, Contractors, Visitors, and Others, dated August 24, 2021, as modified or replaced by subsequent amendments thereto (collectively, the "Mandate"), and discriminatory policies adopted by the DOE in the implementation of the Mandate.

3. The Mandate violates fundamental constitutional rights, both facially and as applied, arbitrarily and capriciously discriminates against employees with sincere religious objections to vaccination– even though the employees pose no direct threat to others because of their religious or medical needs– and places unconstitutional conditions on employment.

2

4. In implementing the Mandate, state actors working on behalf of the City of New York adopted facially unconstitutional standards and policies subjecting Plaintiffs and thousands of other employees to per se unconstitutional heresy inquisitions and other religious harassment.

5. Mayor de Blasio sanctioned and encouraged this discrimination. In press briefings, he made statements clarifying that the City adopted a preference for the Pope's viewpoint about what "scripture" requires on the topic of vaccines, expressed hostility towards religious opposition to vaccination as largely "invalid" and stated that the City would be openly preferencing Christian Scientists, Jehovah's Witnesses, and to get an exemption, employees would have to be a "standing member of a faith that has a very, very specific long-standing objection" to vaccination according to the Mayor's religious viewpoint. Mayor de Blasio further stated that the City would discriminate against anyone with beliefs that fall under the definition of heresy—that is, lesser recognized, unorthodox or personally held religious beliefs.

6. Under the ex-Mayor's openly discriminatory standard, people with personally held religious beliefs or unorthodox religious beliefs were expressly supposed to be (and were) singled out for discriminatory treatment by the DOE even though their beliefs are sincere.

7. In addition to being discriminatory, the Mandate is irrational.

8. COVID-19 vaccine mandates cannot stop the spread of SARS-CoV-2 in schools. The vaccines may blunt the severity of the disease, but the evidence does not support an assumption that they stop infection with and transmission of SARS-CoV-2 to others.

9. Moreover, there are far less invasive measures available to ensure public safety than forcing employees to violate their deeply held religious beliefs or lose their jobs.

10. The Mandate is an outlier. No other school district in the state requires vaccination as a condition of employment.

3

11. It is also overbroad. There is no option to get tested in lieu of vaccination. Nor is natural immunity recognized, even though the data overwhelmingly shows that natural immunity is more robust and durable than vaccine immunity. Moreover, remote employees are not allowed an exemption or accommodation, even those who can easily work outside of the classroom due to the nature of their work.

12. By the same token, the Mandate is underinclusive. Unvaccinated bus drivers are allowed to bus children to school each day in enclosed vehicles, for hours at a time. Exceptions are also made for delivery people, unvaccinated adults coming to receive a COVID-19 vaccine, and many other categories. And, the DOE has deemed it safe for one million unvaccinated children to come to school each day without issue. If all of these categories of persons can safely be in the schools each day, there is no reason why the small percentage of non-exempt staff with a religious objection to vaccination cannot also be safely accommodated.

13. Excluding unvaccinated staff has not proven to have any impact on mitigating the spread of COVID-19.

14. Before the unvaccinated staff were excluded on October 4, 2021, the average number of infections for all staff across the New York City school district was about 40 active infections at a time for the first month of school. This, despite an outsize delta variant outbreak.

15. After exclusion of all unvaccinated teachers, average percent of staff infected remained largely the same, and followed the same curve as the outbreaks in the largely unvaccinated student population.

16. Currently, there are over five thousand staff members infected among the fully vaccinated staff. This is in large part due to the Omicron variant. Vaccination has proven ineffective at stopping infection with the now dominant Omicron variant.

17. Perhaps most shocking, because such a large percentage of the fully vaccinated staff is currently infected with COVID-19, and the schools were already in a staffing crisis caused by the mass suspension of thousands of other qualified unvaccinated teachers and staff as a result of the Mandate, the DOE adopted the recommendation that ACTIVELY INFECTED teachers should return to school without testing to ensure they are no longer contagious after only five days. *See, e.g.,* https://www.businessinsider.com/teachers-can-return-to-classroom-after-positive-covid-test-mild-symptoms-2022-1.

18. Schools are in a crisis and desperately need teachers, especially experienced teachers like the Plaintiffs and Class members in this lawsuit.

19. Plaintiffs have dedicated their careers to serving the children of New York. They just want to return to their jobs so that they can make sure that the students they care so much about do not fall through the cracks during this crisis.

<u>THE PARTIES</u>

### *The* **Kane** *Plaintiffs*

20. Before the DOE suspended him without pay for failure to violate his sincerely held religious beliefs, Plaintiff MICHAEL KANE ("Mr. Kane") was a special education teacher in the New York City public school system for over fourteen years.

21. Plaintiff WILLIAM CASTRO ("Mr. Castro") is an administrator in the Bronx Borough Office who has been educating children in the New York City Public School system for over twelve years. He was recently reinstated to his position after it was determined that he was wrongly denied an exemption, but he remains segregated and adversely impacted.

22. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff MARGARET CHU ("Ms. Chu") was teaching ENL at a public school in East

Harlem. She has been educating children in the New York City public school system for over twelve years.

23. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff HEATHER CLARK ("Ms. Clark") was a DOE Central Offices Employee working as an "Assessment Systems Training Manager" for the New York City public school system in Brooklyn in a DOE administrative building.

24. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff STEPHANIE DI CAPUA ("Ms. DiCapua") was a physical education teacher working in the New York City public school system on Staten Island. She has been employed by the DOE for four years, and teaching for eight years.

25. Before the DOE suspended him without pay for failure to violate his sincerely held religious beliefs, Plaintiff ROBERT GLADDING ("Mr. Gladding") taught at a New York City public school on the Upper East Side, where he has taught for the last seventeen years.

26. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff NWAKAEGO NWAIFEJOKWU ("Mrs. Nwaifejokwu") taught first grade in the Bronx. She has been a teacher with the DOE for twelve years, and before that was a Head Start teacher.

27. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff INGRID ROMERO ("Mrs. Romero") was an elementary schoolteacher in the New York City public school system in Queens at the same school she attended as a child. She has been teaching in New York City public schools for over eighteen years.

28. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff NATASHA SOLON ("Ms. Solon") was an Assistant Principal working in the

Bronx.

29. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff TRINIDAD SMITH ("Mrs. Smith") taught at a public school for special needs children in Brooklyn. She has been teaching with the DOE for almost twenty years.

30. Plaintiff AMARYLLIS RUIZ-TORO ("Mrs. Toro") is an Assistant Principal of Administration at a New York City Public School in Queens. She has been educating children in the New York City public school system for twenty years. Though her religious exemption was "accepted" she has been segregated and adversely impacted by the Mandate.

### *The* Keil *Plaintiffs*

31. Before the DOE suspended him without pay for failure to violate his sincerely held religious beliefs, Plaintiff MATTHEW KEIL ("Keil") worked for the DOE as a teacher for over 20 years.

32. Before the DOE suspended him without pay for failure to violate his sincerely held religious beliefs, Plaintiff JOHN DE LUCA ("De Luca") was employed by the DOE as a teacher for the past 10 years.

33. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff SASHA DELGADO ("Delgado") was employed by the DOE for the past 15 years.

34. Before the DOE suspended him without pay for failure to violate his sincerely held religious beliefs, Plaintiff DENNIS STRK ("Strk") worked for the DOE for the past 13 years as a high school social studies teacher.

35. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff SARAH BUZAGLO ("Buzaglo") worked for the DOE since 2017 as a

teacher.

36. Before the DOE suspended him without pay for failure to violate his sincerely held religious beliefs, Plaintiff EDWARD a/k/a ELI WEBER ("Weber") was employed by the DOE as a teacher since September 2001.

37. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff CAROLYN GRIMANDO ("Grimando") was employed by the DOE as a teacher for the past 18 years.

38. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff AMOURA BRYAN ("Bryan") was employed by the DOE for the past 13 years. She began working as a special education teacher with DOE Home Instruction Schools in August 2021. In that position, she worked from a remote location in an isolated, non-school-building workplace, and did not interact in-person with DOE students or staff.

39. Before the DOE suspended her without pay for failure to violate her sincerely held religious beliefs, Plaintiff JOAN GIAMARRINO ("Giamarrino") was employed by the DOE as a teacher for the past 14 years.

40. Before the DOE suspended him without pay for failure to violate his sincerely held religious beliefs, Plaintiff BENEDICT LOPARRINO ("LoParrino") was employed by the DOE as an elementary school teacher for the past 17 years.

### *Defendants*

41. Defendant City of New York (the "City") is a municipal corporation constituting the local municipal government of the population residing in New York, Bronx, Queens, Kings and Richmond Counties in New York State. The First Amendment of the United States Constitution applies to this defendant by virtue of the Fourteenth Amendment.

42. Defendant Mayor Bill de Blasio ("Mayor de Blasio"), sued personally and in his official capacity, was the chief executive officer of the City until January 1, 2022. Mayor de Blasio was the architect and proponent of the challenged Mandate. Mayor de Blasio acted at all times under color of law in the acts attributed to him herein.

43. Defendant David Chokshi ("Commissioner Chokshi") is the Commissioner of Health and Mental Hygiene of the City of New York ("DOHMH"). Sued in his official capacity, Commissioner Chokshi promulgated the Mandate and subsequent amendments in coordination with Mayor de Blasio's directives. Commissioner Chokshi acted at all times under color of law in the acts attributed to him herein.

44. Defendant Board of Education of the City School District of the City of New York d/b/a New York City Department of Education ("DOE") is the department of city government responsible for the management of the New York City School District and the administration of the City's public schools. Through the issuance of Chancellor's Regulations, the DOE sets policies in the City's public schools. The Department is responsible for implementing the Mandate. For all purposes, the DOE serves as the government or public employer of the Plaintiffs and all other persons who work for it.

45. Defendant David Chokshi ("Commissioner Chokshi") is the Commissioner of Health and Mental Hygiene of the City of New York and head of NYC's Department of Health and Mental Hygiene ("DOHMH"). Sued in his official capacity, Commissioner Chokshi acted at all times under color of law in the acts attributed to him herein.

46. Defendant David C. Banks ("Chancellor Banks") is the Chancellor of the DOE. Sued in his official capacity, and acting at all times covered herein under color of law, Chancellor Banks sets policies and oversees the employment of teachers, administrators and other employees for

the DOE and is responsible for the enforcement of such policies with respect to such employees.

## JURISDICTION AND VENUE

47. This court has jurisdiction to adjudicate all federal claims raised in this matter under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the laws and Constitution of the United States; the Supremacy Clause of the Constitution of the United States, which allows federal district courts to hear suits alleging preemption of state and local laws by the Constitution and federal laws made in pursuance thereof; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343 in relation to Defendants' deprivation and infringement under color of law of the Plaintiffs' rights, privileges, and immunities secured by the United States Constitution and laws, as detailed further herein.

48. This Court has the authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorney's fees and costs under 42 U.S.C. § 1988.

49. Venue is proper in the United States District Court for the Southern District of New York for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendants unlawfully deprived many of the Plaintiffs and Class members of their rights under the laws and Constitution of the United States, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur.

## CLASS ACTION ALLEGATIONS

50. The *Kane* Plaintiffs bring this class action pursuant to Rule 23 in their representative capacity on behalf of themselves and the Class of all others similarly situated as defined in this

complaint. Plaintiffs propose a Class consisting of all persons employed directly or indirectly by the DOE who assert religious objections to the Mandate (the "Class").

51. This action meets the following prerequisites of Rule 23(a):

    a. Numerosity: The Class includes thousands of members. Due to the high number of class members, joinder of all members is impracticable and, indeed, virtually impossible.

    b. Ascertainability: The proposed Class is ascertainable. Every Plaintiff is employed directly or indirectly by the DOE. Anyone who asserts that they have religious objections to the DOE Mandate is eligible to join the class.

    c. Commonality: A substantial pool of common questions of law and fact exists among the Class, including but not limited to:

        i. Whether the DOE adopted facially discriminatory policies and practices for determining religious exemptions and suspended or otherwise adversely impacted the employment conditions of thousands of employees pursuant to these policies;

        ii. Whether the Mandate is subject to strict scrutiny on its face;

        iii. Whether the Mandate is subject to strict scrutiny as applied through facially unconstitutional and discriminatory Exemption Standards;

        iv. Whether the Mandate as implemented can survive strict scrutiny, including whether there are less restrictive means of mitigating the spread of COVID-19;

        v. Whether the First Amendment applies to determinations about the validity of religious beliefs made by state actors considering religious exemption and accommodation, and what standard of review is required to assess those

determinations;

    vi.   The irrationality and arbitrariness of particular provisions of the Mandate;

    vii.   Appropriate remedies to address the discrimination that occurred.

d.  Typicality: Named Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are all directly or indirectly employed by the DOE. The harm suffered by Plaintiffs and the cause of such harm is representative of the respective Class.

    i.   The claims or defenses of the Named Plaintiffs and the Class arise from the same events and actions by Defendants and are based on the same legal theory.

    ii.   The Named Plaintiffs include most subgroups of the proposed Class– including *inter alia* those who declined to apply under the facially discriminatory Exemption Standards policy because it appeared futile or offensive, those who applied initially, were denied and then appealed, those who were denied and declined to appeal under the facially discriminatory Exemption Standards policy, those who were granted appeal hearings, those who were not given a chance for a hearing on appeal, those who were accepted in their zoom appeal, those who were denied on appeal, those who were accepted after second review by the "Citywide Panel" and those who were denied after second review by the "Citywide Panel."

    iii.   Since preliminary injunctive relief was already afforded to the diverse Plaintiffs collectively by the Second Circuit without distinction among the subcategories, it follows that they and those similarly situated have enough commonality to meet the standards under Rule 23.

e.  Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class.

f.  Plaintiffs do not have any interests that conflict with the interests of the members of the Class. Plaintiffs have engaged competent counsel who are experienced in complex litigation, including class actions.

g.  Superiority: A class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous similarly situated individuals to prosecute their common claims in a single forum simultaneously without duplication of evidence, expense, and resources. This action will result in uniformity of decisions and avoid risk of inconsistency and incompatible standards of conduct in the judicial system. It will also more efficiently allow adjudication of the pattern and practice claims.

h.  Maintainability: This action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b):

   i.  The individual amount of restitution involved is often so insubstantial that the individual remedies are impracticable and individual litigation too costly;

   ii.  Individual actions would create a risk of inconsistent results and duplicative litigation;

   iii.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby rendering final injunctive relief or declaratory relief appropriate for the Class as a whole; and

   iv.  Individual actions would unnecessarily burden the courts and waste judicial resources.

i.  Predominance: The questions of law or fact common to Class Members predominate over any questions that may affect only individual members, and a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy.

FACTS COMMON TO ALL CLAIMS

52. In March 2020, ex-Governor Cuomo declared a state of emergency due to the emergence of the COVID-19 pandemic.

53. In response to the pandemic, DOE closed all schools in its system, pivoting to a program of system-wide remote instruction in Spring 2020. All school personnel and students participated in school activities through remote means.

54. During the 2020–2021 school year, DOE conducted classes using a hybrid model, in which some teachers and students participated remotely, and some were physically present on school grounds.

55. On June 23, 2021, ex-Governor Cuomo issued a declaration that the state of emergency due to COVID-19 was officially over in New York.

56. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with presently available vaccines; (3) vaccine protection wanes significantly after a short period of time. Entire governments began to acknowledge that we will need to learn to live with COVID-19 as an endemic part of human life, and everyone (vaccinated and unvaccinated alike) will at some point catch and spread COVID-19.

57. Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get

14

vaccinated with one of the still-experimental COVID-19 vaccines. At a press conference, he

described the goals of the program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities, indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[1]

58. No religious or medical exemptions are offered under the "Key to New York City" mandate,

making it one of the most draconian vaccine policies to have ever been enacted. The religious

exemption was purposefully left out due to the ex-Mayor's hostility towards religious

objections to vaccination.

59. Two days after the "Key to NYC" was announced, on August 5, 2021, Wolf Blitzer

interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky

clarified that the data on vaccine effectiveness against the then-dominant delta variant are

conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection

or transmission. "But what they can't do anymore is prevent transmission." When asked if

asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly

right."[2]

---

[1]https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability
[2]http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html
1.

60. Instead of pausing his mandates, Mayor de Blasio began what appears to be a crusade in earnest against the unvaccinated, expanding his ever-expanding mandates into the workplace.

61. First, in mid-August 2021, Mayor de Blasio issued a mandate for all New York City government employees, including employees of the DOE, requiring them to get vaccinated or be subjected to weekly testing requirements. As he issued this mandate, Mayor de Blasio remarked that he hoped that the testing requirements would be so burdensome that people would need to get vaccinated to avoid them – demonstrating his animus toward persons who refused to get vaccinated for religious or other reasons.

62. Then, on August 23, 2021, once again with no justification from the data or case numbers, Mayor de Blasio and Commissioner Chokshi announced that DOE employees would no longer have an option to undergo weekly testing but would now be terminated if they did not receive at least their initial COVID-19 vaccination by September 27, 2021. As announced, the new policy did not allow exemptions for any reason.

63. On August 24, 2021, Commissioner Chokshi promulgated a written vaccine mandate ("Original Mandate"), incorporating the policy announced on August 23rd. The Original Mandate included no exemptions for employees of DOE, no matter whether they were employed in DOE school buildings or remotely (with various exceptions for certain categories of employees or reasons other than religious accommodation provided).

64. Lawsuits and labor disputes ensued. Mass protests erupted and continue to be held.

65. The City openly refused to agree to consider any religious exemptions or accommodations to the policy as the parties tried to negotiate.

*Arbitration and Initial Lawsuits Forced the City to Agree to Accommodate Religious Beliefs*

66. On September 1, 2021, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse. The challenge moved to arbitration.

67. On September 10, 2021, an arbitrator, Martin F. Scheinman, issued an order in the UFT Arbitration ("UFT Award") that required DOE to permit religious exemptions to its vaccine requirements, but imposed unconstitutional restrictions on the criteria and manner in which requests for such exemptions were to be determined and draconian consequences for unvaccinated DOE employees, even those who did receive an exemption (collectively "Exemption Standards.")

68. Arbitrator Scheinman has held public fundraisers for Mayor de Blasio and is a major donor. His neutrality is in question.

69. On information and belief, the discriminatory religious exemption criteria provisions of the UFT Award were composed almost entirely of language and procedures proposed by the City.

***Unconstitutional Exemption Standards Formally Adopted by DOE***

70. *Inter alia*, the UFT Award contained the following provisions:

   a.   As an alternative to any statutory reasonable accommodation process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and nonpedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical

17

exemption requests to the mandatory vaccination policy ... *Id*. At 6-7, Section I.

b.  Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m. *Id*.

c.  Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an on line source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists). *Id*. at 9, Section I.C.

d.  The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial. *Id*. at 9-10, Section I.E.

e.   If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from

the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination. *Id.* at 10, Section I.F.

f.  A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing. *Id.* at 10-11, Section I.G.

g.  Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding. *Id.* at 11, Section I.H.

h.  While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as

determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application. *Id*. at 11-12, Section I.I.

i.  An employee who is granted a [ ] religious exemption [ ] under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/ or accommodation is in place. [ ] Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment. *Id*. at 12-13, Section I.K.

j.  The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution. *Id*. at 13, Section I. L.

k.  Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose. *Id*. at 13, Section II.A.

l.  During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period. *Id*. at 14, Section II.C.

m.  During the period of September[ ] 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue

to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job). *Id*. at 16, Section III.A.

n.  During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned. *Id*. at 17, Section III.B.

o.  Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions contained, herein, all parties retain all legal rights at all times relevant, herein. *Id*. at 17, Section III.C.

71. On September 15, 2021, Arbitrator Scheinman issued a second arbitral award in a negotiation between the DOE and the Council of Supervisors and Administrators ("CSA"), which

22

represents DOE employees in supervisory and administrative positions. The CSA Award

mirrored the UFT Award in all ways relevant to the instant litigation.

72. On information and belief, at least two additional awards were issued in union arbitrations

between DC37, a union that represents persons who work for DOE (or indirectly for DOE,

through DOHMH) as school aides and in other staffing positions, and DOE and DOHMH,

with provisions that mirror the UFT awards in all ways relevant to the instant litigation.

73. The NYC DOE officially adopted the religious accommodation policy set forth by Arbitrator

Scheinman as DOE policy.

74. Defendants acknowledge that none of the underlying collective bargaining agreements contain

a waiver provision waiving individual employees' right to sue in court for discrimination or

constitutional violations.

75. Instead, the contracts all have express provisions guaranteeing that individual rights are not

waived. For example, on information and belief, arbitrations between the UFT and DOE are

governed by an agreement dated May 1, 2014 called the Joint Intentions and Commitments

("Joint Intentions"). The Joint Intentions contain *inter alia*, the following provisions (at 177,

Art. 22, Section d, paras. 2, 4) that limit the UFT's powers in arbitration:

a. Nothing contained in this Article or elsewhere in this Agreement shall be construed to

permit the Union to present or process a grievance not involving the application or

interpretation of the terms of this Agreement in behalf of any employee without his/her

consent.

b. Nothing in this Article or elsewhere in this Agreement shall be construed to deny to

any employee his/her rights under Section 15 of the New York Civil Rights Law or

under the State Education Law or under applicable Civil Service Laws and

Regulations.

c.   Nothing contained herein shall be construed as a waiver of any substantive arbitrability

objection or to preclude any other resort to judicial proceedings as provided by law.

76. None of the Plaintiffs consented to permit any union to process a grievance concerning the

Defendants' attempt to deprive them of their constitutional rights and, on information and

believe, neither did any of the Class members.

77. Meanwhile, the UFT and fifteen other labor unions representing employees of DOE filed a

lawsuit ("New York State Litigation") in the New York State Supreme Court in New York

County on or about September 9, 2021 mounting a facial challenge to the constitutionality of

the Original Mandate.[3]

78. Justice Laurence Love issued a Temporary Restraining Order in the New York State Litigation

against enforcement of the Original Mandate because it failed to provide for religious and

medical exemptions.

79. The 2021-2022 school year for DOE commenced on September 13, 2021 for students.

80. On September 15, Commissioner Chokshi issued a new mandate, which rescinded the Original

Mandate, as amended. The amendment extended the vaccination requirement to staff of

charter schools and their contractors, but it still did not apply to schoolchildren. It added a

requirement that "Public meetings and hearings held in a DOE school building must offer

individuals the opportunity to participate remotely in accordance with Part E of Chapter 417 of

the Laws of 2021."  It created special exceptions for individuals who enter "a DOE school

setting, DOE building, or charter school setting [ ] for the limited purpose to deliver or pick up

items unless the individual is otherwise subject to this Order [or who are] present [at] such

locations to make repairs at times when students are not present in the building unless the individual is otherwise subject to this Order.  It also excepted the following classes of persons:

    a.  Students attending school or school-related activities in a DOE school setting;

    b.  Parents or guardians of students who are conducting student registration or for other purposes identified by DOE as essential to student education and unable to be completed remotely;

    c.  Individuals entering a DOE school building for the limited purpose to deliver or pick up items;

    d.  Individuals present in a DOE school building to make repairs at times when students are not present in the building;

    e.  Individuals responding to an emergency, including police, fire, emergency medical services personnel, and others who need to enter the building to respond to or pick up a student experiencing an emergency;

    f.  Individuals entering for the purpose of COVID-19 vaccination;

    g.  Individuals who are not eligible to receive a COVID-19 vaccine because of their age; or

    h.  Individuals entering for the purposes of voting or, pursuant to law, assisting or accompanying a voter or observing the election.

81. The following language was added: "Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law."

### *The Religious Exemption Policy is Unconstitutional*

82. The DOE adopted the discriminatory arbitration policy as its sole official policy for

---

[3] *New York City Municipal Labor Committee, et al., v. The City of New York, et al.*, No. 158368/2021 (N.Y. Co.).

determining religious exemptions.

83. The DOE knew or should have known that these standards are blatantly unconstitutional and thus impermissible for adoption by a government employer.

84. The Exemption Standards require the state to impermissibly pass judgment on which religions are "valid" and which it will decline to acknowledge or give its blessing.

85. Specifically, people who follow personal religious paths, or who belong to religions that are not "established" and "recognized" by the random reviewing administrator will <u>not</u> be considered.

86. The policy further provides that religious objections based on personally held religious beliefs, and not necessarily echoed by the official doctrine of a church as relayed by "clergy", will be denied.

87. Moreover, to be considered, the exemption "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs.

88.  To the extent that people have "recognized" church leaders that write letters attesting that a person has religious beliefs against vaccination and these beliefs are the beliefs of the church, this documentation cannot be available online. If the church has placed a description of their ministry online, the person will be denied an exemption.

89. Additionally, if a person does happen to belong to an "established" and "recognized" religious organization that is hierarchical and provides letters from clergy (that are not available online), that person will still be denied if any "leader" of that person's "religious organization" has ever spoken publicly in favor of vaccination.

26

90. "Leader" is not defined and in practice, the DOE has interpreted this very broadly (i.e., if one is Jewish, and any Jewish faith leader has ever made a statement in favor of vaccines, the DOE zealously argued that the employee's religious exemption should be denied even if the employee's particular faith did not include following that particular "religious leader").

91. As alleged by the *Kane* Plaintiffs in their initial complaint, filed before any determinations were made, the language of the policy shows that the intention is to deny everyone or substantially everyone. In fact, the policy gives only one example of a religion that will be accepted for exemption: Christian Science.

92. This intention was made plain to the employees. Multiple supervisors and agents of the DOE advised teachers that the DOE intended to deny all religious exemptions other than Christian Science-based objections. They asserted that the DOE has instructed, without authority, that "all other religions have publicly made statements in support of vaccination" and thus that anyone belonging to any other religion than Christian Science must be denied.

93. The City was represented by Corporation Counsel in all of the zoom appeals. In each appeal, the DOE representatives repeatedly and zealously argued for unconstitutional reasons for denial, repeatedly arguing that employees' applications should be rejected because they conflict with the Pope's decision to get vaccinated, or sometimes another popular faith leader (often one that had little or nothing to do with the religious beliefs of the applicant being assessed). Corporation Counsel also frequently cited a letter from Defendant Commissioner Chokshi, which questioned the validity of religious objections to the use of fetal cells in the development of COVID-19 vaccines.

94. In no uncertain terms, the DOE participated in heresy inquisitions, and openly advocated for discrimination against their employees because they held minority religious views or religious

views which Defendants believe are "wrong".

95. This widespread, acknowledged policy reflected ex-Mayor de Blasio's guidance and admission of how the City would handle the applications for religious accommodation. In a press briefing held on September 23, 2021, ex-Mayor de Blasio was asked how the City intended to implement the religious exemption policies and what criteria would be used. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. **And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated**. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection**.

96. It is long-settled that discrimination against personally held religious beliefs is unconstitutional and the Defendants were on notice that such criteria violates their employees' rights.

97. In the 1980s, the New York State Legislature similarly limited religious exemptions, only allowing exemption from vaccination to families who were "bona fide members of a recognized religious organization" with teachings that were contrary to immunization.

98. After parents with personally-held religious beliefs challenged the language codified into the Public Health Law in federal court, it was determined that the statute violated the Establishment Clause of the United States Constitution in a number of ways, one of which was to exclude those with personally held religious beliefs from protection.

99. As a result of that holding, New York State had to change its statutory language to provide religious exemptions to anyone who holds a religious objection, whether personally held or echoed by an established religious organization. No certification from clergy or attestation of

membership could be required.

100.      To this day, the amended Section 2165 of the New York State Public Health Law, which governs immunization requirements for adults, subsequently states: "this section shall not apply to a person who holds genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such person being admitted or received into or attending an institution."

101.      Such broad and equal protection is the Constitutional floor. The City violated the rights of thousands of employees by adopting this facially unconstitutional policy to administer accommodations required by the First Amendment and Title VII.

*Implementation of the Exemption Standards*

102.      The religious exemption policy was intentionally set up to make it impossible to receive a meaningful chance at a religious exemption, while attempting to sidestep the expected lawsuits about the unconstitutionality of withholding such exemptions.

103.      Indeed, upon the proclamation that the City now had a mechanism for religious and medical exemption, the temporary restraining order in the State litigation was dissolved.

104.      However, what was not before the state court was the details of the religious exemption policy, which if examined, would have been readily revealed as facially unconstitutional.

105.      In addition to discrimination claims, Plaintiffs, many of whom are tenured teachers and staff, have procedural due process rights that were grossly violated by the DOE's policy.

106.      Although the UFT Award set a deadline of September 20, 2021 for employees of DOE to apply for exemption from the Vaccine Mandate, DOE waited until Saturday, September 18, 2021 to inform many of their employees of the opportunity to apply for the exemption. Most employees had only two days or less to apply for exemption under the UFT Award. CSA

employees were only provided with one day.

107.    Thus, covered employees seeking an exemption for religious reasons were given only a

few days (or in some cases one day) to prepare and submit their applications even though these

requests require, in addition to thoughtful and detailed explanations of faith written by the

employees, documentation from religious leaders – specifically clergy members – and the

documentation could not be available online.

108.    The SOLAS system, where requests had to be uploaded, promptly jammed, leaving

many employees unable to apply.

109.    Some DOE employees who have religious objections to the Vaccine Mandate (such as

Plaintiff Smith) purposely declined to file applications for exemption from the vaccination

requirement because the Exemption Standards expressly excluded those with personally held

religious beliefs from protection and were facially unconstitutional and offensive. Said

employees believed an application would be futile. Many of these employees instead began

raising money for a lawsuit.

110.    Upon information and belief, at least five thousand DOE employees, including most of

the Named Plaintiffs, did file religious-based requests for exemption from the Mandate on or

before the deadline.

111.    All applications were immediately denied through an autogenerated form email stating

that any accommodation would be an "undue hardship" on DOE. This same email was even

sent to employees who already worked remotely and those who could easily be accommodated

remotely (such as IT or administrative positions).

112.    Upon information and belief, some of those who were issued these insulting computer-

generated denials then joined with their colleagues to try to generate support needed to file for

emergency relief, realizing that the City was not going to act in good faith to provide religious accommodation. Others attempted to file an appeal, but were shut out of the system because it crashed during the short one-day period in which the appeals were supposed to be submitted.

113.    DOE attorneys represented to the Court of Appeals that approximately 1,400 DOE employees were able to file appeals from decisions denying their exemption requests within the one day allotted.

114.    Many of these 1400 were denied an opportunity for a zoom appeal, with no explanation whatsoever. Others were given fifteen minutes to meet with an arbitrator over Zoom, in adversarial proceedings including an attorney for DOE, and then were promptly denied, with no explanation whatsoever.

115.    The DOE alleges that 165 employees eventually received a religious exemption through appeal.

116.    Upon information and belief, the majority of those 165 alleged "acceptances" were granted *after* the *Kane* Plaintiffs filed a motion for emergency relief on October 4, 2021, and were issued in anticipation of litigation.

117.    Pursuant to the DOE's blatantly unconstitutional religious accommodation policy, thousands of DOE employees, including most Named Plaintiffs, were denied religious accommodation and suspended without pay beginning October 4, 2021.[4]

118.    Pursuant to Section II.A of the Exemption Standards, they were eligible to receive health insurance for a finite period but "prohibited from engaging in gainful employment" under Section II.C thereof.

---

[4] The original date of September 27, 2021 was pushed back to October 4, 2021 because of a temporary restraining order from the Second Circuit.

119.     Pursuant to Section III of the Exemption Standards, unvaccinated employees of DOE, including the Plaintiffs, are faced with a Hobson's Choice between two alternatives: (1) they may choose to "separate" from DOE, lose their tenure and careers, but remain eligible for health insurance through September 5, 2022, and receive compensation for unused CAR days; or (2) they may opt to extend their unpaid leave status through September 5, 2022, remain eligible for health insurance, but be prohibited from gainful employment for an entire year without income from any source. Both options require the "separated" employee to sign an express waiver of any right to challenge the separation. The DOE's required waiver document for election of Option (1) includes the following representation: "As it relates to the DOE, I understand that I lose all entitlements to reversion, retention, and tenure." If unvaccinated employees failed to elect option (1) by October 29, 2021 or Option (2) by November 30, 2021, then the DOE has the power unilaterally to terminate their employment starting on December 1, 2021 according to Section III of the Exemption Standards.

120.     The Exemption Standards provided the exclusive procedure pursuant to which DOE employees were able to file applications for religious exemptions from the Mandate.

***Kane and Keil Lawsuits and Early Proceedings***

121.     While all of this was happening, the teachers and educators impacted by the mandates were in a state of crisis. The labor disputes and pending lawsuits meant that the landscape was changing every day. The Mandate itself was amended three or four times in the month between its announcement and original effective date. The Mandate was also stayed more than once in various courts.

122.     As it became apparent that help was not coming from many of the broader suits, those with religious objections to the Mandate and the discriminatory standards began organizing to

try to bring the issues with the religious exemption process before the Court.

123. These are working class Plaintiffs, who were each in a state of crisis brought on by ex-Mayor de Blasio's shock and awe vaccine policies. They do not have the money to walk into a high-priced law firm and hire a team of attorneys. Nor do they have the ability to fight every battle while other lawsuits are pending that might provide relief. They have to conserve their resources.

124. The *Kane* Plaintiffs raised money with great difficulty and filed for emergency relief as soon as they were able - just before the effective date of October 4, 2021. They filed seeking relief for themselves and all others similarly situated.

125. At that time, many of the *Kane* Plaintiffs still did not know whether their applications were accepted or denied yet. They did know, however, that whatever the outcome, the process itself was boldly discriminatory and harmful.

126. The district court denied injunctive relief after two hearings.

127. A separate set of educators filed suit in the *Keil* matter as soon as they were able to considering the hurdles in trying to raise funds and secure a law firm to help.

128. The *Keil* Plaintiffs were denied relief with no opportunity for a hearing.

129. At no time during the lower court proceedings did any Defendant assert that there was some "alternative" process or set of standards that could have been employed.

130. Both sets of Plaintiffs sought emergency relief through appeal.

131. The November 28, 2021 merits panel decision of the Second Circuit Court of Appeals found that the Mandate, as applied through the Exemption Standards, was likely to be unconstitutional. Corporation Counsel admitted in open court that the policies they had adopted and used to determine religious accommodations were "constitutionally suspect."

132.     The Second Circuit held that Plaintiffs are likely to succeed, vacated and remanded the denial of injunctive relief and ordered that each of the Named Plaintiffs receive "fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel" (the "Citywide Panel") adhering to "standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law."

133.     The Citywide Panel was created by the Defendants and is entirely controlled by them, and the provision for referral of such panel set forth in the Second Circuit's order was adopted *verbatim* by the court from a proposal drafted by Defendants.

134.     The DOE promised to extend the same "fresh look" by the Citywide Panel to many of the thousands of others who were suspended under the admittedly unconstitutional Exemption Standards policy.

135.     Upon information and belief, some of the proposed Class have been given the opportunity to ask for a "fresh look" by the Citywide Panel.

***The Citywide Panel***

136.     The Citywide Panel process is just another veiled attempt to continue to discriminate against employees with sincerely held religious beliefs against COVID-19 vaccination. It does not provide adequate safeguards to meet the basic constitutional or statutory standards.

137.     First, it has not been extended to everyone. Other than for Named Plaintiffs in these categories, the Citywide Appeals Panel option has not been extended to DOE workers who either declined to file an administrative application pursuant to the discriminatory Exemption Standards or who declined (or were unable) to file an appeal pursuant to the discriminatory

34

Exemption Standards, and on information and belief, to others who object to the Mandate on

religious grounds, including DOE employees whose attempts to file exemption applications or

appeals were rejected or ignored by the Defendants.

138.     For these employees, their status with DOE continues to be governed by the

unconstitutional Exemption Standards – which means that each and every such person who is

unvaccinated has either been dismissed already, or is now on leave without pay and subject to

dismissal by the DOE despite possessing a religious objection to vaccination without ever

having been offered any constitutionally valid process for applying for a religious exemption.

139.     Second, the Citywide Appeals Panel was supposed to apply standards for the

evaluation of religious exemptions that complied with the law, including *inter alia* the

standards established by Title VII of the Civil Rights Act of 1964, the New York State Human

Rights Law, the New York City Human Rights Law, and the New York State and United

States Constitutions. They failed to do so.

140.     Rather, the Citywide Appeals Panel did not apply these standards, and is simply using

this "fresh look" process to try to justify their original unlawful discriminatory suspensions in

bad faith.

141.     Third, even though Defendants essentially admitted that they had openly discriminated

against thousands of employees on the basis of religion, their review of these determinations

was not undertaken by a neutral decision-maker.

142.     Instead, Defendants employed their own staff, and worse, the attorneys who represent

them defending against this lawsuit and who had initially overseen the denials under the

unconstitutional policy, to provide the "fresh look."

143.     Defendants likely owe substantial amounts of money to each person that they

discriminated against. They are inherently vested in upholding the denials and cannot be allowed to self-police in this manner mid-litigation or have a say in determining whether the suspensions were justifiable under some new theory.

144.     Fourth, no Plaintiff was given any meaningful opportunity to be heard, or adequate notice of the reasons for their denial.

145.     Fifth, the issuance of more autogenerated denials reveals once more that individualized determinations required by law are not taking place in good faith. This "fresh look" policy is nothing more than an attempt to whitewash the discrimination that already took place.

146.     The applications submitted by fourteen of the Named Plaintiffs were reviewed within two weeks, as ordered by the Second Circuit.

147.     All were summarily rejected with an autogenerated explanation "does not meet criteria" email save one.

148.     The one Named Plaintiff whose application was accepted received the same explanation "does not meet criteria". He was reinstated with back pay but is still barred from entering any school building, without explanation, even though he has natural immunity.

149.     All fourteen decisions stated that the decision was final and no indication was given that any additional information would be provided. The denials required that Plaintiffs get vaccinated within three days of receiving the decision.

150.     Plaintiffs filed an application to renew their motion for a preliminary injunction within days after receiving their denials. Several days later, attorneys for the DOE sent counsel for the Plaintiffs an email with purported "reasons" justifying the denials.

151.     Upon information and belief, these "reasons" were an afterthought, generated in response to Plaintiffs' allegations about the summary nature of the sham "fresh look" process.

152.     On information and belief, the Citywide Appeals Panel has no published rules or regulations to govern its actions, keeps no records of its decision-making process, and is not required to give any reasoned explanation of its decisions.

153.     On information and belief, the few additional individual DOE employees whose religious exemption requests have been denied by the Citywide Appeals Panel have also received denials that lacked explanations, as the Named Plaintiffs originally were given.

154.     On information and belief, no one except the Named Plaintiffs in this lawsuit has received, or ever will receive, any explanations at all for denials issued by the Citywide Appeals Panel.

155.     Corporation Counsel's explanations, if they were accurate, show that the panel violated standards established by the United States Constitution, Title VII and the other laws that the Panel was required to apply.

156.     The most common reason for denial was that Plaintiffs' religious beliefs are personally held and thus cannot be "religious in nature" since Plaintiffs allegedly have control over what beliefs to adopt. This explanation was given to all those whose beliefs are derived from guidance from prayer, or moral conscience, for example. The DOE attorneys stated that such beliefs cannot be "religious in nature" though they acknowledged that all of the beliefs were sincerely held *religious* beliefs.

157.     Other Plaintiffs were allegedly denied because the DOE asserted the Plaintiffs are wrong about their religious beliefs. These were precisely the kinds of unconstitutional reasons that were challenged successfully on interlocutory appeal, and which the Second Circuit explained are blatantly violative of the First Amendment's protections.

158.     Each email also added that in addition, the DOE would deny each applicant even if

their beliefs were found valid because it would be an "undue hardship" to the DOE to allow

any unvaccinated teachers to enter school buildings. This was not supported or substantiated,

nor did they explain why some teachers were accommodated nonetheless under the

discriminatory standards.

159.    Moreover, according to Corporation Counsel's letter explaining the panel's decisions,

the panel received submissions from both the Plaintiffs and from the Defendants. While

Defendants were thoroughly familiar with the facts set forth in Plaintiffs' applications, and

were able to tailor their submissions in an attempt to rebut them, the Plaintiffs were not

afforded any opportunity to review Defendants' submissions to the panel or to rebut them.

This built-in advantage in the system designed by Defendants and adopted by the Second

Circuit panels violated Plaintiffs' rights to due process and deprived them of a fair hearing.

160.    Ultimately, even if Defendants could demonstrate that any Class member possessed

some secular objections to the vaccine in addition to their religious objections, this would not

undermine their religious beliefs when such beliefs constitute their primary concern.

161.    On information and belief, the First Amendment's religion clauses require the DOE to

provide an accommodation to Plaintiffs that is the least restrictive alternative available to the

Defendants. It is not constitutional for the Defendants, as governmental actors, to deny

Plaintiffs – and thousands of other religiously motivated employees – their constitutional

rights simply because the DOE finds it to be inconvenient to accommodate those rights.

162.    Following the denial of their appeals by the Citywide Appeals Panel, the Plaintiffs

were informed that they must present proof of vaccination to the City by December 28, 2021,

or opt-in to extended leave-without-pay-and without-outside-employment status (waiving their

rights to challenge the Defendants' actions in court), or be fired.

163.    This threat puts Plaintiffs – and everyone who is similarly situated – under tremendous pressure to betray their religious beliefs in order to protect the livelihoods, income and insurance protections for themselves and their families during a winter where COVID-19 and its Delta and Omicron variants are once again predicted to wreak havoc upon the health of the general population (without any apparent regard to vaccination status as Omicron easily infects the vaccinated and unvaccinated alike).

***The Vaccine Mandate is not Neutral or Generally Applicable***

164.    The religious exemption policies are not neutral or generally applicable.

165.    Though the Plaintiffs and most other DOE employees are banned from entering any school building despite having religious beliefs that do not allow them to be vaccinated, there are multiple carve-outs for persons who can enter school buildings.

166.    Pursuant to the Vaccine Mandate, the one million children who attend New York City schools can enter school buildings each day.

167.    Bus drivers are allowed to be unvaccinated, even though they have children in enclosed spaces for long periods of time, and they can enter school buildings unvaccinated.

168.    Voters, delivery people and visiting parents can also enter school buildings unvaccinated.

169.    Moreover, people whose vaccine immunity waned long ago, or who have only just begun their doses are allowed to teach in person under the terms of the mandate.

170.    In addition, the Mandate has been tainted by substantial evidence of religious animus, not only from the City of New York, but by decision makers at the State level as well.

171.    The Mandate was promulgated on the same day that Governor Kathy Hochul was appointed interim Governor of the State of New York.

172.     Governor Hochul has strongly held religious beliefs in support of vaccination. In place of a cross, she wears a golden "Vaxed" necklace, which she describes in religious terms. Before taking office, she met with Mayor de Blasio and coordinated a vaccine strategy.

173.     Two days after Mayor de Blasio's New York City Department of Health Vaccine Mandate was passed without a religious exemption, Governor Hochul removed the religious exemption from the New York State Department of Health regulation governing healthcare workers.

174.     Mayor de Blasio's amended mandates reference the state mandates as a justification to enact his own.

175.     Both mandates were to take effect on September 27, 2021. The day before the state mandate was supposed to take effect, Governor Hochul gave a sermon at a Brooklyn church, during which she said that God made the vaccine and that she was recruiting apostles to coerce those who did not understand God's will and what God wants (that we be vaccinated). Governor Hochul then told the press that the Pope supports vaccination and that no religious objections to vaccination are valid, and this is why she removed the religious exemption from the state healthcare mandate.

176.     Mayor de Blasio's statements have frequently echoed this New York government assertion that people's religious beliefs against vaccination are "invalid" because they are unorthodox. Representatives of the DOE repeatedly argued the same in each Zoom appeal.

177.     These statements are as ignorant as they are unlawful.

178.     The history of religious opposition to vaccination is well-established and religious objectors exist in nearly every faith tradition.

179.     Even within the Catholic Church, there is currently a robust debate about the religious

40

propriety of getting a COVID-19 vaccine.

180.     Similar to abortion, the topic of vaccination is so intertwined with religion that it is

itself a religious issue, and any vaccine mandate is inherently enmeshed with religion.

181.     Refusing to allow for reasonable religious accommodation is itself indicative of a lack

of neutrality.

182.     The State has now doubled down on its persecution of those with religious objections

to vaccination.

183.     Just before this mandate was to take effect, Governor Hochul gleefully announced that

she had instructed the Department of Labor to deny unemployment compensation to anyone

who is unable to work due to a vaccine requirement.

184.     Several terminated DOE employees have applied and been denied unemployment

compensation even though they are unable to get vaccinated due to their sincerely held

religious beliefs.

185.     Even as the DOE's own data showed that the vaccine mandates were not stopping the

spread, Mayor de Blasio just kept issuing more random mandates. After these proceedings

began, he issued additional mandates for general city employees, firefighters, police officers,

daycare workers, and even employees in the private sector.

186.     The government of New York City is treating vaccination as a religious sacrament,

wholly divorced from the science or law. Their goal is not and has never been to stop the

spread of COVID-19. It is to spread the gospel of COVID-19 vaccination even if it means

trampling religious rights and ignoring the irrationality of such policies.

***The Vaccine Mandate is Not Narrowly Tailored***

187.     The DOE's restrictions, prohibitions and "accommodations" on religious exemptions

41

to the vaccine mandate are not narrowly tailored to promote a compelling interest.

188.     There is no compelling reason to force the five percent of teachers who have religious objections to vaccination to violate their sincerely held religious beliefs.

189.     DOE cannot meet their burden of proving that the protection of the children who attend City schools requires 100% of the teachers and staff to be vaccinated (rather than the 95% that currently are) or that the same end of virus protection could not be accomplished by means that would inflict less harm upon a significant number of religiously observant DOE employees.

190.     New York City's DOE is the only school district in the entire State of New York that requires vaccination for all of its employees. All other districts in the state, including the adjacent school districts with overlapping populations and employees, allow unvaccinated teachers and school personnel to work in school buildings, subject to state testing requirements.

191.     All of these other school districts have a governmental interest that is identical to that of the DOE, but they have not found it necessary to suspend, segregate or fire their religiously motivated workforce.

192.     To date, the peer-reviewed evidence does not support the assumption that the vaccinated are substantially less infectious than unvaccinated people, particularly against the now dominant strains of SARS-CoV-2 widely circulating.

193.     On the contrary, transmission was not even studied in clinical trials, and it was expressly acknowledged from the outset that these vaccines cannot provide sterilizing immunity (meaning protection against transmission). These vaccines were not designed to stop transmission and the evidence-based science conclusively shows that they do not stop

transmission of SARS-CoV-2 enough to mitigate community spread.

194.     Any initial hopes that the vaccines would somehow turn out to provide sterilizing immunity have long-since been dashed, particularly with the dominance of the delta variant and now the omicron variant, upon which vaccination appears to have little to no impact in stopping infection.

195.     Even before the emergence of Omicron, the science established that vaccines cannot stop transmission. In July, the CDC released the findings of a study confirming the vaccinated are as infectious as the unvaccinated. The study also showed the vaccinated are as likely to contract COVID-19, and asymptomatic vaccinated people were just as infectious as asymptomatic unvaccinated people. Multiple other studies emerged at the same time showing the same findings.

*196.*     It is not surprising, then, that high vaccination rates do not translate into lower community spread.

*197.*     For example, a recent Harvard study found that "there appears to be no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases." Subramanian S V and Akhil Kumar. "Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

*198.*     Moreover, at the same time, evidence emerged that the vaccines were even waning in efficacy for symptom mitigation thus prompting many to start advocating for boosters after a few months. Studies from Israel and other highly vaccinated countries show efficacy plummeting less than eleven weeks after vaccination. Israel is already now contemplating a fourth booster, as their third has lost effectiveness.

199.     Defendants' own publicly available data support these points. The NYC DOE

publishes regular updates on the number of infected students and in-person staff working in

New York City Schools. That data shows that excluding unvaccinated staff has not decreased

the percentage of staff infected with COVID-19 at all (in fact, there are thousands currently

infected among the fully vaccinated staff, whereas before exclusion of the unvaccinated, there

were typically only a few dozen infected).

200.     Nor was there ever a science-based reason to exclude these teachers and staff. Many of

them have already been infected, and have as good or better immunity than their vaccinated

co-workers. Many worked without issue throughout the pandemic on the frontlines. There was

no emergency requiring their removal in October, and no reason not to allow them to return to

the class room now.

201.     Moreover, beyond the termination threat embodied by the Mandate, the DOE's

pernicious treatment of employees seeking religious exemptions shows animus: employees are

required to choose between resigning or suffering another ten months of continued unpaid

"leave" status, with a prohibition on outside employment. These loyal, longstanding

employees are being told to "quit or starve," in essence. The policy is designed to be punitive

and it is unconscionable, but consistent with ex-Mayor De Blasio's intent to impose

requirements so burdensome that people would need to get vaccinated to avoid them.

202.     Many of these employees have children and spouses to feed, elderly parents to support,

and eventually, a retirement to fund. To deny teachers and other educators both a salary and

any option to earn money from other sources is not, by any understanding, a narrowly tailored

provision. It does not meet even Title VII standards, much less strict scrutiny.

203.     Even for those few random employees who were granted an exemption, the

accommodation is not sufficient. There is no reason to segregate religious employees and bar them from accessing school buildings. This segregation has employment consequences and the DOE cannot meet their burden of establishing that such drastic action is necessary.

204.     Essentially, DOE is treating unvaccinated employees as if they have COVID-19, even if they are regularly testing and can establish that they do not have COVID-19. Because they are being treated as if they have a communicable disease, the appropriate standard is to assess whether they pose a direct threat to others – that is, a significant risk of substantial harm.

205.     The DOE cannot meet this burden. Unvaccinated employees who are regularly tested do not pose a risk to anyone else and certainly not more of a risk than their largely untested vaccinated co-workers, who clearly can and are catching COVID-19 at staggering rates.

206.     These provisions, along with the skewed application procedures that appear to be engineered to deny exemptions, accomplish two purposes: to make refusal to vaccinate so onerous that religious opponents of vaccination will be forced to act against their beliefs or waive their legal rights, and to save money through the mass "separation" of religiously motivated employees.

207.     The Mayor of New York City controls the New York City school system. These policies were always ordered from the top down.

208.     As the new Mayor of New York City, Mayor Adams has vowed to continue to require in-person schooling for DOE schoolchildren and vaccination for all DOE employees. As the new leader of the DOE, Chancellor Banks is required to follow Mayor Adams's instructions and, on information and belief, he is doing so, including by continuing to require that DOE require vaccination for all of its employees.

209.     The children, meanwhile, are in crisis. New York City has put out desperate ads stating

that anyone with a bachelor's degree (even with no teaching experience) can be hired.

210.    A staffing crisis has deprived hundreds of thousands of children of basic services and

programs that are supposed to be guaranteed to them under law.

211.    Violence has increased as staffing issues do not allow sufficient supervision.

212.    Multiple stabbings have occurred.

213.    Schools are closing, not because the children are sick, but because there aren't enough

staff to keep them open.

214.    Without discounting that COVID-19 should be taken seriously, it is well-understood

that it is a mild disease in children with a risk of death that is so low as to be statistically

insignificant.

215.    With the milder variants now circulating, and vaccines and therapeutics available to

those who want to use them, there is no compelling need to mandate COVID-19 vaccination in

schools.

***Plaintiff's Injuries and Standing to Seek Declaratory and Injunctive Relief***

216.    All Plaintiffs have sincere religious objections to vaccination and are entitled to opt out

of these vaccines both because they are experimental medicine and because the vaccines

conflict with their deeply held religious beliefs.

217.    They bring this suit on behalf of themselves and all similarly situated teachers and

educators in New York City with sincere religious objections to taking a COVID-19 vaccine.

<u>FACTS RELATING TO INDIVIDUAL PLAINTIFFS</u>

***Michael Kane***

218.    Michael Kane ("Mr. Kane") is a resident of Nassau County and has been a special

education teacher in New York City public school system for over fourteen years.

219.    Mr. Kane objects to the Vaccine Mandate due to his long-standing sincerely held

religious objections to vaccines.

220.     These religious objections are sincerely held, and deeply personal. Mr. Kane was raised

Buddhist and Catholic.

221.     Through the years, and after battling addiction and depression, Mr. Kane found

salvation in his deep personal relationship with God, and the spiritual forces of Christ and

Buddha.

222.     Mr. Kane derives his religious beliefs from personal communion with God, meditation,

and prayer, as well as study of the sacred teachings of Buddha, Christ and spiritual texts.

223.     He does not blindly follow the dictates of any one preacher or clergy member, and

objects to having to submit any "certification" from an outside party about what his faith is or

should be.

224.     Mr. Kane's clear guidance from prayer and meditation is to refrain from vaccination.

This is in line with the religious beliefs that he relied upon to free himself from addiction and

depression by giving up pharmaceutical interventions that he'd been using to unsuccessfully

treat his condition, and instead turning to prayer.

225.     Pursuant to his personal religious beliefs, Mr. Kane has not had a flu vaccine or any

other vaccine for over twenty years.

226.     Mr. Kane duly submitted an exemption request on Monday, September 20, 2021. By

the end of the day, he received the form letter claiming he was denied on the basis of undue

hardship.

227.     Mr. Kane is a dedicated and experienced tenured teacher. He teaches some of the most

vulnerable students in New York City, in a field that is terribly understaffed.

228.     Mr. Kane's students are very attached to him.

229.    When Mr. Kane was removed from the classroom, many of his students suffered serious harm and neglect.

230.    Upon information and belief, they are not receiving their mandated services, they do not have adequate tenured and trained teachers, and they are daily subjected to danger and neglect.

231.    Mr. Kane was subjected to discrimination and harassment by DOE employees in his Zoom arbitration.

232.    For example, Corporation Counsel (who represented the DOE in the zoom appeals) stated repeatedly that though they found he was sincere in his religious beliefs, he should be denied accommodation because the Pope disagrees with Mr. Kane.

233.    Mr. Kane explained that his religious views are not shaped by the Pope or the Dalai Lama, but rather, come from prayer.

234.    Mr. Kane was left in pending status for several days after his Zoom appeal, but finally summarily denied any accommodation after the initial TRO appearance on October 4, 2021.

235.    Mr. Kane's same materials were reviewed by the Citywide panel. In these materials, the primary reason provided for exemption was guidance from prayer.

236.    Once again, the Citywide panel noted that they did not have reason to doubt the sincerity of Mr. Kane's religious views, but nonetheless denied him on the grounds that they did not consider guidance from prayer to be "religious" in nature as it is personally interpreted.

237.    Without relief, Mr. Kane will be terminated imminently.

238.    Upon information and belief, Mr. Kane has natural immunity from prior exposure, though he has not been tested.

239.    Either way, Mr. Kane does not pose a significant risk to anyone else based on his

vaccine status and has been safely teaching in the NYC schools throughout the pandemic.

240.        He has a family to support, and losing his job has been very hard on him and his

family.

*William Castro*

241.        .            William Castro ("Mr. Castro") is a resident of Pennsylvania and works in the

New York City School District as an administrator in the Bronx Borough Office.

242.        He has been working in the New York City Public School system for over twelve

years.

243.        Mr. Castro grew up in public housing in Queens and attended public school in New

York City. Early on, he developed an appreciation for the power of education, seeing that it

could elevate people's lives and provide meaningful opportunities.

244.        He knew, from a young age, that he wanted to be an educator.

245.        Mr. Castro began his career as a teacher teaching English in public schools on the

Lower East Side for over eight years. He started as a teacher, then quickly became a lead

teacher and then Dean of Students.

246.        Mr. Castro's background is similar to many of his students, and his leadership and

passion for teaching has been an inspiration to countless New York City children.

247.        He always goes above and beyond, seeing needs and fulfilling them. At his first job, he

noticed, for example, that no one had stepped up to create a basketball program for the girls.

So, on top of all the other things he was handling, he started a team and served as coach for

five years, inspiring the children to apply the discipline and skills learned on the team to their

academic studies as well as their athletic achievements.

248.        At the urging of colleagues, and because he wanted to share his skills and passion for

education on a broader scale, Mr. Castro went back to school to pursue a career in administration.

249.    With certifications as a School Building Leader, School District Leader, English Language Arts Teacher, and English as a Second Language Instructor, it was a natural fit for Mr. Castro to be hired three years ago as the ESL service administrator for the lowest performing district in the Bronx. This district is characterized as "high needs" and has many ESL students from diverse cultural and language backgrounds.

250.    Mr. Castro was hired to the Borough office in November 2019.

251.    Though he was very new to the position when the pandemic hit, Mr. Castro poured his heart and soul into the job to ensure that the ESL students received the instructional services they need and make sure the school did not let them fall through the cracks.

252.    When the first shutdown occurred, area leaders were trying to figure out what to do and looking for guidance.

253.    Mr. Castro did not wait, but rather "took the bull by the horns," quickly realizing that since they were going into this new arena with fully remote learning, the teachers were going to need substantial support to learn how to navigate online systems and platforms.

254.    Mr. Castro immediately began professional development with teachers, and led sessions that were conducted remotely, where he had over a hundred participants at a time in multiple sessions. His efforts were applauded and the teachers in his district were particularly prepared.

255.    Mr. Castro worked tirelessly over the next year and a half to maintain this excellence and make sure the students in his district were taken care of and overworked teachers were supported and listened to.

256.       Some students were in person, some remote. Constant issues arose, and everyone was

anxious and stretched to the limit. But Mr. Castro consistently stepped up to be there for his

community and to be a leader.

257.       Though there was no vaccine or even PPE available from the school in the beginning

of the pandemic, he would not hesitate when asked to go into the buildings to support students

and staff. His constant refrain was "anything you need me to do, I will do it for the schools and

these communities."

258.       In December 2020, Mr. Castro got sick. Soon after, his wife got sick as well.

Diagnosed with COVID-19 by his physician, Mr. Castro lost his sense of smell and taste, and

developed symptoms of long-COVID, with brain fog and fatigue lasting for several months.

259.       He was allowed to take a leave of absence to rest and recover, but instead, he

continued to work for his district remotely, putting in long days to support the community and

students he cares so much about even though he was not well.

260.       Once he recovered, Mr. Castro was routinely asked to start going back into schools and

buildings, including for school building readiness walkthroughs in preparation for the return of

in-person learning.

261.       As an administrator, he was never required or expected to be vaccinated, or even

tested.

262.       Mr. Castro has a religious objection to vaccination that is long-standing and deeply

held.

263.       Mr. Castro submitted his exemptions through the online system within the one day

afforded to CSA employees. He meets all of the criteria set forth in the award. He belongs to a

church that shares and supports his religious views on vaccines, no leader of his church has

gone on record making statements supportive of vaccines, he is sincere, he submitted a letter from his pastor, and his church does not violate any of the rules set forth in the policy.

264.     Nonetheless, Mr. Castro was summarily denied with the boilerplate "undue hardship" letter.

265.     Mr. Castro then timely and immediately appealed. During his Zoom appeal, they affirmed he is sincere, and he pointed out that he met all of the criteria. Nonetheless, the DOE argued that he should be denied relief because he and his church hold beliefs that run contrary to Pope Francis' beliefs. Essentially, the DOE takes the position that Mr. Castro's religion is heretical because it is different from the Pope's.

266.     The DOE also argued that because Defendant Chokshi says that the COVID-19 vaccines do not use aborted fetal cells, one of the reasons for objecting (indirect participation in abortion) is invalid.

267.     Defendant Chokshi is wrong. COVID-19 vaccines used fetal cell lines at some point in development or testing. But even if he was not, the DOE has no authority to deny religious accommodation because they believe that someone's beliefs are wrong.

268.     Mr. Castro poses no heightened danger to his community due to his vaccine status. Mr. Castro's district needs him and has suffered as a result of his removal.

269.     Mr. Castro was denied his religious exemption and removed from the payroll on October 18, 2021

270.     Mr. Castro is supporting his wife and son, and his wife is pregnant.

271.     After the "fresh look" review, Mr. Castro was reinstated with back pay.

272.     However, the impacts of being wrongfully suspended without pay for three months were devastating on him and his family.

273.     While on unpaid leave, his health deteriorated from the stress. He suffered from chest pain and heart palpitations and symptoms related to his previous diagnosis of Bell's Palsy returned.

274.     Mr. Castro had found out his wife was pregnant a week before being placed on unpaid leave. He couldn't sleep at night after the suspension because he did not know if he would be put out in the streets with his family and did not know how he would be able to make rent.

275.     He had to take out a loan, because without income for four months, he was unable to pay for basic things, like rent, food, school expenses, car expenses and medical bills.

276.     Because he was still wrongfully suspended when the annual health insurance benefits transfer period occurred for New York City employees, he was ineligible to choose the plan he needed to ensure coverage for his family this upcoming year.

277.     Since Mr. Castro's wife is pregnant, the previous coverage was not ideal for the upcoming year, particularly since it did not cover most providers in Pennsylvania, where they live. When Mr. Castro was suspended, he attempted to login and transfer to another carrier during the election period, as would have been his right. The website informed him that only employees on active payroll had this privilege.

278.     Because Mr. Castro is not vaccinated, he is not allowed to even attend visits with his wife in New York City due to Mayor de Blasio's ever-increasing crackdown on the unvaccinated. Now his wife is forced to go to visits alone.

279.     Mr. Castro was at every appointment for his son, and being denied access now is very hard on both him and his wife.

280.     If he had been able to transfer coverage, he would have been able to attend all visits in Pennsylvania, which has no such restrictions. Moreover, his wife is now in jeopardy, as they

will need to drive all the way to New York City for her to give birth in June.

281.     Mr. Castro is now reinstated to his former position, but he is not allowed to report to school buildings as he did in the past to provide side-by-side support and training to teachers in the classrooms or given them constructive feedback after observing in-person instruction.

282.     This was a very important and fulfilling aspect of his role.

283.     There is no reason why Mr. Castro needs to be segregated and deprived of this aspect of his job. It could have lasting consequences on his career and sense of fulfillment in his work.

*Margaret Chu*

284.     Margaret Chu ("Ms. Chu") is a resident of Brooklyn, New York and teaches English as a Second Language in a public school in Harlem, New York.

285.     Ms. Chu is Chinese-American and was born and raised in New York City.

286.     She was recently certified to teach English as a New Language ("ENL" – formerly "ESL") and now works as an ENL teacher in East Harlem. This is her calling, and her dream job.

287.     Previously, she taught special education for twelve years.

288.     Ms. Chu loves her students and is a dedicated and passionate teacher.

289.     Ms. Chu is a practicing Roman Catholic, with sincerely held religious convictions against the COVID-19 vaccine. She believes in God and his teachings, went to twelve years of Catholic school, completed all of her Sacraments, and lives her life according to the teachings of the Bible. Her moral conscience prevents her from being able to take these vaccines.

290.     Ms. Chu's Parish wrote a letter in support of her religious accommodation.

291.     Ms. Chu's mother and grandparents came to the United States to escape the repressive

government of China. Ms. Chu cannot believe that she now faces the same kind of tyranny and lack of respect for individual religious beliefs and other fundamental rights that her family tried to escape.

292.    Ms. Chu timely filed for an exemption, was summarily denied, timely appealed and was granted a Zoom appeal.

293.    At the Zoom appeal, the DOE representatives and Arbitrator Barry Peek ridiculed her concerns about abortion and her Catholic faith. The DOE representatives from Corporation Counsel stated that Ms. Chu should be denied because her beliefs are not supported by the Pope.

294.    Ms. Chu felt like she was the subject of a witch hunt. She eloquently explained that her religious beliefs as a Catholic are not dictated by the Pope's choices. She discussed the responsibility of all Catholics to follow their moral conscience.

295.    The DOE and the arbitrator would not accept that Ms. Chu could have different beliefs than the Pope and though they acknowledged she was sincere, the DOE argued that Ms. Chu should be denied.

296.    Ms. Chu was still pending at the TRO hearing on October 4, 2021. She was denied an exemption after the TRO hearing and removed from the payroll.

297.    Ms. Chu timely submitted all requested materials to the Citywide panel for a review of her denial.

298.    Though the DOE found that Ms. Chu had sincere religious objections to COVID-19 vaccination, Corporation Counsel decided that following one's moral conscience is not "religious in nature" as it is a personal decision not one dictated by an authority figure.

299.    Essentially, they used the same discriminatory standards they had employed the first

time.

300.     Thus, without relief, Ms. Chu will be formally terminated imminently.

301.     The impacts of this four-month long suspension have been extreme.

302.     Ms. Chu has always been an industrious and diligent worker. She put herself through

school, earning two bachelor's degrees, two master's degrees, and all the while taking care of

herself and her family.

303.     She has always dreamed of becoming an ESL teacher. This dream came true in August

of 2021, when, after countless interviews and persistence, she got a position in Harlem.

304.     Emotionally and mentally, being suspended from this job, having no money, and

enduring the harassment and derision from her employers about the supposed invalidity of her

religious beliefs has been very hard on Ms. Chu.

305.     Ms. Chu is proud, and has never had to borrow money from anyone. Now, she is

desperate. She has run out of savings, had to borrow money, and has been denied

unemployment insurance, as the DOE wrote to the unemployment board, claiming she was

"discharged for misconduct" as a result of her failure to violate her religious beliefs by taking

a COVID-19 vaccine.

306.     Upon information and belief, the DOE has reported the same status of "suspension for

misconduct" in all of Ms. Chu and thousands of other employees' records.

307.     Ms. Chu has realized that she may be forced to move out of New York City. Her

elderly parents, who she cares for, depend on her however, and they cannot move. The stress

of this situation has kept Ms. Chu up night after night and is taking a toll on her health.

*Heather Jo Clark*

308.     Heather Clark ("Ms. Clark") is a DOE Central Offices Employee. Her job title is

56

"Assessment Systems Training Manager" and until she was suspended for failing to violate her sincerely held religious beliefs, she worked in Brooklyn in an administrative building.

309.     Ms. Clark was raised Christian. She attended church each week, belonged to Christian youth groups throughout college, and spent summers at Christian programs.

310.     Due to concerns about the role that the Church played in covering up child abuse and other serious moral failings, she became disillusioned and for a time, renounced her faith.

311.     Many years ago, however, after becoming seriously ill, she visited a Christian healer, who laid hands on her, and renewed her sense of Christ and God.

312.     From then on, Ms. Clark has been a devout Christian, but has opted to follow a primarily personal path to Christ.

313.     Ms. Clark has sincere religious objections to vaccines. These beliefs are grounded in guidance from the Holy Spirit, as well as her objection to the use of aborted fetal cell lines in the production and testing of the vaccines.

314.     On September 16, 2021, she duly submitted a religious exemption letter through the SOLAS system reflecting these concerns.

315.     The next day, she received back the same form email that everyone else did stating that it would be an undue hardship to accommodate her since it would not be safe for her to enter into any school building.

316.     For Ms. Clark, this reason makes no sense. Ms. Clark worked remotely for the NYC DOE since April 2020 with no indication that this has created any type of "undue hardship" for the DOE. Moreover, she is not a classroom teacher, but works in the Central Offices when not working remotely, so does not enter school in any event as a typical part of her job.

317.     Ms. Clark timely filed an appeal but was denied the opportunity for a Zoom hearing

even though she holds sincere religious beliefs in opposition to vaccination.

318.    Ms. Clark timely submitted her materials to the Citywide panel for review.

319.    The Citywide Panel acknowledged that Ms. Clark's religious beliefs are sincere, but rejected the validity of the beliefs or the characterizing of guidance from the Holy Spirit as religious in nature because it allows Ms. Clark to follow individualized guidance.

320.    Ms. Clark also shared stories of other situations in which she'd followed the guidance of the Holy Spirit, even when it seemingly conflicted with her own interests. For example, years ago, Ms. Clark was prescribed Vioxx by her doctor. As she always does, she prayed, and received clear guidance from the Holy Spirit that she should not take it. Seemingly against medical advice and her own personal interests, she declined to take it. Several weeks later, Vioxx was removed from the market for causing heart attacks. The DOE characterized these stories as showing that Ms. Clark's views were scientific rather than religious. This is clearly inaccurate.

321.    Ms. Clark has now been off of the payroll for over three months and will be imminently terminated without relief.

322.    The sudden and extended loss of employment forced her to relinquish her New York City apartment, which she loved and which is an irreparable loss.

323.    Her belongings are in storage, and she now has to stay at the good will of her family, living, as she puts it, "on other people's terms, like a child or a ward."

324.    Because she had to move out of New York City to stay with family, she is no longer in the area/network covered by her health insurance, which means that she has very high health care bills that she has had to incur.

325.    Celebrating Christmas has always been a particular joy for Ms. Clark. This year, she

could not afford to buy presents or any special foods. She suffers from extreme stress from being daily forced to choose between her job and her faith.

### Stephanie Di Capua

326.     Stephanie DiCapua ("Ms. DiCapua") is a physical education teacher working in the New York City Public School System in Staten Island.

327.     Due to her deeply held religious beliefs, Ms. DiCapua is unable to be vaccinated. These beliefs are long-standing and are also reflected in the official teachings of her particular Christian church. Stephanie's pastor sent a letter supporting her religious exemption and pointing out the teachings of the Bible that support and guide their religious viewpoints.

328.     On Friday, September 17, 2021, Ms. DiCapua received the same form rejection letter that all other employees received, alerting her that her religious accommodation would not be honored because it would present an undue hardship on the DOE.

329.     She appealed but was summarily denied even the right to have a Zoom hearing without explanation.

330.     On October 4, 2021, Ms. Di Capua was removed from the payroll and suspended without pay.

331.     Ms. Di Capua's removal, like the removal of all Plaintiffs, is a great loss to the students and the community.

332.     Ms. DiCapua has been employed by the DOE for over four years and has taught for over eight years.

333.     She always goes above and beyond, and volunteers for new projects at school to give her students the best experience possible. She created a physical education leader club in her school, raised money for their first ever Wellness Room, created the school's first ever

Wellness Committee, developed a student and staff cookbook, and created various school wide wellness initiatives for students to participate in.

334.     Ms. DiCapua is dedicated to her job and to the kids she teaches. In addition to her normal duties, she coaches softball and organized a before-school fitness and sports program and was selected to be a physical education reviewer through the Office of School Wellness to develop the first ever physical education scope and sequence for students in the NYC DOE.

335.     Ms. DiCapua supplied a detailed, heartfelt, six-page single-spaced letter and record from her church supporting her religious exemption for "fresh look" by the Citywide Panel.

336.     Ms. DiCapua's religious objections to vaccination have been long-standing, well-documented and are grounded in her reading of her obligations under the Bible, and her understanding of what faith requires of her.

337.     Ms. DiCapua also belongs to a church that shares her beliefs.

338.     Bizarrely, as if they never read her letter, Corporation Counsel's reasons for denial asserted that though they do not question the sincerity of her religious beliefs, they believed her decision was about opposition to the mandate. The DOE also said: "[t]he employee did not provide, beyond the most general response, any examples of other medications or specific vaccines she has refused due to her articulated religious belief." This is belied by the six-page letter, which does detail other vaccines and interventions that Ms. DiCapua declined due to her religious beliefs – including the flu vaccine. Ms. DiCapua's letter was solely focused on her religious beliefs. She never mentioned any particular opposition to mandates nor is this the source of her religious objection. The Citywide Panel never interviewed Ms. DiCapua and had no valid basis to infer such reasons for denial.

339.     Upon information and belief, the Citywide Panel never even read her materials but

simply made up a hasty reason to deny Ms. DiCapua. Nothing in her materials supports their conclusion.

340.     The last three months without salary, having to choose daily between her faith and job, has been devastating for Ms. DiCapua.

341.     She has suffered irreparable harm in the form of debilitating stress, fear and hopelessness that she might have to compromise her religious beliefs to keep her job. She cannot pay her student loan debt, buy food, pay rent.

342.     She has become very sad and depressed.

343.     She wanted to be a teacher all her life and worked very hard to achieve her dream.

344.     She had no financial assistance, and has over $50,000 in student loan debt.

345.     Until she was suspended, she was on track to get student loan forgiveness for this debt and was on income-based repayment plans.

346.     How, without intervention, she will not qualify for loan forgiveness.

347.     Ms. DiCapua did what she was supposed to do. She works hard. She put herself through college. She paid for her master's degree out of pocket and through loans that she diligently paid back.

348.     She worked through the pandemic without any thought for herself, because that is what she was asked to do and the students needed her.

349.     She got COVID-19, and now has natural immunity.

350.     Now, though she poses no direct threat to anyone, she is shunned, treated as diseased, and deprived of an income.

351.     Before she was suspended, Ms. DiCapua was planning a wedding, and looking forward to starting a family.

352.     Now these plans are all on hold. She cannot afford a wedding. The couple cannot afford to start a family now.

353.     Each day presents unbearable coercion to give in and violate her faith. Each day that she has to live with this coercion destroys Ms. DiCapua's spirit and breaks her heart.

***Robert Gladding***

354.     Robert Gladding ("Mr. Gladding") resides in Manhattan and until October 4, 2021, he taught at a New York City public school on the Upper East Side, where he has taught for over seventeen years.

355.     Mr. Gladding has been a teacher with the New York City public school system for over twenty years.

356.     Mr. Gladding is a very religious man and has sincerely held religious objections to the Mandate.

357.     He was raised a Christian and was encouraged from a young age to develop a personal relationship with Christ.

358.     His mother, also a Christian, lived through the horrors of World War II in her home country of Germany, where she witnessed the horrific effects of religious intolerance and adherence to dogma. She survived that Godless and dangerous time by always being guided by her inner connection with Christ. She encouraged Robert to find God personally rather than through the dictates of fallible human leaders.

359.     Throughout Mr. Gladding's life, his choices have been made in consultation through prayer with God, including even such fundamental decisions as where to live, when to have a child, what profession to follow and of course, what medical course of action to follow.

360.     He became a teacher in response to a calling he believes to have received from God to

join the New York City Teaching Fellows in 2001 after the tragedy of 9/11 so deeply wounded his beloved City.

361.    The teachings of Mr. Gladding's faith tradition and his guidance from prayer prohibit vaccination.

362.    On Friday, September 17, he submitted a religious exemption detailing his personal religious path and sincerity, and his religious objections to vaccines, grounded in prayer, along with a letter from an interfaith minister who can attest to Mr. Gladding's sincerity and commitment to his religious practices.

363.    Mr. Gladding was summarily denied, and denied after appeal, even though he has a long-standing religious objection to vaccination.

364.    After the motion for emergency relief was filed on October 4, 2021, Mr. Gladding was oddly changed to "pending" status from denied. A few hours after the TRO hearing, his application was changed back to denied.

365.    Upon information and belief, these changes were made in anticipation of litigation, as the DOE simultaneously used this pending status to claim that the matter was not ripe for consideration of injunctive relief.

366.    Mr. Gladding has dedicated his career to his students and to teaching. It would be a serious blow to the New York City education system and to his school if he were to be summarily dismissed.

367.    Mr. Gladding timely submitted documentation of his sincere religious objection to vaccination. He documented his long history of turning to prayer for all major decisions. He noted that the most important reason for his objection was grounded in guidance from God: "Most importantly, I have sought guidance directly from God, and He has answered me

through prayer clearly and unequivocally – it is a sin to get vaccinated, and I cannot do it. I have learned to listen when God guides me this way and I must do so now."

368.     Mr. Gladding was denied on the grounds that the DOE believes personally held religious beliefs derived from prayer are not religious in nature, because individuals allegedly have discretion about what to do according to what guidance they get.

369.     This reason for denial violates Mr. Gladdings constitutional rights.

370.     Mr. Gladding has been irreparably harmed by the discrimination he has faced.

371.     He cannot afford to stay in New York City any longer without employment, and he and his wife have had to begin preparations to leave.

372.     Unfortunately, he has teenaged daughters, who are not prepared to leave their schools.

373.     The family is being separated, and Mr. Gladding will miss the last two years of his time with his children before they leave for college.

374.     Mr. Gladding and his family are in crisis, and desperately need this Court's intervention to save their precious time together.

*Nwakaego Nwaifejokwu*

375.     Nwakaego Nwaifejokwu (Mrs. Nwaifejokwu) has been a teacher with the New York City Public School system for twelve years. Prior to that, she worked with Head Start.

376.     Until she was suspended for declining to violate her deeply held religious beliefs on October 4, 2021, she taught First Grade in the Bronx.

377.     For Mrs. Nwaifejokwu, teaching is not just a job, it is a passion. She finds herself spending hours of time outside of school making preparations to support her students, staying up late into the night thinking about how to get things "just right."  She loves her students, and they love and need her.

64

378.     When the school announced suddenly in 2020 that they were going remote, no training or assistance was offered. Mrs. Nwaifejokwu spent hours working alone and with her colleagues to learn how to use various online platforms and make sure their students were supported. She went above and beyond, working in the wee hours of the morning and late into the night to reach out to families, support her students and make sure that she was able to give them the best education possible in such difficult circumstances.

379.     At that time, she was teaching kindergarten. When school resumed, 70 percent of the students were still remote, so Mrs. Nwaifejokwu had to work with the other teachers to come up with creative solutions to make sure everyone was taken care.

380.     Several of the children in her class are on the autistic spectrum. Mrs. Nwaifejokwu is luckily able to draw on her many years as a special education teacher to support them while handling these uncertain times.

381.     Mrs. Nwaifejokwu has sincere religious objections to vaccination.

382.     Mrs. Nwaifejokwu timely filed for an exemption and was summarily denied. She appealed and then was denied again without explanation.

383.     When Mrs. Nwaifejokwu submitted her religious exemption materials to the Citywide Panel, they determined that she does qualify for religious exemption after all. Nonetheless, they denied her, stating: "The record before the Panel demonstrated that the employee holds sincerely held religious beliefs sufficient to justify a reasonable accommodation if such accommodation did not present an undue hardship. However, the panel believes the DOE has successfully demonstrated that an accommodation, in appellant's case, would create an undue hardship if granted. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the

vulnerable and still primarily unvaccinated student population."

384.     Mrs. Nwaifejokwu does not pose a direct threat to her students based on her vaccine status.

385.     She taught these students without issue throughout the pandemic, and for months after the "emergency" Mandate was passed.

386.     Currently, the DOE is sending actively *infected* teachers into the classroom instead of Mrs. Nwaifejokwu, who is not infected.

387.     Moreover, the DOE could at the very least provide an alternative accommodation, such as allowing Mrs. Nwaifejokwu to provide remote support to students.

388.     The DOE has not met its burden of showing that termination for cause is the least restrictive method of safeguarding the school population.

389.     The impacts of being suspended without pay for the last three months have been immense. Mrs. Nwaifejokwu has had to take out a loan and use personal credit cards just to pay for basic day-to-day expenses. The credit is running out.

390.     Mrs. Nwaifejokwu's situation is now at a crisis level. She does not know what she is going to do to safeguard herself and her family.

391.     Moreover, being deprived of doing the work she is so passionate about is irreparably harming Mrs. Nwaifejokwu.

392.     The stress of being daily coerced into choosing between her job and her faith is causing serious physical, mental and emotional harm.

393.     Mrs. Nwaifejokwu has started suffering from severe headaches, stomach aches, and debilitating panic and depression.

394.     This holiday season broke Mrs. Nwaifejokwu's heart. She was unable to buy or give

holiday gifts to her family. She could not even celebrate her mother's birthday as she previously planned due to finances.

395.     Without assistance, Mrs. Nwaifejokwu faces the imminent threat of the loss of her home, and other severe consequences imposed by the DOE.

### Ingrid Romero

396.     Ingrid Romero ("Mrs. Romero") resides in New Jersey and is an elementary school teacher in the New York City Public School system in Queens. She has been teaching for over eighteen years.

397.     Mrs. Romero grew up in Queens, though she has a lot of family in Ecuador, who she and her husband help to financially support.

398.     Mrs. Romero is a dedicated and beloved teacher. She teaches third grade at the same school that she attended when she was a little girl.

399.     Mrs. Romero regularly leads workshops and has been recognized by principals and parents as an excellent educator. Many teachers and principals from other schools visit her classroom to observe and learn from her best teaching practices.

400.     Mrs. Romero's presence at the school is vital, and she is a role model and an inspiration to her students. Her students relate to her.

401.     Mrs. Romero understands what the children are going through in a way that many cannot. Her mother, who came to the United States over fifty years ago, still does not speak English. Mrs. Romero had to learn on her own initiative. She shares this with her students and tells them not to give up, and that they can achieve their dreams if they just give it their best effort.

402.     When Mrs. Romero sees her students or former students in the hall, they typically

exchange their favorite hello. She says, "Ok! Remember kids, always do your best, and nothing…" and they respond enthusiastically: "Nothing less!" That is her saying: "Do your best, and nothing less. That's all I am asking from you."

403.     Mrs. Romero encourages her students to be excellent at English but to speak their native language too, to never forget where they come from and be proud of their culture and heritage. She is proud of who she is and where she comes from, and she helps the children feel pride in where they come from and who they are as well.

404.     In March 2021, Mrs. Romero and her family were diagnosed with COVID-19 through testing. Now recovered, she has lasting natural immunity and poses no danger to any of her students or colleagues.

405.     Mrs. Romero cannot take a COVID-19 vaccine because of her sincerely held religious beliefs.

406.     She has always been a deeply religious person, but three years ago, after her husband got cancer, she re-committed to God on a very deep level.

407.     Mrs. Romero learned to pray over every medical decision. When it comes to the COVID-19 vaccines, she cannot take them, because she learned that they were derived through the use of aborted fetal cells.

408.     Mrs. Romero timely submitted her application to SOLAS in September but was denied.

409.     She also timely submitted an application to the Citywide Panel, but was again denied. The Citywide Panel erroneously decided that because she'd gotten a flu shot many years ago, before she recommitted to God, and before she learned about the use of aborted fetal cells in vaccines, that disqualifies her from following her faith now.

410.     This reason for denial is unconstitutional. It does not matter if people have always been

perfect in their faith, or whether their religious beliefs have always been the same.

411.    Mrs. Romero has demonstrated that she is a devout Catholic. She shared many stories about the central place that faith holds in her life, she has demonstrated her commitment to God not only in her materials, but in the fact that she has been willing to suffer months of deprivation and harm by the DOE to stand by her faith.

412.    The financial impacts of being suspended without pay these months have been devastating, not just on her and her immediate family, but also on her family in Ecuador, who depends on her help.

413.    Mrs. Romero's cousin, for example, has lupus, and needs medications that Mrs. Romero's income has been providing. Other extended family also relies on this income for survival.

414.    Mrs. Romero's heart is broken, thinking of her students in the hands of untrained teachers and staffing shortages.

415.    Having to choose between her job and her faith is breaking her heart.

### Trinidad Smith

416.    Trinidad Smith ("Ms. Smith") was adopted from an orphanage in Bogota, Colombia, as a child.

417.    She worked hard, earned a master's degree, and has been teaching in the New York City public schools for almost twenty years.

418.    Until she was suspended on October 4, 2021 for failing to get vaccinated, Ms. Smith taught in District 75, an all special education district, in a school for children with autism and serious emotional disturbance.

419.    Ms. Smith is one of the more senior teachers in her district and is irreplaceable.

420.     Ms. Smith cannot take the vaccines because she is opposed to them on religious grounds.

421.     Ms. Smith is a devout Catholic. However, after learning about the serious abuses taking place in the Catholic Church, and the associated years of cover-ups and collaboration from leadership, she decided to leave the Church and practice her Catholicism through direct communion with spirit and God.

422.     Because Ms. Smith has a personal practice, she did not qualify for exemption under the discriminatory Exemption Standards. But her religious convictions are no less sincere.

423.     She objects to the facially discriminatory process and instead of filing an application under the facially discriminatory process, filed this lawsuit to demand that the City provide a constitutional process.

424.     Ms. Smith's removal from the school she teaches at has been devastating for the children. They are currently facing serious neglect and are not receiving needed care and services due to the staffing crisis caused by the mandate.

425.     Ms. Smith does not pose a direct threat to anyone based on her vaccine status and has been safely teaching in the school throughout the pandemic without issue.

426.     In November, Ms. Smith submitted a heartfelt religious exemption letter to the Citywide Panel as directed by the Second Circuit.

427.     She explained that her beliefs are derived from prayer, and provided her religious history. She was adopted by very religious people, and raised in the belief that prayer is medicine. As a child, Ms. Smith was never taken to the doctor, but healed through faith and food. As an adult, Ms. Smith continues to turn to prayer for any medical decision, and that is what she did when faced with this decision as well. Ms. Smith received strong guidance from

prayer not to take the COVID-19 vaccines (or any other vaccine she has prayed about), and thus she has abstained in consideration of God's will.

428.　　The Citywide Panel denied Ms. Smith's application, stating in the email that counsel forwarded, "[t]he record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Indeed, the appellant, in his *[sic]* documentation, refused to rule out use of such medications if ultimately it was a necessary medical intervention for him *[sic]* instead noting, thus far, he *[sic]* has had no such occasions to require medication and had not previously been vaccinated."

429.　　The Panel never spoke to Ms. Smith. She never "refused to rule out" anything. She simply wrote a letter, explaining her religious beliefs.

430.　　The reason for denial exhibits an improper encroachment by the state into deciding what religious beliefs they deem valid or invalid. It is improper for the state to make these decisions, or to interfere in Ms. Smith's relationship with God and prayer.

431.　　Ms. Smith has suffered heavy, irreparable harm as a result of this Mandate and the discrimination she faced.

432.　　She is a single parent, raising a thirteen-year-old son.

433.　　She has been working since she was fifteen years old.

434.　　Three years ago, she achieved her dream and bought a house.

435.　　The loss of income has left her unable to pay her mortgage for four months. Without intervention, she is at imminent risk of losing her home.

436.　　She was unable to buy any presents for her child this year at Christmas, and any gifts that were sent to them were spent on food and basic bills.

437.     Ms. Smith's son is getting ready to start high school in the fall. He asks constantly whether they will lose the house, because he really wants to go to school with his friends in the neighborhood.

438.     He is a major athlete, and plays football and basketball. They chose the neighborhood in part because of the sports teams in the district.

439.     Ms. Smith has worked hard to provide her son with the opportunities that she did not have growing up in an orphanage in Colombia.

440.     It breaks her heart to see her son so worried. Ms. Smith has also been suffering severe emotional and mental anguish thinking about her students.

441.     Colleagues report that the students are left without adequate staff every day. The vaccinated teachers are all catching COVID-19, and the staffing crisis caused by the expulsion of the unvaccinated teachers is now exacerbated to a crisis point.

442.     Many of the children are regressing. In this context, this puts the other children in serious danger. Violent outbursts have been increasing, and the children are not receiving their mandated services.

443.     Untrained staff are being placed in dangerous situations that they do not know how to handle or manage.

444.     Ms. Smith desperately wants to go back to the classroom to help the children she loves and has dedicated her life to caring for.

445.     She does not want to lose her tenure, but she cannot keep living without any income.

446.     Moreover, unless this Court intervenes, Ms. Smith will be ineligible to teach summer school this year as well, since eligibility for teaching in the summer is tied to days taught during the year. Ms. Smith depends on the summer school income to pay her mortgage.

447.     Without intervention, Ms. Smith and her students will be irreparably harmed.

**_Natasha Solon_**

448.     Natasha Solon ("Ms. Solon") is an assistant principal that worked in the Bronx she was

suspended without pay on October 4, 2021 for failing to violate her sincerely held religious

beliefs.

449.     Ms. Solon is a deeply religious person. Her grandfather presided over the Mt. Olivet

Baptist Church in Brooklyn until his death, and Ms. Solon was raised in the church.

450.     After the revelations about pedophilia and other unholy activities in the Church

emerged, Ms. Solon decided to rely on her personal relationship with God as a guide. They

attend online services and are deeply devoted to prayer.

451.     Ms. Solon prays about all major medical decisions. She has declined life-saving

treatments including blood transfusions and other vaccines on the basis of guidance from

prayer in the past. She also consults the Bible regarding interventions that could fall afoul of

scripture.

452.     Ms. Solon timely submitted a religious exemption letter on September 18, 2021,

detailing her sincerely held religious beliefs against vaccination.

453.     She was immediately denied through an autogenerated message.

454.     She timely appealed and was denied without any opportunity to be heard or

explanation for why.

455.     Ms. Solon was then placed involuntarily on leave without pay. She has not received

any income since October 4, 2021.

456.     The effects of this involuntary suspension have been severe.

457.     Ms. Solon recently bought a house. Because she has received no income since October,

the house is now in foreclosure proceedings and she is at imminent risk of losing it.

458.    Moreover, without income, Ms. Solon was unable to pay for her son's college expenses, and he had to take a leave of absence and miss a semester of college.

459.    Ms. Solon and her children are completely out of resources. They cannot even afford to buy food or basic supplies. They are desperate.

460.    Ms. Solon attempted to apply for other jobs, but even though she is extremely well qualified, was not getting any calls back.

461.    Finally, a woman at one of the schools confided in her that the reason she was not getting hired was because the DOE put a "problem" code next to her records, which, upon information and belief, they have put next to every employee's name who is unvaccinated.

462.    This problem code means misconduct and severely prejudices Ms. Solon in attempting to find new work.

463.    Ms. Solon has never had any kind of disciplinary action or mar on her record before this and has done nothing to merit this problem code.

464.    Ms. Solon is also ineligible for unemployment insurance, because DOE has asserted that failing to get vaccinated is misconduct meriting termination for cause.

***Amaryllis Ruiz-Toro***

465.    Amaryllis Ruiz-Toro ("Mrs. Toro") is an Assistant Principal of Administration at a New York City Public School in Queens.

466.    Mrs. Toro has been educating children for almost two decades. She spent years teaching ELA, and then serving as Dean at the same school in Queens. In September 2019, just before the start of the pandemic, she was promoted to the job of Assistant Principal.

467.     As an administrator at a Title I school, the bulk of the work Mrs. Toro does is to service and support the students, largely from immigrant and lower socio-economic families, both academically and most recently socially and emotionally with internal support systems to address the current traumas that this pandemic has caused for students, families, and staff.

468.     Mrs. Toro is deeply committed to this work. In the days leading up to the first school closures, when masks and PPE were not available, Mrs. Toro did not complain. She worked tirelessly alongside her colleagues, ensuring that her staff was protected even if it meant she had to be without.

469.     She assured the students and parents that whatever happened, she would not abandon them, and that she and the school would do everything in their power to support them.

470.     During the months of largely remote education that followed, Mrs. Toro, who is bilingual, maintained her demanding duties as an Assistant Principal and also supported families as a bilingual person to ensure Latino families were receiving support and having their needs addressed and heard.

471.     When students returned to school, she personally greeted them each day and made sure to find ways to make them feel safe and supported.

472.     Educating students and caring for her community is everything to Mrs. Toro, and she has made a lot of sacrifices to do this work.

473.     After the return, even when the option for remote work was offered, Mrs. Toro elected to be there in the school to help her community. She knew that her physical presence was necessary to support students and staff and help offer a sense of normalcy.

474.     This was a big risk. Her sons and daughter all suffer from chronic asthma. Mrs. Toro

reached deep and had to rely on her sincere and powerful faith in God to guide her and her

family and keep them safe.

475.     Mrs. Toro worked actively with her principal to ensure that their systems would

support all their constituents and were running as smoothly as possible. She initiated and

supervised the freshmen advisory program to support the school's youngest members,

researched and created activities and strategies that would help the teachers best support the

students during their remote learning, and even created a once-a-week mindfulness session for

the staff members so that they would find a place of refuge and support.

476.     She made sure that no one was left behind.

477.     Mrs. Toro recently had COVID-19 and is naturally immune. A large percent of the

fully vaccinated teachers and staff are catching COVID-19 currently.

478.     Mrs. Toro does not mind getting tested regularly. However, she cannot take the

COVID-19 vaccine.

479.     Mrs. Toro has prayed on this issue and has received clear guidance from prayer not to

take the vaccine. On this basis, she declined vaccination when it was made available.

480.     On September 17, 2021, Mrs. Toro met with her principal (at his request) to discuss the

fact that she was filing a religious and medical exemption. He told her that the policy was

crafted in such a way that it was simply not possible to get a religious exemption regardless of

sincerity. He reiterated the DOE's policy for any employee who is refusing to comply with

their mandate and asked Mrs. Toro as to whether she would resign or take a leave of absence

(unpaid). She explained that she will do neither.

481.     Mrs. Toro is the primary breadwinner in her home. She has a mortgage and three kids under the age of eighteen. All three of her children have serious asthma and require expensive medical plans. Two of her children are in private Christian schools.

482.     Mrs. Toro has spent her career as an educator and is on the path to becoming a principal. She was in agony feeling she had to choose between her faith and her job.

483.     Mrs. Toro submitted her exemption request and was initially denied with everyone else. She timely appealed.

484.     Mrs. Toro's zoom appeal took place after the TRO appearance on October 4, 2021.

485.     The DOE representative was more constrained in their arguments as a result, though they still insulted Mrs. Toro's beliefs and advocated for denial, not because of sincerity, but based on the allegation that her beliefs were wrong because they conflict with the Pope's.

486.     The arbitrator said that many of his colleagues were denying people who belonged to minority churches but that he, as a Southerner, appreciated that there were independent and non-denominational churches.

487.     The DOE attorneys (Corporation Counsel) still argued zealously for denial based on discriminatory reasons.

488.     Mrs. Toro met all of the criteria in the award. She was granted an exemption that will expire in June 2022.

489.     Nonetheless, she is still barred from entering any classroom.

490.     She is regularly harassed and retaliated against since she submitted an exemption, and she is in danger of losing her ability to become a principal, because the window to get her mentoring and supervisory hours accomplished is rapidly closing, as she is barred from entering any school building to accomplish the requirements.

491.     Moreover, Mrs. Toro has been barred from attending any of the ELI trainings necessary for the completion of her SBL license, because they are all held in classroom buildings which means she is barred from attendance. She needs to complete all training sessions for this academic year.

492.     Being barred from the trainings and classroom irreparably harms her ability to progress in her career.

493.     Ms. Toro has faced discrimination and arbitrary harassment since her religious exemption was approved.

494.     She is currently barred from working in her normal office due to the Mandate, even though there are no children in the building where she normally works, and now has to travel far from home to work in another office to fulfill her current work requirements.

### Matthew Keil

495.     Plaintiff Mathew Keil has been an employee of the DOE for more than twenty years. Over the course of those years, he has accrued seniority in the Department, received tenured status, accumulated Years In Service that have put him close to earning the right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement. He is unvaccinated and he refuses to be vaccinated for religious reasons.  The Mandate threatens to deprive him not only of his career but also all of the economic and retirement benefits that he has accumulated over his long service with the Department.

496.     Keil is an ordained deacon in the Russian Orthodox Church and serves as such in the Saint Sergius Chapel at the Synodal Headquarters of his denomination in New York City. He converted to the Russian Orthodox Church and was catechized and baptized in 1999. In the

years that followed, he demonstrated his strong commitment to Orthodoxy. For many years,
Keil spent his summers in the Russian Monastery in Jordanville, New York, and over the past
twenty years he also traveled far and wide to many Orthodox places of pilgrimage – including
the Greek monasteries on Mt. Sinai in Egypt, as well as to those in the Holy Land, and in
Constantinople. He was blessed, in the winter of 2004, to venerate the relics of Saint Nicholas
in Bari, Italy.

497.    Keil was tonsured as a reader in the Russian Orthodox Church in 2008, ordained as a
sub-deacon in 2011, and ordained as a deacon in 2013. He regularly goes to confession.

498.    Keil provided all of the foregoing information in the application he submitted to DOE
for a religious exemption. He also provided the following information in support of his
application:

a.  The religious beliefs to which Russian Orthodox individuals adhere to affect not only
their behavior on Sundays when they go to Church, but also their choice of careers,
education, diets and marital relations, and even their very bodies. "For so it is written,
Know ye not that we are the temple of God, and that the Spirit of God dwelleth in
you?" (1 Corinthians 3:16).

b.  For example, the Orthodox generally do not embalm or cremate their dead, get tattoos,
donate blood to the non-Orthodox, or obtain heart transplants or other surgeries that
may defile their bodies. This is not to say that one cannot find members of the Church
who do in fact do such things, but rather that such is not generally accepted as
orthopraxis by traditionally minded faithful.

c.  The same goes for vaccinations. There are no verses in the Bible dealing with
vaccinations, and consequently many Orthodox believers have no problem inoculating

either themselves or their children. However, the Church gives its members the ability to look critically at contemporary society, and it provides the eternal criteria by which they can judge the world around them and choose for themselves what would violate their conscience and obligations to God.

d.  In 2007, Keil developed his religious beliefs concerning vaccinations when he spoke with monks at St. Nectarios' monastery in Roscoe, New York, and they stated that Geronda Ephraim, the spiritual head of the monastery and many other monasteries in North America, enjoined the monks and other people from getting vaccinated. After studying the Scriptures, prayer, and engaging in other spiritual disciplines, Keil developed the following beliefs.

   i.  Vaccinations, unlike other medications, are injected directly into people's blood.

   ii.  Keil believes that the Old and New Testaments make it unmistakably clear that we must be scrupulous about the purity of our blood.

   iii.  The primary concern from an Orthodox point of view is the sacredness of our blood through the partaking of Holy Communion. It is only through this Blood of our Lord Jesus Christ that we can be reconciled to God the Father (see Ephesians 1:6-8).

   iv.  Taking vaccinations profanes the sacredness of our mortal bodies by mixing the Lord's Body and Blood, which is in us, with the cells of monkeys, chicken embryos, bovine serum, rabbit brains, dog kidneys, live viruses, formaldehyde, and even cells cultured from aborted fetuses.

   v.   Such pollution and unnatural mixing is specifically condemned by God in the

80

Bible (see Hebrews 10:29).

vi. Even though the Covid vaccines do not contain fetal tissues, every single one has utilized aborted human fetal cell lines at one time or another during their development through either their testing or manufacturing.

vii. Multiple Orthodox jurisdictions have stated that it is absolutely clear that to take any one of these vaccinations would involve one in the sin of abortion.

viii. In a larger sense, the practice of vaccination also runs contrary to the Orthodox mindset of trusting in God for our health, pursuing Him and His aid primarily. Scripture demonstrates that sickness and disease are a direct result of Satan, sin, and our fallen state, so healing must be sought above all from God.

ix. Ultimately, the Orthodox Church has always upheld the right to follow one's own properly formed moral conscience. We will be judged by God for having done or not done the things in this life that we believed to be truly right.

e. As a result of these beliefs, throughout his adult life, Keil has completely abstained from vaccinating himself (and his wife and six children).

f. Keil does not, however, judge others of his faith who decide to vaccinate either themselves or their children.

499. During the 2020-2021 school year, Keil fulfilled all of the responsibilities of his job remotely. He was ready, willing and able to do the same during the 2021-2011 school year.

500. In September 2021, Keil submitted a request for religious exemption from the Vaccine Mandate pursuant to the Exemption Standards. Keil submitted a detailed affidavit in support of his religious exemption claims, and a letter from his bishop. In his affidavit, Keil described his religious history and beliefs in detail, as summarized above. On September 22, 2021, the DOE

81

informed Keil that his exemption request was denied. The DOE's denial letter stated that his

"application was reviewed in accordance with applicable law as well as the Arbitration Award

in the matter of your union and the Board of Education regarding the vaccine mandate."

Nevertheless, it stated that,

> We have reviewed your application and supporting documentation for a
> religious exemption from the DOE COVID-19 vaccine mandate. Your
> application has failed to meet the criteria for a religious based accommodation.
> Per the Order of the Commissioner of Health, unvaccinated employees cannot
> work in a Department of Education (DOE) building or other site with contact
> with DOE students, employees, or families without posing a direct threat to
> health and safety. We cannot offer another worksite as an accommodation as
> that would impose an undue hardship (i.e. more than a minimal burden) on the
> DOE and its operations.

501.     Keil immediately requested an appeal.

502.     On October 1, 2021, Keil participated in an appeal hearing pursuant to the Exemption

Standards. Keil orally affirmed the truth of the facts set forth in his affidavit.

503.     At the hearing, the DOE representative first restated the Department's position that

accommodating Keil's sincerely held religious beliefs would pose an undue hardship.

However, besides saying the DOE was bound by the Health Commissioner's Vaccine

Mandate, the DOE representative did not provide any evidence or explanation about how

accommodating Keil would be an undue hardship, especially when numerous other school

districts in the State of New York have not implemented a vaccine mandate.

504.     Next, the DOE representative shifted to addressing the sincerity of Keil's beliefs. He

began by claiming that medicines such as Tylenol and Advil have been manufactured and

tested using aborted fetal cell lines, and questioned whether Keil was aware that many other

everyday products have been tested and manufactured using aborted fetal cell lines as well.

505.     While he was unaware of the connection between aborted fetal cell lines and the

medicines mentioned, Keil is familiar with a number of products that were manufactured or testing using aborted fetal cells, and said so, and testified that as a result, he does not partake of them or allow his family to partake of them, due to their sincerely held religious beliefs.

506.     The DOE representative's inquiries during Keil's appellate hearing did not focus on the sincerity of his beliefs but on their validity.

507.     Keil provided evidence that his religious objection is to the use of fetal cells in any aspect of the vaccine, including its testing, research, or manufacturing, and that he was aware that there are no fetal cells actually present in the vaccine, but this did not make his religious objection any less religious or sincere.

508.     The representative from DOE also stated that Keil's beliefs regarding the vaccination did not seem to be religious in nature but were merely personal, asserting that there are other Orthodox Christians who choose to get vaccinated.

509.     Keil explained in response that under the Church's teachings, each individual Christian has the obligation to follow his own conscience as informed by his faith and study of the Scriptures in determining whether to get vaccinated. That decision is a personal one between the individual and God.

510.     On October 4, 2021, Arbitrator Riley[5] denied Keil's appeal, and provided no explanation for the denial. Keil was immediately placed on administrative leave without pay from his employment with DOE.

511.     Pursuant to the orders of the United States Court of Appeals for the Second Circuit on November 15 and 30, 2021, Keil submitted to a "fresh look" examination of his application for religious exemption by the Citywide Appeals Panel. On or about December 10, 2021, Keil

received a notice informing him that his appeal was denied, and requiring him to vaccinate

himself to remain employed by DOE, or to "opt-in" to an extended leave without pay program

along with a waiver of rights by December 28, 2021, or to face termination of his employment

and insurance coverage.

512.     Corporation Counsel sent an email to Plaintiffs' counsel on December 13, 2021 that

purported to explain Keil's denial by the Citywide Panel as follows:

**APPEAL NO. 00004823, Matthew Keil**

After carefully reviewing the documentation provided by all parties, the Citywide
Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant
Keil's reasonable accommodation. One panel member found that appellant
articulated a sincerely held religious belief that precludes vaccination and be
entitled to a reasonable accommodation if one did not present an undue hardship.
The others did not reach this issue because the panel determined that a religious
accommodation cannot be granted because, even assuming a valid basis for a
reasonable accommodation, the DOE has satisfied what is necessary under the law
to demonstrate undue hardship. Appellant is a classroom teacher who, under the
present circumstances, cannot physically be in the classroom while unvaccinated
without presenting a risk to the vulnerable and still primarily unvaccinated student
population. DOE has met its burden under the law that diverting the appellant from
classroom duties constitutes an undue hardship.

513.     Keil is now faced with the choice imposed by the Exemption Standards: because he

holds religious beliefs that forbid him from accepting vaccination, he must either violate his

religious beliefs and vaccinate himself; or resign from his employment with DOE after a 20-

year career, with limited benefits, and waive his constitutional rights; or go on unpaid leave

until September 5, 2022, with limited benefits and a prohibition on gainful employment, and

waive his constitutional rights; or be fired effective December 1, 2021.

514.     If Keil wishes, or needs, to earn paid income between now and next September, instead

of draining his savings, the Defendants are requiring him to surrender almost all of the benefits

---

[5] Plaintiffs do not concede that the appellate hearings conducted pursuant to the Exemption Standards were arbitrations.

and other seniority and economic rights that he has earned over his years of loyal service with the DOE. He is ready, willing and able to work, and capable of working remotely or, if in person, in a fully-masked, socially-distanced, fully tested work environment – as he has done in the past.

515.     Because the Defendants have refused to respect Keil's constitutional right to religious freedom, have inflicted substantial harm upon him because he has stood up for his rights, and are on the precipice of a deadline, set by themselves, that will change Keil's status even further with the DOE and inflict still more harm, Keil is forced to go to court to restrain further harm and to defend his constitutional rights.

### John De Luca

516.     Plaintiff John De Luca is employed by the DOE as a teacher. He is unvaccinated and he refuses to be vaccinated for religious reasons.

517.     During the 2020-2021 school year, De Luca fulfilled his job responsibilities remotely.

518.      De Luca is a member of the Catholic church and has a sincerely held religious belief that he should not receive any of the Covid-19 vaccines.

519.     De Luca was brought up in the Christian faith and has been a lifelong follower of the teachings of God. His Christian upbringing, religious schooling, and study of the Old and New Testaments, his lifelong following of the teachings of God, and his daily prayers with God are the foundation of his personal religious beliefs. Through these experiences, De Luca believes that he knows that God will seek retribution against him for not following God's laws and for De Luca's lack of faith in God.

520.     One of God's commandments is "You shall not kill." See, Exodus 20:13. De Luca understands that all the Covid vaccines have used aborted fetal cell lines as part of their

development or in the testing of the vaccines. De Luca believes that if he were to take any of these vaccines, he would be participating in the abortions which resulted in these cell lines and committing a sin against God.

521.     De Luca believes that the Catechism of the Catholic Church supports his religious beliefs. According to a 1992 volume which dealt with the issue of conscience, "Man has the right to act in conscience and in freedom so as personally to make moral decisions." The Vatican II document *Dignitatis Humanae*, says, "He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters." The Code of Canon Law, Canon 748, Section 1, declares that "All are bound to seek the truth in matters which concern God and his Church; when they have found it, then by divine law they are bound, and they have the right to embrace and keep it." While the Catholic Church considers the vaccines to be morally acceptable, De Luca, like many other Catholics, objects to the vaccines for reasons of conscience.

522.     In September 2021, De Luca submitted his request for a religious exemption to the DOE. It was quickly denied, and De Luca filed an appeal. He received notice of his appellate hearing in late October.

523.     On October 25, 2021, De Luca submitted his appeal documentation, including a letter from Monsignor Joseph Giandurco, the (Catholic) Pastor of The Church of St. Patrick, affirming the Catholic teaching that everyone has the right to follow their conscience and acknowledging De Luca's objection based on his Catholic faith and his conscience.

524.     On October 26, 2021, De Luca participated in the arbitration hearing on his appeal.

525.      At the arbitration hearing, the representative from DOE stated that it was the DOE's position that De Luca's request for a religious exemption was "properly denied because it is a

somewhat political, philosophical objection, and his religious leaders -- the religious leaders of that denomination -- have clearly and publicly expressed support for the vaccination."

526.      Arbitrator Peek stated during the hearing that while De Luca had produced contradictory documents from Louisiana and North Dakota, New York's Department of Health did state the Johnson and Johnson vaccine was produced using fetal cell lines, but that the research "definitely proves that neither Pfizer nor Moderna were produced with any use of fetal cells." He went on to say to De Luca, "when you find out I'm right, you'll understand."

527.       De Luca was questioned by Arbitrator Peek about his vaccine history during the hearing. De Luca testified that he had received vaccines as a child but has not taken the flu vaccine, Tylenol, or aspirin in over 5 years.

528.      The DOE representative went on to say that De Luca's religious leaders have "clearly and publicly" expressed support for the vaccine. She noted that the September 24, 2021, Clergy letter De Luca submitted in his exemption application explicitly states that the vaccine is morally acceptable and that the church recommends that the vaccination be taken. The DOE's advocate went on to note that the Pope has spoken publicly in favor of the vaccine and has encouraged all to get vaccinated.

529.       The DOE representative characterized De Luca's religious beliefs as personal, political, and philosophical, and were thus not a legitimate reason to have an exemption.

530.      The DOE representative repeated the claim of the appellate examiner that the Commissioner of the NYC Department of Health and Mental Hygiene had stated that neither Pfizer nor Moderna use any fetal cell lines for the production and manufacturing of the vaccines.

531.      The DOE representative represented to the hearing officer that De Luca had provided

critical "in-person" services and that it would be a severe undue hardship for the DOE not to have a vaccinated teacher due to the shortage of teachers. She said that the DOE is required to provide students with an environment that is safe and conducive to learning.

532.    Arbitrator Peek asked De Luca if he was aware of the Pope's statement that there is a moral obligation to get vaccinated. "If you found out that the Pope said that people have a moral obligation to take the vaccine, what impact does that have on you?" When De Luca said "no," Arbitrator Peek went on to ask "if the leader of the Catholic Church, or one of the major leaders of the Catholic Church, says you have a moral obligation to be vaccinated, how do you, in your mind, say that that would be against the Word of God, and you would be condemned for that and deemed a murderer, when your religious leader says you should do it?"

533.    Arbitrator Peek continued to question the legitimacy of De Luca's beliefs, stating that documents he had provided containing Church positions on personal conscience were from the 1990s and "none of them dealt with this issue of vaccination."

534.    On October 26, 2021, Arbitrator Peek denied De Luca's appeal without any explanation for the denial.

535.    Pursuant to the orders of the United States Court of Appeals for the Second Circuit on November 15 and 30, 2021, De Luca submitted to a "fresh look" examination of his application for religious exemption by the Citywide Appeals Panel. On or about December 10, 2021, De Luca received a notice informing him that his appeal was denied, and requiring him to vaccinate himself to remain employed by DOE, or to "opt-in" to an extended leave without pay program along with a waiver of rights by December 28, 2021, or to face termination of his employment and insurance coverage.

536.     Corporation Counsel sent an email to Plaintiffs' counsel on December 13, 2021 that

purported to explain De Luca's denial by the Citywide Panel as follows:

**APPEAL NO. 00004832, John Deluca**

After carefully reviewing the documentation provided by all parties, the Citywide
Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant
Deluca's reasonable accommodation. The record before the Panel demonstrated
that the employee holds sincerely held religious beliefs sufficient to justify a
reasonable accommodation if such accommodation did not present an undue
hardship. However, the panel believes the DOE has successfully demonstrated that
an accommodation, in appellant's case, would create an undue hardship if granted.
Appellant is a classroom teacher who, under the present circumstances, cannot
physically be in the classroom while unvaccinated without presenting a risk to the
vulnerable and still primarily unvaccinated student population.

537.     De Luca is now faced with the choice imposed by the Exemption Standards: because

he holds religious beliefs that forbid him from accepting vaccination, he must either resign

from his employment with DOE, with limited benefits, and waive his constitutional rights; or

go on unpaid leave until September 5, 2022, with limited benefits and a prohibition on gainful

employment, and waive his constitutional rights; or be fired effective December 1, 2021.

538.     If De Luca wishes, or needs, to earn paid income between now and next September,

instead of draining his savings, the Defendants are requiring him to surrender almost all of the

benefits and other seniority and economic rights that he has earned from his work with the

DOE. He is ready, willing and able to work, and capable of working remotely or, if in person,

in a fully-masked, socially-distanced, fully tested work environment – as he has done in the

past.

539.     Because the Defendants have refused to respect De Luca's constitutional right to

religious freedom, have inflicted substantial harm upon him because he has stood up for his

rights, and are on the precipice of a deadline, set by themselves, that will change his status

even further with the DOE and inflict still more harm, De Luca is forced to go to court to

restrain further harm and to defend his constitutional rights.

***Sasha Delgado***

540.     Plaintiff Sasha Delgado has worked for the New York City Department of Education

for 15 years, and as an Individualized Education Program teacher for the past nine years. Over

the course of those years, she has accrued seniority in the Department, received tenured status,

accumulated Years In Service that count toward the right to retirement benefits, and

accumulated CAR credits that under normal circumstances can be cashed in for income at the

time of retirement. She is unvaccinated and she refuses to be vaccinated for religious reasons.

The Vaccine Mandate threatens to deprive her not only of her career but also all of the

economic and retirement benefits that she has accumulated over her fifteen years of service

with the Department.

541.     During the 2020-2021 school year, Delgado fulfilled her job responsibilities remotely.

542.     Delgado was raised as a member of the Catholic church, attended mass every Sunday,

completed all of her Catholic sacraments, and attended Catechism classes growing up.

543.     As a teenager, she joined her church's youth group and volunteered as a catechist,

teaching religious instruction to children.

544.     Delgado attended a Catholic college because she felt that it was important to her to

incorporate religious values into her education.

545.     In early adulthood, Delgado became a born-again Christian.

546.     Since then, Delgado have taken Christian-based classes at churches, attended Christian

retreats, and attended Christian-led conferences and events. She participates in weekly

fellowship conference calls with other believers and her pastor where they hear preaching,

pray and read the Scriptures from the Bible.

547.        Delgado was baptized at Christian Revival Temple 14 years ago.

548.        She is currently a member of Miracle Tabernacle Ministries.

549.        In Delgado's spiritual journey as a Christian, the more she read the Bible, studied,

prayed, and fasted, the more she felt led by the Lord not to take any vaccinations, or to allow

her son to have them.

550.        Delgado believes that the Word of God states that we are created in the image of God,

and this affirms the unique value of all human life. She believes as a Christian that her body is

the temple of the Holy Spirit and therefore, she is forbidden to inject His temple with the

COVID-19 vaccine. She cites as support for her beliefs 1 Corinthians 3:16: "Don't you know

that you yourselves are God's temple and that God's Spirit dwells in your midst?" She also

cites 1 Corinthians 3:17: "[i]f anyone destroys God's temple, God will destroy that person; for

God's temple is sacred, and you together are that temple."

551.        Delgado objects to the Pfizer and Moderna COVID-19 vaccines because, she

understands, in the early development of mRNA vaccine technology, they used fetal cells for

"proof of concept" (to demonstrate how a cell could take up mRNA and produce the SARS-

CoV-2 spike protein), or to characterize the SARS-CoV-2 spike protein. Likewise, she

understands that the nonreplicating viral vector vaccine produced by Johnson & Johnson

required the use of fetal cell cultures, specifically PER.CG, in order to produce and

manufacture the vaccine. Delgado believes that these vaccines would alter her God-given body

and that they are the equivalent of a prohibited "unclean food," as referenced in the Bible, that

would harm her conscience.

552.        As a result of these religious beliefs, Delgado does not drink any alcohol or eat pork

because she is forbidden to eat or drink things that are unclean and alter the state of mind.  She

does not use products on her skin or hair that have toxins and chemicals in them because she wants to take care of her body as God's temple.

553.     On September 19, 2021, Delgado submitted her original request for a religious exemption to the DOE. Her application informed the adjudicators about her religious journey and her religious objections to vaccination as set forth above.

554.     On September 22, 2021 the DOE denied Delgado's application, stating that

> [y]our application has failed to meet the criteria for a religious based accommodation. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

555.     The denial notice also stated that "[t]his application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate."

556.     Delgado requested an appeal and submitted an additional letter from her pastor, Ron Cohen.

557.     On October 1, 2021, Delgado attended the hearing on her appeal. She was represented by Christina Martinez, Esq. at the appeal.

558.     At the appeal hearing, Karen Solimando, the representative from DOE, emphasized that the DOE was applying a "very narrow" religious exemption to Delgado's proceeding, and informed the hearing officer that Delgado's exemption request had been denied for three reasons.

559.     It should be noted that the United States Constitution requires a "broad" reading to be given to claims for religious exemption, not a "narrow" one. Attorney Solimondo's statement

at the appeal hearing constitutes an admission that the DOE's initial denial was based on an unconstitutional attitude of hostility toward religious freedom.

560.     First, Attorney Solimondo said that Delgado did not have a pastor's letter supporting her request.

561.     However, while this is an unconstitutional requirement, Delgado had sent a letter from her pastor to the general appeals email address. Arbitrator David Riley confirmed at the hearing that he had the pastor's letter within his file.

562.     Attorney Solimando next stated that, "I believe that there's no theological objection raised by many if not all of the denominations in Christianity to the vaccine."

563.     The requirement that her request be denied if the leader of her religious organization has spoken publicly in favor of the vaccine is a violation of Delgado's rights under the First Amendment of the Constitution. Even if this requirement had been legal, however, Attorney Solimando's statement was incorrect as a matter of fact.  According to Delgado, the leader of her religious organization, her pastor, has never spoken publicly in favor of the religious vaccine. With respect to Delgado's statement that the vaccination violates her religious beliefs, Pastor Cohen's letter stated, "I do stand and agree with her and ask that she be free of this mandate."

564.     Attorney Solimando explained the third reason for the denial of Delgado's religious exemption request as follows:

> [T]o the extent that the objection is predicated on the use of fetal cell tissue or fetal cell lines the Department of Health and Mental Hygiene has submitted a letter to the arbitration panel which clearly states that none of the Covid vaccines contain fetal tissue or fetal cells and that the fetal cell line that was used for the vaccine production and manufacturing were used only in the early research phases and in a way that is very common in the development of drugs including very common over-the-counter medications such as Tylenol, Advil, Aspirin,

etc. So I don't believe that is a basis to support this exemption request.
I'll also note it's very clear in that letter that no fetal cells, tissue, or cell
lines are used in the production of Pfizer or Moderna vaccines."

565.     Delgado's initial application for exemption had informed the DOE that her religious
objection is to the use of fetal cells in any aspect of the vaccine, including its testing, research,
or manufacturing. She understands that no fetal cells are actually present in the vaccine, but
argued to the appellate examiner that this did not make her religious objection any less
religious or sincere.

566.     Further, Delgado understands that Attorney Solimando's statement that "no fetal cells,
tissue, or cell lines used in the production of Pfizer or Moderna" is untrue; Delgado
understands that while there are no fetal cells, tissues, or cell lines *present in* the Pfizer or
Moderna, they were used in the *manufacturing* of Pfizer and Moderna vaccines.

567.     On October 4, 2021, Arbitrator Riley denied Delgado's appeal, and provided no
explanation for the denial. Delgado was immediately placed on administrative leave without
pay from her employment with DOE.

568.     Pursuant to the orders of the United States Court of Appeals for the Second Circuit on
November 15 and 30, 2021, Delgado submitted to a "fresh look" examination of his
application for religious exemption by the Citywide Appeals Panel. On or about December 10,
2021, Delgado received a notice informing her that her appeal was denied, and requiring her to
vaccinate herself to remain employed by DOE, or to "opt-in" to an extended leave without pay
program along with a waiver of rights by December 28, 2021, or to face termination of her
employment and insurance coverage.

569.     Corporation Counsel sent an email to Plaintiffs' counsel on December 13, 2021 that
purported to explain Delgado's denial by the Citywide Panel as follows:

**APPEAL  NO. 00004830, Sasha Delgado**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Delgado's reasonable accommodation. The record before the Panel demonstrated facts that cast doubt on appellant's claim that the religious belief she articulated would preclude her from vaccination. While appellant said she would abstain from other medication should she learn similar things about its development, the only medication in which appellant seems to have had sufficient concern to research whether it was tested on such cells is the COVID-19 vaccine. Indeed, appellant suggests that she may have taken similar medications in the past based on the "belief" that they were not tested on fetal cells. These responses strongly indicate appellant is taking a different approach with respect to the COVID-19 vaccine than she does in analogous circumstances.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

570.     Respondents' panel drew an adverse inference from their finding that Appellant

Delgado did research for the COVID-19 vaccine but not other medications.  This is not

relevant to whether her belief is religious in nature or sincerely held. Not all other medications

were as controversial or as deliberated as the Covid-19 vaccine. Many reasonable and

intelligent members of society did their research on it, whether or not they had a religious

objection.

571.     Delgado is now faced with a grim choice imposed by the Mandate and the Exemption

Standards: because she holds religious beliefs that forbid her from accepting vaccination, she

must either resign from her employment with DOE after a 15-year career, with limited

benefits, and waive her constitutional rights; or go on unpaid leave until September 5, 2022,

with limited benefits and a prohibition on gainful employment, and waive her constitutional

rights; or be fired effective December 1, 2021.

572.      If Delgado wishes, or needs, to earn paid income between now and next September, instead of draining her savings, the Defendants are requiring her to surrender almost all of the benefits and other seniority and economic rights that she has earned over her years of loyal service with the DOE. She is ready, willing and able to work, and capable of working remotely or, if in person, in a fully-masked, socially-distanced, fully tested work environment – as she has done in the past.

573.      Because the Defendants have refused to respect Delgado's constitutional right to religious freedom, have inflicted substantial harm upon her because she has stood up for her rights, and are on the precipice of a deadline, set by themselves, that will change her status even further with the DOE and inflict still more harm, Delgado is forced to go to court to restrain further harm and to defend her constitutional rights.

***Dennis Strk***

574.      Plaintiff Dennis Strk has been a Social Studies teacher at Francis Lewis High School in Queens for the past 13 years. Over the course of those years he has accrued seniority in the Department, received tenured status, accumulated Years In Service that accrue toward his right to retirement benefits, and accumulated CAR credits that under normal circumstances can be cashed in for income at the time of retirement. He is unvaccinated and he refuses to be vaccinated for religious reasons.  The Vaccine Mandate threatens to deprive him not only of his career but also all of the economic and retirement benefits that he has accumulated over his years of service with the Department.

575.      Dennis Strk was profoundly influenced early in life by the religious values of his grandparents and parents and by their strong faith in God. Strk learned to pray in both English and Croatian, celebrated Christian holidays such as Easter and Christmas, and attended

religious school once his parents could afford it.

576.     Strk's faith deepened as a teenager, when he had the privilege of attending Saint

Francis Preparatory School. There, he learned to truly live his faith in the service of others,

following the model of Christ, and he grew passionate about social justice. During the spring

break of Strk's senior year, he had the opportunity to act on his faith by attending a service trip

to Kentucky to help the local community with a variety of projects such as repairing metal

roofs, community cleanup, and attending religious services.

577.     As he entered adulthood, Strk learned more about Christian approaches to health as he

further explored the Holy Scriptures and began to realize that vaccination is a sin and an

affront to God's plan for His people and to the teachings of the Bible.

578.     Strk believes that conscious sins are addressed in Hebrews 10:26-29, which states that

if we deliberately keep on sinning after we have received knowledge of the truth we are

deserving of punishment. Since he believes that vaccination would be a conscious betrayal of

his faith, he has not been vaccinated in 13 years.

579.     Strk believes that our bodies are created in the image of God and are sacred temples

that are not to be defiled. Strk understands that Covid-19 vaccines contain blood or cells from

animals, and the research involved in vaccines also uses these profane ingredients as well. He

believes that if these substances are then injected into the bloodstream, this results in the

defilement of our sacred temples. He believes that such vaccinations therefore violate the

teachings found in the Book of Leviticus 17:1 which says that the life of a creature is in the

blood.

580.     Because he understands that vaccines contain substances that defile our blood and lead

to a betrayal of faith, Strk is committed to living a pure and holy life by refusing vaccination,

as expressed in 2 Corinthians 7:1-4. Strk believes that his body is not just a sacred temple created in the image of God; it is also a vessel of worship (Romans 12:1-3).

581.    If he were to depend on vaccination as his primary source of preventative health, Strk believes that he would be betraying his trust in God's power to heal illness. Strk believes that the source of his health comes first and foremost from God, citing Jeremiah 17:5-10 for a powerful explanation of the consequences faced by those who trust more in man than in God.

582.    On September 17, 2021, Strk submitted his request for a religious exemption to the DOE, explaining his religious objections to the adjudicator as set forth above.

583.    On September 19, 2021, the DOE denied Strk's application, stating that he had failed to meet the criteria for a religious-based accommodation, that under the Commissioner of Health's Order, unvaccinated employees cannot work in DOE buildings without posing a direct threat to people's health and safety, and that offering another worksite would pose an undue hardship on the DOE.

584.    On September 20, 2021, Strk submitted, as additional appeal documentation, a PDF of a Federal Register publication regarding "Federal Law Protections for Religious Liberty" which can be accessed here: https://www.govinfo.gov/content/pkg/FR-2017-10-26/pdf/2017-23269.pdf.

585.    On September 24, Strk took part in the hearing on his appeal.

586.    At the appeal hearing, the representative from DOE stated that one of the reasons Strk's exemption was denied was that he did not have a letter from clergy. Strk responded that a clergy letter is not required under the law, but the representative from DOE stated that it was required under the arbitration award.

587.    The DOE representative also questioned Strk's objection to the vaccines' connection to

aborted fetal cells. She stated that there is no actual aborted fetal cell tissue as an ingredient in the vaccines.

588.     Strk explained that even if there is no fetal tissue in the vaccine itself, his objection is to the use of aborted fetal cells in the research of the vaccine. Furthermore, his objection is not just to the testing or manufacturing of the vaccines using fetal tissue, but also to the use of animal blood in the development of vaccines, since he believes that the defiling of blood leads to a betrayal of faith.

589.     The representative from DOE also stated that accommodating Strk's religious beliefs would be an undue hardship on the DOE's daily operations

590.     Strk was informed that Arbitrator Carol Hoffman denied his appeal in an email dated October 5, 2021, although the denial itself was dated September 24, 2021.

591.     Pursuant to the orders of the United States Court of Appeals for the Second Circuit on November 15 and 30, 2021, Strk submitted to a "fresh look" examination of his application for religious exemption by the Citywide Appeals Panel. On or about December 10, 2021, Strk received a notice informing him that his appeal was denied, and requiring him to vaccinate himself to remain employed by DOE, or to "opt-in" to an extended leave without pay program along with a waiver of rights by December 28, 2021, or to face termination of his employment and insurance coverage.

592.     Corporation Counsel sent an email to Plaintiffs' counsel on December 13, 2021 that purported to explain Strk's denial by the Citywide Panel as follows:

**APPEAL NO. 00004835, Dennis Strk**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Strk's reasonable accommodation. The record before the Panel demonstrated facts that cast doubt on appellant's claim that the religious belief he articulated would

preclude him from vaccination. Specifically, appellant's responses are equivocal with regard to how acts on the articulated belief outside of the specific context of COVID-19 vaccination. For example, appellant does not deny using medications that are tested on fetal cell lines, only that he tends to "avoid" them and pursue alternatives if available. The submissions demonstrate the appellant is making a fact-based decision concerning vaccination and, in doing so, relying on incorrect facts regarding COVID-19 vaccines, such as that all COVID vaccines contain fetal cells.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

593.    According to Corporation Counsel's depiction of the panel's reasoning, the panel

erroneously based its denial of Strk's application on the ground that Appellant Strk "rel[ied]

on incorrect facts regarding COVID-19 vaccines, such as that all COVID vaccines contain

fetal cells." This reasoning violated Strk's rights for several reasons. First, even if Appellant

Strk believed that the Covid-19 vaccines contained aborted fetal cells—which he does not—

and  that inaccuracy was the basis for his sincerely held religious objection, again, the DOE

could not deny him a religious exemption on the basis that his belief was untrue as a matter of

fact. Indeed, in *Jolly v. Coughlin,* 76 F.3d 468 (2d Cir. 1996), the defendant lodged a religious

objection to a purified protein derivative test because he believed it was artificial within the

meaning of the Rastafarian faith, while the defendant there argued that the test was natural in

origin. The Court held that, regardless of which party held a correct version of the facts,  "[w]e

have no competence to examine whether plaintiff's belief has objective validity" and still

found that plaintiff's beliefs were entitled to free exercise protection. *Id.* at 476.

594.    The panel went a step further than just misapplying the law here, however. They

completely misstated Appellant Strk's beliefs, which have been precisely and eloquently

articulated over and over again. Appellant Strk is fully aware that the Covid-19 vaccines do

not contain aborted fetal cells, and stated as much in his original religious exemption request,

in his declaration before the Southern District which became part of the Second Circuit's

record, and in his supplemental documentation submitted to Respondents. 21-cv-08773, ECF

No. 50-3 at 4 ("I avoid medical products and food products that are researched, developed,

tested, and/or produced using aborted human fetuses"); R355 ("The individual from the DOE .

. . . stated that there is no actual aborted fetal cell tissue as an ingredient in the vaccines. I

explained that . . . my objection is to the use of aborted fetal cells in the research of the

vaccine").

595.     Respondents' panel further abused the First Amendment in their assertion that

Appellant Strk should be denied because even though he stated that he "avoid[s]" using

"medical products and food products that are researched, developed, tested, and/or produced

using aborted human fetuses," but he "does not deny using [them]." Respondents make a

distinction without a difference. Respondents seem to suggest that the sincerity of Appellant

Strk's beliefs are lessened by the fact that he "avoids" these products rather than "denies"

using them. Such absurd hairsplitting is not permitted under the First Amendment. *Roman

Catholic Archdiocese of N.Y. v. Sebelius,* 987 F. Supp. 2d 232, 249-250 ("where a law places

substantial pressure on a plaintiff to perform affirmative acts contrary to his religion, the

Supreme Court has found a substantial burden without analyzing whether those acts are *de

minimis*").

596.     The DOE is now forcing Strk to decide by December 28, 2021 whether to be placed on

unpaid leave with benefits for a limited time period, with no right to engage in paid

employment elsewhere (but only if he surrenders his legal right to challenge the DOE's actions), to resign and retain his benefits for a limited time period (but only if he surrenders his legal right to challenge the DOE's actions), or to lose his job and his health insurance.

597.     If Strk wishes, or needs, to earn paid income between now and next September, instead of draining his savings, the Defendants are requiring him to surrender almost all of the benefits and other seniority and economic rights that he has earned over his years of loyal service with the DOE. He is ready, willing and able to work, and capable of working remotely or, if in person, in a fully-masked, socially-distanced, fully tested work environment – as he has done in the past.

598.     Because the Defendants have refused to respect Strk's constitutional right to religious freedom, have inflicted substantial harm upon him because he has stood up for his rights, and are on the precipice of a deadline, set by themselves, that will change his status even further with the DOE and inflict still more harm, Strk is forced to go to court to restrain further harm and to defend his constitutional rights.

*Sarah Buzaglo*

599.     Plaintiff Sarah Buzaglo has been employed by the DOE since 2017 as a teacher. She is unvaccinated and she refuses to be vaccinated for religious reasons.   The Vaccine Mandate threatens to deprive her not only of her career but also of economic and retirement benefits that she has accrued during her employment with the Department.

600.     During the 2020-2021 school year, Buzaglo fulfilled her job responsibilities remotely.

601.     Buzaglo is an Orthodox Jew. From birth, she was raised to believe in God and the laws of the Torah which provide a blueprint for how she lives her life. The clothing she chooses to wear each day follow the laws of "*tzniut*," modesty. The food she eats daily is in accordance

with the laws of "*kashrut*," the kosher diet. The prayers she utters each morning, the Sabbath she welcomes each weekend, and the holidays she celebrates each year all are in accordance with the laws of the Torah as she believes God commanded.

602.     When she was old enough to attend pre-school, Buzaglo's parents enrolled her in a small educational program located in a nearby synagogue. At the age of three, she was already learning how to sing Sabbath songs and morning blessings, as well as songs about Jewish history.

603.     After pre-school Buzaglo was enrolled in Prospect Park Yeshiva, an all-girls yeshiva where students studied two curricula: Judaic studies in the morning, and secular studies in the afternoon.

604.     Buzaglo's Judaic studies included daily classes and exams in Bible study (*Tanach*), Prayer (*Beu'r Tefilla*), Psalms (*Tehillim*), Jewish Law (*Halacha*), Jewish History (*Historia*), Hebrew (*Ivrit*), Sages Commentary on the Torah (*Rashi*), The Book of Prophets (*Navi*), and the weekly Torah portion (*Parsha*). She engaged in the study of these subjects from first to eighth grade, which left a lasting impact on her formative years.

605.     After graduating from Prospect Park Yeshiva, Buzaglo chose to attend an even more religious high school program at Yeshiva of Brooklyn High School for Girls.

606.     At Yeshiva of Brooklyn, Buzaglo's faith strengthened. With Rabbi Mandel and Rebbetzin Spector (the Hebrew principal) encouraging and supporting her, she led the morning prayers for her class. She volunteered with the school's "*chessed*" organization to visit an elderly woman, as God commanded his people to be kind and compassionate. Buzaglo began attending prayers at synagogue frequently. She volunteered as a counselor at the weekly Sabbath program for children in her local synagogue, telling them stories about the weekly

Torah portion and organizing games to keep them entertained so that their parents could rest. Eventually Buzaglo was asked to become the chapter leader and managed a team of eight to ten counselors, running the Sabbath *Bnos* Program until graduation.

607.     Following her graduation from high school, Buzaglo again chose to strengthen her faith further by pursuing a gap year of study in a seminary program for women located in the holy city of Jerusalem.

608.     When Buzaglo graduated from Meohr Bais Yaakov Seminary and returned to New York City, she determined that she wanted to engage in God's holy work and continue teaching. She accepted a position teaching fourth and fifth grade at the Hassidic all girl's school Bais Yaakov D'Chassidei Gur. During this time, Buzaglo attended the Jewish program at Touro College, where she pursued a Bachelor's Degree. Touro's program accommodated her religious needs by providing kosher food in the cafeteria and scheduling no classes during Jewish holidays. Later, Buzaglo taught English classes at Bnot Chaya Academy, a program for Jewish teens at risk, many who were victims of sexual abuse, physical abuse, drug addiction, neglect, eating disorders, and mental health issues.

609.     After working in Bnot Chaya Academy for five years, Buzaglo completed a Master's degree in Education and went to work for New York City public schools. She has worked since then in a school with a large immigrant population of students with diverse religious, ethnic, and socio-economic backgrounds. Buzaglo's own religious background has helped her to understand and mentor her NYC public school students. When a Muslim student was being bullied for wearing a hijab, Buzaglo encouraged her to be proud of her choice to dress modestly and addressed the bullying. When her Muslim students struggled to focus during Ramadan, she sympathized and created a lighter lesson plan and workload because she

understood hunger pains from fasting on Yom Kippur and Tisha Ba'av. When some students needed help to obtain permission to miss class time for afternoon prayers, she reached out to an imam to help. When organizing class trips, Buzaglo always ensured that kosher, vegan, and halal food options were available to accommodate all of her public school students' diverse dietary needs.

610.     Buzaglo's religious opposition to vaccination developed after she reached adulthood. She was vaccinated as a child, as her pediatrician advised her parents.

611.     However, after consulting with her Rabbi as an adult and doing her own study of scripture and Torah law, Buzaglo discovered a host of issues that exist with vaccination that go against her religious beliefs.

612.     For several reasons based in scripture and Torah law, vaccines are problematic for Buzaglo. She adheres to a personal interpretation of what Judaism and the Torah mean to her. The Jewish faith allows for individual translation by each member of the community, and it is up to the individual worshipper to process the messages of the Torah and act accordingly. Through her studies, Buzaglo developed the following religious beliefs relating to vaccinations:

   a.  Sanctity of Blood: The Torah dictates that man should not mix the blood of man and that of animals. (*Rashi, Kesuvos* 60A) According to Buzaglo, it is well documented that a majority of vaccines are prepared using tissue cultures from animals. This directly contradicts the teachings of Buzaglo's faith as she understands it. Additionally, the Torah prohibits Jews from eating blood (Leviticus 19:19) and Buzaglo understands from this that injecting blood into one's bloodstream is a direct prohibition as well. To Buzaglo, this prohibition practically applied means that a vaccine that contains blood

105

cells taken from the kidney of a monkey, etc. and is injected into human blood vessels is considered problematic, sinful, and blasphemous to God's name.

b. Sanctity of Life/Abortion: As Buzaglo understands it, Judaism holds dear the value of human life. But in her view, vaccines violate the sanctity of human life. While conducting her research, she learned that a majority of vaccines (including Varicella, Rubella, Hepatitis A, Rabies, and Covid-19) are made by growing viruses in fetal cells. Buzaglo learned that both the Moderna and Pfizer vaccines were tested for the presence of spiked protein on human kidney cells which were removed from an aborted fetus. As she understands it, the Johnson & Johnson vaccine was actually made using fetal retinal cells.

c. Both Genesis and Deuteronomy discuss the sanctity of life including how we were created in God's image, and that to defile God's image is to defile God himself. As Buzaglo understands Torah, a fetus is considered a human life, and to end that life is murder and a direct violation of the Torah.

d. Buzaglo has adopted views on vaccination that she understands Torah to require. To her, the act of bringing life into this world brings holiness and the image of God with it, and the notion of injecting into her own bloodstream sells from a poor fetus is blasphemous. Buzaglo believes that taking a vaccine means participating in sin and going against God's will and the sanctity of life she holds dear.

e. Foreign Materials: As Buzaglo understands it, the Torah prohibits us from welcoming any foreign materials into the body, and this is precisely what vaccines are. As a Torah observant Jew, Buzaglo keeps her body and blood unpolluted and without

contamination. She considers these vaccinations to represent a defilement of the body, blood, and soul.

f.  Self - Flagellation: Buzaglo understands that Torah observant Jews, like herself, are forbidden to self-flagellate. As she understands it, in Judaic law, one is not permitted to inject oneself with a vaccine that offers no significant medical curative benefit to the patient, even if it is allegedly good for others. As she understands it, Scripture prohibits inflicting oneself with Biblically unnecessary gashes, wounds or pokes: "You are children of the Lord, your God. You shall not poke yourselves . . ." ( Deuteronomy 14:1.) "You shall not make incisions in your flesh for any soul . . . I am the Lord." (Leviticus 19:28). The same lesson is further underscored in other scriptural verses (e.g., Leviticus 21:5). To Buzaglo, this is a serious Biblical injunction. In her case, since she has natural immunity protecting her from COVID, she perceives no health need for her to receive an injection. As she sees it, to obtain an unnecessary injection would be in direct violation of Judaic law.

g.  Exposure to Unnecessary Risk: Buzaglo believes that Torah observant Jews like herself are forbidden to expose themselves to risk that is unnecessary to the individual (in her case, she believes that natural immunity to COVID-19 makes vaccination unnecessary). In her view, Scripture does not permit exposing oneself to any risk in the absence of a significant medical benefit to one's own self that outweighs the risk. She finds support in a Torah verse that states: "Guard your own soul scrupulously." (Deuteronomy 4:9). As she interprets Torah, if a Torah-adherent individual has natural immunity or, for some other reason, faces minimal or negligible risk from COVID, he is prohibited to expose himself to the risks of the vaccine.

107

h. Betrayal of Faith in God: As a Torah observant Jew, Buzaglo believes that God is the ultimate healer. Each year during the high holy day of Yom Kippur Buzaglo utters the prayer "He alone determines who shall live, and who shall die, who by fire, who by drowning, who by illness, who by pestilence, etc." Every morning as she opens her eyes, Buzaglo utters the Modeh Ani prayer: "Thankful am I in your presence, for you have returned to me my soul, how great is your mercy." Every morning, as she utters morning prayers, Buzaglo says the blessing of Refaeinu: "Heal us, God, then we will be healed; save us, then we will be saved, for You are our praise. Bring complete recovery for all our ailments, for You are G-d, King, the faithful and compassionate Healer. Blessed are You, Hashem, Who heals the sick of His people Israel." Buzaglo prays for her students suffering from physical and mental ailments when she says this prayer. She prayed for herself, when she contracted Covid last year, and God answered her prayers. Within a week she was feeling stronger and healthier.

i. Buzaglo's faith is in God as the ultimate healer, and she feels that her faith must be in him one-hundred percent, for that is the covenant she entered with him. Buzaglo keep his commandments, and in turn she believes that He will not bring pestilence or disease into her home. (Exodus 15:26). Seeking health from a vaccine, as if it were a solution to illness, or able to protect her from whatever fate God has planned for her, is sinful and heretical in her view. She believes that to do so would weaken her belief in God. Reliance upon a vaccine, as she sees it, would remove the opportunity for prayer and ruin the spiritual connection between herself and God. She believes that reliance on vaccines promises eternal and perfect health without earning it. As a Torah observant Jew, Buzaglo refuses to bow before a false God, like a pharmaceutical company or a

vaccine. She will turn with prayers as she always has to the ultimate healer - her creator.

j.  Altering God's Creation: The Book of Genesis states that God created man in His image. It is Buzaglo's belief that God knew what he was doing and the body of man needs no "fixing" by mankind. Buzaglo sees vaccines as "fixing," for mankind cannot improve on G-d's creation. As she sees it, the mRNA vaccine inserts a synthetic genetic code into her body, to prompt her body to create spiked proteins which will "save her" from the virus. But God has created man, not Moderna or Pfizer or J&J, or any scientist working for any team of vaccine researchers and developers. Buzaglo believes that if she were to accept the vaccine-makers' synthetic code into her body it would be as if she were telling God, "Hey, Creator, you forgot to give me this code that will save my life!" To Buzaglo, that would be sinful, heretical and blasphemous.

613. On September 20, 2021, Buzaglo submitted her request for a religious exemption to the DOE. She supported her exemption request with substantially all the information that is set forth above.

614. On September 22, 2021, DOE denied her request in an email that stated the following:

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

615. Notably, the denial also stated that "[t]his application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate."

616.     On September 23, 2021, Buzaglo submitted an appeal letter to the DOE, explaining that she did not agree that a clergy letter was constitutionally required, but complying with the request for such a letter.

617.     Buzaglo's rabbi stated in his letter that he had discussed the matter with her, that she cited authentic scriptural sources that underlie valid objections under Torah law, and that he and the congregation are in complete agreement. He asserted, "[i]n fact, our congregation categorically opposes this vaccine as a matter of religious tenet, . . ."

618.     During her appeal hearing on October 5, 2021, Buzaglo explained that various communities in Judaism have differing levels of religious observance.  She gave an example from her visit to a South American town where no kosher food was available. Her Conservative Jewish friend had permission from her rabbi to eat a kosher species of fish at a non-kosher restaurant. Her Orthodox Ashkenazi friend had permission to eat a salad served on a plastic plate (not contaminated by non-kosher meat). Buzaglo's rabbi, however, told her that she was forbidden from ingesting anything at all in that restaurant as there was no way of knowing if non-kosher meat had touched any of the cutlery or foodstuffs. As a result, Buzaglo had to buy raw fruit at a market.

619.     When it was his turn to speak, the DOE's representative admitted that he was unfamiliar with how diverse Judaism and its leadership and laws can be. He then shared a link to an article from the Jerusalem Post citing how the Sephardic Chief Rabbi of Israel had spoken in favor of a vaccine.

620.     Buzaglo was not allowed to respond to the article, but the Sephardic Chief Rabbi of Israel is an elected political position, the Sephardic Chief Rabbi of Israel is not her rabbi nor her rabbi's mentor, and she is not bound by his opinions or rulings.

621.     Buzaglo never received direct notice of the denial of her appeal, but DOE informed her via email on October 8, 2021 that she had been placed on leave without pay, signifying that her appeal had been denied.

622.     On information and belief, several other Orthodox Jews who based their religious exemptions requests to the DOE vaccine mandate on the same sincerely held religious beliefs that Buzaglo expressed in her application were granted religious exemptions.

623.     Pursuant to the orders of the United States Court of Appeals for the Second Circuit on November 15 and 30, 2021, Buzaglo submitted to a "fresh look" examination of her application for religious exemption by the Citywide Appeals Panel.

624.     Buzaglo was told on December 6, 2021 that her position as a DOE classroom teacher had been filled by a full-time replacement teacher by November 30, if not sooner. Upon information and belief, by December 6, the replacement teacher had already announced to the class that she will be the class's teacher until the end of the year. This is despite the fact that the DOE was purportedly giving Buzaglo's claims fresh consideration during that time.

625.     On or about December 10, 2021, Buzaglo received a notice informing her that her appeal was denied, and requiring her to vaccinate herself to remain employed by DOE, or to "opt-in" to an extended leave without pay program along with a waiver of rights by December 28, 2021, or to face termination of her employment and insurance coverage.

626.     Corporation Counsel sent an email to Plaintiffs' counsel on December 13, 2021 that purported to explain Buzaglo's denial by the Citywide Panel as follows:

**APPEAL NO. 00004822, Sarah Buzaglo**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Buzaglo's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not

question, are   not preventing the employee from vaccination. Rather, the appellant's decision not to vaccinate comes from non-religious sources: a belief that the mandate is unconstitutional – a legal contention that has been rejected by courts of competent jurisdiction -- and factual beliefs about the vaccination that conflicts with the factual findings of the DOHMH Commissioner in imposing the mandate.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

627.      Buzaglo submitted a 12-page letter comprehensively and eloquently explaining her religious objections to the vaccination. Nevertheless, the panel determined that her beliefs were *not* rooted in her understanding of Judaic law and Scriptures, her advice from her rabbi, or her understanding of her God's requirements—which she thoroughly outlined in her statement and which are entitled to protection under governing Supreme Court and Second Circuit case law—but instead by her "belief that the mandate is unconstitutional . . . and factual beliefs about the mandate that conflict with factual findings of the DOHMH Commissioner."

628.      If counsel's depiction of the panel's conclusions is accurate, it is clear that the panel applied improper standards and legally improper reasoning. Buzaglo's beliefs regarding the constitutionality of the mandate do not undermine, weaken, or cancel her sincerely held religious objections.

629.      Furthermore, any difference between Buzaglo's understanding of the facts and the factual findings of the Health Commissioner are irrelevant as a matter of law. *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996) (finding it inappropriate for defendant to delve into whether plaintiff's sincerely held religious belief was "accurate or logical" or whether

"plaintiff has been in some way 'misinformed'" and holding that plaintiff's beliefs were still entitled to free exercise protection); *Smith v. Board of Education*, 844 F.2d 90, 93 ("Generally it is not proper for courts to evaluate the truth or correctness of an individual's sincerely held religious beliefs.")

630.    Buzaglo is now faced with a wrenching choice imposed by the Exemption Standards: because she holds religious beliefs that forbid her from accepting vaccination, she must either resign from her employment with DOE, with limited benefits, and waive her constitutional rights; or continue on unpaid leave until September 5, 2022, with limited benefits and a prohibition on gainful employment, and waive her constitutional rights; or be fired effective December 1, 2021.

631.    If Buzaglo wishes, or needs, to continue to receive her DOE health insurance between now and next September, the Defendants are requiring her to surrender any rights she has to challenge her dismissal. She is ready, willing and able to work, and capable of working remotely or, if in person, in a fully-masked, socially-distanced, fully tested work environment – as she has done in the past.

632.    Because the Defendants have refused to respect Buzaglo's constitutional right to religious freedom, have inflicted substantial harm upon her because she has stood up for her rights, and are on the precipice of a deadline, set by themselves, that will change her status even further with the DOE and inflict still more harm, Buzaglo is forced to go to court to restrain further harm and to defend her constitutional rights.

### Edward a/k/a Eli Weber

633.    Plaintiff Edward a/k/a Eli Weber ("Weber") has been employed by the DOE since 2001 as a teacher. He is unvaccinated and he refuses to be vaccinated for religious reasons.

113

The Vaccine Mandate threatens to deprive him not only of his career but also of economic and retirement benefits that he has accrued during his employment with the Department.

634.     During the 2020-2021 school year, Weber fulfilled his job responsibilities remotely.

635.     Weber has been a Chassidic Jew for 24 years.

636.     Weber attends synagogue every day, keeps the Sabbath, and observes all of the Jewish Holidays.

637.     Weber prays three times a day.  He begins his day at 3 a.m. and studies Jewish books for at least an hour before he attends synagogue and goes to work.  He immerses in a Mikvah, a purifying bath every day before prayer. He studies with a habrusa (friend) every night after dinner.

638.     Everything he does, outside of his work with the DOE, is involved in spiritual practice.

639.     Weber is bound by Jewish law in all aspects of his life.  He does not eat without saying a blessing before and after. He kisses a mezuzah upon entering his house.  He follows all the laws of family purity, has a full beard, and wears a yarmulke and strings on his shirt, even when he sleeps.

640.     Under Jewish law, and according to his sincerely held religious beliefs, he is bound by the authority of his rabbi.

641.     He therefore asked his rabbi—Rabbi Daniel Green, the Director and spiritual leader of Keystone Jewish Center in Brooklyn—to provide him with an opinion on whether any of the Covid-19 vaccines are permissible by "Halacha," which refers to Jewish law as delineated by biblical and Talmudic dictates.

642.     On October 1, 2021, Weber applied for a religious exemption from the DOE. He submitted his letter from Rabbi Green, which stated, among other things, the following:

It is categorically forbidden by Jewish religious law to be injected with said vaccine, otherwise known as the mRNA injection (whether that of Pfizer, Moderna, or Johnson & Johnson). The prohibition is Halachically binding, as it involves various serious breaches of Shulchan Aruch (Jewish Code of Religious Law).

643.     His union representative told him that his letter was the strongest he had seen yet.

644.     Weber believes that making any use of human cell lines (including research, testing, or manufacturing)—like the Covid-9 vaccines do—is  forbidden in Judaic Law, because Judaism honors the sanctity of life of the unborn and strictly prohibits abortions of otherwise-viable fetuses who pose no mortal risk to the mother. This is tantamount to murder and infanticide, and is strictly prohibited, as stated in Bereishis 9:6: "Whoever sheds the blood of a human being inside another human being shall his blood be shed, for in the image of God He made (each) human being." Furthermore, Judaic law prohibits deriving benefits from any human corpse, including that of a miscarried fetus.

645.     It is also forbidden under Jewish law to take a medication that is coerced, or to coerce preventative medicine. The very notion of a mandatory vaccine policy is anathema in Judaism since it usurps body sovereignty, a Biblical imperative (Vayikra 25:55). Scripture requires its adherent to reject any and all forms of bodily subjugation to any human overlord, irrespective of alleged benefit to oneself or one's community.

646.     Weber believes the body was created by a Creator; therefore, changing the blue-print for the creation, by means of altering genetic function of cells, runs contrary to Halachic Judaic law and ethics. Any such reprehensible mingling of the genetic function of body cells with a foreign substance plainly runs afoul of Judaic law, and includes in modified messenger RNA and recombinant DNA technologies, both of which constitute a profound alteration of the implicit genetic function as designed by the Creator.

647.     Weber would never consider putting something in his body that would affect his DNA. The idea of harming his ancestral DNA in any way is abhorrent to him; likewise, the thought of putting aborted material, or even to be in the same room as such material, goes against everything he believes in, according to his religious worldview.

648.     His religious beliefs also extend to his diet. He does not eat pork or shellfish. He is careful not to mix milk and meat and he has two sinks and separate sets of utensils for each. He only eats kosher food.  He is stricter than most orthodox Jews in his practice.

649.     Even though he received vaccines as a child, when he lived a secular lifestyle, he now avoids vaccines completely as he relies on God to protect him from disease.

650.     On October 1, 2021, the DOE denied his application, and on October 2, 2021, he was placed on leave without pay.

651.     He tried to send more information from another Rabbi about his beliefs but SOLAS, the computerized vaccination portal, refused to accept further information.

652.     He did not choose to appeal his religious exemption denial at that time because his personal religious beliefs did not match the requirements of the standards that were set forth in the application and appeal process, so he concluded an appeal would be futile.

653.     Since that time, the DOE has admitted that the standards it used to assess his  religious exemption request and thousands of others were constitutionally suspect and has made assurances to the Second Circuit in both its oral argument and in multiple briefings to that Court that "the City has been working on making an opportunity for fresh consideration available more broadly to Department of Education employees who unsuccessfully sought religious exemptions pursuant to the appeals process (2d Cir. 21-2678 ECF No. 53; 2d Cir. 21-2711 ECF No. 70)." 2d Cir., 21-2711, ECF No. 90 at 18; *id.* at 27 ("the City is making an

opportunity for fresh consideration available more broadly to Department of Education employees who unsuccessfully sought religious exemptions pursuant to the arbitration award's appeal process").

654.     On November 19, 2021, he emailed the DOE and explained that he had not chosen to appeal his religious exemption denial earlier because his personal religious beliefs did not match the requirements of the standards that were set forth in the application and appeal process, so he concluded an appeal would be futile.

655.     He hoped the DOE would give him an opportunity to appeal under the Citywide Panel process, given the fact that it admitted the standards it used when evaluating his initial request were unconstitutional.

656.     He never heard back from the DOE. He has not received an opportunity to file an appeal pursuant to the Citywide Appeal Panel process.

657.     He is currently at risk of being terminated and losing his health insurance.  He has not been paid since October, and cannot apply for unemployment.

### Carolyn Grimando

658.     Plaintiff Carolyn Grimando has been employed by the DOE for the past 18 years. She is unvaccinated and she refuses to be vaccinated for religious reasons.   The Vaccine Mandate threatens to deprive her not only of her career but also of economic and retirement benefits that she has accrued during her employment with the Department.

659.     In September when Grimando originally found out about the DOE's vaccination mandate, she was recovering from Covid-19.

660.    She therefore applied for a medical exemption from the Mandate, because the Centers for Disease Control and Prevention had stated that anyone recovering from Covid-19 should wait a prescribed amount of time before getting a vaccination.

661.    Even though she had religious objections to the vaccine, she did not request a religious exemption at the same time, because she did not know that she could.

662.    Grimando later found out that even though the DOE had a religious exemption process, it was not accepting both religious and medical exemption requests from the same person.

663.    In any event, when she found out about the religious exemption process, she was intimidated by the requirements she saw listed in the Exemption Standards, especially the one that said that requests "shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine," since she is a Catholic and know that the pope has spoken publicly in favor of the vaccine.

664.    Grimando submitted a medical exemption request on September 13, 2021. Even though the SOLAS system acknowledged that individuals recovering from Covid should not be vaccinated for 90 days, her medical exemption was denied. She tried again and was denied a second time.

665.    She tried multiple times to get ahold of the DOE to ask why her medical exemption was denied. A representative from Human Resources eventually got back to her to tell her that her documentation was not properly uploaded. Both that individual and her union representative recommended that she apply again.

666.    Upon Grimando's third application, the DOE granted her a temporary medical exemption for 45 days, even though the SOLAS system said that individuals with Covid-19 should not be vaccinated for 90 days.

667.     On October 12, even though her medical exemption had not yet expired, she submitted another medical exemption seeking to extend her first exemption for another 45 days. The DOE denied her request.

668.     Her medical exemption expired after the deadline for submitting a religious exemption request expired. However, she found out that the DOE was still accepting religious exemption requests.

669.     Even though Grimando was nervous that the DOE would not grant her a religious exemption request due to the Exemption Standards, she decided to submit a religious exemption request anyway.

670.     Her religious exemption request was submitted on her parish's letterhead and signed by her priest, Father Italo Barozzi. He serves at the Church of Saint Mel in Flushing, New York, which is her parish. Grimando also periodically attends Queen of Martyrs parish in Forest Hills.

671.     She explained that she was baptized into the Catholic Church as a child, and she has been a faithful practitioner of the Catholic religion her entire life.

672.     Grimando believes that the Roman Catholic Church teaches that a person may refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment.

673.     In her statement, Grimando cited to the *Catechism of the Catholic Church* which instructs that following one's conscience is following Christ Himself:

In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law: "Conscience is a law of the mind; yet Christians would not grant that it is nothing more; . . . Conscience is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ."

674.     Therefore, if a Catholic comes to an informed and sure judgment in conscience that he or she should not receive a vaccine, Grimando believes that the Catholic Church requires that the person follow this certain judgment of conscience and refuse the vaccine.

675.     Grimando believes that the Bible outlines the fact that God created the body both "fearfully and wonderfully." (Psalm 139:13-16). She believes that by manipulating genetic operations, the Covid-19 shots alter what God has made, which literally assumes the position of God. She believe this to be a sinful practice under these circumstances.

676.     Grimando also believes that the Bible states that the body is the Temple of the Holy Spirit. She believes she is commanded to take good care of it, not to defile it, and certainly not introduce something into it that could potentially harm it (1 Corinthians3:16-17, 1 Corinthians 6:19-20, 2 Corinthians 5:10, and 2 Corinthians 7:1).

677.     She believes that these vaccines (by the very disclosure of the vaccine manufacturers) contain carcinogens, neurotoxins, animal viruses, animal blood, allergens, and heavy metals. She believes that introducing these substances into her body would violate the Bible's command to honor it as God's temple.

678.     Grimando also believes she has a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions. Since the Covid-19 vaccinations were either researched and tested or manufactured using aborted fetal cells, she objects to them on this basis as well.

679.     Due to Grimando's sincerely held religious beliefs, she has not been vaccinated since she was a child, she almost never takes prescription drugs, and she eats a vegetarian diet.

680.     On November 23, 2021, Grimando's religious exemption request was denied because it "failed to meet the criteria for a religious based accommodation."

681.     The DOE did not give her an opportunity to appeal that denial.

682.     This was despite the fact that the DOE made assurances to the Second Circuit in both its oral argument and in multiple briefings to that Court that "the City has been working on making an opportunity for fresh consideration available more broadly to Department of Education employees who unsuccessfully sought religious exemptions pursuant to the appeals process (2d Cir. 21-2678 ECF No. 53; 2d Cir. 21-2711 ECF No. 70)." 2d Cir., 21-2711, ECF No. 90 at 18; *id.* at 27 ("the City is making an opportunity for fresh consideration available more broadly to Department of Education employees who unsuccessfully sought religious exemptions pursuant to the arbitration award's appeal process").

683.     On November 30, 2021, Grimando was forced to choose whether to be vaccinated in violation of her sincerely held religious beliefs, be placed on unpaid leave with benefits for a limited time period (but only if she surrendered her legal right to challenge the DOE's actions), or to lose her job and her health insurance.

684.     While she chose to extend her leave without pay status in SOLAS, she signed the waiver under duress.

685.     In an email that she wrote to various DOE officials later that day, she stated that "[t]he reason why I am signing the waiver in SOLAS is because SOLAS doesn't give me a choice to skip the waiver to extend my leave without pay status."

686.     She also stated the following:

> I am NOT waiving my right to seek religious exemption and accommodation from any requirement that conflicts with my sincerely held religious beliefs, and I am not waiving my rights to seek legal redress from any wrongful denial of such exemption or accommodation.
>
> I am NOT waiving my right to challenge the involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process.

I am NOT waiving my right to challenge any wrongful termination.

687.    Grimando is now faced with the choice imposed by the Exemption Standards: because she holds religious beliefs that forbid her from accepting vaccination, she must either violate her religious beliefs and vaccinate herself; or resign from her employment with DOE, with limited benefits, and waive her constitutional rights; or go on unpaid leave until September 5, 2022, with limited benefits and a prohibition on gainful employment, and waive her constitutional rights; or be fired effective December 1, 2021.

688.    If Grimando wishes, or needs, to earn paid income between now and next September, instead of draining her savings, the Defendants are requiring her to surrender almost all of the benefits and other seniority and economic rights that she has earned from loyal service with the DOE. She is ready, willing and able to work, and capable of working remotely or, if in person, in a fully-masked, socially-distanced, fully tested work environment.

689.    Because the Defendants have refused to respect Grimando's constitutional right to religious freedom, have inflicted substantial harm upon her because she has stood up for her rights, and are on the precipice of a deadline, set by themselves, that will change Grimando's status even further with the DOE and inflict still more harm, Grimando is forced to go to court to restrain further harm and to defend her constitutional rights.

*Amoura Bryan*

690.    Plaintiff Amoura Bryan has been employed by the DOE for the past 13 years. She is unvaccinated and she refuses to be vaccinated for religious reasons.   The Vaccine Mandate threatens to deprive her not only of her career but also of economic and retirement benefits that she has accrued during her employment with the Department.

691.     Bryan began working for the DOE as a special education teacher with DOE Home Instruction Schools starting in August 2021.

692.     The DOE mandated all employees to be vaccinated or submit exemption/accommodation requests without consideration of working conditions that do not require Covid-19 vaccination.

693.     On September 13, 2021, Bryan submitted her request for a religious exemption from SOLAS. In the SOLAS portal, there was a preference to submit a letter from a religious leader/clergy and select an option that stated "I do not work in a school building." No further questions were asked in the online application, such as what Bryan's current teaching position is.

694.     On September 17, 2021, the DOE denied Bryan's application in an email that stated,

> your application has failed to meet the criteria for a religious based accommodation because, per the Order of the Commissioner of Health, unvaccinated employees cannot work in a school building without posing a direct threat to health and safety. Due to the configuration for the 2021-2022 school year, which includes no remote class work, we cannot offer another worksite as an accommodation, as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

695.     The denial also stated that "[t]his application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of the UFT and the Board of Education regarding the vaccine mandate."

696.     The denial stated that Bryan had one school day to appeal.

697.     Bryan was confused and shocked by the DOE's decision because she is a remote teacher working in an isolated, non-school building workspace, and she does not interact with students or staff. Bryan's DOE Home School Instruction administrators have assigned her to a

stationary location where she works remotely using Google Classroom to teach students who are learning from home due to medical accommodations.

698.     That is because Bryan's students are medically fragile and unable to attend school due to either medical or psychiatric conditions.

699.     Employees who successfully obtain religious or medical exemptions from DOE's vaccination mandate have been accommodated by working remotely, which Bryan already did.

700.     Bryan was unable to reply to the email from DOE's SOLAS portal to inform them of their erroneous assumption that she provides in-person instruction in a school building.

701.     A UFT representative named Michael Sill informed Bryan that he would reach out to the DOE regarding her situation. Mr. Sill also advised her to appeal her denial and mention her current working conditions as a remote worker in a non-school building.

702.     Bryan submitted a sworn affidavit in support of her appeal.

703.     Although she is affiliated with the Seventh Day Adventist Church, Bryan did not mention that affiliation in her sworn statement, because she believes her spiritual and moral obligations are ultimately to God, and not to any church. It is her religious belief that the church does not have authority over the decisions she makes pertaining to her health or her body; only God does. Additionally, even though she was baptized, she believes that organized religions and religious leaders do not control her relationship and commitment to God and the Bible. She instead made her request for a religious accommodation based upon her own faith practices and religious beliefs, which are protected under the law, regardless of their affiliation with any church.

704.     Due to Bryan's church upbringing and faith in the Bible, she believes that God is the manufacturer/creator of all life on this earth and in the universe and as the manufacturer, God

124

has authority to give instructions on how best to care for this complex machinery called the body since the Bible explains God is the creator in Genesis Chapter 1.

705.     The Bible is Bryan's guide and directs her life, including her health care choices. She believes that she does not own her body but that her body is the temple of God (1 Corinthians 6:19) and that "[i]f any man defile the temple of God, him shall God destroy: for the temple of God is holy, which temple ye are" (1 Corinthians 3:17).

706.     She also believe based on 1 Corinthians 3:17 that she must not defile her body with anything that can change the natural functions of her organs, that she must not ingest any "unclean substances" (as discussed in Leviticus 7:21 and 2 Corinthians 6:17), and that she must not take any action that would cause her cells to function contrary to how God manufactured them to work naturally.

707.     Bryan believes firmly what it says in Exodus 15:26 that if she keeps God's commands and laws and if some sickness does come upon her (like Covid 19), that God is "the Lord that heal[s]" me. But she does understand that healing does not always come in this life, and that true healing is in the promised after life in eternity with God.

708.     She also adheres to what her Bible school teacher calls the ten laws of health, which are religious medical practices rooted in Scripture and that include such things as trusting in the God of the Bible (Exodus 23:25), temperance (Acts 15:29 and 1 Peter 2:11), and plant-based nutrition (Genesis 1:29).

709.     As a result of these beliefs, she does not smoke, drink, or use any illicit drugs, and her diet is predominantly plant-based.

710.     Bryan also believes it would be a violation of these religious beliefs to receive a Covid 19 vaccination.

711.        On September 24, 2021, Bryan attended the arbitration hearing on her appeal.

712.        At the arbitration hearing Bryan explained her sincerely held religious beliefs as stated in her sworn statement and informed the arbitrator of her current working conditions as a remote worker at a non-school building with no interactions with students or staff.

713.        Bryan's UFT representative Matt Kirwan confirmed her current working conditions and acknowledged that Mr. Sill from UFT said he would speak with DOE on her behalf about how she does not engage in in-person instruction. She asked the arbitrator if she could submit an email as part of her supporting documents confirming this, and he said she did not need to since she was already sworn in and he believed her.

714.        At the hearing, the representative from the DOE inquired about Bryan's affiliation with the Seventh Day Adventist Church and stated that the Seventh Day Adventist Church does not oppose the vaccine.

715.        Bryan explained that it was her personal religious belief in God's laws and the requirements of the Bible that she should not take the vaccine, regardless of her affiliation with the Seventh Day Adventist Church. She repeated what she said in her opening statement given at the arbitration.

716.        Bryan does not believe any UFT representative ever spoke to DOE on her behalf.

717.        On October 18, 2021, Bryan's assistant principal James Maresca wrote a letter in support regarding her current teaching position as a remote worker in a non-school building.

718.        In that letter, he confirmed that Bryan works remotely with her students from a non-school setting.

719.        He stated further:

> [Ms. Bryan's] instruction is primarily with elementary students with various disabilities, requiring her to instruct these students via Zoom on

a daily basis, covering all aspects of the curriculum for each student. In addition, Miss Bryan is required to set up and maintain a Google Classroom for each student as evidence of work completed. As a remote teacher, she does not pose a risk to the health and safety of the children because she does not work from a school building. There is no discernible reason Miss Bryan would need to be vaccinated to perform her duties, as she is in no direct contact with students or staff members.

720.     On October 4, Bryan reached out to Mr. Sill and Mr. Kirwan, explaining that she had not heard from them regarding their promised advocacy on her behalf.

721.     On October 5, 2021, she received an email stating that the arbitrator denied her exemption request and that she is placed on a Leave of Absence without pay.  There was no explanation about why she was denied.

722.     Mr. Sill responded to Bryan's October 4 communication in a dismissive email, stating that he was sorry that her appeal did not turn out the way she had hoped but that he could no longer help her, and that her only recourse was the courts or vaccination.

723.     On October 6, 2021, she submitted a new application with documentation explaining that she does not provide in-person instruction within a school building.

724.     On October 7, 2021, she was denied the reasonable accommodation via an email which stated "[r]epeat Application previously reviewed and determined." The email did not address the fact that her original denial was based on incorrect facts.

725.     She is distraught over this situation because it has prevented her from being able to be there for her students. Bryan's religious exemption denial was based on factually incorrect information and an unconstitutional exemption process.

726.     After the DOE admitted and the Second Circuit determined that the Exemption Standards were constitutionally suspect, Bryan was given the opportunity to re-appeal her denial.

727.     On December 2, Bryan submitted additional documentation showing clearly, as her original documentation did, that her position is remote, which is the accommodation the DOE was already providing to people who obtained religious exemptions.

728.     The DOE has not yet decided Bryan's re-appeal, but she risks termination and loss of her health insurance if she is not reinstated.

729.     Bryan is therefore faced with a wrenching choice imposed by the Vaccine Mandate and the Exemption Standards: because she holds religious beliefs that forbid her from accepting vaccination, she must either resign from her employment with DOE, with limited benefits, and waive her constitutional rights; or continue on unpaid leave until September 5, 2022, with limited benefits and a prohibition on gainful employment, and waive her constitutional rights; or be fired effective December 1, 2021.

730.     If Bryan wishes, or needs, to continue to receive her DOE health insurance between now and next September, the Defendants are requiring her to surrender any rights she has to challenge her dismissal. She is ready, willing and able to work, and capable of working remotely or, if in person, in a fully-masked, socially-distanced, fully tested work environment.

731.     Because the Defendants have refused to respect Bryan's constitutional right to religious freedom, have inflicted substantial harm upon her because she has stood up for her rights, and are on the precipice of a deadline, set by themselves, that will change her status even further with the DOE and inflict still more harm, Bryan is forced to go to court to restrain further harm and to defend her constitutional rights.

### Joan Giamarrino

732.     Plaintiff Joan Giammarino has been employed by the DOE since September 2007. She is unvaccinated and she refuses to be vaccinated for religious reasons.   The Vaccine Mandate

threatens to deprive her not only of her career but also of economic and retirement benefits that she has accrued during her employment with the Department.

733. In September when Giammarino originally found out about the DOE's vaccination mandate, she chose not to apply for a religious exemption, because she knew she could not meet the Exemption Standards

734. Specifically, the Exemption Standards required the submission of a clergy letter.

735. Giammarino is a practicing Catholic, but she did not think she could find a priest who would support her position, even though it stemmed from her sincerely held religious beliefs.

736. She was raised with a strong very religious background as a Christian, and her entire family life from childhood was built upon Christian teachings. She attended Catholic elementary school for eight years, a Catholic high school for four years, and a Catholic University for four years as well.

737. Giammarino cannot participate in taking the Covid-19 vaccine because the vaccines involve the use of aborted fetuses in either their testing or manufacturing. She is strongly opposed to abortion in any form as a Christian, and could never allow one of these vaccines to be put into her body without feeling like she was committing a sin by accepting the murder of one of God's precious children.

738. The Ten Commandments are one of the core foundations of Giammarino's personal religious beliefs and therefore dictate how she lives her life as a Christian. Since the Fifth Commandment clearly states, "[t]hou shalt not kill," she believes that she cannot consciously participate in a process that she believes forsakes not only the sanctity of a human life, but also that of a human soul. She also believes that time and distance from an evil that originated long

ago does not excuse it or make her free of responsibility for participating in it. Injecting fetal cells into her body therefore violates her religious beliefs.

739.     Giammarino prayed for quite some time about taking the vaccine, as she knew the repercussions to her professional life and her ability to provide for herself would both be negatively impacted, but she knew from meeting God in prayer that it would be against her religious beliefs to take it.

740.     As a result of her sincerely held religious beliefs regarding vaccination, she has not been vaccinated in 20 years.

741.     Despite learning that the DOE admitted to the Second Circuit Court of Appeals that the process and standards it used to consider religious exemption applications, including the clergy letter requirement, were "constitutionally suspect" and proposed an alternative process with purportedly constitutional standards, the DOE did not make this process available to Giammarino.

742.     In addition to her religious objection to the vaccine, Giammarino's doctor advised her against taking the vaccine due to two autoimmune disorders. However, she chose not to apply for a medical exemption because her personal medical conditions did not match the requirements of the Exemption Standards, so she concluded an application would be futile.

743.     On November 29, 2021, Giammarino sent Michael Mulgrew, UFT president, and Beth Norton, UFT general counsel, an email explaining why she did not apply for a medical exemption.

744.     In that email, she also explained that the DOE conceded that the Exemption Standards were "constitutionally suspect" and that the DOE had proposed an alternative process with purportedly constitutional standards.

745.     Since a great number of UFT members' applications and appeals were also considered under the same admittedly unconstitutional process, Giammarino demanded that the UFT bring a claim directly to Scheinman Arbitration and Mediation Services by November 30, 2021 for expedited resolution, because she did not believe the Arbitration Agreement was created and implemented in good faith.

746.     She never heard back.

747.     On December 6, Giammarino mailed a certified letter to the DOE stating that she originally chose not to apply for a religious exemption because her personal religious beliefs did not match the narrow requirements of the Exemption Standards, so she concluded an application would be futile. She also stated that she was unable to secure a letter from a religious leader as required, as few clergy members would oblige. Since the Second Circuit Court of Appeals declared and the DOE admitted that these standards were "constitutionally suspect," she demanded that she have the option to have her religious exemption application considered under a fair, constitutionally sound process.

748.     She also attached a statement explaining her religious beliefs and requesting a religious exemption.

749.     On the same day, she also sent a certified letter to the DOE requesting a medical exemption.

750.     On December 14, 2021, she received an email from the DOE stating that it received her paper application for a reasonable medical accommodation, that all accommodation requests were transferred to the SOLAS system, that the DOE was administratively closing her request, and that she should apply online via SOLAS.

751.     After the Second Circuit's ruling, the DOE never offered Giammarino the opportunity to apply for a religious exemption, even though it was on notice that she declined to apply originally because of its admittedly unconstitutional requirements.

752.     She also never heard back from the DOE regarding the religious exemption request that she submitted by mail in December.

753.     Giammarino has been placed on unpaid leave and she is at risk of being terminated and losing her health insurance.

754.     Giammarino is therefore faced with a wrenching choice imposed by the Vaccine Mandate and the Exemption Standards: because she holds religious beliefs that forbid her from accepting vaccination, she must either resign from her employment with DOE, with limited benefits, and waive her constitutional rights; or continue on unpaid leave until September 5, 2022, with limited benefits and a prohibition on gainful employment, and waive her constitutional rights; or be fired effective December 1, 2021.

755.     If Giamarrino wishes, or needs, to continue to receive her DOE health insurance between now and next September, the Defendants are requiring her to surrender any rights she has to challenge her dismissal. She is ready, willing and able to work, and capable of working remotely or, if in person, in a fully-masked, socially-distanced, fully tested work environment.

756.     Because the Defendants have refused to respect Giamarrino's constitutional right to religious freedom, have inflicted substantial harm upon her because she has stood up for her rights, and are on the precipice of a deadline, set by themselves, that will change her status even further with the DOE and inflict still more harm, Giamarrino is forced to go to court to restrain further harm and to defend her constitutional rights.

***Benedict LoParrino***

757.     Plaintiff Benedict LoParrino lives in the Bronx and has been employed by the New York City Department of Education as an elementary school teacher for 17 years.

758.     In September when he originally learned of the DOE's vaccination mandate, he chose not to apply for a religious exemption by the September 20, 2021 deadline because he knew he could not meet the requirements stated in the Arbitration Award.

759.     Specifically, the Arbitration Award required the submission of a clergy letter.

760.     LoParrino is a practicing Catholic, but he did not think he could find a priest who would support his position, even though it stems from his sincerely held religious beliefs.

761.     LoParrino was also discouraged from applying because Mayor de Blasio said that religious exemptions would only be granted for Christian Scientists and Jehovah's Witnesses.

762.     LoParrino was baptized Catholic and served as an altar boy when he was in grammar school. He attended Catholic school his entire life, from elementary school through college. He lives his life based on the teachings of Jesus Christ and engages in daily prayer.

763.     According to the teachings of the Roman Catholic Church, a person may be required to refuse a medical intervention if his or her informed conscience comes to a sure judgment. Further, there are authoritative church teachings that demonstrate a principled religious basis on which a Catholic may determine that he or she ought to refuse certain vaccines on the basis of conscience.

764.     One of these is that there is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cell lines derived from direct abortions.

765.     Since each of the three Covid-19 vaccines was either tested or produced using aborted fetal cells, it is LoParrino's sincerely held religious belief that he has a moral duty to refuse them to avoid being complicit in the sin of abortion.

766.     The Catechism of the Catholic Church instructs that following one's conscience is akin to following Christ Himself, and if a Catholic comes to an informed and sure judgment that he or she is not to receive the vaccine, then the Catholic Church requires that the person refuse it.

767.     Therefore, since LoParrino has come to an informed and sure judgment that taking any of the Covid-19 vaccines would make him complicit in the sin of abortion, he understands the teachings of the Catholic Church to require that he refuse them.

768.     Due to his sincerely held religious beliefs, LoParrino has not been vaccinated since he was a child.

769.     Even though he had missed the deadline and did not think his request would be accepted due to the requirements in the Arbitration Award and Mayor de Blasio's statements, on November 3, 2021, LoParrino decided to apply anyway.

770.     He was unable to apply online, so he sent his request via certified mail to the DOE. He also emailed it to the DOE.

771.     In his application, LoParrino provided a detailed explanation of Catholic doctrine on moral decision-making involving vaccines, and provided reference material in support of the specific points that he made concerning that doctrine, including the points made above. He also described his individual decision-making process in which he applied Catholic doctrine and deduced that he, individually, was required by his understanding of vaccine facts and Catholic doctrine to refuse vaccination.

772.     Since submitting his application for exemption to the DOE, LoParrino has learned that the DOE admitted to the Second Circuit Court of Appeals that the process and standards that it had used to consider religious exemption applications, including the clergy letter requirement, were "constitutionally suspect" and proposed an alternative process with purportedly constitutional standards. However, the DOE has not made this process available to LoParrino, even though he had sent them his request by mail and email.

773.     On December 13, LoParrino received an email from the DOE stating that it had received his request for a medical exemption, that it had transferred all accommodation requests to the Self-Service Online Leave Application System ('SOLAS'), that his request was being administratively closed, and that he should re-apply online via SOLAS.

774.     LoParrino was confused about this email because he had requested a religious exemption, not a medical exemption from the Mandate.

775.     Nevertheless, LoParrino tried to re-submit his religious exemption request on SOLAS that day, but received an error message that stated "[y]ou have been identified as being noncompliant to the vaccine mandate. You can't submit an application for Reasonable Accommodation or Covid-19 Vaccine Related Exemption/Accommodation at this time."

776.     LoParrino then emailed the DOE, explaining that he had received an error message when attempting to submit his religious exemption request, and asked for help getting this resolved.

777.     The email he received in response stated that the DOE's "records indicated" that he was "currently on leave without pay" and that he needed to contact his union for further assistance.

778.     On December 19, a union representative reached out to LoParrino to help him with his religious exemption application. She asked whether LoParrino had applied by the September 20 deadline. He replied that he had missed that deadline.

779.     She responded that "[i]f you missed the deadline, your application is not eligible for consideration."

780.     LoParrino has been placed on unpaid leave and is at risk of being terminated and losing his health insurance and other employment rights. The DOE's efforts to force LoParrino to violate his religious beliefs in order to retain his job is causing LoParrino to suffer great distress.

## FIRST CLAIM FOR RELIEF
### (Liability under the Free Exercise Clause By All Plaintiffs Against All Defendants)

781.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

782.     The Vaccine Mandate is unconstitutional, both facially and as applied to the plaintiffs and others, because it violates their right to religious freedom under the First Amendment.

783.     The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that Congress (and by extension, State and City governments) shall make no law prohibiting the free exercise of religion.

784.     Laws that burden religion are subject to strict scrutiny under the Free Exercise Clause unless they are neutral and generally applicable.

785.     Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.

786.     A law is not generally applicable if it invites the government to consider the particular

reasons for a person's conduct by providing a mechanism for individualized exemptions.

787.    A law is not generally applicable if exceptions are carved out on its face or in practice, or if it is just one of many specifically applicable mandates relating to the same issue.

788.    A law that is overinclusive in its restrictions on religious activity or beliefs, by encompassing more protected conduct than necessary to achieve its goal, is invalid.

789.    Laws that burden religious exercise must survive strict scrutiny if they are not neutral and generally applicable or if they are overinclusive or underinclusive.

790.    A government policy can survive strict scrutiny under the Free Exercise Clause only if it advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so.

791.    The Mandate requires all DOE employees to be vaccinated, but by its terms it acknowledges religious accommodations are required to be considered. The Vaccine Mandate contains no other guidance as to how DOE is to determine which "accommodations" are "reasonable" and "otherwise required by law." Adjudicators of requests are, therefore, given discretion to determine whether or not to grant exemption requests based on their own individual determinations as to whether such requests are "reasonable" or "required by law."

792.    Because the Mandate gives the DOE and outsourced appellate examiners unrestricted discretion to determine the validity of various religious exemption applications, it is by definition, not neutral or generally applicable, and thus must be subject to strict scrutiny.

793.    The United States Supreme Court has made it clear that Government fails to act neutrally when it proceeds in a manner that is intolerant of religious beliefs, and that religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to

137

merit First Amendment protection.

794.     The First Amendment protects the unorthodox religious beliefs of people who dissent from the doctrines of the faith traditions to which they belong just as strongly as it protects the orthodox beliefs and practices of those who are faithful to those traditions.

795.     The Mandate is overinclusive on its face. As one of many examples, it requires all employees of the DOE to submit to vaccination, no matter where they work. The Mandate's requirement of vaccination even for employees of DOE who do not "work in-person in a DOE school setting, DOE building, or charter school setting" is not necessary for the achievement of the Defendants' interest of protecting the health of schoolchildren. With respect to non-DOE employees of the City, however, the same Mandate only requires vaccination of those employees "who work in-person in a DOE school setting, DOE building, or charter school setting." There is no rational basis for extending the Mandate to all DOE employees and enforcing it against remote workers. The Mandate is invalid on its face as a result.

796.     Moreover, the Mandate is underinclusive, in that it allows infected vaccinated employees to teach in the classrooms even though they can and are spreading COVID-19, while excluding uninfected unvaccinated employees who pose far less risk to anyone.

797.     The Mandate is not neutral. Mayor de Blasio routinely dismisses and marginalizes religious objections to vaccines when discussing the Mandate. His comments and context of the passage and implementation of the Mandate show a lack of neutrality and open hostility towards religious objections to vaccination. Mayor de Blasio and other decision-makers went so far as to state that religious objections to vaccination are invalid because they conflict with the Pope's interpretation of scriptures.

798.     Moreover, the DOE implemented the Mandate through a facially unconstitutional and

discriminatory set of Exemption Standards. Under these standards, they suspended thousands of people for holding religious beliefs that they deemed heretical, or out of line with the discriminatory standards.

799.     Adjudicators who decided religious exemption applications and SAMS appeals under the Vaccine Mandate were directed to apply standards set forth in the Exemption Standards in obeying the Mandate.  The Exemption Standards did not cure the Mandate's Constitutional defects. Rather, they highlighted them. On their face, the Exemption Standards violate the Free Exercise Clause in the following ways:

800.     First, the Exemption Standards require that exemption requests "must be documented in writing by a religious official (e.g., clergy)." Since the constitutionally required definition of religion is not limited to  traditional, organized religions such as Christianity, Judaism, Islam, Hinduism, and Buddhism, but also includes religious beliefs that are new, uncommon, not part of a formal church or sect, or only held by a small number of people, the "clergy writing" requirement requires the exemption adjudicator to refuse exemption requests filed by people who may not be able to supply a "clergy letter" because they do not belong to a formal church or who may belong to a denomination that does not have "clergy" or who, indeed, may possess sincere religious beliefs that are not shared by others. This requirement also excludes persons who may not be able to get a "clergy letter" from religious officials of their own denomination because they possess unorthodox views concerning vaccination that are at odds with the orthodox viewpoint of that particular sect.

801.     Secondly, under the Exemption Standards, adjudicators are required to deny any request made by a person who belongs to a denomination of which "the leader … has spoken publicly in favor of the vaccine" and states that only applicants from "recognized and

established religious organizations" will be granted an exemption. This prohibition violates Free Exercise (and Establishment Clause) principles because it makes religious orthodoxy a requirement of exemption from the Vaccine Mandate. The slogan "heretics have no rights" should be consigned to histories of the Inquisition and religious wars: it has no place in a country in which religious freedom is a fundamental right and establishment of religion is proscribed by our basic law. However, the DOE has enshrined the precept in the provisions of its Exemption Standards.

802.     Thirdly, the Exemption Standards require adjudicators to deny exemption applications "where the documentation is readily available (e.g., from an online source)." This entirely irrational requirement seems to be intended to prevent religious exemption applicants from getting assistance from the very first place where everybody goes for information in 2021: Google and the worldwide web. A rule that disqualifies everyone who looks to the internet for information to support their religious objections cannot assist the adjudicator in determining whether or not a particular applicant possesses a genuine religious objection to vaccination: it is vastly overbroad.

803.     Fourthly, the Exemption Standards contain a negative pronouncement as to what types of ideas the applicant is not permitted to hold concerning vaccination, namely, those that are "personal, political or philosophical in nature," but no positive guidance as to what types of beliefs and objections must be considered to be religious beyond adherence to Christian Science and, perhaps, other similar sects. American Constitutional law recognizes that religion includes all aspects of religious observance and practice, as well as belief. *See also* 42 U.S.C.S. § 2000e(j) (defining religion under Title VII and the First Amendment). Many religious individuals may sincerely hold ideas concerning vaccination that qualify as both

140

religious and also as "personal, political or philosophical."  The Exemption Standards entirely ignore these well-known Constitutional interpretations and violate the Free Exercise Clause by guiding adjudicators only on how to deny applications under such circumstances, and not on how to discern whether beliefs are also religious and therefore approvable.

804.    The UFT Arbitrator's Order recites that the arbitrator personally relied upon submissions from the City's legal team in formulating the specific terms of the order, a task which he was incapable of completing on his own. Thus, the City had a hand in the drafting of the very terms which the order requires DOE employees to apply and enforce.

805.    The City also expressly adopted the unconstitutional Exemption Standards as official policy. The arbitrators award states that it will be the City's exclusive policy for granting exemptions to their Mandate, and Mayor de Blasio admitted to the press that the City adopted the standards in the award.

806.    The government cannot adopt and enforce an unconstitutional policy. The City and the DOE not only adopted and enforced the policy, but zealously advocated for even more discrimination than the Exemption Standards required.

807.    The City and the DOE each have a constitutional duty to respect the religious freedoms of employees, a responsibility which it cannot avoid by outsourcing its unconstitutionally directed exemption denials to a well-connected arbitration service.

808.    The DOE violates the Free Exercise Clause every time it applies the terms of the Exemption Standards to deny an individual request for religious exemption. It violates the Free Exercise Clause every time it takes any action with respect to an individual's employment, enforcing the provisions of the Mandate and Exemption Standards or fails to reinstate and remedy the suspensions carried out under the Mandate and Exemption Standards.

809.     The Mandate and the Exemption standards are also being applied to individual cases in ways that violate the Free Exercise Clause.  On countless occasions, DOE representatives and the exemption adjudicators themselves have made statements in appellate exemption hearings that violate the City's First Amendment responsibilities, including *inter* alia arguments that "as a Christian, you can't have a valid exemption claim, because every Christian leader is in favor of vaccination," claims that clergy letters that assert an individual right to conscience as an element of orthodox religious faith must be disregarded because the Pope or other denominational leaders support vaccination, and arguments that moral conscience and guidance from prayer or the Holy Spirit are not valid religious sources of objection to vaccination.

810.     The Department's system of adjudicating exemption requests also produces arbitrary results.  In numerous instances, DOE staff and appellate adjudicators have rendered completely inconsistent decisions in cases involving applicants with substantially similar circumstances who submitted substantially similar evidence in support of their applications.

811.     They have even rendered conflicting decisions with regard to the same individual applicants.

812.     Religious exemption determinations are, by their very nature, discretionary and must be strictly scrutinized when made by government actors.

813.     The Mandate is not "narrowly tailored" to promote the compelling interests of the DOE with the least amount of interference with the religious beliefs and practices of DOE employees. Rather, as implemented by the DOE, it seems to be drafted to inflict maximum harm on persons who believe that vaccination is unholy, by denying the greatest number of exemption applications with the least amount of due process. The requirement that applicants

present a clergy letter; the prohibition of exemptions when denominational leaders favor vaccination; the requirement that applicants be part of a recognized and established religious organization; the identification of a religious group that is presumptively entitled to exemption; the dire consequences of rejection, including termination of employment or mandatory unpaid unemployment on leave, the cramped deadlines for submission of applications, appeals, and elections under the Exemption Standards – none of these is necessary for or even related to the protection of schoolchildren from infection. One wonders whether the Defendants may be using the vaccination issue as a pretext to cut expenses on the backs of teachers and other staff who hold unpopular religious beliefs.

814.    The "black box" decisions of the Citywide Appeals Panel, and the purported explanations for those decisions provided by Corporation Counsel, indicate that Citywide Appeals Panel process is also constitutionally flawed. On information and belief, the decision makers are using justifications similar to those that are stated in the Exemption Standards. Their refusal or inability to provide evidence of narrow tailoring of their decisions in all instances, and their profligate use of the "undue hardship" rationale to deny appeals even of DOE employees whose religious objections to vaccination they concede to be genuine and sincerely held, and who are willing to work remotely, show that the Defendants  are hiding behind an opaque  Citywide Appeals Panel process to mask their refusal to protect religious liberties guaranteed by the Constitution. The panel is simply another sham intended to enable Defendants to deprive Plaintiffs, and others similarly situated, of their religious freedom.

815.    Case in point: while the Citywide Appeals Panel routinely asserts that it would be an undue hardship to grant any accommodation whatsoever to the Plaintiffs or Class members, it would be no burden at all for the City to relieve them of the "no outside employment"

requirement while they are in "leave without pay" status. Their failure to go even that far shows that no one on the Panel has given even a fleeting thought about how to lighten the burdens the Defendants impose upon unvaccinated DOE employees who wish to remain faithful to their religious beliefs.

816.       The DOE also apparently does not find it to be an undue hardship to allow actively infected teachers to return to school due to the present teacher shortage, while simultaneously finding it to be an undue hardship to allow unvaccinated, uninfected teachers who have tested negative for Covid to return to their positions. The inconsistency in the DOE's approach completely de-legitimizes its undue hardship argument and shows its undeniable targeting of individuals with religious objections to the vaccine, even at the cost of harming the very children its Mandate purports to protect.

817.       Defendants are not entitled to rely on Title VII standards that may permit private employers to use a lesser "undue hardship" analyses to deny religious exemption requests to their employees. The First Amendment requires the Court to apply strict scrutiny to the Vaccine Mandate and its implementation through the Citywide Appeals Panel process, because that process involves an individualized assessment of the reasons why DOE employees refuse to be vaccinated. In an important federal case involving religious exemptions from a COVID-19 mandate imposed by the United States military, the Court found that the applications process imposed by the United States Navy invoked the requirement of strict scrutiny:

> The Navy's mandate is not neutral and generally applicable. First, by accepting individual applications for exemptions, the law invites an individualized assessment of the reasons why a servicemember is not vaccinated. See Pls.' App. 153–55 (NAVADMIN 190/21) (describing the exemption process and authority to grant exemption). Consequently, favoritism is built into the mandate.

*U.S. Navy Seals 1-26 v. Biden*, 4:21-cv-01236, Dkt 66 at 20 - 21 (N.D. Tex. Jan. 3, 2022) (citing *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021) -- "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.") (cleaned up).

818.    The deleterious effect of unfair denial is that employees whose applications are denied by this corrupt process were required either to elect by October 29, 2021 to resign from their jobs or to opt-in by November 30, 2021 to an agreement to spend the next ten months without income – and with a waiver of legal rights. Everyone who refused to do so is now subject to termination, with the exception that Plaintiffs' deadline is temporarily suspended, and other DOE employees who have submitted appeals to the Citywide Appeals Panel are subject to rolling deadlines based on the dates of their denials.

819.    The Defendants' policies require Plaintiffs and other unvaccinated DOE employees to make this Hobson's Choice, giving up any right of contest in any court. This court has power to stay that choice, and the effects of choices already made pursuant to Defendants' unconstitutional and anti-religious policies, until it is able to make a final determination that the Mandate is unconstitutional on its face and as applied, and it is necessary for the Court to exercise its power in order to prevent manifest injustice to the rights of all of those DOE employees whose exemption applications have been denied by unjust and unconstitutional proceedings (or who refused to make such applications because of the clear unconstitutionality of such proceedings).

WHEREFORE, Plaintiffs ask the Court to declare that the Mandate and the Exemption Standards are invalid  on their face and as applied to the Plaintiffs and the Class because they violate the Free Exercise Clause of the First Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to

order the DOE to restore all employees who have been adversely affected by the Mandate or the

Exemption Standards to employment with DOE with back pay and restoration of time in service,

seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and

Class Members, and to award attorney's fees and costs to Plaintiffs.


## SECOND CLAIM FOR RELIEF
**(Liability under the Establishment Clause By All Plaintiffs Against All Defendants)**

820.       Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as if

fully set forth herein.

821.       The Mandate preferences certain religions over others and is not "neutral" when it

comes to the various religions practiced by the employees of the DOE. The Defendants'

representatives have tried to defend it by declaring that it has the approval of religious leaders

of many denominations, and in appellate hearings, the DOE's advocates declare that all the

religions of the world support vaccination, with the unique exceptions of Jehovah's Witness

and Christian Science adherents, and thus all heretics who disagree should be denied.

822.       This is not true. It is also an impermissible attempt by government officials to establish

an official orthodoxy on "valid" religious sentiment regarding vaccines.

823.       The Mayor and the DOE representatives have gone so far as to repeatedly assert that

religious objections to vaccination are invalid because the Pope says that scripture does not

prevent vaccination.

824.       The Mandate facially and as applied is expressly designed to financially coerce those

who disagree with the Pope on vaccination into getting vaccinated in spite of their sincere

religious objections. This is a clearcut violation of the Establishment Clause under the Larson

test, the Coercion test and multiple other Establishment Clause tests.

146

825.     The Establishment Clause is America's constitutional bulwark against theocracy. Any official action to prescribe orthodoxy in religion, or to force citizens against their will to profess adherence to such orthodoxy or to act in conformity with it, is a violation of the Establishment Clause.

826.     Through the Exemption Standards, the Mandate confirms a preference of the DOE for religious orthodoxy and an intolerance of religious dissent. Its requirement of a clergy letter confers a preference on persons who belong to an organized religion with distinctions between laity and clergy. Its blanket rejection of claims that contradict a denominational leader's published position, as well as members of unrecognized or unestablished religious organizations, treats sincere dissenters in a manner that is inferior to the treatment of persons who hold orthodox beliefs. Its rejection of materials published online betrays a suspicion of religious groups that organize to oppose vaccine mandates. And its explicit acceptance of Christian Science's position of vaccine opposition privileges adherents to that belief system over others in the exemption process.

827.     As a result of these standards for adjudication, adherents to the Christian Science faith and individuals whose individual anti-vaccination beliefs accord with the orthodox statements of clergy in a hierarchical faith receive a government-created advantage in applying for, and receiving, religious exemptions from the Mandate. Others are disfavored as a matter of black-letter government policy.

828.     The inclusion of offensive and unconstitutional standards in the Exemption Standards, and the application of such standards in DOE and appellate decisions denying exemption applications, including those of the Plaintiffs and Class members, violate the Establishment Clause by giving members of some religious groups a preference over others.

829.     The inclusion of attorneys from the Office of Corporation Counsel, which is the law

firm that represents the City of New York and the DOE, and the same law firm that zealously

advocated for discrimination in the zoom appeals originally held under the unconstitutional

standards, violates the Establishment Clause, as it involves the Defendants not only in the

administrative determination of Plaintiffs' claims to religious exemption and accommodation,

in which they are required to perform in a non-partisan role, but also in the process of

defending those very same denials in adversary judicial proceedings. In the course of this work

Corporation Counsel is required to determine what is, and is not, religious, and to apply the

standards that are determined by the Defendants at every step of the process to the evaluation

and determination of Plaintiffs' claims and to the opposition of such claims in court. This

impermissibly and excessively entangles the Defendants in religious affairs.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandate and the Exemption

Standards are invalid  on their face and as applied to the Plaintiffs and the Class because they violate

the Establishment Clause of the First Amendment to the United States Constitution, to permanently

enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to

order the DOE to restore all employees who have been adversely affected by the Vaccine Mandate or

the Exemption Standards to employment with DOE with back pay and restoration of time in service,

seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and

Class Members, and to award attorney's fees and costs to Plaintiffs.


### THIRD CLAIM FOR RELIEF
**(Deprivation of Procedural Due Process By All Plaintiffs Against All Defendants)**

830.     Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as if

fully set forth herein.

148

831.      The Constitutional right of procedural due process provided in the Fourteenth

Amendment encompasses the right to notice, an opportunity to be heard, and a fair, unbiased

decision sufficient to adequately protect the rights at stake.

832.      The Mandate, both facially and as applied, denies Plaintiffs and other DOE employees

a meaningful right to be heard by leaving them in the position of not knowing what material to

present to the adjudicator to make a decision or what the grounds for appeal might be.

833.      Under the original Exemption Standards, no notice was given to articulate the reasons

that applications were denied. Rather, arbitrary and capricious autogenerated notices were

provided that failed to individually assess each applicant or provide meaningful evaluation of

their request for religious accommodation.

834.      The Citywide Panel has not cured the problem. First, as a matter of law, Plaintiffs have

already proven a prima facie case of being discriminated against.

835.      The burden then shifts to the Defendants to prove that they have valid

nondiscriminatory reasons that can cure the problem. This burden was not met for any of the

Named Plaintiffs. Rather, the Citywide Panel simply rubber-stamped Defendants' original

decisions with no explanation or care given to each applicant's application.

836.      The hasty emails sent three days after Plaintiffs applied for injunctive relief against the

"final" denials issued on December 10, 2021 do not cure the issue either.

837.      The emails revealed that the Panel failed thoroughly to review the applications, applied

improper and unconstitutional standards, and failed to provide an opportunity to be heard.

Rather, they were simply cherry-picking facts (or making them up), looking for reasons to

deny each Plaintiff in order to justify their prior open discrimination.

838.      The decision makers were inherently biased and conflicted, and given the property

interests at stake (including tenure and substantial sums of money and other property rights belonging to the Plaintiffs and other persons similarly situated) the process was woefully inadequate.

839.    For these reasons, the lack of standards in the Mandate as applied by the DOE renders the religious exemption process unconstitutionally vague and in contravention of the procedural due process clause of the Fourteenth Amendment.

840.    The Mandate sets no lawful standards by which the Plaintiffs and other DOE employees may compare the Exemption Standards or the decisions made by DOE employees or agents with respect to their individual exemption applications. To the contrary, the Mandate permitted the Defendants to make each succeeding decision in Plaintiffs' cases without any procedural protections, without right of rebuttal to the Defendants' input, and without application of Constitutionally-mandated adjudication standards. Since their exemption denials were imposed pursuant to the Mandate, its vagueness deprived them of their Constitutional right to due process of law under the Fourteenth Amendment.

WHEREFORE, Plaintiffs ask the Court to declare that the Mandate and Enforcement Standards are invalid facially and as applied because they are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

**FOURTH CLAIM FOR RELIEF**

**(Hybrid Rights Claim: Violation of Substantive Due Process Rights Guaranteed by
The Fourteenth Amendment to the United States Constitution
And First Amendment Rights Claims
By *Kane* Plaintiffs and Class Against all Defendants)**

841.     The *Kane* Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

842.     Plaintiffs have a protected substantive due process right to be free from the forced or coerced administration of medical products, especially medical products that are experimental or could cause them harm.

843.     This right is also a fundamental human right, so widely recognized as to be defined by the world courts, the laws of nations, and by the Second Circuit Court of Appeals and the Supreme Court of the United States as a *Jus Cogens* norm.

844.     As well, or in the alternative, this right to refuse experimental medicine is secured by the Due Process Clause of the United States Constitution and corresponding provisions in the New York State Constitution, international protocols and treaties adopted by and entered into by the United States, and by the laws and regulations of the United States and New York, to be free from burdens on rights deemed "fundamental" in nature.

845.     All of the available COVID-19 vaccines are still experimental in nature.

846.     They were rushed to market in a matter of months, skipping years of the normally required testing process.

847.     The only available vaccines in this country are available under Emergency Use Authorization, which forbids compulsory mandates.

848.     The FDA has approved one vaccine – Pfizer's "Comernaty" vaccine – but Comernaty is not available in New York, rendering this fact meaningless for all operative purposes.

849.     Even if Comernaty was available, or other vaccines were licensed, these vaccines are all still undergoing clinical trials and are still blatantly experimental in nature.

850.     Under international law, national law, state law and local law, experimental medical products cannot be mandated.

851.     All vaccines, including these ones, can cause harm to some people. People with natural immunity face a greater risk of harm from COVID-19 vaccines as do certain demographic groups represented in this class – including men under twenty-five and people with certain pre-existing conditions.

852.     Under the United States Constitution, people also have a fundamental right to refuse any medicine, whether it is experimental or not, even lifesaving medication.

853.     Considering the serious rights at stake, and the dearth of evidence to show this policy is necessary or effective in light of the fact that the vaccinated can transmit disease and have inferior immunity to those who have caught the disease, there is no rational reason to mandate vaccines for school employees. Given that the vaccines are still experimental, this mandate shocksthe conscience.

854.     The Vaccine Mandate is not narrowly tailored to impose the least restrictive burdens on fundamental rights. Rather, it is intentionally tailored to create an outsized burden in order to coerce participation in experimental medicine for no apparent reason.

855.     Moreover, Plaintiffs are entitled to strict scrutiny review of their Free Exercise claims because this case is a hybrid rights case, and the mandate burdens not only Plaintiffs' First Amendment rights but also burdens Plaintiff's fundamental right to refuse experimental medicine.

856.     Plaintiffs have no adequate remedy at law available against defendants for the injuries

and the irreparable harm they imminently suffer as a direct result of the Vaccine Mandate.

WHEREFORE, Plaintiffs ask the Court to declare that the Vaccine Mandate and Enforcement Standards are invalid facially and as applied because they violate the substantive due process rights of all DOE employees, as well as hybrid rights under the First and Fourteenth Amendment, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Vaccine Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

### FIFTH CLAIM FOR RELIEF
### (Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the New York State Constitution – By *Kane* Plaintiffs Against all Defendants)

857.     On behalf of themselves and the Class, the *Kane* Plaintiffs reallege and incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

858.     By their actions, as described herein, Defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiffs to the deprivation of the rights, privileges, or immunities secured by the United States Constitution and New York Constitution.

859.     The Mandate violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and the corresponding provision of the New York State Constitution) because it discriminates against unvaccinated people who need to exercise their fundamental rights to refuse experimental vaccines that conflict with their sincerely held

153

religious beliefs.

860.     As applied through the Exemption Standards and other official policy of the DOE, the Mandate also discriminates against minority religious viewpoints.

861.     There is no rational basis for this discrimination. Plaintiffs pose no more danger to others than a person who is vaccinated. Both groups are equally able to spread COVID-19.

862.     The policy of discriminating based on an individual's willingness or ability to subject themselves to medical experimentation or to give up their deeply held religious beliefs shocks the conscience and cannot be justified as relating to any rational, permissible goal. It is not grounded in science, but rather in the effort to coerce people into waiving their protected rights.

863.     Plaintiffs face the loss of their employment, ability to practice their vocation, contractual rights and violation of civil rights and liberties as a result of the discriminatory regulation.

864.     Moreover, the policies adopted by the DOE facially discriminate against Plaintiffs and their similarly situated class members on the basis of religion by refusing to afford accommodations to people who hold minority or unorthodox religious viewpoints.

865.     The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

866.     While performing those duties, Defendants intentionally deprived Plaintiffs of securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the State of New York by arbitrarily discriminating against them based on medical status, religious beliefs, and creed.

WHEREFORE, Plaintiffs ask the Court to find that the Vaccine Mandate and Enforcement

Standards are invalid facially and as applied because they violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

### SIXTH CLAIM FOR RELIEF
**(Violation of the Supremacy Clause of the United States Constitution**
**and Violations of Federal Statutory Provisions Governing EUA products**
**– By *Kane* Plaintiffs Against all Defendants)**

867.        The *Kane* Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

868.        Federal laws and regulations governing the approval and administration of medical products preempt all contrary or inconsistent laws of the states and/or local governments.

869.        The Vaccine Mandate is patently contrary to United States law, and thus preempted and invalid.

870.        Title 21 of the United States Code, Section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product."

871.        Because all available vaccines in New York are each investigational products, only permitted for use under an Emergency Use Authorization, the laws and regulations of the

155

United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including Plaintiffs.

872.          Plaintiffs do not consent to being vaccinated with an experimental vaccine, especially one which violates their sincerely held religious beliefs.

873.          As well, Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

874.          21 C.F.R. § 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

875.          EUA vaccines and the licensed Comirnaty vaccine are all still being subjected to clinical trials. Population-wide surveillance and data are still being gathered for all of them, whether the "test subjects" consent or not. Whether licensed or not, all available COVID-19 vaccines are classified as experimental medicine.

876.          None of the exemptions provided in sections 50.23 and 50.24 apply to Plaintiffs.

877.          Plaintiffs are competent to make a decision concerning medical treatment and experimentation and will not consent.

878.          Accordingly, the Vaccine Mandate also violates federal law and regulations governing the administration of experimental medicine and is thus preempted.

879.          Plaintiffs have no adequate remedy at law available against Defendants for the injuries and the irreparable harms they are suffering as a direct result of the Mandate.

WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory

judgment that the Vaccine Mandate violates and is preempted by the laws and regulations of the United States governing the administration of investigational medical products, for an injunction prohibiting enforcement of the Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

### SEVENTH CLAIM FOR RELIEF
### (Violation of Matthew Keil's Constitutional and Statutory Rights)

880.    Plaintiff Matthew Keil realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

881.    Factual allegations concerning Keil's claims for relief are set forth above at paragraphs 495 - 515 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

### EIGHTH CLAIM FOR RELIEF
### (Violation of John De Luca's Constitutional and Statutory Rights)

882.    Plaintiff John De Luca realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

883.    Factual allegations concerning De Luca's claims for relief are set forth above at paragraphs 516 - 539 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

### NINTH CLAIM FOR RELIEF
### (Violation of Sasha Delgado's Constitutional and Statutory Rights)

884.    Plaintiff Sasha Delgado ("Delgado") realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

885.    Factual allegations concerning Delgado's claims for relief are set forth above at paragraphs 540 - 573 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

### TENTH CLAIM FOR RELIEF
### (Violation of Dennis Strk's Constitutional and Statutory Rights)

886.    Plaintiff Dennis Strk realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

158

887.    Factual allegations concerning Strk's claims for relief are set forth above at

paragraphs 574 - 598 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a

permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff,

reinstating Plaintiff to active employment status, awarding back pay and nominal and

compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and

awarding attorney's fees, costs and expenses to the Plaintiff.

## ELEVENTH CLAIM FOR RELIEF
### (Violation of Sarah Buzaglo's Constitutional and Statutory Rights)

888.    Plaintiff Sarah Buzaglo realleges and incorporates by reference the allegations

recited in all paragraphs of this Complaint as if fully set forth herein.

889.    Factual allegations concerning Buzaglo's claims for relief are set forth above at

paragraphs 599 - 632 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a

permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff,

reinstating Plaintiff to active employment status, awarding back pay and nominal and

compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and

awarding attorney's fees, costs and expenses to the Plaintiff.

## TWELFTH CLAIM FOR RELIEF

### (Violation of Edward (Eli) Weber's Constitutional and Statutory Rights)

890.    Plaintiff Edward (Eli) Weber realleges and incorporates by reference the

allegations recited in all paragraphs of this Complaint as if fully set forth herein.

891.     Factual allegations concerning Weber's claims for relief are set forth above at paragraphs 633 - 657 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## THIRTEENTH CLAIM FOR RELIEF

### (Violation of Carolyn Grimando's Constitutional and Statutory Rights)

892.     Plaintiff Carolyn Grimando realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

893.     Factual allegations concerning Grimando's claims for relief are set forth above at paragraphs 658 - 689 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## FOURTEENTH CLAIM FOR RELIEF

### (Violation of Amoura Bryan's Constitutional and Statutory Rights)

160

894.     Plaintiff Amoura Bryan realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

895.     Factual allegations concerning Bryan's claims for relief are set forth above at paragraphs 690 - 731 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

### FIFTEENTH CLAIM FOR RELIEF

**(Violation of Joan Giammarino's Constitutional and Statutory Rights)**

896.     Plaintiff Joan Giammarino realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

897.     Factual allegations concerning Giamarrino's claims for relief are set forth above at paragraphs 732 - 756 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

### SIXTEENTH CLAIM FOR RELIEF

**(Violation of Benedict LoParrino's Constitutional and Statutory Rights)**

898.     Plaintiff Benedict LoParrino realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

899.     Factual allegations concerning LoParrino's claims for relief are set forth above at paragraphs 757 - 781 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## SEVENTEENTH CLAIM FOR RELIEF

**(Violation of Michael Kane's Constitutional and Statutory Rights)**

900.     Plaintiff Michael Kane realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

901.     Factual allegations concerning Mr. Kane's claims for relief are set forth above at paragraphs 218 - 240 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

162

## EIGHTEENTH CLAIM FOR RELIEF

### (Violation of William Castro's Constitutional and Statutory Rights)

902.    Plaintiff William Castro realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

903.    Factual allegations concerning Mr. Castro's claims for relief are set forth above at paragraphs 241 - 283 of this Complaint.

WHEREFORE, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## NINETEENTH CLAIM FOR RELIEF

### (Violation of Margaret Chu's Constitutional and Statutory Rights)

904.    Plaintiff Margaret Chu realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

905.    Factual allegations concerning Ms. Chu's claims for relief are set forth above at paragraphs 284 - 307 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and

compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTIETH CLAIM FOR RELIEF

### (Violation of Heather Clark's Constitutional and Statutory Rights)

906.    Plaintiff Heather Clark realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

907.    Factual allegations concerning Ms. Clark's claims for relief are set forth above at paragraphs 308- 325of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-FIRST CLAIM FOR RELIEF

### (Violation of Stephanie Di Capua's Constitutional and Statutory Rights)

908.     Plaintiff Stephanie Di Capua realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

909.    Factual allegations concerning Ms. Di Capua's claims for relief are set forth above at paragraphs 326 - 353 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and

compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-SECOND CLAIM FOR RELIEF

### (Violation of Robert Gladding's Constitutional and Statutory Rights)

910.　　Plaintiff Robert Gladding realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

911.　　Factual allegations concerning Mr. Gladding's claims for relief are set forth above at paragraphs 354 – 374 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-THIRD CLAIM FOR RELIEF

### (Violation of Nwakaego Nwaifejokwu's Constitutional and Statutory Rights)

912.　　Plaintiff Nwakaego Nwaifejokwu realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

913.　　Factual allegations concerning Mrs. Nwaifejokwu's claims for relief are set forth above at paragraphs 375 – 395 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff,

reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-FOURTH CLAIM FOR RELIEF

### (Violation of Ingrid Romero's Constitutional and Statutory Rights)

914.     Plaintiff Ingrid Romero realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

915.     Factual allegations concerning Mrs. Romero's claims for relief are set forth above at paragraphs 396 - 415 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-FIFTH CLAIM FOR RELIEF

### (Violation of Trinidad Smith's Constitutional and Statutory Rights)

916.     Plaintiff Trinidad Smith realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

917.     Factual allegations concerning Mrs. Smith's claims for relief are set forth above at paragraphs 416 - 447 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a

permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-SIXTH CLAIM FOR RELIEF

### (Violation of Natasha Solon's Constitutional and Statutory Rights)

918.     Plaintiff Natasha Solon realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

919.     Factual allegations concerning Ms. Solon's claims for relief are set forth above at paragraphs 448 - 464 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-SEVENTH CLAIM FOR RELIEF

### (Violation of Amaryllis Ruiz-Toro's Constitutional and Statutory Rights)

920.     Plaintiff Amaryllis Ruiz-Toro realleges and incorporates by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

921.     Factual allegations concerning Mrs. Toro's claims for relief are set forth above at paragraphs 465 - 494 of this Complaint.

Wherefore, Plaintiff asks this Court to issue declaratory and injunctive relief including a

167

permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

## TWENTY-EIGHTH CLAIM FOR RELIEF

### (Liability Under 42 U.S.C. Sec. 1983 by all Plaintiffs against all Defendants)

922.     Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

923.     Defendants NYC and DOE acted under the color of state law, and at the direction of the individual Defendants, when they imposed the Vaccine Mandate, cooperated in the creation of the Exemption Standards and acceded thereto, enforced and applied the terms of the Vaccine Mandate and the Exemption Standards and denied Plaintiffs' requests for religious exemption and appeals from such denials.

924.     The Plaintiffs have been, and are being, deprived by the activities of the Defendants of their right effectively to apply for and receive religious exemptions from the vaccination requirements of the Vaccine Mandate.  Their right to religious freedom is being substantially and unfairly burdened.

925.     Defendants' Vaccine Mandate created a system of unconstitutional and unfair exemption application procedures that are designed to deny the religious exemption applications of as many people as possible, including Plaintiffs.  Through the creation, application and enforcement of the standards and procedures set forth in the Exemption

Standards, Defendants have ensured that the Plaintiffs, and many others, have been denied a fair adjudication and accommodation of their religious freedom rights.

926.     The Plaintiffs did not at any point or in any way effectively consent to the unconstitutional actions of the Defendants, nor have they ever effectively waived their civil right to demand in court that the Defendants respect their First Amendment freedoms.

927.     On information and belief, Defendants Commissioner Chokshi and former NYC Schools Chancellor Meisha Porter, or subordinates directly subject to their control, formulated the Vaccine Mandate that NYC and the DOE have enforced against the Plaintiffs, and conspired in the establishment of unconstitutional standards for the consideration of Plaintiffs' religious exemption requests.

928.     Plaintiffs have suffered damages, including without limitation lost salaries, lost potential earnings, loss of health insurance coverage, loss of seniority, loss of employment and deprivation of their right to religious freedom.

WHEREFORE, Plaintiffs request judgment declaring that the Vaccine Mandate, as implemented by the Exemption Standards and the Citywide Appeals Panel process, is void and unenforceable as against them and all other persons similarly situated, an award of damages as further described above in an amount to be determined by the Court, or nominal damages, and an award requiring Defendants to pay Plaintiffs' legal fees and expenses in this matter pursuant to 42 U.S.C. sec. 1983.

### TWENTY-NINTH CLAIM FOR RELIEF

**Violation of the New York City Human Rights Law by all Plaintiffs against All Defendants**

929.     Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

930.     In 2005, the City Council amended the administrative code to emphasize that the New York City Human Rights Law's uniquely broad and remedial purposes, and again in 2016 to clarify its intent to foster jurisprudence that maximally protects civil rights in all circumstances.  The Second Circuit has therefore construed this statute "more liberally than its State and federal counterparts." *Makinen v. City of NY*, 857 F3d 491, 495 (2d Cir 2017) (internal quotation marks omitted); *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78, 947 N.E.2d 135, 922 N.Y.S.2d 244 (2011) (requiring the NYCHRL to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible").

931.     Defendants have adopted an unlawful discriminatory practice by imposing the Vaccine Mandate upon Plaintiffs and Class Members as a condition of retaining their employment, while denying their religious exemption requests, because complying with the Mandate would require Plaintiffs and Class Members to violate their sincerely held religious beliefs and practices.

932.     Plaintiffs and all similarly situated Class Members have sincere religious beliefs against vaccination. They alerted the Defendants that they are unable to be vaccinated because of these beliefs, but were nonetheless suspended or segregated or otherwise adversely impacted because Defendants refused to accommodate their sincerely held religious beliefs.

933.    Plaintiffs and Class Members were furthermore then harassed, retaliated against and further discriminated against as a result of their sincerely held religious beliefs and creed.

934.    Defendants engaged in no bona fide effort to demonstrate that an undue hardship exists. Despite the fact that Plaintiffs' and Class Members' initial denials stated that their applications were reviewed under the Arbitration Award and applicable law, Plaintiffs' and Class Members' initial denials stated that accommodating them would be an "undue hardship (i.e. more than a minimal burden) on the DOE and its operations."

935.    Applicable law includes the New York City Human Rights Law.

936.    "Importantly, in contrast to Title VII which does not define 'undue hardship' in the context of religious accommodation, the NYCHRL adopts a rigorous definition of an employer's 'undue hardship' as 'an accommodation requiring significant expense or difficulty,' and mandating that '[t]he employer shall have the burden of proof to show such hardship.'" *Id.* (quoting N.Y.C. Admin. Code § 8-107(3)(b)).

937.    Therefore, the DOE's claim that accommodating Plaintiffs would be more than a minimal burden on the DOE incorrectly states the standard for undue hardship and cannot constitute a valid reason for denying Plaintiffs' requests.

938.    Plaintiffs' and Class members' appeal denials did not even attempt to state an undue hardship, and certainly did not constitute a bona fide effort to demonstrate an undue burden. They were merely rubber-stamped denials from the arbitrator that provided no elaboration whatsoever.

939.     Plaintiffs' and Class Members' third denials, the result of the so-called "fresh consideration" of the City-wide panel, again stated undue hardship, but made no attempt to distinguish why it was an undue hardship under Title VII and why it was an undue hardship under the New York City Rights Law—which is what the law requires.

940.     Indeed, although Title VII's analytical framework is applicable to the NYCHRL, claims under the City law must be reviewed 'independently from and more liberally' than their federal counterparts." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005)).

941.     Accommodating Plaintiffs and Class members will not result in their inability to perform the essential functions of their positions, as most are willing to engage in masking, social distancing, and periodic testing. Further, Plaintiffs taught their students remotely during the height of the pandemic.

942.     Defendants have not stated a cost of accommodating Plaintiffs, including the costs of loss of productivity and of retaining or hiring employees. In fact, Defendants' cost of *not* accommodating Plaintiffs itself constitutes a significant expense or difficulty on the DOE, as the DOE is currently facing a teaching shortage and has invited teachers who have tested positive for Covid-19 back into the classrooms, when Plaintiffs are ready and willing to resume their teaching positions.

WHEREFORE, Plaintiffs ask the Court to declare that the Defendants have violated their rights and the rights of Class Members under the New York City Human Rights Law, to permanently enjoin the enforcement of the Mandate and the Exemption Standards against employees asserting

sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

**THIRTIETH CLAIM FOR RELIEF**

**Violation of the New York State Human Rights Law by all Plaintiffs against All Defendants**

943.     Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

944.     Plaintiffs reallege and incorporate by reference the allegations recited in paragraphs of this Complaint as if fully set forth herein.

945.     Defendants have adopted an unlawful discriminatory practice by imposing the Vaccine Mandate upon Plaintiffs and Class Members as a condition of retaining their employment, while denying their religious exemption requests, because complying with the Mandate would require Plaintiffs and Class Members to violate their sincerely held religious beliefs and practices.

946.     Plaintiffs and all similarly situated Class Members have sincere religious beliefs against vaccination. They alerted the Defendants that they are unable to be vaccinated because of these beliefs, but were nonetheless suspended or segregated or otherwise adversely impacted because Defendants refused to accommodate their sincerely held religious beliefs.

947.     Plaintiffs and Class Members were furthermore then harassed, retaliated against

and further discriminated against as a result of their sincerely held religious beliefs and creed.

948.　　　Defendants engaged in no bona fide effort to demonstrate that an undue hardship exists. Despite the fact that Plaintiffs' and Class Members' initial denials stated that their applications were reviewed under the Arbitration Award and applicable law, Plaintiffs' and Class Members' initial denials stated that accommodating them would be an "undue hardship (i.e. more than a minimal burden) on the DOE and its operations."

949.　　　Applicable law includes the New York State Human Rights Law, which states that an undue hardship exists when the accommodation would cause significant expense or difficulty, not "more than a minimal burden" (which is the standard under Title VII).

950.　　　Therefore, the DOE's claim that accommodating Plaintiffs would be more than a minimal burden on the DOE incorrectly states the standard for undue hardship and cannot constitute a valid reason for denying Plaintiffs' requests.

951.　　　Plaintiffs' and Class members' appeal denials did not even attempt to state an undue hardship, and certainly did not constitute a bona fide effort to demonstrate an undue burden. They were merely rubber-stamped denials from the arbitrator that provided no elaboration whatsoever.

952.　　　Plaintiffs' and Class Members' third denials, the result of the so-called "fresh consideration" of the City-wide panel, again stated undue hardship, but made no attempt to distinguish why it was an undue hardship under Title VII, why it was an undue hardship under the New York State Human Rights Law.

953.　　　Accommodating Plaintiffs and Class members will not result in their inability to

perform the essential functions of their positions, as most are willing to engage in masking, social distancing, and periodic testing. Further, Plaintiffs taught their students remotely during the height of the pandemic.

954.    Defendants have not stated a cost of accommodating Plaintiffs, including the costs of loss of productivity and of retaining or hiring employees. In fact, Defendants' cost of *not* accommodating Plaintiffs itself constitutes a significant expense or difficulty on the DOE, as the DOE is currently facing a teaching shortage and has invited teachers who have tested positive for Covid-19 back into the classrooms, when Plaintiffs are ready and willing to resume their teaching positions.

WHEREFORE, Plaintiffs ask the Court to declare that the Defendants have violated their rights and the rights of Class Members under the New York State Human Rights Law, to permanently enjoin the enforcement of the Mandate and the Exemption Standards against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

## REQUEST FOR RELIEF

955.    Plaintiffs respectfully ask this Court for the following relief:

1.   Certifying the proposed Class pursuant to Rule 23;

2.   On the First Claim for Relief (paragraphs 782 through 820 hereof), Plaintiffs ask the Court to declare that the Mandate and the Exemption Standards are invalid  on

175

their face and as applied to the Plaintiffs and the Class because they violate the Free Exercise Clause of the First Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

3.  On the Second Claim for Relief (paragraphs 821 through 830 hereof), Plaintiffs ask the Court to declare that the Mandate and the Exemption Standards are invalid on their face and as applied to the Plaintiffs and the Class because they violate the Establishment Clause of the First Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Vaccine Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

4. On the Third Claim for Relief (paragraphs 831 through 841 hereof), Plaintiffs ask the Court to declare that the Mandate and Enforcement Standards are invalid facially and as applied because they are unconstitutionally vague in violation of

176

the Due Process Clause of the Fourteenth Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

5.  On the Fourth  Claim for Relief (paragraphs 842 through 857 hereof), Plaintiffs ask the Court to declare that the Mandate and Enforcement Standards are invalid facially and as applied because they violate the substantive due process rights of all DOE employees, as well as hybrid rights under the First and Fourteenth Amendment, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Vaccine Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

6.  On the Fifth Claim for Relief (paragraphs 858 through 867 hereof), Plaintiffs ask the Court to find that the Mandate and Enforcement Standards are invalid facially and as applied because they violate the Equal Protection Clause of the Fourteenth

177

Amendment to the United States Constitution, to permanently enjoin their enforcement against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members, and to award attorney's fees and costs to Plaintiffs.

7. On the Sixth Claim for Relief (paragraphs 868 through 880 hereof), Plaintiffs respectfully request that the Court enter a declaratory judgment that the Mandate violates and is preempted by the laws and regulations of the United States governing the administration of investigational medical products, for an injunction prohibiting enforcement of the Mandate, for attorneys' fees, costs pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just.

8. On the Seventh Claim for Relief (paragraphs 881 through 882 hereof), Plaintiff Matthew Keil asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

9. On the Eighth Claim for Relief (paragraphs 883 through 884 hereof), Plaintiff John De Luca asks this Court to issue declaratory and injunctive relief including a

178

permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

10. On the Ninth Claim for Relief (paragraphs 885 through 886 hereof), Plaintiff Sasha Delgado asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

11. On the Tenth Claim for Relief (paragraphs 887 through 888 hereof), Plaintiff Dennis Strk asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

12. On the Eleventh Claim for Relief (paragraphs 889 through 890 hereof), Plaintiff Sarah Buzaglo asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate

against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

13. On the Twelfth Claim for Relief (paragraphs 891 through 892 hereof), Plaintiff Edward (Eli) Weber asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

14. On the Thirteenth Claim for Relief (paragraphs 893 through 894 hereof), Plaintiff Carolyn Grimando asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

15. On the Fourteenth Claim for Relief (paragraphs 895 through 896 hereof), Plaintiff Amoura Bryan asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back

pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

16. On the Fifteenth Claim for Relief (paragraphs 897 through 898 hereof), Plaintiff Joan Giammarino asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

17. On the Sixteenth Claim for Relief (paragraphs 899 through 900 hereof), Plaintiff Benedict LoParrino asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

18. On the Seventeenth Claim for Relief (paragraphs 901 through 902 hereof), Plaintiff Michael Kane asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all

seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

19. On the Eighteenth Claim for Relief (paragraphs 903 through 904 hereof), Plaintiff William Castro asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

20. On the Nineteenth Claim for Relief (paragraphs 905 through 906 hereof), Plaintiff Margaret Chu asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

21. On the Twentieth Claim for Relief (paragraphs 907 through 908 hereof), Plaintiff Heather Clark asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and

expenses to the Plaintiff.

22. On the Twenty-First Claim for Relief (paragraphs 909 through 910 hereof), Plaintiff Stephanie Di Capua asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

23. On the Twenty-Second Claim for Relief (paragraphs 911 through 912 hereof), Plaintiff Robert Gladding asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

24. On the Twenty-Third Claim for Relief (paragraphs 913 through 914 hereof), Plaintiff Nwakaego Nwaifejokwu asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

25. On the Twenty-Fourth Claim for Relief (paragraphs 915 through 916 hereof), Plaintiff Ingrid Romero asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

26. On the Twenty-Fifth Claim for Relief (paragraphs 917 through 918 hereof), Plaintiff Trinidad Smith asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

27. On the Twenty-Sixth Claim for Relief (paragraphs 919 through 920 hereof), Plaintiff Natasha Solon asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

28. On the Twenty-Seventh Claim for Relief (paragraphs 921 through 922 hereof),

Plaintiff Amaryllis Ruiz-Toro asks this Court to issue declaratory and injunctive relief including a permanent injunction forbidding the Defendants from enforcing the Mandate against Plaintiff, reinstating Plaintiff to active employment status, awarding back pay and nominal, actual and compensatory damages, restoring all seniority, tenure rights, Years in Service and CAR and awarding attorney's fees, costs and expenses to the Plaintiff.

29. On the Twenty-Eighth Claim for Relief (paragraphs 923 through 929 hereof), Plaintiffs request judgment declaring that the Vaccine Mandate, as implemented by the Exemption Standards and the Citywide Appeals Panel process, is void and unenforceable as against them and all other persons similarly situated, an award of damages as further described above in an amount to be determined by the Court, or nominal damages, and an award requiring Defendants to pay Plaintiffs' legal fees and expenses in this matter pursuant to 42 U.S.C. sec. 1983.

30. On the Twenty-Ninth Claim for Relief (paragraphs 930 through 943 hereof), Plaintiffs request judgment declaring that the Defendants have violated their rights and the rights of Class Members under the New York City Human Rights Law, to permanently enjoin the enforcement of the Mandate and the Exemption Standards against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members and Class

185

Members, and to award attorney's fees and costs to Plaintiffs.

31. On the Thirtieth Claim for Relief (paragraphs 944 through 955 hereof), Plaintiffs request judgment declaring that the Defendants have violated their rights and the rights of Class Members under the New York State Human Rights Law, to permanently enjoin the enforcement of the Mandate and the Exemption Standards against employees asserting sincere religious objection to vaccination, and to order the DOE to restore all employees who have been adversely affected by the Mandate or the Exemption Standards to employment with DOE with back pay and restoration of time in service, seniority and tenure rights, to award actual, consequential and nominal damages to Plaintiffs and Class Members and Class Members, and to award attorney's fees and costs to Plaintiffs.

32. On all Claims for Relief: awarding relief to the Class equivalent to the relief requested for the individual named Plaintiffs identified herein.

33. On all Claims for Relief: awarding costs of suit; investigation costs; payment of reasonable attorneys' fees; declaratory relief, injunctive relief, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class respectfully demand a trial by jury for all issues so triable in this action.

Dated:  New York, New York
January 10, 2021

Respectfully submitted,

NELSON MADDEN BLACK LLP

186

*Attorneys for Keil Plaintiffs and the Class*

*/s/ Jonathan R. Nelson*

**By: Jonathan Robert Nelson (JN8796)**
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4300
jnelson@nelsonmaddenblack.com


GIBSON LAW FIRM, PLLC

*/s/ Sujata S. Gibson*
**Sujata S. Gibson**
*Attorney for Kane Plaintiffs and the Class*
Gibson Law Firm, PLLC
408 W Martin Luther King, Jr. Street
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

Mary Holland, Esq., *Of Counsel*
Michael Howard Sussman, Esq., *Of Counsel*

## VERIFICATION

I, Heather Clark, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED AMENDED JOINT COMPLAINT are true and correct based on my personal knowledge (unless otherwise indicated) and if called upon to testify as to their truthfulness, I would and could do so. I declare under penalties of perjury, under the law of the United States of America, that the foregoing statements are true and correct.


Dated: 01/10/2022                    Signed: _____
                                                    Heather Clark

**VERIFICATION**

I, Stephanie di Capua, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED AMENDED JOINT COMPLAINT are true and correct based on my personal knowledge (unless otherwise indicated) and if called upon to testify as to their truthfulness, I would and could do so. I declare under penalties of perjury, under the law of the United States of America, that the foregoing statements are true and correct.


Dated: 01/10/2022                                    Signed: _____
                                                                              Stephanie di Capua

**VERIFICATION**

I, Margaret Chu, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED AMENDED JOINT COMPLAINT are true and correct based on my personal knowledge (unless otherwise indicated) and if called upon to testify as to their truthfulness, I would and could do so. I declare under penalties of perjury, under the law of the United States of America, that the foregoing statements are true and correct.

Dated: 01/10/2022                                    Signed:  Margaret Chu

## VERIFICATION

I, Robert Gladding, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED AMENDED JOINT COMPLAINT are true and correct based on my personal knowledge (unless otherwise indicated) and if called upon to testify as to their truthfulness, I would and could do so. I declare under penalties of perjury, under the law of the United States of America, that the foregoing statements are true and correct.

Dated: 01/10/2022                          Signed: _____
                                                            Robert Gladding

## VERIFICATION

I, Nwakaego Nwaifejokwu, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED AMENDED JOINT COMPLAINT are true and correct based on my personal knowledge (unless otherwise indicated) and if called upon to testify as to their truthfulness, I would and could do so. I declare under penalties of perjury, under the law of the United States of America, that the foregoing statements are true and correct.

Dated: 01/10/2022

Signed
Nwakaego Nwaifejokwu

**VERIFICATION**

I, Ingrid Romero, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED AMENDED JOINT COMPLAINT are true and correct based on my personal knowledge (unless otherwise indicated) and if called upon to testify as to their truthfulness, I would and could do so. I declare under penalties of perjury, under the law of the United States of America, that the foregoing statements are true and correct.


Dated: 01/10/2022                                    Signed: _____
                                                                    Ingrid Romero

## **VERIFICATION**

I, Amaryllis Ruiz-Toro, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED AMENDED JOINT COMPLAINT are true and correct based on my personal knowledge (unless otherwise indicated) and if called upon to testify as to their truthfulness, I would and could do so. I declare under penalties of perjury, under the law of the United States of America, that the foregoing statements are true and correct.

Dated: 01/10/2022

Signed: _____
Amaryllis Ruiz-Toro