# Exhibit "3"

```
                UNITED STATES COURT OF APPEALS
                   FOR THE SECOND CIRCUIT


-----------------------------------X
                                   :
KEIL, ET AL.,                      :
          Plaintiff, Appellants,   : Case No.:
                                   : 21-3043-cv(L)
                v.                 : 31-3047-cv(CON)
                                   :
                                   : February 24, 2022 at 10:00
CITY OF NEW YORK, ET AL.,          : Thurgood Marshall
          Defendant, Appellees.    : U.S. Courthouse
                                   : New York
-----------------------------------X

            SECOND CIRCUIT PANEL OF JUDGES
            CHIEF JUDGE DEBRA ANN LIVINGSTON
                 JUDGE AMALYA LYLE KEARSE
                 JUDGE JOHN MERCER WALKER, JR.
```

Plaintiffs-Appellants hereby appeal to the United States Court of Appeals for the Second Circuit from the Order entered on December 14, 2021, denying Plaintiffs' application for a Preliminary Injunction, provisional class certification and an Order reinstating Plaintiffs and all proposed class members to their prior positions. This appeal is taken from each and every part of the December 14, 2021 Order.

```
APPEARANCES:

FOR THE APPELLANTS:
                          BARRY BLACK, ESQ.
                          SUJATA GIBSON, ESQ.
                          Nelson Madden Black LLP
                          475 Park Avenue South, Suite 2800
                          New York, NY 11016

FOR THE APPELLEES:
                          SUSAN PAULSON, ESQ.
                          NYC Law Department
                          100 Church St.
                          New York, NY 10007-2601



Proceedings recorded by electronic digital sound recording;
transcript produced by transcription service.
```

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    2

1                    P-R-O-C-E-E-D-I-N-G-S

2              THE COURT:  Mr. Black, can you hear me?

3              MR. BLACK:  I can, Your Honor, good morning.

4              THE COURT:  And Ms. Gibson?

5              MS. GIBSON:  I can, Your Honor.  Good morning.

6              THE COURT:  Good morning.  Mr. Black?

7              MR. BLACK:  Thank you, Your Honor.  Preliminarily, I

8   wish to thank the Court for allowing Professor Gibson and me to

9   argue remotely, and we respectfully reserve two minutes each

10  for rebuttal.  May it please the Court, the First Amendment

11  reads, Congress shall make no law respecting an establishment

12  of religion or prohibiting the free exercise thereof.

13              Comforted by this Court's November 28th decision and

14  order, New York City's version of the First Amendment appears

15  to read something like this.  Congress shall freely make dozens

16  of laws that prohibit the free exercise of religion, so long as

17  reasonable accommodations are considered, at the sole

18  discretion of a stealthy tribunal acting in the shadows, which

19  shall, from time to time, grant a request or two, denying the

20  rest with no explanation.

21              In November, the City crafted, and this Court

22  adopted, against our repeated objections, a process for

23  considering religious objections that, by virtue of its

24  discretionary nature, compels strict scrutiny.

25              And we are not alone in making this argument.  The

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   3

1                         P-R-O-C-E-E-D-I-N-G-S

2    United States District Court for the Northern District of Texas

3    recently held that the United States Navy's vaccine mandate is

4    not neutral or generally applicable because, and I quote, "by

5    accepting individual applications for exemptions, the law

6    invites an individualized assessment of the reasons why a

7    service member is not vaccinated.  Consequently, favoritism is

8    built into the mandate."

9              In its November 28th decision and order, this Court

10   held that the arbitration awards accommodation standards when

11   neither neutral nor generally applicable because, and I quote,

12   "The arbitrators reviewing their requests for religious

13   accommodations had substantial discretion over whether to grant

14   those requests."

15             But then, the Court went on to order a fresh

16   consideration process, which is constitutionally tainted by the

17   very same individualized exemptions, which likewise subjected

18   --

19             THE COURT:  Wouldn't your argument suggest that Title

20   VII then is unconstitutional; is that your argument?

21             MR. BLACK:  Not at all, Your Honor, it's just Title

22   VII was designed, was legislated for -- largely, to expand --

23   to broaden antidiscrimination and bring it into the private

24   sector, but Title VII cannot lower the standard of review for

25   discrimination within the government, within a State actor's

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   4

1                         P-R-O-C-E-E-D-I-N-G-S

2    purview.  It cannot.

3              So, to the extent that Title VII is applicable to the

4    actions of the citywide panel, well, sure, they can -- they

5    must consider -- they may consider under Title VII, whether the

6    conduct is -- whether the position asserted is religious,

7    whether it's sincerely held, but what they cannot do, Judge

8    Livingston, is they cannot lower the level from -- the strict

9    scrutiny level of the First Amendment to the de minimis burden

10   that's applicable to a private actor.

11             THE COURT:  Mr. Black, isn't the other side arguing,

12   in effect, that this is not subject to strict scrutiny, it's

13   rational basis, notwithstanding the fact that you have this

14   citywide appeals panel, that it's all rational basis.  And, of

15   course, the -- I think the original panel -- the first time

16   around, found that the mandate itself was not facially

17   unconstitutional.

18             You're arguing, I think, that the process,

19   accommodations process, is unconstitutional.  Am I correct in

20   that score?

21             MR. BLACK:  That's correct, although we --

22             THE COURT:  Right.  Then the question is, it seems to

23   me, the next question is, are we under rational basis still, or

24   are we under strict scrutiny?  And if we're under strict

25   scrutiny, why is that the case?

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    5

1                      P-R-O-C-E-E-D-I-N-G-S

2              MR. BLACK:  Okay.  We have argued before, and we

3    continue to argue, that the mandate itself is subject to strict

4    scrutiny.  We recognize and accept that this --

5              THE COURT:  That's already been decided.

6              MR. BLACK:  -- Court has held previously.  That's

7    been decided, but the process is clearly subject to strict

8    scrutiny, for the following reasons.  First, it's overinclusive

9    and underinclusive, it is -- has a history of religious animus

10   in its application, it involves hybrid rights, we cited to that

11   in our brief and, most importantly, it is replete with

12   boundless discretion.

13             We don't know who these people are who are making

14   these decisions, they do it behind closed doors, they provide

15   summary denials without any explanation, and then --

16             THE COURT:  There was --

17             MR. BLACK:  -- when we go and --

18             THE COURT:  -- there was an explanation given after,

19   you know, I think they did the interviews for a couple of days,

20   and then there was a weekend, and then they came out with their

21   decisions after that.

22             MR. BLACK:  Your Honor, I respectfully disagree with

23   those -- with that factual recitation -- because what really

24   happened is, at almost 5 p.m. on Friday, within one hour of

25   each other, every single appellant received a denial, to my

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    6

1                          P-R-O-C-E-E-D-I-N-G-S

2    understanding, the original appellants before the complaint was

3    amended.

4              And there were no reasons given, and on its face, on

5    its face, it said final decision.  This is the final decision.

6    It did not say anything else was going to be forthcoming.

7    There was no indication to counsel that anything else was going

8    to be forthcoming.

9              THE COURT:  But something was -- something did, in

10   fact, there was additional explanation that eventually you were

11   provided, right?

12             MR. BLACK:  Yes, well, after we had argued our

13   motion, five days later.

14             THE COURT:  I'm just trying to get the time -- make

15   sure that I understand the timeline.  Did you receive the

16   summaries before or after the district court's decision?

17             MR. BLACK:  My understanding is, it was after the

18   district court's decision and, in fact, it's important to note,

19   Judge Livingston, that that day the City sent, I believe it was

20   via a letter to the Court, there was a writing by the City

21   which indicated that only that morning they had been advised

22   that there were reasons that had been provided.

23             This was, apparently, as much a surprise to them, and

24   we're not going to, in any way, suggest that this was concocted

25   later with less than appropriate motives, so it was perhaps a

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    7

1                          P-R-O-C-E-E-D-I-N-G-S

2    surprise to them, but it was certainly a surprise to us.  But,

3    most importantly, it's important for this panel to understand

4    the position that we, as advocates, advising our clients under

5    the rules of ethics, having to zealously advocate our clients'

6    interests within the bounds of the law.

7              We received a notice at 5 p.m. on Friday that said

8    you have three days.  And it was a confusing notice because

9    they were already technically on leave without pay, but it said

10   you'll be put on leave without pay.

11             There was clearly some error, does that mean they're

12   going to be fired, does it mean they're not going to be fired?

13   What does that mean?  In any event, it requires some choice and

14   some coercion into potentially violating their religious

15   convictions.

16             So with three days left to make some decision for we

17   don't know what's going to happen, possibly including

18   termination, we do -- we certainly can't engage in any

19   discovery, we can't run back to the panel --

20             THE COURT:  When did you learn --

21             MR. BLACK:  -- that we don't even know of.

22             THE COURT:  -- when did you learn that the three-day

23   -- that the three days would not apply to your clients?

24             MR. BLACK:  We never learned of that at all.  The

25   three days was the three days.  There was nothing that we're

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   8

1                    P-R-O-C-E-E-D-I-N-G-S

2   aware of that suggests that those three days did not apply.  We

3   had three days.

4           And so in that three-day process, we had to rush --

5   we worked through the weekend -- and I believe it was Saturday

6   evening when we thought --

7           THE COURT:  Was it three days or was it three

8   business days?

9           MR. BLACK:  It was three business days, Judge Kearse,

10  but I believe that the calculation was that the very first

11  business day on which it could be enforced against anyone was

12  going to be Tuesday morning; if I recall.

13          And so we rushed and placed it before -- or it might

14  have been Wednesday morning -- and so we rushed to get it

15  before Judge Caproni that weekend, and we requested a Monday

16  morning, 10 a.m. ruling by the Court so that we had some time

17  and some flexibility to scramble and possibly come up to this

18  Court should it be denied over there.

19          We couldn't just sit back and wait, and the notion

20  that, well, we could have just gotten more information, why

21  didn't you just ask for any, well, when you get a termination

22  letter that says this is final, gives you no indication that

23  anything else is forthcoming, what do you do?

24          You run into the judge and say, Judge, now we --

25  we've been terminated with no explanation.  Now the judge says

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   9

1                         P-R-O-C-E-E-D-I-N-G-S

2    in her order, well, I don't have enough before me.

3            Well, the judge could very easily have temporarily

4    stated, granted a TRO, and said, Counsel, we're going to extend

5    this -- it's not -- nothing's going to happen now, hold up,

6    don't worry, your clients are not going to be terminated in

7    three days.  I'm going to give you another two weeks for

8    information.

9            The judge could have ordered the City, or asked the

10   City, to provide more information.  Is there any more

11   information?

12           THE COURT:  Mr. Black, I'd like to go back to the

13   original discussion that we were having before, which is

14   whether this is strict scrutiny or not, and if this panel --

15   your point is that these are discretionary decisions by the

16   citywide appeals panel, and that --

17           MR. BLACK:  Yes.

18           THE COURT:  -- they then came up with reasons why

19   they decided whatever they did, but that doesn't change the

20   character of the panel and the fact that they can exercise

21   discretion to decide who is -- who gets accommodation and who

22   doesn't; is that right?  And --

23           MR. BLACK:  That is absolutely correct.

24           THE COURT:  -- and that under Fulton -- it's your

25   position that under Fulton that that means that this is a

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   10

1                        P-R-O-C-E-E-D-I-N-G-S

2    strict scrutiny question.

3            MR. BLACK:  Your Honor, it's under Fulton, but it's

4    also, even under Smith itself because Smith in its decision

5    cites Sherbert and Thomas as having been subject to strict

6    scrutiny because they included the language that constitutes

7    individualized exemptions.

8            In Sherbert the language was without good cause, and

9    the Court held that that good cause standard traded a mechanism

10   for individualized exemptions.

11           Well reasonable accommodations, a panel sitting

12   behind closed doors deciding who lives and who dies, so to

13   speak, is -- it is no less discretionary than without good

14   cause.

15           THE COURT:  Right, I'm going to -- going back to

16   Fulton -- and I'm going to ask your adversary about this, so

17   your adversary can take note, the language in Fulton -- and

18   this is going to be -- this is a softball question, I have to

19   tell you --

20           MR. BLACK:  I appreciate it, Judge.

21           THE COURT:  -- the language that Justice Roberts used

22   the creation of a formal mechanism for granting exceptions

23   renders a policy not generally applicable, regardless of

24   whether any exceptions have been given, because it invites the

25   government to decide which reasons for not complying with the

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   11

1                        P-R-O-C-E-E-D-I-N-G-S

2    policy are worthy of solicitude.

3            That, you know, seems to me is your -- is certainly

4    one of your stronger arguments here.

5            MR. BLACK:  It is, Your Honor, and specifically,

6    speaking of the invitation, I should point -- the invitation to

7    -- to go down all sorts of unsavory paths, the unfortunate

8    reality here is that, under the Title VII analysis, a -- sham

9    determinations are enabled -- and the, you know, the Czar,

10   before he beheads 99 of 100 prisoners standing before him, it

11   doesn't help a lot if he's got a rule book that he glances at.

12   So, you know --

13           THE COURT:  Let me --

14           MR. BLACK:  -- if the Czar is --

15           THE COURT:  -- I understand your point.  I have one

16   other point, and this is not a softball, why -- how is there

17   irreparable harm here?  Your clients can be reimbursed if the

18   injunction is denied, and they can -- they eventually could be

19   made whole in damages.

20           And cases have said that loss of health insurance and

21   other incidentals relative to employment are encapsulated

22   within the general rule that employees -- employee termination

23   is not subject to a preliminary injunction.

24           MR. BLACK:  Your Honor, I know that Professor Gibson

25   intends to address specifically the question of irreparable

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   12

1                    P-R-O-C-E-E-D-I-N-G-S

2  harm, but I would note, most poignantly, that five days ago --

3  or six days ago now -- the Fifth Circuit in Sambrano v. United

4  Airlines held that under both constitutional and statutory

5  provisions -- because that, of course, was a private -- United

6  Airlines is a Title VII case, it's not a government actor --

7  but the Court specifically applied the same analysis to any

8  constitutional situation.

9            A plaintiff demonstrates irreparable harm by alleging

10  a violation of her right -- rights to freely exercise her

11  religion.  United has presented plaintiffs with two options,

12  violate their religious convictions, or lose all pay and

13  benefits indefinitely.  That is an impossible choice for

14  plaintiffs who want to remain faithful but must put food on the

15  table.

16            THE COURT:  The problem --

17            MR. BLACK:  In other words --

18            THE COURT:  -- the problem with that argument is,

19  that by the time this was -- by the time we're dealing with --

20  the choice had already been made because February 18th had come

21  and gone, and you had to make a choice by that time, and this

22  all occurs after that.

23            So they were either terminated, or they had received

24  an accommodation, or they had opted for the extension by that

25  time, right?

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    13

1                          P-R-O-C-E-E-D-I-N-G-S

2            MR. BLACK:  Yes and no, Your Honor.

3            THE COURT:  Well, if --

4            MR. BLACK:  First of all --

5            THE COURT:  -- let's take your yes first because I --

6            MR. BLACK:  -- okay.

7            THE COURT:  -- the reason that I say that, is

8    because, if that's the case, then the whole choice question --

9    and that being a -- something that could conceivably be the

10   basis for a preliminary injunction is no longer here, no longer

11   in this case.

12           Everybody is in one of these categories, and then --

13   so there's nothing really to enjoin that isn't compensable by

14   monetary damages.

15           MR. BLACK:  Not necessarily, Your Honor, because

16   right now, people are still compelled by their -- to make a

17   decision.  They can very easily go back to their employer and

18   say, you got me, I'm vaccinating tomorrow, let me have my job

19   back.

20           The City is scrambling to try to fill the positions

21   of these teachers.  Their students have been with them for a

22   whole year prior, having substitute teachers.

23           So if these people are still facing daily turmoil --

24   they don't sleep at night because they're figuring, what do I

25   do tomorrow?  Am I finally going to give in, put God aside,

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   14

1                          P-R-O-C-E-E-D-I-N-G-S

2    and get vaccinated, just so that I can take care of my sick

3    children and my family, so they can have medical insurance?

4    Some of them are on unpaid leave --

5            THE COURT:  That argument would justify preliminary

6    injunctions in every employee termination situation.

7            MR. BLACK:  This -- not necessarily, Judge Walker,

8    because this is unique.  This is a very fluid situation.  In

9    the news daily, we hear that the State, the City, are

10   considering now backing off on mandates, maybe in a month there

11   won't be mask mandates.  Who knows what'll happen with vaccine

12   mandates?  Maybe in a month-and-a-half the City decides, guess

13   what?  Teachers no longer needed to be vaccinated.

14           I don't know what's going to happen. It could happen

15   tomorrow, it could happen in six months, it could never happen,

16   who knows what the City intends to do, which goes to some of

17   its lack of general applicability, but that's another situation

18   -- another story.

19           But right now, teachers don't know what's going to

20   happen tomorrow.  This is a -- pandemics, Your Honor, of course

21   don't happen every day, so this is not the same as any other

22   situation, but there's another point, the City has precluded

23   them, even if they signed a waiver, for example -- many of them

24   signed a waiver -- even with -- so they were not terminated --

25   but even with the waiver, they still have the ability to go

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   15

1                     P-R-O-C-E-E-D-I-N-G-S

2   back now and say, because they don't -- they're not getting

3   paid -- they're on unpaid leave with a waiver signature.

4            Matthew Keil -- this is Keil v. City of New York --

5   Matthew Keil signed a waiver under duress because he had to

6   take care of his family and his child who has great medical

7   needs.

8            So he still is under duress because every day he

9   wakes up in the morning and says, do I get vaccinated so I can

10  earn an income, do I just give this all up just so that I can

11  take care of my family?  He cannot work.  When you sign a

12  waiver, the City said you can't take any alternate employment.

13           THE COURT:  Can you tell us among your clients, how

14  many which have been terminated and how many signed the waiver?

15  You know, give us a sense of what category and how many fall

16  within each.

17           MR. BLACK:  Sure.  Under the amended complaint, two

18  plaintiffs have signed the waiver, two plaintiffs have not yet

19  been terminated, are still waiting -- awaiting citywide appeals

20  panel determinations -- others have been terminated.

21           Under the original complaint, I just noted that the

22  lead named plaintiff, Matthew Keil, has signed the waiver,

23  everyone else has been terminated.

24           Of course, while this Court decided in its November

25  decision not to expand the reach of the relief that it granted

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   16

1                          P-R-O-C-E-E-D-I-N-G-S

2    to a larger class, we believe it is applicable, and there are,

3    I don't know, how many countless people who have not yet been

4    terminated, yet await decisions, and every day are faced with

5    this dilemma.

6              THE COURT:  I have a -- just a -- maybe you can help

7    clear this up, just in trying to understand the broader facts

8    of this case.  My understanding is that -- from somewhere I

9    read -- that 99.3 percent of the employees are vaccinated, at

10   this time.  Do you know that?  Is that --

11             MR. BLACK:  Of the general employee population of the

12   Department of Education?

13             THE COURT:  Right.

14             MR. BLACK:  I understand something --

15             THE COURT:  And there's 75,000 -- 147,000 general

16   employees, and I think there's something in the order of about

17   75,000 teachers in New York.  Is that -- do you know if that

18   99.3 percent applies to them as well?

19             MR. BLACK:  I do not.  Perhaps my colleague --

20             THE COURT:  Okay.  Well --

21             MR. BLACK:  -- counsel for the City will know.

22             THE COURT:  -- we'll see, but, if so, we're talking

23   about, of the teachers, 525 teachers out of the 75,000 have not

24   been vaccinated.  And there are something like 1,700 schools in

25   the system -- so we're talking about one person for every three

1                    P-R-O-C-E-E-D-I-N-G-S

2    schools that has not been vaccinated.

3              I just, you know, to me it goes into the calculation

4    of whether there can be a reasonable -- some reasonable

5    accommodations, rather than --

6              MR. BLACK:  Judge Walker, I agree with that, I agree

7    with that, and I know that the City has yet to explain, in any

8    concrete way, why it constituted undue hardship to accommodate

9    these plaintiffs.

10             THE COURT:  Yeah.

11             MR. BLACK:  Let alone a broader class, which this

12   Court didn't grant relief to a broader class.  So just, how can

13   you not have accommodated 14 or 15 people, but also there is a

14   recent decision, the Navy SEALs v. Biden case, in which the --

15   I do believe it says Northern District of Texas held -- in some

16   very interesting language, it said, and I quote, "The Navy --

17   the Navy provides a religious accommodation process, but by all

18   accounts, it is theater."

19             The Navy has not granted a religious exemption to any

20   vaccine in recent memory.  It merely rubber stamps each denial.

21   That sounds almost like that language was written for this

22   case.

23             I remember Judge Livingston was on the original

24   merits panel, and I remember arguing that oral argument to,

25   Your Honor, Judge Livingston, I said, what's going to happen

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    18

1                         P-R-O-C-E-E-D-I-N-G-S

2    is, if you're going to give them Title VII, they're just going

3    to say great, undue hardship, denied, denied, denied, denied,

4    denied, and that's exactly what they did.  And that's not what

5    a State actor is allowed to do.

6            THE COURT:  Can I just ask, this is my big

7    difficulty, let's assume for the moment that the appeal is not

8    moot, as you say, the February 18th, deadline doesn't moot the

9    appeal -- you know you, as the moving -- as the motions panel

10   said, you're the moving party in this litigation, and you might

11   be in a different posture if we -- if some evidence had been

12   put forward before the district court.

13           But the summaries explaining the basis for these

14   denials are not before the district court.  There's no record

15   developed.  And so I'm having difficulty seeing why, at this

16   juncture, you could be entitled to preliminary relief, other

17   than the most, you know, other than waiving the banner of

18   strict scrutiny, and that automatically means that you win,

19   because there is not an evidentiary development here.

20           MR. BLACK:  So, Your Honor, first of all, there is an

21   evidentiary development which happens a little late, but

22   through no fault of our own.  Again, it was -- on its face, it

23   said final decision.  We have no indication from Counsel, from

24   the citywide panel, from anyone, that there's going to be

25   anything else forthcoming.

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   19

1                    P-R-O-C-E-E-D-I-N-G-S

2            And when we filed our motion, our emergency motion,

3    virtually the next day, before even one business day had

4    expired, if the City had simply picked up the phone, and called

5    and said, Counsel, we see your motion, rather than opposing it,

6    oops, we made a mistake, there are explanations forthcoming

7    when you ask -- when you agree to stay this motion, and we'll

8    agree to another week, and we'll provide you all those reasons,

9    and maybe then it'll obviate your motion.

10           They didn't do that.  They sat quietly, and five days

11   later they signed a letter saying, this morning we learned that

12   we have explanations, and we're providing them to you.  That's

13   beyond unreasonable to expect of the mover -- of the movant --

14   of the plaintiff to have had some kind of clairvoyant awareness

15   of these forthcoming things.

16           So we were stuck with only one option, run to the

17   Court and say don't -- and beg the Court to not allow these

18   people to be terminated.  I want to also add one thing,

19   because, Judge Walker, you had inquired earlier about, well,

20   isn't it already a done deal now because most of them have been

21   terminated, but in Elrod v. Burns, almost all of the employees

22   had already been terminated, and the court there still found

23   irreparable harm.

24           So these are serious constitutional violations,

25   considerations, and the fact that many, or even if all of them

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    20

1                          P-R-O-C-E-E-D-I-N-G-S

2      had been terminated, I don't think would really change the fact

3      that there is an ongoing irreparable harm in this very fluid

4      situation.

5              THE COURT:  Can you -- Mr. Black, I know your time is

6      over but I wanted to clarify the fact on one other area, and

7      that is, my understanding is that at one point the City

8      actually recalled people who had contracted COVID and used them

9      as teachers.

10             And when did that occur, and how many people were

11     there like that?

12             MR. BLACK:  We don't have statistics, but we do know

13     that that is a fact.  It was -- we only know it from the

14     newspapers, like anyone else.  It was very publicly announced

15     that they invited vaccinated (sic) teachers back into schools.

16             We also have it from internal documents, I believe

17     that our clients picked up --

18             THE COURT:  Well, they were vaccinated teachers.  It

19     wasn't the fact that they were vaccinated teachers that was

20     remarkable, because they were trying to get the teachers

21     vaccinated --

22             MR. BLACK:  -- no, they're infected.

23             THE COURT:  -- but that they had been infected.  They

24     had contracted the disease.

25             MR. BLACK:  Right, right.  So now there has been a

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    21

 1                    P-R-O-C-E-E-D-I-N-G-S

 2    whole bunch of debate in the medical science as to whether

 3    natural immunity provides greater protection than a vaccine; I

 4    don't know the answer to that, but clearly an infected teacher

 5    is more dangerous than an uninfected teacher, whether

 6    vaccinated or not.

 7            You have live COVID and you're going into a classroom

 8    but, presumably, they were wearing masks, presumably they were

 9    socially distant.  So if you can accommodate a person with --

10    with live virus into the classroom -- how can you not

11    accommodate an unvaccinated person who is going to take all the

12    required measures to protect the children and protect those

13    around them --

14            THE COURT:  So it would go to that --

15            MR. BLACK:  -- by social distancing or wearing a

16    mask?

17            THE COURT:  -- it would go to that question about

18    accommodation, and it would also go to the question of whether

19    they're using the least restrictive means, if this is a strict

20    scrutiny situation.

21            MR. BLACK:  Correct.

22            THE COURT:  And -- yeah.  Okay.

23            THE COURT:  We'll hear from your colleague.

24            MS. GIBSON:  Good morning, and may it please the

25    Court?  Your Honors, I'm going to address two fundamental

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   22

1                      P-R-O-C-E-E-D-I-N-G-S

2    errors made in the district court, other than the error of

3    applying strict scrutiny.

4            And I think, given the questions before, that this

5    may shed some light.  The first is irreparable harm, and the

6    second is allocation of burdens, under strict scrutiny or under

7    the statutory provisions.

8            On the first point, irreparable harm.  This is a

9    point where I prepared a little bit more, so I want object to

10   make some important corrections first to what just happened.

11           So, number one, Elrod v. Burns, in that case the

12   Supreme Court held that in First Amendment cases, irreparable

13   harm is presumed to have occurred.  This presumption is

14   repeated over and over by the Supreme Court, and the language

15   is very strong.

16           There is no question that, in First Amendment cases,

17   irreparable harm is fact.  This circuit is an outlier, one of

18   only two, that has, in very limited circumstances, deviated

19   from that clear and present holding from the Supreme Court.

20           And those cases are cases like Savage v. Gorski, in

21   which this Court found -- actually a remarkably similar case to

22   Elrod v. Burns, which was also an employment case, that they

23   were going -- that you were not going to apply strict -- the

24   presumption of irreparable harm, because of the most important

25   difference between Savage v. Gorski and Elrod v. Burns which

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   23

1                        P-R-O-C-E-E-D-I-N-G-S

2    was there wasn't ongoing coercion, not because the employees

3    had been terminated, in fact, in Elrod v. Burns, as we pointed

4    out in our motion papers, at the time that they filed, most had

5    been terminated but not dismissed.

6              But by the time they reached the Supreme Court,

7    everyone had long since been terminated, and still the Supreme

8    Court, in that case, held that there was coercion present,

9    because in Elrod v. Burns, the criteria had been that employees

10   had to switch their party in order to keep their jobs.  So that

11   coercive condition still existed, whether or not they've been

12   terminated, whereas in Savage v. Gorski, this Court held that

13   we can deviate because, unlike in Elrod v. Burns, here the

14   plaintiffs are not being asked, and they have not alleged, that

15   they have to choose -- that they could switch their party in

16   order to keep their jobs.

17             And that was the key difference, the coercive element

18   was not there, and this Court recognized, quite explicitly, and

19   we quote in our moving papers.  So it really --

20             THE COURT:  Why was -- just -- why wasn't the

21   coercion -- why doesn't that dissipate on February 18th, when

22   people are put into the various categories?  They're either

23   accommodated, they're terminated, or they're given the

24   extension to September?

25             MS. GIBSON:  Well, in Elrod v. Burns, the Supreme

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   24

1                    P-R-O-C-E-E-D-I-N-G-S

2   Court did not think that termination was sufficient, but

3   terminated the coercive element of that condition --

4            THE COURT:  That was because there was an ongoing

5   ability -- because that was a question of whether you were --

6   in which political party you were in.  And people --

7            MS. GIBSON:  Well, they didn't --

8            THE COURT:  -- could switch their political parties

9   at any time --

10           MS. GIBSON:  -- but they'd been --

11           THE COURT:  -- and keep their jobs.

12           MS. GIBSON:  -- permanently terminated though, by the

13   time they got to the Supreme Court.  Every last one had been

14   permanently terminated, and the Court --

15           THE COURT:  Uh-huh.

16           MS. GIBSON:  -- recognized that.  But they said that

17   we don't look at what's happening now, we look at the status

18   quo prior, not the status quo ante instead of the status quo

19   post.  So they said, at the time, when they filed their initial

20   motions, they hadn't all been terminated, and they felt that

21   it's important enough for the Court to intervene in a First

22   Amendment coercive condition such as this, that it is per se

23   irreparable harm.

24           I can give you three answers that I believe are

25   relevant, but first I want to say that we don't know that

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    25

1                      P-R-O-C-E-E-D-I-N-G-S

2    everybody's been terminated or waived their rights.  What we do

3    know, is that Matthew Keil received a letter, saying on

4    February 18th, he has to make a choice of waiving his rights or

5    being terminated.

6            We also know that these same plaintiffs, as the City

7    repeatedly complains about, have received many different

8    notices, with many different dates where they had to make this

9    supposed final decision.

10           They were told that they had dates in October, they

11   were told that they had dates in November that didn't come to

12   play, they were told in their final determinations that they

13   have three days to make this decision, but that didn't come

14   into play, even though we filed for an appeal two days after.

15           They were told after the stay was dissolved by the

16   motions panel, they were not immediately terminated, as they

17   had been threatened back in December, but rather given February

18   dates, at least Matthew Keil, and we believe that there was a

19   February 14th date, but then there was some confusion because

20   there was a February 18th, date.

21           I can't say whether all 10 of my plaintiffs have

22   received that same letter or been terminated, but even if they

23   were, the fact remains that in New York City, if they want to

24   get any job at all, what is in the record is that there are 83

25   mandates now, that cover every sector of employment.  So there

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   26

1                        P-R-O-C-E-E-D-I-N-G-S

2   is no possible job that any of these people can get, unless

3   they violate their faith.

4            So unless they want to -- and they're not allowed to

5   get unemployment insurance, and they're not allowed to get

6   public benefits -- a recent paper -- news article came out

7   about that.  To the extent that we're going to say that there's

8   a changed circumstances since we filed, because the City

9   represents that they fired everybody, we would be allowed then

10  to put in additional information why the coercive element is

11  still there.  And these are exactly the kinds of things we

12  would have to talk about.

13           And we'd have to talk about the fact that one of the

14  proposed class members committed suicide recently, after

15  learning that the Court was not going to extend protection to

16  all employees of the DOE.  And we'd have to talk about other

17  irreparable harms that have occurred and continue to occur.

18           However, back to the Supreme Court, one of the

19  reasons that the irreparable harm -- so there is ongoing

20  coercion clearly here -- but one of the reasons the Supreme

21  Court also, I believe, made this per se standard for First

22  Amendment is, when it is already a violation of the

23  establishment clause to put a coercive condition on the

24  practice of religion.  So if you have a State actor doing that,

25  that's already a violation, not only of the individual's

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   27

1                         P-R-O-C-E-E-D-I-N-G-S

2   rights, but it's irreparable harm for all of us to allow that

3   to continue.

4           So I think that that's another element, and it might

5   also explain why cases like Brown v. Board of Education and

6   others, where people were already not allowed into school, and

7   there wasn't a coercive element, it would still qualify for the

8   injunctive standard.

9           And to come to one final point about irreparable

10  harm, however, Your Honors asked --

11          THE COURT:  Can I just -- your time is expired, we --

12  I want to make sure we hear both points that you wanted to

13  make, so I would -- I think we understand your argument on

14  irreparable harm, so I'm glad this is your final point on it,

15  and then I would move on.

16          MS. GIBSON:  I can move on, Your Honor.  I will just

17  -- I'll just move on to the burdens.  So in burdens, once

18  strict scrutiny is applied, the burden then, according to We

19  the -- this Court in We the People v. Hochul -- or We the

20  Patriots v. Hochul -- this Court stated that the plaintiff's

21  burden is to establish that strict scrutiny applies in a free

22  exercise claim.

23          After that, the burden shifts to the defendant to

24  establish that they used the least restrictive means.  So the

25  burden, you know, when the lower court really erred by placing

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   28

1                           P-R-O-C-E-E-D-I-N-G-S

2    the burden of establishing less restrictive means on the

3    plaintiffs.  It's not the plaintiff's job to supplement the

4    City's woefully inadequate reasons for denial, that's their

5    burden to meet.  They must demonstrate.

6             And if they didn't do it in the denial letters, at

7    least once we filed the papers, they then had the burden to do

8    it after the fact, when the district court invited them to

9    respond.

10            Rather than saying, oh, you know, we clarified this

11   morning on our due date for a response that maybe we'll come up

12   with some more reasons that eventually we'll give to Counsel,

13   they should have given those reasons then to the Court, or at

14   least later that same day.  They didn't.  They didn't even get

15   them to us before our reply went in.

16            I don't believe they -- they might have given it to

17   us before the district court made a decision the next morning,

18   but I'm not sure.  The point is it's their burden --

19            THE COURT:  Could you repeat what you just said, that

20   you might have received the summaries the day before the

21   district court made a decision; is that what you just said?

22            MS. GIBSON:  Not the day before, because I know when

23   we submitted our replies, the day before the decision came in,

24   we didn't have them yet.  And the --

25            THE COURT:  When did you --

24, FEBRUARY, 2022                NEW YORK, NEW YORK   29

1                    P-R-O-C-E-E-D-I-N-G-S

2            MS. GIBSON:  -- and they did not --

3            THE COURT:  -- when did you receive them?

4            MS. GIBSON:  It could have occurred after our replies

5    went in, but that night --

6            THE COURT:  I have them here, I have them here.  The

7    date was -- the time and date was December 13th at 4:27.

8            MS. GIBSON:  Right.  And the district court, I

9    believe, ruled in the morning of the 14th.  We had already

10   submitted our replies.  I know I wrote the reply before

11   receiving the summary.  It's possible it crossed in the, you

12   know, and came into my email while I was furiously typing to

13   submit a reply, but --

14           THE COURT:  Did you ask --

15           MS. GIBSON:  -- in any event, it's not --

16           THE COURT:  -- the district court for an opportunity

17   to expand the record, or ask the district court to reconsider

18   the decision, based on new information?

19           MS. GIBSON:  We did.  We asked the district court --

20   we filed a -- essentially, we filed a motion for a stay pending

21   appeal -- or an injunction pending appeal the day afterwards,

22   but we --

23           THE COURT:  No, I mean did you ask the district court

24   to reconsider its decision before coming here?  Did you say --

25           MS. GIBSON:  -- well --

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    30

1                           P-R-O-C-E-E-D-I-N-G-S

2              THE COURT:  -- we have some additional evidence that

3    we'd like to develop?

4              MS. GIBSON:  Before moving for an injunction, we did.

5    We asked -- we didn't ask for a motion to renew -- but, again,

6    I'm going to go back to burden.  It wasn't our burden to

7    supplement the woefully inadequate final decision.  To the

8    extent that the City wants to say that ex post facto they

9    wanted to come up with some reasons, that's their burden.  They

10   have to show the reasons under strict scrutiny, but also under

11   the statutory standards.

12             And they also have to show a lot more.  The district

13   court -- the City provided nothing in response to the district

14   court's request for a response.  They didn't -- in their

15   answer, they provided no factual material at all -- not even in

16   their Declaration of Counsel, on any of the points that they

17   have to make.

18             So our only point is one the only burden on us was to

19   establish that this is subject to strict scrutiny and to

20   establish a prima facie case under either the discrimination

21   standards or Title VII, which I believe we've done.  This is

22   how.  First of all, it's a matter of law about whether this is

23   just -- this type of discretionary decision is generally

24   applicable or not.  The district court erred by saying --

25             THE COURT:  Are you summing up -- thank you, Ms.

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   31

1                        P-R-O-C-E-E-D-I-N-G-S

2   Gibson, I just wanted -- I think we understand this part of

3   your argument, too, so if you want to sum up, we'll hear from

4   the City.

5            MS. GIBSON:  Sure.  Just in sum, we did make a prima

6   facie case under Title VII, and even there, under the statutory

7   requirements, the City was required to demonstrate through a

8   preponderance of evidence in their answer that they had a good

9   faith basis -- that they had -- that they were -- that they

10  could not reasonably accommodate the plaintiffs.

11           Even if you consider post, you know, ex post facto

12  reasons that were submitted later, we can look at them; they

13  don't meet muster under strict scrutiny or Title VII, or the

14           New York State or New York City Human Rights laws,

15  and they certainly don't meet muster, given that this is a

16  discrimination case where we presented direct evidence of a

17  written policy that requires discrimination against religious

18  -- unorthodox religious views, and that is a prima facie case

19  that is very hard to rebut.  You can't do it even with showing

20  that you have an independent good faith reason, you've got to

21  have an affirmative defense under Transworld Airlines.

22           They didn't have that.  You can't have that in this

23  kind of discrimination case because, unlike an age

24  discrimination case, where there might be some affirmative

25  defense, this Court and the Supreme Court has held, in no

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    32

1                         P-R-O-C-E-E-D-I-N-G-S

2    uncertain terms, that there can never be a valid reason for

3    discriminating between religions.

4              THE COURT:  Thank you, Ms. Gibson, we'll hear from

5    your adversary.

6              MS. PAULSON:  Thank you, Your Honor.  Thank you, Your

7    Honors.  May it please the Court, Susan Paulson on behalf of

8    the City appellees.  Your Honors, the district court

9    providently exercises discretion in denying the plaintiff's

10   motion because -- simply because the plaintiffs failed to carry

11   their burden to demonstrate their entitlement to preliminary

12   injunctive relief.

13             In their one-and-a-half-page letter, they cited no

14   case law, made very few arguments generally, and none as to

15   irreparable harm specifically.  They have raised some serious

16   arguments to this Court that were not considered by the

17   district court because they were not presented in the motion.

18             They were not presented in the motion, and they were

19   not presented with any support.  The arguments they present in

20   their brief are unpreserved.  Their motion incorporated by

21   reference prior filings that addressed standards that are no

22   longer in effect, and Ms. Gibson just argued that they

23   established a prima facie case of discrimination based upon the

24   written policy, which I assume she was referring to the written

25   standards and arbitration awards that this Court already held

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    33

1                      P-R-O-C-E-E-D-I-N-G-S

2    to be constitutionally suspect.

3              That does not establish that the entirely distinct

4    process, operating under distinct standard, by distinct

5    adjudicators of the citywide panel, was similarly

6    constitutionally suspect.  They need to develop a record --

7              THE COURT:  What were the standards --

8              MS. PAULSON:  -- in that regard.

9              THE COURT:  -- what were the standards that were used

10   --

11             MS. PAULSON:  Yes, Your Honor.

12             THE COURT:  -- by the panel?

13             MS. PAULSON:  The standards --

14             THE COURT:  I know the panel made decisions --

15             MS. PAULSON:  Uh-huh.

16             THE COURT:  -- but I don't know of any standards --

17   preexisting standards -- they just came up with whatever

18   reasons occurred to them, didn't they?

19             MS. PAULSON:  The preexisting standards, as ordered

20   by this Court, were Title VII and the City and State Human

21   Rights law, and those were informed by the EEOCs published

22   guidance for how to apply Title VII in context --

23             THE COURT:  What good are they if the standard is

24   strict scrutiny?  That's -- if you look through the lens of

25   strict scrutiny, then you get into the question of whether or

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    34

1                          P-R-O-C-E-E-D-I-N-G-S

2    not this is in effect, you know, various discretionary

3    decisions, and whether those reasons that are given are in

4    effect second-guessing the -- the reasons -- the basic

5    conclusion that these are sincerely-held religious beliefs.

6              MS. PAULSON:  Certainly, Your Honor, but there's no

7    basis to apply strict scrutiny here.  You get to strict

8    scrutiny if they had established that the process that the

9    citywide panel used was neither neutral nor generally

10   applicable.  And once -- if they had --

11             THE COURT:  Right.

12             MS. PAULSON:  -- established --

13             THE COURT:  Right.  That's generally --

14             MS. PAULSON:  -- that the process --

15             THE COURT:  -- true under Smith, but everything

16   changes, doesn't it, when there's a creation of a -- and I'm

17   reading now -- a formal mechanism for granting exceptions

18   renders a party's -- a party -- a policy not generally

19   applicable, regardless of whether any exceptions have been

20   given, because it invites the government to decide which

21   reasons for not complying with the policy are worthy of

22   solicitude.  That's the Fulton case.

23             MS. PAULSON:  Yes, Your Honor --

24             THE COURT:  Why isn't that squarely at issue here?

25             MS. PAULSON:  It's not squarely at issue here because

24, FEBRUARY, 2022                NEW YORK, NEW YORK   35

1                   P-R-O-C-E-E-D-I-N-G-S

2   what concerned the court in Fulton was that there was

3   unfettered discretion -- that there was unfettered discretion

4   to deny exemptions to the policy --

5             THE COURT:  And what were the --

6             MS. PAULSON:  -- without considering --

7             THE COURT:  -- what were the fetters on discretion

8   here?  I've read these --

9             MS. PAULSON:  Here, they are --

10            THE COURT:  -- I've read -- wait a minute -- I've

11   read all the answers, and one of them was reversed, the others

12   were all affirmed, and what I don't know is what the fetters

13   were.  It just seems to me that they came up with reasons --

14   and some of which seemed to question the sincerity of the

15   religious beliefs, even though they had acknowledged that the

16   person did have sincere religious beliefs.

17            MS. PAULSON:  Your Honor, none of them were denied

18   based upon a questioning of the sincerity of religious belief.

19   They were denied based on either a conclusion that the

20   objection to vaccination was not based upon religious belief,

21   or on undue hardship, or on both.  But, Your Honor, the

22   concerns in Fulton were unfettered discretion, which like Smith

23   had this undefined standard of good cause.  Those are not the

24   circumstances here.

25            The circumstances here are that they're applying laws

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    36

1                        P-R-O-C-E-E-D-I-N-G-S

2    that have articulated standards, and they're applying them

3    through the lens of guidance, promulgated by the EEOC, that

4    permits the employer in determining these Title VII reasonable

5    accommodation requests from specific COVID-19 vaccination

6    requirements to make inquiry to determine whether or not the

7    objection is based on sincerely-held religious beliefs, and the

8    panel did exactly that.

9            But, Your Honor, we don't have the record before the

10   district court, the motion that they filed and the information

11   they provided, not only did not include those summaries which

12   you are now referencing and discussing with me, but it included

13   no information about the panel's process.

14           And although the plaintiffs argue that it was not

15   their burden, that's incorrect.  On a preliminary injunction,

16   they bear the burden of persuasion at all points.  But not only

17   that, they didn't argue in their motion that it was not their

18   burden.  There was no reason -- they say that when the district

19   court invited the parties to introduce -- there was no reason

20   for the defendants to be alert to or consider that the

21   plaintiffs believed that they had a burden to present.

22           We had a one-and-a-half-page motion that cited no

23   case law, that had no information, that they now say we should

24   somehow have surmised that what they meant was that it was our

25   burden to establish that the citywide panel process was

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    37

1                         P-R-O-C-E-E-D-I-N-G-S

2  constitutionally firm, as opposed to their burden to establish

3  a likelihood of success on the merits on their claim that it

4  was constitutionally (inaudible).

5           If they had raised that argument in their motion, the

6  court may have ordered the defendants to provide information.

7  The defendants may have elected to create a record in that

8  regard.  I will note parenthetically --

9           THE COURT:  Well, they say one of their arguments is

10  that it was -- the situation is very fluid -- they had received

11  a notice that their clients would be terminated or would be put

12  to the choice of termination in three days --

13           MS. PAULSON:  Right.

14           THE COURT:  -- and that they just had to --

15           MS. PAULSON:  I mean, it's --

16           THE COURT:  -- seek an appeal.

17           MS. PAULSON:  It's clear on the face of the notice,

18  which -- so the citywide panel process was created after there

19  was a mandate for the rest of the city workforce to be

20  vaccinated.  It was not created in response to this litigation,

21  it was not created for these plaintiffs.

22           After the previous litigation here, and the

23  recognition that the process provided in the arbitration awards

24  was constitutionally suspect, the defendants offered, and the

25  Court endorsed and ordered, that these DOE individuals would

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    38

1                          P-R-O-C-E-E-D-I-N-G-S

2    get an opportunity for review by this preexisting citywide

3    panel that was organized to consider appeals from denial of

4    reasonable accommodation requests from the rest of the city

5    workforce.

6            They were not similarly situated because the DOE

7    employees had already been placed on leave without pay.  So

8    this did not operate seamlessly, and we own that fact.  They

9    got autogenerated messages as soon as the panel votes were in

10   that made the determination on their request.  The

11   autogenerated notices had been generated for the rest of the

12   City workforce, individuals who had not previously been placed

13   on leave without pay.

14           The notices clearly stated on their face, as this

15   Court Motions Panel recognized, as the district court's

16   decision recognized, that they had three days to vaccinate or

17   be placed on leave without pay, a status that all of these

18   plaintiffs had occupied since October.

19           There was no threat of termination.  The notice was

20   incorrect, as they were already on leave without pay, but

21   nothing in the notice said -- now the notice was autogenerated,

22   it wasn't until it was generated that we learned that the

23   plaintiffs had received it, and DOE had received it, that the

24   panel notified us that they had decisions that were

25   forthcoming.

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2            We promptly notified the plaintiffs of this matter,
 3   it's in the record on A1155, it was on two days after they
 4   filed the motion, it was on December 13th, before the district
 5   court had ruled that summaries of the decisions were
 6   forthcoming, as we had been informed by the citywide panel.
 7            When they came, we transmitted to them at the end of
 8   that same day, as Your Honor, Judge Walker, noted, at I believe
 9   about 4:30 that afternoon, the day before the district court
10   order -- ruled.  When the district court ruled, they did not
11   seek reconsideration.  They did not ask to reopen the record.
12   They did not ask for us to be ordered to present any evidence.
13   Instead, they immediately doubled down and appealed to this
14   Court.
15            The arguments that they present, as to strict
16   scrutiny, as to burden shifting, as to coercion, are not
17   arguments that they developed before the district court.  They
18   didn't develop them, they didn't present a record for them,
19   they didn't cite any case law in support, they have some
20   arguments that are worthy of being litigated in a proper forum,
21   on a proper record, and a proper posture, but they don't have
22   arguments that can be or should be determined on their merits
23   by this Court and the request for preliminary injunctive
24   relief, that was made, you know, essentially without any
25   support.
```

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    40

1                      P-R-O-C-E-E-D-I-N-G-S

2              I'll just return and say, in particular as to

3    irreparable harm, the district court noted that the plaintiffs

4    neither attempted to nor demonstrated irreparable harm.  They

5    have arguments in that regard that they presented to this

6    Court, that they did not present in their motion to the

7    district court.

8              THE COURT:  Well, they make the argument here that

9    Elrod says that irreparable harm is presumed.

10             MS. PAULSON:  Your Honor --

11             THE COURT:  What's your response?

12             MS. PAULSON:  -- yes, I don't believe that Elrod

13   speaks up broadly.  So irreparable harm is preserved when

14   there's a likelihood of success on the merits on a First

15   Amendment claim.  And Elrod says a possible constitutional

16   violation is not --

17             THE COURT:  You're saying --

18             MS. PAULSON:  -- irreparable harm.

19             THE COURT:  -- you're saying there are issues here,

20   that if properly litigated could result in a finding that

21   strict scrutiny was not, you know, that the justification is

22   insufficient.

23             MS. PAULSON:  I'm sorry, Your Honor, the

24   justification where?

25             THE COURT:  You're saying that there are issues here,

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    41

1                           P-R-O-C-E—E—D-I-N-G-S

2    going to whether or not strict scrutiny is satisfied by the

3    City?

4             MS. PAULSON:  Well, certainly, there are issues as to

5    whether strict scrutiny should apply --

6             THE COURT:  Right.

7             MS. PAULSON:  -- because we have no information that

8    the panel's process was not neutral or generally applicable.

9             THE COURT:  Your point is that they didn't litigate

10   that --

11            MS. PAULSON:  Correct.

12            THE COURT:  -- issue before --

13            MS. PAULSON:  Correct.

14            MS. PAULSON:  And then, if litigated, right, so on

15   irreparable --

16            THE COURT:  If it turns out that strict scrutiny is

17   the applicable standard, then wouldn't the Elrod presumption

18   kick in?

19            MS. PAULSON:  Wouldn't the -- pardon me?

20            THE COURT:  The Elrod presumption.  The Elrod

21   presumption --

22            MS. PAULSON:  I do --

23            THE COURT:  -- would kick in under those

24   circumstances.

25            MS. PAULSON:  -- yes.  I think if strict scrutiny

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   42

1                        P-R-O-C-E-E-D-I-N-G-S

2    applied, they would -- and they had -- they arguably would be

3    closer to demonstrating a likelihood of success on the merits

4    on their First Amendment claim, because in Elrod they said that

5    the injury was threatened and occurring at the time of the

6    respondents' motion, and the respondents officially

7    demonstrated a probability of success on the merits.  That's

8    what Elrod depended on.

9            But then it also said, the Court might properly have

10   held.  The Court didn't say that the Court necessarily had to

11   hold that that constituted irreparable harm.  The Court might

12   properly have held under those two situations.  But, most

13   critically, that second situation is completely absent here.

14   They have not sufficiently demonstrated a probability of

15   success on the merits, and for that reason the Elrod

16   presumption has no application here.

17           In addition, as Your Honor correctly recognized, any

18   harm occasioned by the coercive deadline by which the

19   plaintiffs had to make a choice has now passed.  The named

20   plaintiffs who are before this Court, not whoever's in the

21   amended complaint that was filed on January 7th, after the

22   district court had decided on this motion --

23           THE COURT:  Let me --

24           MS. PAULSON:  -- or anybody else --

25           THE COURT:  -- let me just go to these -- let me go

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    43

1                      P-R-O-C-E-E-D-I-N-G-S

2    to some of these facts that I asked your adversary.

3              MS. PAULSON:  Sure.

4              THE COURT:  How many people have been vaccinated now

5    in the citywide population of DOE of 147,000; is it 99.3?

6              MS. PAULSON:  Yes, that is my understanding, Your

7    Honor.

8              THE COURT:  Okay.  Is that also true of the teachers

9    as well?

10             MS. PAULSON:  That's --

11             THE COURT:  The teachers are a lesser number within

12   the universe, right?

13             MS. PAULSON:  -- that -- I apologize, but I don't

14   know that number applies to the DOE workforce.  So I don't know

15   --

16             THE COURT:  About teachers.

17             MS. PAULSON:  -- it's 99.3 percent of the 147,000,

18   basically.

19             THE COURT:  So if it's 147, then that means the

20   remaining 0.7 percent -- 0.7 of 1 percent -- is 1029, and there

21   are 1,700 public schools.  Obviously, you can't do averages,

22   but there obviously could be quite a number that are

23   unvaccinated in one place and none in the other.  But still,

24   we're talking about a relatively small number, and it surprised

25   me that, out of 1,029, there wouldn't be -- if there's -- if

24, FEBRUARY, 2022                NEW YORK, NEW YORK    44

1                       P-R-O-C-E-E-D-I-N-G-S

2    it's 0.7 -- then the accommodations couldn't be found somehow

3    --

4              MS. PAULSON:  Your Honor, again --

5              THE COURT:  -- in the general rule.  And we get the

6    -- the sort of boilerplate response on the individuals here

7    that hardship is there because the person has to be in a

8    classroom.  And I just don't know that that's, you know,

9    whether that's sound or not.  It casts some doubt to me on the

10   --

11             MS. PAULSON:  Certainly.

12             THE COURT:  -- on the responses on February --

13   December 13th.

14             MS. PAULSON:  Certainly.  And the problem here again

15   is that we don't have a record to understand that.  It is clear

16   from those summary decisions, where it says DOE established,

17   and we have represented our papers, that the panel sought from

18   DOE information to defend their undue hardship argument.

19             That information is not before the Court, the

20   plaintiffs did not request that information, we cannot properly

21   evaluate your, you know, reasonable question of why they

22   couldn't accommodate these teachers.

23             That information as to what would be involved, what

24   the expense would be, what the operational cost, what the

25   numbers would be, what the various considerations the DOE --

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   45

1              P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  And one --

3          MS. PAULSON:  -- presented to the panel.

4          THE COURT:  -- and one other thing on the undue

5  hardship, and that is the question of bringing in teachers who

6  actually have had COVID, and are still recovering from COVID,

7  to teach.  If you could do that, it's hard to see why this --

8  it's justified to exclude the people who would be masked, and

9  tested, and so forth, and wouldn't have COVID, and let them

10 teach if they -- without their vaccinations.

11         MS. PAULSON:  I'm not aware of any information that

12 the DOE invited teachers that they thought were still

13 infectious with COVID back into the classroom.  You know, as

14 one of my adversaries acknowledged, the guidance coming from

15 CDC has been ever-changing in this regard, as to five days, or

16 10 days, or whether --

17         THE COURT:  Well, there are a lot of little details

18 in this case and I can't put my finger on exactly where that --

19 where I read that -- but it was in --

20         MS. PAULSON:  It was in --

21         THE COURT:  -- somewhere in the papers.

22         MS. PAULSON:  -- a news article that they annexed,

23 but, again, as I said, I'm not aware that any teachers whom

24 they were aware were still infectious --

25         THE COURT:  There hasn't been any --

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    46

```
 1                        P-R-O-C-E-E-D-I-N-G-S

 2            MS. PAULSON:  -- were invited.

 3            THE COURT:  -- your point is, there hasn't been any

 4    discovery on any of this anyway.

 5            MS. PAULSON:  There has been no discovery,

 6    whatsoever.  Your Honor, I would just conclude by saying that

 7    the district court saw this motion for what it was, premature

 8    and wholly undeveloped.  The district court was not slamming

 9    the door to the plaintiffs to develop their case and to press

10    these claims.

11            You know, as this Court has recognized, there are

12    some difficult issues here that are worthy of attention, but in

13    coming to court and requesting the extraordinary relief of an

14    injunction, the plaintiffs bore the burden, and they simply

15    failed to meet it.

16            THE COURT:  Can I just ask one question?  Sorry to do

17    it as you're summing up, but --

18            MS. PAULSON:  Yes.

19            THE COURT:  -- I think you were going to address the

20    question of mootness and the February 18th deadline, and what

21    you may know about the status of the plaintiffs.

22            MS. PAULSON:  Yes, Your Honor.  Of the 15 plaintiffs

23    who are before the Court, two of them have received

24    accommodations, one of them, Matthew Keil, has elected to

25    remain in the extended leave without pay program through next
```

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   47

 1                         P-R-O-C-E-E-D-I-N-G-S

 2   fall, and the remaining 12 were terminated effective February

 3   18th.

 4              THE COURT:  Thank you.

 5              MS. PAULSON:  Thank you very much.  For all those

 6   reasons, I would ask that the district court's decision be

 7   affirmed.

 8              THE COURT:  And we'll hear rebuttal.

 9              MR. BLACK:  Thank you, Your Honor.

10              THE COURT:  Just it's a little hard to communicate on

11   the Zoom.  Thank you all for your arguments.  I'm going to try

12   and enforce the clock pretty strictly on rebuttal, if there are

13   no questions from my colleagues, just because we have two

14   additional cases to hear this morning.  But with that said, Mr.

15   Black?

16              THE COURT:  You're using up your time kind of in a

17   strange way --

18              MR. BLACK:  Am I -- I'm sorry, do you hear me?

19              THE COURT:  Yes, we won't count those seconds --

20              MR. BLACK:  Oh.

21              THE COURT:  -- against you.

22              MR. BLACK:  I'm sorry.  Thank you for your patience.

23   Your Honor, it is true that the Court's have held that monetary

24   damages generally do not alone provide the basis for a

25   preliminary injunction, but context tells a whole other story.

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   48

1                      P-R-O-C-E-E-D-I-N-G-S

2   These are teachers.  They aren't wealthy, their careers are

3   driven by a tenure track, seniority, and a clean record.

4               The City has engaged in frightening hostility towards

5   those that have committed their lives to our children.  It has

6   prohibited them from taking work elsewhere, it has cancelled

7   their health insurance, it has reported to the -- them to the

8   Department of Labor as having engaged in misconduct.  It has

9   actively sought to hurt them, for no reason other than their

10  wanting to stand by their religious convictions.

11              First named plaintiff, Matthew Keil, is an ordained

12  Deacon of the Russian Orthodox Church.  His wife homeschools

13  their six children, including six-month-old John, who suffers

14  from Down syndrome.  Deacon Keil was coerced to waive his

15  constitutional rights, in order to maintain health insurance

16  coverage, without which the family cannot afford to pay the

17  massive medical bills assigned with caring for sweet little

18  John.

19              If having to choose between your faith and your

20  child's health is not irreparable harm, then what is?  If

21  having to choose between your faith and 35 years you've

22  invested in your career is not irreparable harm, then what is?

23  If having to choose between your faith or becoming unemployed

24  with no real alternate income opportunities is not irreparable

25  harm, then what is?

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   49

1              P-R-O-C-E-E-D-I-N-G-S

2              And, finally, in what universe is terminating

3    hundreds of teachers and leaving them and their families

4    without income, health insurance, and professional options not

5    irreparable harm?  And how is this even humane?  I thank the

6    Court for its time and consideration.

7              THE COURT:  Thank you, Mr. Black.  We'll hear from

8    Ms. Gibson.

9              MS. GIBSON:  Thank you, Your Honor -- Your Honors.

10   Oliver Wendall Holmes warned that great cases, like hard cases,

11   make bad law.  He clarified that great cases are called great

12   not by reason of their importance, but because of some accident

13   of immediate, overwhelming interest which appeals to the

14   feelings and distorts the judgment.

15             This is such a moment.  In times like this, we are

16   now -- emotions are running high now in year-three of this

17   pandemic.  In times of pandemics historically, people have

18   looked for a scapegoat on which to unleash their fear and their

19   frustration.

20             Here the unvaccinated, particularly those heretical

21   people who are in the minority and have religious beliefs that

22   prevent vaccination, are such a scapegoat.  New York has made

23   no bones about this, both at the government -- State government

24   and City government level, decision-makers have gone to the

25   press and called these beliefs invalid.

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    50

1                        P-R-O-C-E-E-D-I-N-G-S

2            They have said that the Pope counseled them that

3   these heretical thoughts are not in line with what he believes

4   is required of faith.  The same DOE lawyers that judged these

5   fresh considerations are the very ones who went into the heresy

6   inquisitions and ask that each of these employees be denied

7   accommodation because their beliefs conflict with the Pope's.

8            This is not a fresh look, and you cannot whitewash

9   what has occurred in this case, which is the basis for being

10  here.  This Court did not send them back to moot the case.

11  This Court sent them back for injunctive relief, which they

12  said -- which you said that they deserve.

13           In this case, we have -- our plaintiffs have met

14  their burdens.  They have established that they're entitled to

15  strict scrutiny, they have established our prima facie case

16  that they have religious beliefs that were -- and were denied

17  accommodation after bringing this to the attention of their

18  employer.

19           They have -- they clearly put that in their moving

20  papers, and said that summary denial saying does not meet

21  criteria were not enough to meet the criteria of Title VII,

22  leave aside strict First Amendment protections.  That is what

23  they said in their letters.  To the extent that the defendants

24  do not understand that they then bear the burden of showing

25  that they employed the least restrictive measures, and that

24, FEBRUARY, 2022                    NEW YORK, NEW YORK    51

1                          P-R-O-C-E-E-D-I-N-G-S

2      they had a good reason for this under the statutory and

3      constitutional standards, that is not the plaintiff's fault and

4      cannot be used against them.

5              In fact, it strengthens why these plaintiffs deserve

6      protection.  I will say one more point, which is that the

7      district court recognized very clearly that the three-day

8      deadline was upon these plaintiffs.  I'll bring the Court's

9      attention to page 11, footnote 10 of the district court's

10     order, in which the Court said, the Court specifically, in

11     response to the Keil plaintiff's reply, which suggested perhaps

12     this isn't a real termination deadline of three days, perhaps

13     the injunction from the Second Circuit staying terminations is

14     still in effect.

15             The Court said, the Court disagrees.  The Second

16     Circuit ordered that the injunction will remain in place during

17     reconsideration of plaintiff's renewed request for religious

18     accommodations.  As plaintiffs acknowledge, at least as to

19     them, the proceedings before the citywide panel have concluded.

20     Therefore, the Second Circuit's injunction is no longer in

21     place.

22             The district court recognized, as we recognized for

23     our plaintiffs, that with the injunction dissolved, nothing

24     stood in the way of termination of these plaintiffs.  Within

25     three days, they had to decide whether to waive their rights to

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   52

1                        P-R-O-C-E-E-D-I-N-G-S

2   sue, or be terminated and lose health insurance.

3           And Matthew Keil received his denial on the 8th,

4   before the supplemental materials were even due, and for him,

5   that deadline was Monday.  For the rest, it was Wednesday, and

6   in sum, the Court is taxed with the difficult job of upholding

7   the rights of an unpopular group during a time when everyone is

8   enormously stressed and scared.

9           But the Court is all they have to protect them from

10  the mob, and it is this Court's sacred duty to do so, upholding

11  the Constitution and statutory protections that exist.  Thank

12  you, Your Honors.

13          THE COURT:  Thank you, Ms. Gibson.  We will take the

14  matter under advisement.

15

16          (Whereupon the proceedings are concluded)

17

18

19

20

21

22

23

24

25

*Jeanne Barberis*

La Palabra  Court Reporting, LLC
175 Main St. Ste. 515,
White Plains, NY 10601 (914)-621-7271

24, FEBRUARY, 2022                    NEW YORK, NEW YORK   53

1          I, Valeri Wilson, a transcriber for La Palabra Court

2    Reporting, LLC, do hereby certify:  That said proceedings were

3    listened to and transcribed by me and were prepared using

4    standard electronic transcription equipment under my direction

5    supervision; and I hereby certify that the foregoing transcript

6    of the proceedings is full, true, and accurate transcript to

7    the best of my ability.  I further certify that I am neither

8    counsel for nor related to any party to said action, not in any

9    way interested in the outcomes thereof.

10

11       In witness whereof, I have hereunto subscribed my name

12   this 28th day of February, 2022.

13

     *Valeri Wilson*
14   _____

15

16

17

18

19

20

21

22

23

24

25