21-cv-7863 (VEC) (Lead Case) | 21-cv-8773 (VEC)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MICHAEL KANE, et al.,

Plaintiffs,

-against-

BILL DE BLASIO, et al.,

Defendants.

MATTHEW KEIL, et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

Sujata S. Gibson                    Barry Black
GIBSON LAW FIRM, PLLC               Jonathan R. Nelson
408 W. Martin Luther King, Jr., St. Sarah E. Child
Ithaca, NY 14850                    NELSON MADDEN BLACK LLP
(607) 327-4125                      475 Park Avenue S., Suite 2800
                                    New York, NY 10016
                                    (212) 382-4300

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .........................................................................1

STATEMENT OF FACTS ..................................................................................1

KEY NEW FACTS ..............................................................................................3

ARGUMENT ........................................................................................................6

    I.      Legal Standard ........................................................................................6

    II.     Plaintiffs Are Likely to Succeed ..........................................................7

          A.  The Mandate Substantially Infringes Plaintiffs' Sincere Religious Beliefs ...........7

              1.  The DOE's Religious Accommodation Policies are Subject to Strict Scrutiny ...............8

                  a.  Religious Accommodation Decisions are not Neutral or Generally Applicable ...............9

                  b.  The History of Discrimination Requires Strict Scrutiny .................9

                  c.  The Citywide Panel Decisions are Themselves Discriminatory ....11

                      i.    The Panel Erred by Rejecting Personally Held Religious Beliefs ...............11

                      ii.   The Panel Continued to Improperly Reject Abortion Concerns ...............12

                      iii.  The Panel Misstated Beliefs and Improperly Disputed Facts ...............13

                      iv.  The Panel Review was Not Even Offered to Many Religious Objectors Suspended Under the Stricken Standards ...............14

                      v.   The Panel Did Not Make Accommodation Decisions in Good Faith or With Sufficient Training ...............14

                    d.  Undue Hardship Decisions Do Not Meet Statutory/Constitutional Standards ...............14

                      i.    Defendants Have Not Shown Plaintiffs Pose a Direct Threat ...............15

                      ii.   The Panel Failed to Meet Their Burden of Showing That Accommodation was Not Possible Under Statutory Standards ...............15

                      iii.  The Panel Failed to Meet Its Burden Under Constitutional Standards ...............16

i

2.  The Mandate as a Whole is Subject to Strict Scrutiny..............................18

a.  *Kane v. de Blasio* is Not the Law of the Case on this Issue...........18

b.  Strict Scrutiny Applies Because the Mandate is Not Neutral........19

c.  Strict Scrutiny Applies Because the Mandate is Not Generally Applicable .......................................................................................20

i.  The Mandate Calls for Individualized Exemptions ...........20

ii.  The Mandate Prohibits Religious Conduct While Permitting Similar Secular Conduct .................................21

iii.  The Mandate is Not a Generally Applicable "Across the Board" Law; It is One of Ninety-Seven *Specifically* Applicable Mandates .........................................................22

iv.  The Mandates Run Afoul of Both the Letter of the First Amendment and the Tenor of *Smith* .................................22

3.  The City has an Establishment Clause Problem .....................................22

III.  Plaintiffs Will Suffer Irreparable Harm is No Injunction is Granted...........................23

IV.  The Balance of the Equities Favors Granting a Preliminary Injunction.....................24

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Agudath Isr. v. Cuomo,*
   983 F.3d 620 (2d Cir. 2020) .................................................... 6

*Cantwell v. Conn.,*
   310 U.S. 296 (1940) ............................................................ 12

*Church of Lukumi Babalu Aye v. City of Hialeah,*
   508 U.S. 520 (1993) ............................................................ 19

*Consumers Union of U.S., Inc. v. New Regina Corp.,*
   664 F. Supp. 753 (S.D.N.Y. 1987) ...................................... 18-19

*Desert Palace, Inc. v. Costa,*
   539 U.S. 90 (2003) .............................................................. 16

*Elrod v. Burns,*
   427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) ................ 23, 25

*Emp. Div. v. Smith,*
   494 U.S. 872 (1990) ........................................................ 21, 22

*Forsyth Cnty. v. Nationalist Movement,*
   505 U.S. 123 (1992) ............................................................ 18

*Fulton v. City of Phila.,*
   141 S. Ct. 1868 (2021) ............................................ 9, 16, 17, 18, 20

*Hargrave v. Vermont,*
   340 F.3d 27 (2d Cir. 2003) .................................................... 15

*Intergraph Corp. v. Intel Corp.,*
   253 F.3d 695 (Fed. Cir. 2001) ................................................ 18

*Kane v. de Blasio,*
   2021 U.S. App. LEXIS 35102 (2021) .................................... 8-9, 18, 19

*Jolly v. Coughlin,*
   76 F.3d 468 (2d Cir. 1996) .................................................... 7

*Larson v. Valente,*
   456 U.S. 228 (1982) .......................................................... 8, 23

iii

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ............................................................................. 10, 20

*N.Y. Progress & Prot. PAC v. Walsh ,*
    733 F.3d 483 (2d Cir. 2013) ............................................................................. 25

*Patrick v. Le Fevre,*
    745 F.2d 153 (2d Cir. 1984) ............................................................................. 12

*Ram v. Lal,*
    906 F. Supp. 2d 59 (E.D.N.Y. 2012) ............................................................................. 23

*Roman Catholic Diocese v. Cuomo,*
    141 S. Ct. 63 (2020) ............................................................................. 25

*Smith v. Bd. of Educ.,*
    844 F.2d 90 (2d Cir. 1988) ............................................................................. 14

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ............................................................................. 21

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.,*
    450 U.S. 707 (1981) ............................................................................. 8, 9, 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) ............................................................................. 10

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ............................................................................. 11

*TWA v. Thurston,*
    469 U.S. 111 (1985) ............................................................................. 10

*United States v. Seeger,*
    380 U.S. 163 (1965) ............................................................................. 11-12

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) ............................................................................. 7

**Statutes**

42 U.S.C. § 2000e ............................................................................. 15,16

**PRELIMINARY STATEMENT**

Plaintiffs first moved six months ago for preliminary injunctive relief from a vaccine mandate ("Mandate") that substantially burdens their sincerely held religious beliefs. On November 28, 2021, an expedited Second Circuit Merits Panel ("First Merits Panel") held that the New York City Department of Education ("DOE") likely violated the First Amendment by implementing the Mandate through a facially discriminatory religious exemption policy ("Stricken Standards"). Movant Plaintiffs and thousands of other employees were suspended pursuant to this policy. On remand, Defendants did not cure the harm, but rather inflicted more. Plaintiffs now return to present facts and law, including significant new facts, that illuminate why this Court should enjoin enforcement of the Mandate and immediately order the reinstatement of Plaintiffs and all others denied religious accommodation from the Mandate pending resolution of this matter.

**STATEMENT OF FACTS**

A comprehensive recitation of the relevant facts contained within the Joint Amended Complaint, ECF No. 102, along with declarations and evidence submitted in connection with this request for relief and any previous requests for relief in this Court, are incorporated by reference in this motion. The following summary encapsulates key facts relevant to this Memorandum.

After the First Merits Panel found that the Plaintiffs had demonstrated a substantial likelihood of prevailing on the merits, they remanded the matter to this Court with a requirement that Defendants give "fresh consideration" to Plaintiffs' applications for religious exemptions through a "Citywide Panel" process. [ECF No. 77 at 25-31 and 45-48].

Plaintiffs were instructed that the Citywide Panel ("Panel") would review their original applications submitted under the Stricken Standards. No specific criteria or process was described

1

other than that Plaintiffs were to notify the Panel if they wished to have their applications considered and upload any additional documents they wanted to add on or before the November deadline. [Gibson Decl. Ex. C]. Counsel for Plaintiffs noted that the Plaintiffs were seeking the maximum accommodation available under law, and asked that the Panel engage in an interactive process to discuss possible accommodations. [Gibson Decl. Ex. D]. A generic list of supplemental questions was sent through counsel for all Plaintiffs on December 8, 2021. [Gibson Decl. Ex. A]. The Kane Plaintiffs' submissions are submitted herewith. The Keil Plaintiffs' submissions are already in the record [*Keil et al. v. City of New York, et al.*, No. 21-cv-8773 (VEC) (hereinafter cited as "21-cv-8773") ECF No. 25, 27, 28, 29, 30, 50-3].

Within hours of receiving the supplemental materials on December 9, 2021, Defendants issued boilerplate, summary "auto-response" decisions [21-cv-8773 ECF No. 50-4]. Those decisions provided no explanation of the basis for the denials and no reasoned consideration of Plaintiffs' applications, but they required Plaintiffs to submit proof of vaccination to DOE within three business days. On December 11, 2021, Plaintiffs filed an emergency motion for injunctive relief with this Court [ECF No. 85]. Defendants did not provide any reasons with their opposition three days later, but stated in a footnote that "[a] representative of the Citywide Panel informed appellate counsel for the City this *morning* that written decisions from the panel will be forthcoming." [ECF No. 87 at 2, n. 1].

But no written decisions emerged.  Instead, Plaintiffs received "summaries of the reason for the decision in each appeal" ("Concocted Summaries") after their Reply was submitted; these Concocted Summaries were generated in anticipation of litigation. [Gibson Decl. Ex. B].

2

This Court denied Plaintiffs' motion on December 14, 2021, [ECF No. 90 at 5]. Plaintiffs appealed, and a stay was initially ordered protecting only the named Plaintiffs on appeal. Defendants began terminating employees with religious objections who had not appealed under the Stricken Standards (some because they were unable due to system crashes during the one day afforded, some because appealing seemed futile). When the stay was lifted on appeal, Defendants began sending termination notices to the named Plaintiffs. [Gibson Decl. Ex. I]. Many Plaintiffs are still provided with the option to return to work—if they are willing to violate their faith by getting vaccinated. *See, e.g.*, [Keil Decl. ¶ 19; Clark Decl. ¶¶ 27-28; Delgado Decl. ¶¶ 12-15; DiCapua Decl. ¶¶ 24-25; Strk Decl. ¶¶ 18-20; Chu Decl. ¶¶ 38-39; Bryan Decl. ¶¶ 35-36; LoParrino Decl. ¶¶ 10, Grimando Decl. ¶ 7].

On March 3, 2022, a Second Circuit Merits Panel issued a decision denying relief, stating: "the district court did not abuse its discretion in concluding that Plaintiffs had not carried their burden to show that they were entitled to preliminary injunctive relief," in that there were "no facts before it on which it could conclude that the Citywide Panel's process was irrational in any way or infected with hostility to religion." But the Court specifically went on to hold that "we express no view on the ultimate merits of this case, which may be determined in the future upon a complete and carefully presented record in contrast to the present deficient record before the district court." [USCA2 21-3043, ECF No. 163 at 8-9].

## KEY NEW FACTS

New facts have emerged that require renewed consideration of injunctive relief.

First, at oral arguments in an Eastern District case challenging all the City's Mandates, *New Yorkers for Religious Liberty et al. v. The City of New York, et al.*, No. 22-cv-00072-DG-

3

VMS ("United States District Court for the Eastern District"), in response to a demand to depose panel members concerning the Citywide Panel process, Defendants' lawyers acknowledged that the "universe of all the documents, the entire universe, is documents that Plaintiffs submitted in their original request to their individual agencies, the denial of that request, all of that information was forwarded to the Citywide Panel." [Gibson Decl. Ex. F at 8]. Counsel noted that the panel "has taken in thousands of appeal processes" so any panelist's knowledge would be limited to "the documents [Plaintiffs] produced and . . . the spreadsheet with their vote and any comments if they added any. They would have no really other independent basis of knowledge to testify about at a deposition." [Gibson Decl. Ex. F at 10]. This precludes from the "universe" of possibilities hearings, deliberations, discussions, or any form of panel "decision" jointly issued by its members and confirms that the City simply concocted purported decisions from the "spreadsheet of the votes" by one member from each of three separate City agencies. [Gibson Decl. Ex. F at 8]. Moreover, emails produced today reveal that the Panel was specifically advised to deny applications that are personally held or that are based on an objection to the use of aborted fetal cells [Gibson Decl. Ex. E] and that their spreadsheet notations were for internal purposes only, with no intention of generating written decisions. [*Id.*] These new facts show that the Concocted Summaries Defendants relied on to argue that the previous request for an injunction was premature were not part of the appellate record of the Citywide Panel, but rather were generated in anticipation of litigation after Plaintiffs filed for emergency relief.[1] They show that the Panel

---

[1] Furthermore, Plaintiffs have been in contact with hundreds of DOE teachers who were denied their religious exemption requests by the Citywide Panel and are unaware of any who have received anything akin to the Concocted Summaries. [De Luca Decl. ¶ 14].

continued to discriminate against personally held religious beliefs.

Second, Defendants' lawyers admitted that they have not only failed to overturn the Stricken Standards but have extended these blatantly unconstitutional policies Citywide to nearly every department as an alternative to the Citywide Panel process. *New Yorkers For Religious Liberty v. City of New York*, 1:22-cv-00752-DG-VMS, ECF. No. 44 at 19 (E.D.N.Y. Feb. 28, 2022) (the Stricken Standards "remain"). Thus, not just the DOE, but now also the City as a whole has adopted the facially discriminatory standards as official government policy.

Third, since Plaintiffs first sought preliminary injunctive relief, the City has issued over 97 different specifically applicable vaccine mandates, requiring vaccination of every public and private employee in the City. [ECF No. 120-1]. Plaintiffs now face unprecedented coercion to violate their faith– not just to maintain their careers at DOE, but to be able to work *anywhere*, in any field, in New York City. These Mandates function collectively to suppress religious practices requiring abstention from COVID-19 vaccines and make real the mayor's threat that he wanted people to "literally see vaccination as necessary" to live life in the City [ECF No. 102 ¶ 57].

Most important, a series of recent Emergency Executive Orders eviscerates any argument that these Mandates are neutral or generally applicable. On March 24, 2022, Mayor Adams issued Emergency Executive Order 62 ("EEO 62"), carving out athletes, entertainers and their entourages for special exemption from the City's vaccine mandates, not because they posed any less risk but because the Mayor felt that the City's economic health would benefit.

The order's penultimate whereas clause explains:

New York City athletic teams have been, and continue to be, at a competitive disadvantage because visiting teams can field unvaccinated players, and this competitive disadvantage has negatively impacted, and continues to negatively

impact, New York City teams' success, which is important to the City's economic recovery and the morale of City residents and visitors.

Adams introduced EEO 62 in a live press conference. [Full transcript at ECF No. 120-2]. In the press conference, the mayor made several bold statements:

> I've always said over and over again, we're going to focus on the science, we're going to do what's right, and we're going to make sure we're healthy. And being healthy is not only physically healthy. It's economically healthy. . .. In our nightlife, we're going to keep our nightlife industry thriving, a $35.1 billion industry. Everything from the cook, the dishwasher, the bartender, the bus boy or girl all feeds into this nightlife industry. And by putting our home teams on equal playing field, we increase their chances of winning. And that has a real impact on our city. This is just not fans in the stands, but it is people in the stores. Every time a championship or a game is played here at Yankee or Met Stadium.

These are stunning facts that have not been before this Court, other district courts or the Second Circuit. The First Amendment affords no special protection for millionaire artists and athletes; it does not proscribe laws that prohibit the free exercise of fame or fortune. Even the worthy cook, dishwasher, bartender, and busboy or girl, find no special refuge in our cherished Constitution. But the one class of people for which the Framers anchored everlasting protection is fired, disparaged, and cast aside in utter disgrace.

For Defendants, fame, money, and fun all appear to outrank God—or the Constitution.

## ARGUMENT

## I.  Legal Standard

When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate "(1) a likelihood of success on the merits, (2) irreparable harm absent injunctive relief, and (3) public interest weighing in favor of granting the injunction." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).

Where, as here, the injunction stays enforcement of a state executive branch "emergency" order, this Court "grant[s] no special deference to the executive when the exercise of emergency powers infringes on constitutional rights" because "courts may not defer to the Governor simply because he is addressing a matter involving science or public health." *Id*, at 635.

## II.  Plaintiffs Are Likely to Succeed

Plaintiffs meet their burden of demonstrating likelihood of success on the merits because they have established that their sincere religious beliefs are burdened by the Mandate and that strict scrutiny applies. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021), opinion clarified, 17 F.4th 368 (2d Cir. 2021).

### A.  The Mandate Substantially Infringes Plaintiffs' Sincere Religious Beliefs

Plaintiffs meet their burden of showing that their sincere religious beliefs are substantially burdened by the Mandate. The Court is respectfully referred to the attached Declarations and the Verified Complaint. The very fact that Plaintiffs have elected to withstand the draconian penalties heaped upon them by Defendants rather than get vaccinated against their religious beliefs is likely sufficient to establish sincerity. *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996) ("[t]he plaintiff's steadfast adherence to his claim that submitting to the PPD test would violate the tenets of his religion, despite his continued confinement in medical keeplock, establishes that his right to the free exercise of religion has been substantially burdened.")

Indeed, this Court noted back in October that Plaintiffs met their burden on this point:

Ms. Minicucci: To qualify for religious exemption, plaintiffs would have to show that their religious beliefs prevent them from getting a vaccine, and it's the DOE's position that they have not shown that . . .

> The Court: Ok, but the plaintiffs have put in affidavits that say they have an honestly held religious belief and they, at least some of them, were denied the exemption...What does the city put in to controvert that?

SDNY 21-cv-7863, ECF No. 65 at 35. Defendants could not controvert this point then, and nothing in the Concocted Summaries controverts it now. It matters not whether the burden is through physical force or coercion. For, "[a] person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program...where the state conditions receipt of an important benefit upon conduct prescribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 708 (1981). Certainly, depriving a person of the ability to earn an income through any job or even through unemployment insurance compensation constitutes such a burden.[2]

### 1. The DOE's Religious Accommodation Policies are Subject to Strict Scrutiny

The Mandate, as applied to any DOE employee with a sincere religious objection to the mandate, is unconstitutional. Even the DOE now concedes that they implemented the Mandate through a policy that, on its face, called for unconstitutional religious discrimination. This is a violation of both the Establishment Clause (*see, e.g.,* L*arson v. Valente,* 456 U.S. 228 (1982) ("In short, when we are presented with a state law granting denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality") and the Free Exercise Clause (*Kane v. de Blasio*, 2021 U.S. App. LEXIS 35102

---

[2] See Chu Decl., detailing DOE's attempts to ensure she cannot even receive unemployment compensation because they argue that her failure to get vaccinated constitutes "misconduct."

(2021) (2d Cir Nov. 28, 2021, Nos. 21-2678, 21-2711)). The fact that the unlawful suspensions were allegedly given a "fresh look" by a Citywide Panel does not moot the need for strict scrutiny – on the contrary, it only strengthens the argument.

### a)  Religious Accommodation Decisions are not Neutral or Generally Applicable

The Citywide Panel process and determinations are themselves subject to strict scrutiny because they are the product of a formal mechanism whereby the government is invited to consider granting exceptions to the Mandate. *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1878 (2021). The Panel decides which employees receive a religious accommodation after considering "the particular reasons for a person's conduct." *Id.* (quotation omitted). And that is a classic example of the government granting "exemptions based on the circumstances underlying each application." *Id.* . . . . . As the Second Circuit observed at arguments [Gibson Decl. Ex. H at 26-27]:

> THE COURT: One of the things that Judge Caproni did is that she – she basically said that this was generally applicable and neutral and, therefore, subject to rational basis. And I don't see how you -- how you can get there...I mean, it seems to me that this is the same argument as before, which is that this is a process that is flawed, and it singles out religious people and subjects them to this highly discretionary, idiosyncratic process of getting or having denied religious exemptions. Why isn't that strict scrutiny?

### b)  The History of Discrimination Requires Strict Scrutiny

Strict scrutiny is particularly important here where, just weeks before, the DOE boldly engaged in discriminatory heresy inquisitions and unapologetically argued for persecution of religious minorities.  "Intrafaith differences . . . are not uncommon among followers of a particular creed" and the First Amendment does not allow the state to determine who "more correctly perceived the commands of [a] common faith." Courts are not arbiters of scriptural interpretation." *Thomas*, 450 U.S. at 715–16. The city cannot "act in a manner that . . . presupposes the illegitimacy

9

of [individualized and non-orthodox] religious beliefs and practices," *Masterpiece Cakeshop, Ltd.*
*v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018), or deny certain religious objectors a
religious accommodation based on their denominational affiliation, "religious status," or "religious
identity." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017).

In determining whether strict scrutiny should apply, courts consider not only current
written policies but also "the historical background of the decision under challenge, the specific
series of events leading to the enactment or official policy in question and the legislative or
administrative history, including contemporaneous statements made by members of the decision-
making body." *Id.* The DOE's implementation of the Mandate is infected with animus towards
religious minorities and nothing in the record supports the contention that such animus can be
disregarded mid-litigation. Nor is there a credible reason to believe the discrimination is actually
even overcome. Neither the DOE nor the City even disavow the Stricken Standards. Rather, the
DOE fired many employees without even providing a "fresh look" and the City brags that they
have now adopted the Stricken Standards as an option citywide for most municipal employees.
This alone calls for strict scrutiny. *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1721. Like in
*Masterpiece*, here the City never "disavowed" the Stricken Standards, which "thus cast doubt on
the fairness and impartiality" of the Mandate. *Id.* at 38.

Even under statutory analysis, the shocking prior discrimination here cannot be sidestepped
through a fresh review. In a case involving direct evidence of discrimination, the employer cannot
"rebut" the claim mid-litigation by articulating a non-discriminatory reason for reaching the same
result. *TWA v. Thurston*, 469 U.S. 111, 121 (1985). Only an affirmative defense will suffice. *Id.* .
None is available here. Targeting religious minority groups, including those who hold personal

religious objections rather than orthodox ones, in response to real or perceived threats, no matter how well-intentioned the reason, is forbidden under our laws, triggers strict scrutiny, and cannot withstand strict scrutiny review as a matter of law. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (overruling Korematsu v. United States, 323 U.S. 214 (1944)).

### c)   The Citywide Panel Decisions are Themselves Discriminatory

The Panel decisions, rather than rebut claims of discrimination, only show further unconstitutional reasons for denial. The Concocted Summaries show that, in violation of the Second Circuit's order, Defendants did not apply standards provided by Title VII or the New York State or New York City Human Rights Laws. Instead, they reused and repackaged the Stricken Standards. The "reasons" given for denial do not even comply with EEOC guidelines, leave aside the more stringent guidelines governing the New York State and City statutes.

### i)   The Panel Erred by Rejecting Personally Held Religious Beliefs

The Concocted Summaries show that, in violation of the Second Circuit's order, the Panel once more discriminated against personally held religious beliefs derived from prayer or guidance from the Holy Spirit. Specifically, the Panel claimed that though they do not question that the religious beliefs are "sincerely held" they do not believe that the religious beliefs prevent vaccination because "the religious doctrine articulated provides, ultimately for the appellant to choose to take or abstain from vaccination based on his view of the facts and circumstances." *See, e.g.,* [Kane Decl.], [Gladding Decl.], [Clark Decl.], [DiCapua Decl.], [Smith Decl.], [Chu Decl.].

The Panel is constitutionally and statutorily barred from substituting their judgment about what a claimant's faith requires of them. All that matters is what the Plaintiffs believe is required. *United States v. Seeger*, 380 U.S. 163, 185 (1965) (sincerity tests must be limited to "whether the

beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious."); *Patrick v. Le Fevre*, 745 F.2d 153, 158 (2d Cir. 1984) ("Impulses prompted by dictates of conscience as well as those engendered by divine commands are therefore safeguarded against secular intervention, so long as the claimant conceives of the beliefs as religious in nature.") Title VII tracks the First Amendment definition and defines religious beliefs to "include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional views . . ." 29 C.F.R. § 1605.1 By claiming that Appellants' views were sincerely held but not "religious" in nature because they were derived from a personal relationship with Spirit or God rather than official dogma, Appellees blatantly violated the Constitution. *See Cantwell v. Conn.*, 310 U.S. 296, 310 (1940) (facially invalidating a licensing system under which a government actor had discretion to deny any cause he deemed non-religious).

### ii) The Panel Continued to Improperly Reject Abortion Concerns

Emails produced show that the Panel was instructed to deny religious objections against the use of aborted fetal cells. [Gibson Decl. Ex. E.]: "I'm mostly seeing folks expressing their view that all Covid vaccines contain or were tested using fetal stem cells...My understanding from our conversation is that those would not constitute sincerely held religious beliefs, but what would?"

Indeed, for all but the one Plaintiff who was raised Jehovah's Witness, the Panel arbitrarily rejected applications focused on religious objections to the use of fetal cells, seemingly inventing reasons out of whole cloth. *See, e.g.,* [Strk Decl.] (Panel accused Plaintiff of relying on incorrect facts related to use of aborted fetal cells, and deceptively twisted Plaintiff's statement that he "avoid[s] medical products and food products that are researched, developed, tested, and/or produced using aborted human fetuses" as if it left open room for doubt; *See, also,* [Clark Decl. ¶¶

12

11, 15] (Panel concluded that Plaintiff Clark's abstinence from pain medication and other substances that were developed using aborted fetal cells due to her profound spiritual beliefs about the sanctity of life were merely "fact-based choices about foods and medicines"); [Romero Decl.][3] (rejecting her religious opposition to abortion-related vaccines because she took a vaccine years ago that is not related to abortion); [Chu Decl.] (acknowledging that she has a sincere religious objection to the use of aborted fetal cells in research and development, but stating that the religious beliefs should not prevent her from getting vaccinated). While the Panel may share Mayor de Blasio's faith in the Pope's religious belief that indirect participation in abortion is justified by pandemic concerns, it may not punish disability on those who do not share these religious beliefs.

### iii) The Panel Misstated Beliefs and Improperly Disputed Facts

The Panel routinely misstated beliefs. [*See also* Buzaglo Decl. ¶¶ 8-9]  (Panel found that Plaintiff Buzaglo's objections to the vaccine were <u>not</u> rooted in her understanding of Judaic law, Scriptures, prayer, and her rabbi's advice—which formed a significant portion of her 12-page personal statement—but instead her "belief that the mandate is unconstitutional," a sentiment set forth in less than half a page and which does not undermine her sincerely held religious beliefs); [DiCapua Decl. ¶¶ 11-13] (Panel ignored Plaintiff DiCapua's religious beliefs about what the Bible and God require of her, detailed extensively in her letter, and found that she declines vaccinations based on factual views about Covid, which cannot be found in her application).

---

[3] Rejecting a religious belief on the grounds of "inconsistency" based on a flu shot taken years ago, and well-before a significant change in Plaintiff's religious practice violates statutory and constitutional standards. *See, e.g., T*homas, 450 U.S. at 714 ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.")

The Panel also denied various Plaintiffs' accommodations because of its determination that their sincerely held religious objections were based on incorrect facts. [*See, e.g.*, Buzaglo Decl. ¶¶ 8, 10; Strk Decl. ¶ 8]. State actors may not inquire into the factual accuracy of sincerely held religious beliefs, and punishing plaintiffs for believing what the state deems to be "factually incorrect" is a constitutional violation. *Smith v. Bd. of Educ.*, 844 F.2d 90, 93 (2d Cir. 1988).

### iv) The Panel Review was Not Even Offered to Many Religious Objectors Suspended Under the Stricken Standards

Several Plaintiffs were never even offered a "fresh consideration" of their denial by the Panel and were suspended and terminated under the blatantly unconstitutional Stricken Standards. [ECF No. 102 ¶¶ 633-89, 732-80; Grimando Decl. ¶¶ 5-14; LoParrino Decl. ¶¶ 5-14; Weber Decl. ¶¶ 5-13; Giammarino Decl. ¶¶ 5-13].

### v) The Panel Did Not Make Accommodation Decisions in Good Faith or With Sufficient Training

The Panel's determinations were random, arbitrary and ill-considered. Notably, "there was no, you know, like specific training" for Panel members [Gibson Decl. Ex. F at 11]. And, contrary to the Second Circuit's belief that the Panel "did the interviews for a couple of days, and then there was a weekend, and then they came out with their decisions after that," [ECF 120-3 at 5], there were no interviews, hearings, discussions, or decisions. At best, we are told that there may have been a vote on a spreadsheet and an autogenerated email stating only "does not meet criteria" (even for those that are accepted). This was not a good-faith effort to consider religious accommodations.

### d) Undue Hardship Decisions Do Not Meet Statutory/Constitutional Standards

Defendants' back-up assertion that in any event it would be an undue hardship to accommodate Plaintiffs does not suffice to rebut the prior (or ongoing) discrimination. The

14

unsupported Undue Hardship decisions here cannot even survive the statutory standards. Under Title VII, an employer is prohibited from discriminating because of religion in hiring, promotion, discharge, compensation, or other "terms, conditions or privileges" of employment, and also cannot "limit, segregate, or classify" applicants or employees based on religion "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a)(1), (2).

### i)   Defendants Have Not Shown Plaintiffs Pose a Direct Threat

To claim undue hardship under a theory that the employees' religious objection to vaccines endangers others (which is essentially a "regarded as having an impairment" claim), employers must demonstrate that each employee poses a "direct threat," defined as "a significant risk of substantial harm to health or safety of others that cannot be eliminated or reduced by reasonable accommodation." In a direct threat analysis, employers must consider the best available objective evidence, and, after employing a four-part test, show that the harm is serious and "likely" to occur, not remote or speculative. *Hargrave v. Vermont*, 340 F.3d 27, 35–36 (2d Cir. 2003). Defendants cannot meet this burden. In support of their motions for injunctive relief, Plaintiffs have provided this Court with extensive evidence and offers of testimony reflecting the fact that they pose no direct threat based on their need to remain unvaccinated. [*See, e.g.*, ECF No. 17-6 to 17-8, 18, 19, 85-2 to 85-8]. It is well settled science that the available vaccines cannot stop the spread of COVID-19, and are not as effective as natural immunity, which most of the Plaintiffs have.

### ii)   The Panel Failed to Meet Their Burden of Showing That Accommodation was Not Possible Under Statutory Standards

In the event that an employer meets its burden of showing that the employee's religious

practice makes them a direct threat to others, it still must then show why no accommodation is available without causing an undue hardship (defined as "an accommodation requiring significant expense or difficulty" under the state and local standards). The Panel made no attempt to engage in the interactive process or determine whether any accommodations could mitigate perceived risk. For example, every other school district in the state allows testing in lieu of vaccination. Defendants made no effort to even explore this option. They also showed a shocking lack of interest in actually mitigating the spread of COVID-19, by adopting a policy requiring actively infected employees to return to classrooms where they would spread disease.

While an employee is not necessarily entitled to their first choice of accommodation, the employer bears the burden of production and persuasion through a preponderance of "clear and convincing evidence" that their denial of any accommodation was made in good faith and justified under the governing standards. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–100 (2003). Conclusory statements do not meet the burden of showing direct threat or undue hardship under any of the three governing statutes. (42 U.S.C. § 2000e(m)).

### iii) The Panel Failed to Meet Its Burden Under Constitutional Standards

Certainly, the unsupported undue hardship claims cannot overcome strict scrutiny. "So long as the government can achieve its interests in a manner that does not burden religion, it must do so, in order to survive strict scrutiny under the Free Exercise Clause of the First Amendment." *Fulton*, 141 S. Ct. at 1888.

Furthermore, many of Defendants' undue hardship determinations were so arbitrary as to fail even rational basis scrutiny. For example, before the vaccination mandate was even implemented, Plaintiff Bryan was already working remotely as a special education teacher,

16

teaching her medically accommodated students virtually in an isolated, non-school building workspace. [Bryan Decl. ¶¶ 12, 14]. The DOE nonetheless shockingly determined that allowing her to continue that remote work somehow "pose[d] a direct threat to health and safety," and constituted an undue hardship.  [ECF No. 20 ¶ 8]. The Citywide Panel found the same, never explaining why Bryan's non-remote peers could be accommodated by switching to remote work but that it would be a burden for her to maintain her status quo.  [*Id*. ¶¶ 14, 21]. Likely realizing that the undue hardship argument was untenable, the Citywide Panel also arbitrarily tacked on a sincerity challenge when she got her denial nearly six months later, despite her sincerely held religious objections that were comprehensively detailed in her multiple submissions to the City. [*Id.* ¶¶ 21, 23]; *see also* [Dillon Decl. ¶¶  7, 9, 13, 28] (after DOE's denial of teacher Robert Dillon's religious exemption request on the basis of undue hardship was refuted by letter from Dillon's principal explaining that he could perform his duties remotely, Citywide Panel raised sincerity of Dillon's beliefs as basis for denial for the first time nearly six months later); [Gold-Dvoryadkin Decl. ¶¶ 1, 4, 5, 27] (Panel found that allowing DOE physical therapist for children with a wide variety of disabilities to work remotely posed undue hardship when she handled case load of 20-25 students remotely during height of pandemic and the DOE is currently contracting out remote physical therapy sessions to providers outside the DOE due to physical therapist shortage).  Similarly, Defendants have not demonstrated why at least 165 employees (many of them teachers) were able to be accommodated under the Stricken Standards, while these employees cannot be. Nor has the DOE explained why more teachers cannot teach remotely. They have admitted that thousands of students are engaging in remote instruction and need teachers, and the various off-site remote accommodation sites for the unvaccinated have plenty of space to

accommodate more teachers. For example, one of the DOE's remote workspaces for individuals granted religious and medical exemptions—located at 1087 Ocean Avenue, Brooklyn, NY 11230 ("Brooklyn Worksite")—is currently only being used to accommodate approximately 30 DOE employees when it has the capacity to accommodate up to 312. [Buzaglo Decl. ¶¶ 26, 28-30]. The Brooklyn Worksite contains a large, completely unused basement cafeteria and *at least* approximately seven empty or nearly classrooms that could hold four to six teachers each, at least. *Id*. ¶¶ 30-38.

### 2.  The Mandate as a Whole is Subject to Strict Scrutiny

New facts solidify Plaintiffs' prior arguments (prior arguments incorporated herein by reference) that the Mandate itself is neither neutral nor generally applicable and must be strictly scrutinized insofar as it burdens the free exercise of religion. When a law is generally applied through unconstitutional policies or well-established practices, a facial challenge is appropriate, regardless of what the text of the policy says. *See, e.g.,* F*orsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 131 (1992).

### a)  *Kane v. de Blasio* is Not the Law of the Case on this Issue

This Court is, of course, bound by Second Circuit precedent.  However, insofar as Kane held that "[t]he Vaccine Mandate, in all its iterations, is neutral and generally applicable," *Kane*, 2021 U.S. App. LEXIS 35102 (2d Cir Nov. 28, 2021, Nos. 21-2678, 21-2711), that holding is not the law of the case. The law of the case doctrine is often inapposite upon "the discovery of new and different material evidence that was not presented in the prior action." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed. Cir. 2001). Courts must give particular consideration to the impact of new facts on rulings made in the context of preliminary injunction motions. *Consumers*

18

*Union of U.S., Inc. v. New Regina Corp.*, 664 F. Supp. 753, 760 (S.D.N.Y. 1987) (holding that the Second Circuit's decision on a preliminary injunction did not constitute the law of the case). Significant new facts have emerged here that require fresh consideration of this issue. Indeed, Kane is, on its face, a limited holding "based only on the record developed to [that] date." [ECF No. 77 at 44].

### b) Strict Scrutiny Applies Because the Mandate is Not Neutral

As noted in our prior filings, "[t]he Free Exercise Clause . . . extends beyond facial discrimination. The Clause forbids 'subtle departures from neutrality[.]'" *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993) (internal citation omitted). The legislative history, the circumstances surrounding the Mandate's enactment, and the Mandate's enforcement provide ample evidence of religious animus.

As set forth in Plaintiffs' prior filings, public statements by former mayor Bill de Blasio expressed and reflected religious animus. [ECF No. 102 ¶ 90, 232, 265, 293-98]. Mayor de Blasio stated in no uncertain terms the City' position that religious opposition to vaccination is invalid because the Pope convinced him that scriptures do not support the objections. He further stated that the City *intended* to deny accommodation to DOE employees with unorthodox or personally held religious beliefs and would likely limit exemptions to Jehovah's Witnesses and Christian Scientists. *Id*. The DOE, which is under the Mayor's control, adopted a written policy that exactly mirrored the Mayor's discriminatory statements. The Second Circuit disregarded the Mayor's discriminatory statements on the assumption that "the Mayor did not have a meaningful role in establishing or implementing the (DOE) Mandate's accommodations process." [*Kane*, 2021 U.S. App. LEXIS 35102, at *16-17]. But this assumption is belied by more recent facts. For instance,

19

the creation of the "Citywide Panel" to review all religious accommodation denials shows the City is indeed involved in religious accommodation decisions, rendering the Mayor's discriminatory language highly relevant.   Moreover, EEO-62 demonstrates the Mayor's absolute and ongoing power establishing and implementing the vaccine mandates. The notion that Adams can "peel away" at his own promulgations at his discretion, effectively applying the law (or not) at his whim to those he chooses, clearly shows that de Blasio, like Adams, was in full control of the implementation and enforcement of the vaccine mandates.  [*See generally* ECF 120-2 at 3].  This casts the de Blasio statements in an entirely different light.  The animus was far from mere personal opinion; it infiltrated the Mandate on its face and in its implementation.

Additionally, Defendants now admit that the City has not even disavowed the unconstitutional Stricken Standards but continues to extend them to municipal employees citywide. Such widespread adoption of the discriminatory standards, not just by the DOE but now by the entire City too, solidifies the need to strictly scrutinize the whole Mandate (at least insofar as it burdens religious objectors). *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1721.

### c)  Strict Scrutiny Applies Because the Mandate is Not Generally Applicable.

#### i)  The Mandate Calls for Individualized Exemptions

As discussed *supra*, a law is not generally applicable when it contains a "formal system of entirely discretionary exceptions" or "'invite[s]' the government to consider the particular reasons for a person's conduct by providing a 'mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990)).  The Mandate does exactly that.  On its face, it calls for reasonable accommodation pursuant to relevant laws, and the Citywide Panel is nothing but a formal mechanism for individualized exemptions.  Plaintiffs' appeals were

examined and considered, one at a time, and the government "considered" the particular reasons for each Plaintiff's conduct. Thus, it is not generally applicable. *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990) ("where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason").

### ii) The Mandate Prohibits Religious Conduct While Permitting Similar Secular Conduct

"A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* Here, despite the professed lofty goals to "potentially save lives, protect public health, and promote public safety," the Mandate allows for medical exemptions, and conveniently carves out exemptions for bus drivers—who spend substantial time twice daily with numerous school children in the relatively tight and unventilated confines of a school bus, hundreds—perhaps thousands—of voters and election personnel, parents and UPS and FedEx drivers, and the children who attend school.  But far more constitutionally repugnant, EEO 62 exempts the Mayor's favorite sports teams, millionaire athletes and artists, while refusing exemptions to sincere religious folks. The reasons for these exemption do not matter; the question is whether granting an exemption poses a similar harm to the government's interests. And any exemption to the vaccine mandate poses the same harms. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("Comparability is concerned with the risks various activities pose, not the reasons why people gather"). Teachers, who interact with a population less vulnerable to COVID-19, are required to test regularly, and have myriad ventilation, social distancing and other mitigation efforts in place, are not more of a

danger to others than entertainers and athletes, who cannot socially distance and interact with huge, densely packed crowds of adults at far higher risk of COVID-19.

### iii) The Mandate is Not a Generally Applicable "Across the Board" Law; It is One of Ninety-Seven *Specifically* Applicable Mandates

Plaintiffs have previously noted that *general* applicability involves "general laws" that govern society at large and cannot apply to the Mandates, a multitude of *specifically* applicable regulations issued by ever-changing discretionary executive orders and tailored to differently govern various groups at the whim of a mayor or health commissioner.  [*See generally* EDNY 22-cv-00752, ECF No. 7-1 at 16-19].  Indeed, *Smith* distinguishes its facts from those of *Sherbert* and *Thomas* by noting that they "have nothing to do with an *across-the-board* criminal prohibition on a particular form of conduct."  *Smith*, 494 U.S. at 884 (1990) (emphasis added).

The Mandates fall plainly short in this context. That a municipality, through executive orders no less, would create ninety-seven (and counting) vaccine laws, subject to extension, modification or repeal at the mayor's whim [ECF No. 120-1], is entirely inconsistent with both the spirit and the letter of *Smith* and itself shows the discretionary nature of these regulations.

### iv) The Mandates Run Afoul of Both the Letter of the First Amendment and the Tenor of *Smith*

The First Amendment prohibits *congress*, i.e., government, from imposing laws that prohibit the free exercise of religion.  And *Smith* rested on the recognition of the importance of "[t]he *government's* ability to enforce generally applicable" laws.  *Id.* at 885 (emphasis added). Neither contemplated politically motivated discretionary decisions by a single executive official, as particularly evident in the Adams press conference.

### 3.  The City has an Establishment Clause Problem

22

The Establishment Clause's "clearest command" is that "one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. The City may "effect no favoritism among sects" or "adopt programs or practices which aid or oppose any religion. This prohibition is absolute." *Id.* at 246. The Mandate "does not operate evenhandedly, nor was it designed to do so," rather it likely "effects the *selective* . . . imposition of burdens and advantages upon particular denominations" and religious employees with certain religious affiliations or beliefs. *Id.* at 253–54. The City cannot favor Christian Scientists and Jehovah's Witnesses over other faiths. Nor may the City punish—through the denial of a religious accommodation or the loss of unemployment benefits—employees' affiliation with the Catholic or Jewish faiths by pointing to faith leaders who approve of COVID-19 vaccines.

## III. Plaintiffs Will Suffer Irreparable Harm if No Injunction is Granted

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L. Ed. 2d 547 (1976). Indeed, "[t]he Second Circuit has stated that '[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Ram v. Lal*, 906 F. Supp. 59, 69 (E.D.N.Y. 2012) (quoting *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984)).

In addition to losing their homes, health insurance, source of income, and dignity, along with all of the other serious harms articulated in the Amended Complaint and Declarations, *see, e.g.*, Buzaglo Decl. ¶¶ 18-24, Keil Decl. ¶¶ 10, 12, 23-24,  Bryan Decl. ¶¶ 31-34,  Delgado Decl. ¶¶  16-20, DiCapua Decl. ¶¶  30-32, Smith Decl. ¶¶ 32-25, 42, 44, 46, Romero Decl. ¶¶ 49. Plaintiffs' First Amendment rights have been violated and are continuing to be violated every day

by facing ongoing coercion to violate their sincerely held religious beliefs, *see, e.g.*, Buzaglo Decl. ¶ 25, Keil Decl. ¶¶ 19, 21, 25,  Bryan Decl. ¶¶ 36-39,  Chu Decl. ¶¶  38-41, Delgado Decl. ¶¶ 12-15, 18, 21, DiCapua Decl. ¶¶ 24-28, Smith. Decl. ¶  39, Kane Decl. ¶¶ 39-40, Strk. Decl. ¶¶ 18-20.  Now that the Mandates extend into every sector, if they wish to earn income *anywhere* in New York City, Plaintiffs must violate their sincerely held religious beliefs. Just yesterday, Mayor Adams confirmed the ongoing coercion in a live television interview with CBS News New York With Marcia Kramer [Gibson Decl. Ex. G]:

> **Kramer**: So, if the money permits, would you ever consider rehiring some of the 1,400 people who've lost their jobs because they refuse to get the COVID vaccine. Because it looks to me like given the fact that there's about 5,000 others who have asked for exemptions and didn't get them and now are appealing, that you could lose a lot more people including a large number of police, fire, and emergency service workers. And I wonder if there's any wiggle room if you had the money, if you would consider rehiring them, and otherwise, you're going to have to hire a whole lot more cops and firefighters and things like that. Where are you on that? . . ..
>
> **Mayor Adams**: No, I am hoping that they are smart enough to know that it is imperative to take the vaccine for themselves and their families . . .. And listen, if you love law enforcement the way I love law enforcement, if you love being a firefighter, the way I know my other brothers and sisters out there that are firefighters, rhetorically not physically brothers and sisters, *if you love the job, you're not going to allow a COVID shot to get in the way. . ..*
>
> **Kramer**: *So you're asking them to change their mind?*
>
> **Mayor Adams**: *Yes, I am.* (Emphasis added.)

There can be no serious debate about the point: the Mayor is publicly and unabashedly coercing people to get vaccinated:  *If you change your mind and get vaccinated, you'll get your job back!* God and the First Amendment have no place in this New York City.

## IV. The Balance of the Equities Favors Granting a Preliminary Injunction

In First Amendment cases, the test for obtaining preliminary injunctive relief reduces

24

essentially to a single prong: "the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013). This is so because the deprivation of rights itself "for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976); protection of First Amendment rights is per se "in the public interest," *id.*; and the balance of hardships is entirely one-sided because "the Government does not have any interest in enforcing an unconstitutional law." *Id* Here, given the free exercise rights at stake, and because the Government cannot show "that public health would be imperiled if less restrictive measures were imposed" this element is unmistakably satisfied." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 68 (2020).

## CONCLUSION

For the reasons set forth above, Movants respectfully ask that this Court issue a preliminary injunction barring enforcement of the Mandate against Plaintiffs and any other DOE employee who has applied for religious accommodation and offering each reinstatement of pay and benefits pending resolution on the merits

Dated: New York, New York

April 12, 2022

**GIBSON LAW FIRM, PLLC**
*/s/ Sujata S. Gibson*
By: Sujata S. Gibson, Esq.
408 W. Martin Luther King, Jr. St.
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

**NELSON MADDEN BLACK LLP**
*/s/ Barry Black*
By: Barry Black
Jonathan R. Nelson
Sarah E. Child
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4300
bblack@nelsonmaddenblack.com

*Attorneys for Plaintiffs*
25